IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| REX ALLEN BECKWORTH, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:16-cv-225-ECM |
| | ) | [WO] |
| GREG LOVELACE, Commissioner, | ) | |
| Alabama Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

## I. INTRODUCTION

On April 1, 2016, Petitioner Rex Allen Beckworth ("Beckworth") filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his 2002 conviction for capital murder and resulting death sentence in the Circuit Court of Houston County, Alabama, in connection with the murder of Bessie Lee Thweatt. (Doc. 1).[1] Beckworth and Greg Lovelace, Commissioner of the Alabama Department of Corrections ("the Respondent"), have briefed the petition, and it is ripe for review. After careful review of the entire record, and for the reasons set forth below, Beckworth is not entitled to habeas relief, and this Court will deny his petition.

[1] When filed, this case was assigned to then-Chief District Judge W. Keith Watkins. (Doc. 1). On November 1, 2023, this case was reassigned to the undersigned. (Doc. 53).

**Table of Contents**

**I. INTRODUCTION** ..................... 1

**II. JURISDICTION AND VENUE** ..................... 4

**III. BACKGROUND AND PROCEDURAL HISTORY** ..................... 4

**A. Facts of the Crime and Guilt Phase of the Trial** ..................... 4

**B. Penalty Phase of the Trial** ..................... 10

**C. Direct Appeal** ..................... 12

**D. Rule 32 Proceedings** ..................... 13

**E. Federal Habeas Proceedings** ..................... 18

**IV. STANDARDS OF REVIEW** ..................... 20

**A. Exhaustion and Procedural Default** ..................... 20

**B. AEDPA Review of State Court Decisions** ..................... 24

**V. DISCUSSION** ..................... 28

**A. Beckworth's *Atkins* Claim: That Because He is Intellectually Disabled, He is Ineligible for Execution (Doc. 1 at 8–24, paras. 27–69)** ..................... 29

**B. Beckworth's Claim that the Trial Court Should Have Suppressed the Statements He Made to Police Because They Were Obtained Unlawfully (Doc. 1 at 24–31, paras. 70–87)** ..................... 64

**C. Beckworth's Claim that the Trial Court Denied Him a Fair Trial by Preventing Him from Presenting Mitigating Evidence at the Penalty Phase (Doc. 1 at 32–43, paras. 88–117)** ..................... 85

**1. Beckworth's subclaim that the trial court improperly excluded evidence of his father's sexual molestation of his daughter (doc. 1 at 32–36, paras. 92–100)** ..................... 86

**2. Beckworth's subclaim that the trial court improperly denied funds for a mitigation specialist (doc. 1 at 36–43, paras. 101–17)** ..................... 99

**D. Beckworth's *Brady* Claim: That the State Suppressed Evidence in Violation of His Due Process Rights (Doc. 1 at 43–50, paras. 118–37)** ..................... 109

**1. Beckworth's subclaim that the State suppressed Walker's confession (doc. 1 at 43–48, paras. 119–32)** ..................... 111

**2. Beckworth's subclaim that the State suppressed other favorable evidence (doc. 1 at 49–50, paras. 133–37)** ..................... 129

**E. Beckworth's Claim that His Trial Counsel Rendered Ineffective Assistance at the Guilt and Penalty Phases of His Trial in Violation of His Sixth Amendment Rights by Failing to Investigate and Present Evidence of Beckworth's Background and Family History and His Intellectual Disability (Doc. 1 at 50–91, paras. 138–269)** 135

F. **Beckworth's Claim that Alabama's Capital Sentencing Statute Violated His Right to a Trial by Jury (Doc. 1 at 92–95, paras. 270–80)** ..... 163

G. **Beckworth's Claim that the Trial Court's Denial of His Motion for a Change of Venue Deprived Him of His Rights to a Fair Trial and Impartial Jury (Doc. 1 at 96–103, paras. 281–98)** ..... 173

H. **Beckworth's Claim that the Trial Court's Misstatements of Law During Voir Dire Deprived Him of His Rights to a Fair Trial and Impartial Jury (Doc. 1 at 103–05, paras. 299–309)** ..... 179

I. **Beckworth's Claim that His Trial Counsel Rendered Ineffective Assistance at the Guilt Phase of His Trial in Violation of His Sixth Amendment Rights (Doc. 1 at 105–19, paras. 310–50)** ..... 187

1. **Beckworth's subclaim that his trial counsel failed to object to the prosecutor's inflammatory statements (doc. 1 at 106–07, paras. 311–13)** ..... 188
2. **Beckworth's subclaim that his trial counsel failed to investigate his alibi and background (doc. 1 at 107–08, paras. 314–17)** ..... 192
3. **Beckworth's subclaim that his trial counsel failed to hire independent experts to review the prosecution's forensic evidence (doc. 1 at 108–09, paras. 318–20)** . 198
4. **Beckworth's subclaim that his trial counsel conducted an inadequate voir dire (doc. 1 at 109–11, paras. 321–29)** ..... 202
5. **Beckworth's subclaim that his trial counsel failed to adequately investigate, impeach, and cross-examine the State's witnesses (doc. 1 at 111–13, paras. 330–35)** ..... 207
6. **Beckworth's subclaim that his trial counsel failed to investigate and challenge his statements to police (doc. 1 at 113–17, paras. 336–48)** ..... 213
7. **Beckworth's subclaim that his trial counsel failed to hire a private investigator (doc. 1 at 118–19, paras. 349–50)** ..... 216

J. **Beckworth's Claim that He Was Denied a Fair Trial Because Jurors Failed to Truthfully Answer Questions During Voir Dire and Considered Extraneous Evidence (Doc. 1 at 119–27, paras. 351–72)** ..... 220

1. **Juror A.L. (doc. 1 at 119–26, paras. 353–69)** ..... 220
2. **Juror D.B. (doc. 1 at 126–27, paras. 370–72)** ..... 244

K. **Beckworth's Claim of Cumulative Error (Doc. 1 at 127, para. 373)** ..... 246

**VI. CERTIFICATE OF APPEALABILITY** ..... 250

**VII. CONCLUSION** ..... 251

## II. JURISDICTION AND VENUE

Jurisdiction and venue over Beckworth's petition for writ of habeas corpus are proper under 28 U.S.C. § 2241(d) because he was convicted and sentenced in state court in Houston County, Alabama, which is within the Middle District of Alabama.

## III. BACKGROUND AND PROCEDURAL HISTORY

### A. Facts of the Crime and Guilt Phase of the Trial

On September 1, 2000, a Houston County, Alabama, grand jury indicted Beckworth on one count of murder made capital because it occurred during the commission of a burglary in the first degree, pursuant to ALA. CODE § 13A-5-40(a)(4). The following excerpt from the opinion of the Alabama Court of Criminal Appeals (the "ACCA") on direct appeal describes the facts of the crime and the evidence presented at Beckworth's trial:

> In the early morning hours of January 10, 2000, Rex Allen Beckworth and his younger half brother, James Walker, broke into the home of Bessie Lee Thweatt, an 87–year–old widow who lived alone in the house in which she had resided for 67 years. At the time of her death, Thweatt was 5 feet, 1 inch tall, and she weighed 112 pounds. Thweatt was beaten and shot in the head; her house was ransacked.[FN]1 On January 10, 2000, family members of Bessie Thweatt discovered that the back window of the Ford automobile she drove, which was parked in the carport by her house, and a picture window on the back of her house had been broken. A light in Thweatt's carport had been broken out and the exterior telephone lines to her house had been cut. One of Thweatt's family members, Buford Fortson, stepped onto a cement block that was in front of the broken picture window and climbed into the house to look for Thweatt. Another cement block was inside the house, near the window, and broken glass from the window was inside the house. Fortson called Thweatt's name and looked for her, but Thweatt did not answer. The dining room had been ransacked and furniture had been tossed around. Fortson testified that the door between the dining room and the kitchen had been kicked in; a footprint had been left on the door. The kitchen had been ransacked, and clothing and other items were littered all over the

floors throughout the house. Thweatt was found, dead, on the floor of the kitchen. Her back was by the locked door to the carport and her head was against the kitchen counter. Buford testified that Thweatt's face was "a hundred percent covered with blood" and that her hands were also bloody. The authorities were summoned, and they investigated the murder. The jury viewed photographs and a videotape of the crime scene.

> [FN]1 James Walker was tried separately and convicted for his participation in the burglary-murder. This Court affirmed his conviction and death sentence on appeal. *Walker v. State*, 932 So.2d 140 (Ala.Crim.App.2004).

Gary Jenkins, an investigator with the Houston County Sheriff's Office, videotaped the crime scene, including the broken light in the carport, the severed telephone lines, and what law-enforcement officers believed to be blood splatter on objects near the victim's body. Jenkins testified that he retrieved a bullet from the frame around the door that separated the dining room and the kitchen in Thweatt's house. Another law-enforcement officer at the scene recovered a .22 caliber shell casing on the dining-room floor of Thweatt's house; the casing was approximately 10 to 12 feet from Thweatt's body. The bullet and casing were sent to the forensics laboratory for testing and comparison. The door between the kitchen and dining room appeared to have been pushed in or kicked in and a footprint had been left on the door. A flashlight battery was found beneath the car in the carport.

Forensic testimony established that Thweatt had sustained more than seven blunt-force injuries to her face and head. The injuries resulted in substantial bleeding and bruising of the skin, indicating that Thweatt was alive when the injuries were inflicted. The injuries also resulted in multiple facial skull fractures, indicating to the forensic pathologist who conducted the autopsy on Thweatt's body that a great amount of force was used to inflict the injuries. The pathologist further testified that Thweatt "must have been in deep pain" as a result of the numerous injuries to her face and head because the skin in these areas has many nerve endings. He later acknowledged, however, that he did not know whether Thweatt was rendered unconscious by the blows to her head. He stated that the blunt-force injuries could have been caused by the muzzle or any other part of a gun. The pathologist testified that Thweatt's death was the result of a gunshot wound to her right eyebrow; the shot was fired at close range. The bullet traveled from the front of her head to the back and from the right side to the left side. The bullet also traveled on a slight downward angle from the top of Thweatt's head; the pathologist testified that it was very unlikely that Thweatt was standing straight up when she was shot. The bullet "tore a hole through her brain and

basically separated the two hemispheres, that is, the right and left hemisphere, and impacted upon the back of her head." The bullet had remained in Thweatt's skull; the pathologist removed the bullet fragments and secured them for forensic testing.

One of Thweatt's grandsons, Mark Peacock, a convicted felon who was incarcerated at the time of trial, testified that he knew Beckworth and that he had spoken with him as they passed time together when they both had "a lot of time" on their hands, approximately three years before the trial. Peacock had mentioned to Beckworth that his grandmother had farmland around her house and a red 1977 Thunderbird automobile in her yard; Beckworth had indicated to Peacock that he was familiar with the area where Thweatt lived. Peacock also acknowledged that he informed Beckworth, "[M]y grandmother probably has more money than she knows what do to do with." Testimony from Mary Kelley, Thweatt's daughter, established that Thweatt kept cash in her house and in her vehicle. Upon her death, Thweatt's family learned that she had saved approximately $200,000 in cash.

Chris Hood, a convicted felon who was incarcerated at the time of trial, testified that he knew Beckworth and had spent time with him in November and December 2000. He testified that Beckworth asked him if he could get "a hot gun," one that could not be traced to Hood or to Beckworth. Beckworth said he wanted the gun for his wife, who was a truck driver. Hood testified that he told Beckworth that he would let Beckworth know if he found such a gun. Hood further testified that Beckworth told him that the best way to kill a person was execution-style. Hood said that, after he heard about the January 10, 2000, slaying of Bessie Lee Thweatt, he contacted local law-enforcement officers and told them about Beckworth. Hood also told the officers that Beckworth had lived in Gadsden.

Angela Lynn Foster, an inmate at the Houston County jail at the time of trial serving a sentence for writing a "bad check," testified that James Walker, Beckworth's codefendant, was her half brother. She testified that, on January 4 or 5, 2000, Walker and Beckworth came to a motel in Dothan where she was employed at the time. She said that Walker was 19 or 20 years old at the time and Beckworth was 34 years old. She said that Beckworth appeared to be the leader, the one who decided what he and Walker would do. Foster testified that she later saw inside the trunk of the car Beckworth was driving; among the items she saw inside the trunk were clothing or a quilt and the barrel of a gun that she believed to be a .22 caliber rifle or shotgun sticking out. Beckworth told her that someone had given him the gun. Foster said that Beckworth had a brother in Gadsden.

On January 21, 2000, a farmer who was crossing a bridge approximately one and one-half miles from Thweatt's house, saw the barrel and stock of a rifle in the water beneath the bridge. Houston County deputies arrived soon after and the farmer assisted them in removing a .22 caliber rifle from the water.

Lt. Donald Valenza of the Houston County Sheriff's Office testified as to evidence he observed at the crime scene. He also testified that James Walker was arrested in Gadsden and that Walker made some statements after his arrest. Beckworth was later arrested in Phoenix, Arizona. Lt. Valenza and another officer traveled to Arizona to arrest Beckworth on capital-murder charges. While they were in the Phoenix airport, Valenza told Beckworth that Walker was in custody and that Beckworth and Walker would not be tried at the same time. Beckworth then told Valenza he wanted to give a statement.

Lt. Valenza said that he had read Beckworth the rights provided in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), when he arrested Beckworth, and that he read the rights to him again before he made the statement. Beckworth gave one statement, which Valenza recorded on a pocket recorder, and Beckworth then made a second statement immediately after completing the first one. The tape-recorded statements were played for the jury.

In the first statement, Beckworth stated that, in late December 1999, he and Walker broke into a house and stole a .22 caliber rifle. In the second statement he gave at the airport, Beckworth described the crimes committed against Bessie Thweatt. Beckworth claimed that he and Walker were looking for items to steal so that they could sell them to get money. He said that he thought about this woman living out in the country but that they had no intent to harm her. He said that Thweatt's house had no lights on inside when he and Walker located the residence. Both of them had flashlights, he said. Beckworth said that they looked through the windows but did not see anyone. Beckworth told Walker that he thought he heard someone inside; Beckworth said that he wanted to leave. He said that Walker cut the telephone lines and broke the light in the carport. They threw a concrete block through the window and Walker climbed into the house while carrying the .22 rifle. Beckworth said that he remained outside initially, and he heard Walker fire a shot. Beckworth looked inside but did not see Thweatt; he, too, climbed through the window into the house. Beckworth stated that he told Walker to take Thweatt's purse so they could leave. Thweatt had no money in her purse. Beckworth said that Walker kicked in the door to the kitchen and repeatedly hit Thweatt on the head with the rifle. After the third or fourth

> blow, Thweatt fell. Beckworth said that he again told Walker that they should leave the house. When Walker hit Thweatt again, Beckworth said, the gun went off and the bullet struck Thweatt. Beckworth said the rifle then broke apart. He said that they did not steal anything from Thweatt's house.
>
> Beckworth said that they threw the butt of the rifle in the woods behind Thweatt's house and threw the rest of the rifle into a creek near Thweatt's house. They went to Gadsden and hid in the area for a day or two. Walker did not want to leave Alabama, so Beckworth left the State without him. Beckworth concluded by stating that he was sorry and that he could not bring "this lady's life back."
>
> Joe Saloom, a forensic scientist specializing in firearms and toolmarks examinations, testified that the shell casing recovered from Thweatt's house had been fired from the rifle that was recovered in the creek near her home. He examined the bullet recovered from Thweatt's head and the bullet recovered from the door frame in her house, but found them to be too damaged to determine whether they had been fired from the rifle. Saloom testified that it was highly unlikely that the rifle would fire if it were struck against a person's head. He stated that if the butt of the rifle had been used to strike a person's forehead, the strike could cause the butt of the rifle to break away from the rest of the gun.

*Beckworth v. State*, 946 So. 2d 490, 495–98 (Ala. Crim. App. 2005) (record citations omitted).

Beckworth was represented by court-appointed counsel Scott K. Hedeen ("Hedeen") and Kathleen Nemish ("Nemish"). Houston County Circuit Judge Edward Jackson presided over Beckworth's case. Beckworth's counsel filed numerous pretrial motions, including a motion to change the venue of the trial due to pretrial publicity, (doc. 7-2 at 153–57);[2] a motion for funds to retain a mitigation specialist who could investigate evidence about Beckworth's upbringing and family history to present at the sentencing

[2] Citations to page numbers in documents filed in this case will be to the page number generated by the Court's CM/ECF system.

phase of his trial, (doc. 7-3 at 89–92, 113–34); a motion to declare Beckworth intellectually disabled[3] and ineligible for the death penalty pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), (doc. 7-3 at 160; doc. 7-4 at 33–34); a motion to suppress the statements that Beckworth made to law enforcement in Arizona pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), (doc. 7-2 at 164–66); and a motion to declare Alabama's death penalty statute unconstitutional pursuant to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), (doc. 7-4 at 122–34).[4] As will be explained in further detail in the Discussion section of this Opinion, the trial court held various pretrial hearings on these motions but ultimately denied each motion either before or during trial.

Beckworth's trial began on Thursday, September 12, 2002, and lasted three days. (Doc. 7-9 at 41–214; doc. 7-10; doc. 7-11; doc. 7-12 at 3–181 (transcripts)). The prosecutor, Doug Valeska, called nineteen witnesses, and Beckworth's counsel called none. The State's theory was that Beckworth and James Walker, his half-brother and co-defendant ("Walker"), entered the home of the elderly victim, Bessie Lee Thweatt ("Ms. Thweatt"), by breaking in through the picture window for the purpose of stealing money, found Ms. Thweatt in the home, and killed her by beating her with a rifle and shooting her in the head. On Monday, September 16, 2002, the jury convicted Beckworth of one count of capital murder. (Doc. 7-5 at 170–71).

---

[3] As explained further below, at the time of Beckworth's trial, the term "mentally retarded" was used to describe the condition which is now referred to as "intellectual disability."

[4] Some of these motions were filed by Beckworth's previous court-appointed counsel, Derek Yarbrough.

### B. Penalty Phase of the Trial

The trial court held the penalty phase before the jury on September 16 and 17, 2002. (Doc. 7-12 at 182–203; doc. 7-13; doc. 7-14 at 3–22). The prosecution called one witness in its case in chief: Rodney Peak, Beckworth's probation and parole officer, who testified that Beckworth was on parole when the murder was committed. (Doc. 7-12 at 194–97). Beckworth's counsel called one witness in their case in chief: Dr. Michael D'Errico, Ph.D. ("Dr. D'Errico"), a forensic psychological consultant. (*Id*. at 198–203; doc. 7-13 at 3–62). Dr. D'Errico testified that Beckworth suffers from mild intellectual disability. (Doc. 7-13 at 25). In rebuttal, the prosecution called two of Beckworth's former employers: Kurt Valley, (*id.* at 62–66), and Mike Tabor, (*id*. at 66–71), as well as Dr. Doug McKeown ("Dr. McKeown"), a clinical and forensic psychologist, (*id*. at 71–98). Both of Beckworth's former employers testified that based on their interactions with Beckworth, they did not think that Beckworth was intellectually disabled. (*Id.* at 65, 69–70). Dr. McKeown testified that Beckworth is in the range of borderline intellectual functioning but that he is not intellectually disabled. In surrebuttal, Beckworth called Carol Gobbel, Beckworth's ex-wife and the mother of his daughter Anna. (*Id.* at 109–45). At the conclusion of the penalty phase, by a ten-to-two vote, the jury recommended that Beckworth be sentenced to death. (Doc. 7-5 at 172). The jury also unanimously found that Beckworth was not intellectually disabled. (*Id.* at 169).

On October 28, 2002, the trial court held a sentencing hearing to determine whether it would sentence Beckworth to life imprisonment without parole or to death as the jury recommended. (Doc. 7-14 at 28–34). Neither Beckworth's counsel nor the prosecution

presented any evidence at the hearing. The trial court stated that it would follow the jury's recommendation and sentence Beckworth to death. (*Id.* at 33).

On the same day, the trial court entered a sentencing order. (Doc. 7-14 at 55–60). The court found that the State had proven three statutory aggravating circumstances beyond a reasonable doubt: the capital offense was committed while Beckworth was engaged in a burglary, pursuant to ALA. CODE § 13A-5-49(4); the capital offense was committed while Beckworth was under a sentence of imprisonment, pursuant to ALA. CODE § 13A-5-49(1); and the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, pursuant to ALA. CODE § 13A-5-49(8). (*Id.* at 56–57). The trial court found that no statutory mitigating circumstances existed, pursuant to ALA. CODE § 13A–5–51. (*Id.* at 57–58). However, the trial court found, as non-statutory mitigating circumstances, *see id.* § 13A-5-52, that Beckworth displayed a respectful demeanor during the trial, that he had attended his family's church, and that he loved his family and was loved by his family members. (*Id.* at 59). The trial court also stated that it agreed with the jury's separate verdict that Beckworth was not intellectually disabled. (*Id.*). Finally, pursuant to ALA. CODE § 13A–5–47(e), the trial court considered the jury's advisory verdict of death, weighed the aggravating and mitigating circumstances, and found that the aggravating circumstances outweighed the mitigating circumstances and that death was the appropriate sentence. (*Id.*).

Beckworth filed a motion for a new trial, (doc. 7-5 at 199–202, doc. 7-6 at 3–9), and the trial court held a hearing on the motion on February 18, 2003, (doc. 7-14 at 40–50).

The trial court denied Beckworth's motion for a new trial several days later. (Doc. 7-6 at 154).

**C. Direct Appeal**

Beckworth appealed his conviction and sentence to the ACCA, represented by the same appointed counsel. Beckworth raised the following claims on direct appeal: the trial court erred by denying funds for a mitigation specialist and preventing him from presenting mitigating evidence at sentencing about his background and family history; the trial court erred in finding that Beckworth was not intellectually disabled under *Atkins*, 536 U.S. at 321; the trial court erred by not requiring the prosecution to advise Beckworth prior to his trial of the aggravating circumstances that it intended to rely upon at sentencing; the trial court erred by excusing an alternate juror without cause after the jury had been sworn and empaneled; the trial court misstated the law during voir dire when it asked potential jurors whether anyone had preconceived notions about the death penalty; Alabama's capital murder statute is unconstitutional on its face and as applied to Beckworth under *Apprendi*, 530 U.S. at 589, and *Ring*, 536 U.S. at 589; the trial court erred in denying Beckworth's motion to suppress his statements; the trial court erred in denying Beckworth's motion for a change of venue; the trial court erred in its penalty-phase jury instructions by advising the jury that although their verdict was advisory under then-current Alabama law, if the law changed, their recommendation could become the sentence in the case; the trial court erred by denying Beckworth's request that the jury be instructed at sentencing that mercy could be a mitigating factor; the trial court erred by finding the existence of the aggravating circumstance that the murder was especially heinous, atrocious, and cruel; Beckworth's

presentence report was cursory, contained errors, and lacked information in mitigation about Beckworth's background and the family history; the trial court's sentencing order was erroneous for various reasons; and the trial court erred by denying Beckworth's motion during trial for a directed verdict. (Doc. 7-15 at 2–128).

On August 26, 2005, the ACCA affirmed Beckworth's capital conviction and death sentence. *Beckworth*, 946 So. 2d at 535. On October 3, 2005, Beckworth sought rehearing from the ACCA, (doc. 7-16 at 92–191), but rehearing was denied on December 16, 2005, *Beckworth*, 946 So. 2d at 490. Beckworth filed a petition for a writ of certiorari in the Alabama Supreme Court, (doc. 7-17 at 2–138), but on June 23, 2006, the Alabama Supreme Court denied Beckworth's petition, *Beckworth*, 946 So. 2d at 490 (No. 1050371).

Represented by new counsel from the Equal Justice Initiative of Alabama, Beckworth filed a petition for certiorari in the United States Supreme Court. Beckworth's petition raised one issue: whether the ACCA's holding that the Supreme Court's decision in *Ake v. Oklahoma*, 470 U.S. 68 (1985), did not apply to the provision of funds for a mitigation specialist in a capital case violated the Sixth, Eighth, and Fourteenth Amendments. (Doc. 7-18 at 40–60). On January 8, 2007, the United States Supreme Court denied certiorari review. *Beckworth v. Alabama*, 549 U.S. 1120 (2007) (Mem.).

### D. Rule 32 Proceedings

On June 21, 2007, Beckworth, represented by pro bono counsel Sydney Albert Smith, filed a 79-page Petition for Relief from Judgment Pursuant to Rule 32 of the Alabama Rules of Criminal Procedure (hereinafter, the "Rule 32 Petition") in the Houston County Circuit Court (hereinafter, the "Rule 32 Court"). (Doc. 7-19 at 6–84). The bulk of

Beckworth's petition consisted of claims that his trial counsel were constitutionally ineffective at the guilt and penalty phases of his trial pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984), but he also claimed that the prosecution withheld several items of exculpatory evidence from the defense, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and that he was denied a fair trial and an impartial jury by the failure of one juror—"A.L."—to truthfully disclose information during voir dire, and by the fact that another juror—"D.B."—considered extraneous evidence during deliberations during the penalty phase.[5] The same judge who presided over Beckworth's trial presided over his Rule 32 proceedings.

On August 13, 2007, the State filed an Answer to the petition. (Doc. 7-19 at 101–59). Three days later, the Rule 32 Court dismissed Beckworth's Rule 32 Petition in a two-page order. (*Id.* at 160–61). In the order, the court noted that it remembered Beckworth's trial well. (*Id.* at 160). The court ruled that Beckworth's allegations of ineffective assistance of counsel failed to state a claim for relief, finding that they were of a "conclus[ory] and speculative nature." (*Id.*). The court stated that "[a]lthough, in retrospect, various different or additional investigation and trial measures might have been employed, the Court finds that none of the allegations raised in the Petition give rise to the lack of trial conduct that would have made any difference in Mr. Beckworth['s] trial or its results." (*Id.*). The court did not specifically mention Beckworth's *Brady* or juror misconduct claims.

[5] The jurors' names have been abbreviated to protect their anonymity.

On September 6, 2007, Beckworth filed a combined motion to reconsider the dismissal of his petition and for leave to amend it. (*Id.* at 162–94). In the motion, Beckworth argued that he was in the process of amending his petition to add new claims and bolster existing ones when the Rule 32 Court dismissed it. On September 21, 2007, Beckworth filed a notice of appeal to the ACCA, acknowledging that he was required to do so despite the pending motion for reconsideration because, under Alabama law in the Rule 32 context, even a timely-filed motion for reconsideration did not extend the Rule 32 Court's jurisdiction beyond thirty days after it had denied and dismissed a petition. (*Id.* at 196–98). On September 24, 2007, the Rule 32 Court granted Beckworth leave to amend his Rule 32 Petition by hand-written entry on the docket sheet, which read: "In that this is a capital case, Def. allowed 30 days to amend it's [sic] petition." (*Id.* at 195). Nevertheless, Beckworth proceeded with his appeal because the Rule 32 Court's order granting the amendment was issued more than thirty days after it had dismissed the case on August 16, 2007.

In his appellate brief, Beckworth's first argument to the ACCA was that the Rule 32 Court abused its discretion in dismissing his petition without affording him a reasonable opportunity for amendment. (Doc. 7-20 at 35–45). Beckworth also argued that the Rule 32 Court should have addressed each of the claims he raised in his petition individually. (*Id.* at 45–55).

The ACCA issued an opinion on May 1, 2009. *See Beckworth v. State*, 190 So. 3d 527 (Ala. Crim. App. 2009). The ACCA first held that, since Beckworth did not file a motion to amend prior to the Rule 32 Court dismissing his petition, no issue regarding the

amendment of the petition was preserved for the ACCA's review. *Id.* at 538–39. Relatedly, the ACCA held that because the Rule 32 Court purported to grant Beckworth leave to amend more than thirty days after entry of final judgment, it was without jurisdiction to do so, and the Rule 32 Court's original dismissal order remained in effect. *Id.* at 539.

Regarding Beckworth's contention that the Rule 32 Court should have addressed each of his claims individually, the ACCA acknowledged that a trial court should address all claims raised by a petitioner in a postconviction proceeding, but it noted that its precedent allowed it to affirm the Rule 32 Court if it was correct for any reason, even if not for the reason stated by that court. *Id.* at 540. Thus, the ACCA examined each claim in Beckworth's Rule 32 Petition to determine whether each was properly dismissed. *Id.* at 540–71. Regarding Beckworth's *Brady* claims, the ACCA held that the Rule 32 Court properly dismissed the claims because Beckworth did not plead them with specificity under ALA. R. CRIM. P. 32.6(b)[6] and they were procedurally barred under ALA. R. CRIM. P. 32.2(a)(3) and (5)[7] because Beckworth could have raised them trial or on appeal, but he did not. *Id.* at 540–41. Regarding Beckworth's ineffective assistance of counsel claims, the ACCA held that the Rule 32 Court properly dismissed the claims because Beckworth did not plead them with specificity under ALA. R. CRIM. P. 32.6(b). *Id.* at 546–70. Regarding Beckworth's juror misconduct claims, the ACCA affirmed the Rule 32 Court's dismissal of the claim as it pertained to juror D.B., holding that Beckworth did not plead

[6] Rule 32.6(b) requires that each claim "contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis for those grounds." ALA. R. CRIM. P. 32.6(b).

[7] These sections provide that a petitioner will not be given relief based upon any claim that could have been but was not raised at trial or on appeal. ALA. R. CRIM. P. 32.2.(a)(3) & (5).

that claim with specificity under ALA. R. CRIM. P. 32.6(b). *Id.* at 546, 570–71. However, the ACCA reversed and remanded the claim as it pertained to juror A.L.'s alleged failure to respond truthfully to questions posed during voir dire. *Id.* The ACCA directed the Rule 32 Court to determine whether this claim was due to be dismissed because Beckworth could have raised this claim at trial or on appeal, and if the Rule 32 Court determined that the claim was not due to be dismissed on that ground, to then determine whether the claim was meritorious. *Id.* at 570–71.

On remand, the Rule 32 Court held an evidentiary hearing on Beckworth's juror misconduct claim regarding juror A.L. on October 26, 2009. (Doc. 7-21 at 206–36; doc. 7-22 at 3–25). On October 29, 2009, the Rule 32 Court issued an order denying Beckworth's Rule 32 Petition as to this claim and affirmed its dismissal of the entire petition. (Doc. 7-21 at 203–04).

Beckworth again appealed, and on June 18, 2010, the ACCA affirmed the Rule 32 Court in an unpublished memorandum opinion, dismissing Beckworth's juror misconduct claim as to juror A.L. (Doc. 7-22 at 137–55). Beckworth sought rehearing, (*id.* at 156–218), but it was denied, (*id.* at 219).

On October 29, 2010, Beckworth filed a petition for certiorari in the Alabama Supreme Court. (Doc. 7-23 at 2–73). The Alabama Supreme Court granted the petition on one issue: whether Beckworth was required to proactively plead that his claims could not have been raised at trial or on appeal under ALA. R. CRIM. P. 32.2(a)(3) and (5) in order to state a claim for a constitutional violation under ALA. R. CRIM. P. 32.1(a). (Doc. 7-24 at 26). On July 3, 2013, the Alabama Supreme Court reversed the ACCA's affirmance of the

Rule 32 Court's dismissal of Beckworth's petition solely as it related to one of Beckworth's *Brady* claims. *Ex parte Beckworth*, 190 So. 3d 571, 575 (Ala. 2013). The Alabama Supreme Court remanded that *Brady* claim to the ACCA. *Id.*

On remand, the ACCA again affirmed the Rule 32 Court's dismissal of Beckworth's *Brady* claim. (Doc. 7-25 at 48–52 (*Beckworth v. State*, CR-07-0051 (Ala. Crim. App. Nov. 14, 2014) (unpublished memorandum opinion)). On September 18, 2015, the Alabama Supreme Court denied certiorari, (*id.* at 130), and on April 18, 2016, the United States Supreme Court denied certiorari, (*id*. at 235).

**E. Federal Habeas Proceedings**

On April 1, 2016, Beckworth filed this 28 U.S.C. § 2254 petition, raising eleven claims, some of which include numerous subclaims. (Doc. 1). Beckworth's claims are as follows: (1) because he is intellectually disabled, he is not subject to execution pursuant to the Eighth Amendment and *Atkins*; (2) the statements that he made to law enforcement officials in Arizona were unlawfully obtained in violation of *Miranda*, and should have been suppressed by the trial court; (3) the trial court denied him a fair trial by refusing his request for funds for a mitigation specialist and preventing him from presenting evidence about his background and family history at sentencing; (4) the prosecution suppressed evidence in violation of *Brady*; (5) he received ineffective assistance of counsel at both the guilt and penalty phases of his trial in violation of *Strickland*, specifically with regard to his counsel's investigation and presentation of mitigating evidence; (6) Alabama's capital sentencing statutes violated his Sixth Amendment right to a jury trial, as held in *Ring* and *Hurst v. Florida*, 577 U.S. 92 (2016); (7) the trial court's denial of his motion for a change

of venue deprived him of a fair trial; (8) the trial court deprived him of a fair and impartial jury when it misstated the law in asking death qualifying questions of the venire during voir dire; (9) he received ineffective assistance of counsel at the guilt phase of his trial in violation of *Strickland* in numerous ways; (10) he was denied the right to a fair trial and an impartial jury by juror A.L., who failed to truthfully answer questions during voir dire, and juror D.B., who considered extraneous evidence during deliberations at the penalty phase; and (11) the cumulative effect of the foregoing claims of error violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (*Id.*). This is Beckworth's first and only federal habeas petition. The Respondent filed the state court record and answered the petition. (Docs. 7, 16).

On November 17, 2016, Beckworth filed a motion for an evidentiary hearing pursuant to *Atkins*, arguing that he is intellectually disabled, that he was not afforded a fair opportunity to present evidence of his intellectual disability at trial, and that he should be afforded the opportunity to do so before this Court. (Doc. 22). The following day, Beckworth filed a motion for discovery of evidence that he claimed was suppressed by the State in violation of *Brady*. (Doc. 23). The parties briefed both motions, and the Magistrate Judge to whom this case was then dual-assigned conducted a hearing on the motions on January 17, 2017. (Doc. 34). The Magistrate Judge subsequently entered an opinion denying both motions. (Doc. 35). The Magistrate Judge reasoned that since the Alabama state courts had considered and rejected both Beckworth's *Atkins* and *Brady* claims on the merits, and this Court had not yet determined whether those decisions were "contrary to, or involved an unreasonable application of clearly established Federal law, as determined

by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2), Beckworth's motions for a hearing and discovery were premature. (Doc. 35 at 15–16, 25–26).

The Respondent then filed a brief arguing that some of Beckworth's claims are procedurally barred from review by this Court, (doc. 40), and Beckworth responded, (doc. 41). Beckworth also filed a merits brief, (doc. 42), the Respondent responded, (doc. 43), and Beckworth filed a final reply brief in support of his petition, (doc. 44). On November 1, 2023, this action was reassigned to the undersigned District Judge. (Doc. 53).

## IV. STANDARDS OF REVIEW

A federal court may issue a writ of habeas corpus for a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In other words, this Court's habeas review is limited to federal constitutional questions. *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (per curiam). "[F]ederal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (quoting *Lewis v. Jeffers*, 597 U.S. 764, 780 (1990)).

In reviewing state court proceedings, the federal court applies different standards of review depending on whether the petitioner properly presented his claim to the state courts and whether the state courts addressed the claim.

### A. Exhaustion and Procedural Default

A petitioner in state custody must exhaust the remedies available to him in the state courts before he can bring his claim in a federal habeas corpus action. 28 U.S.C.

§ 2254(b)(1)(A). A remedy is "available" if the petitioner "has the right under the law of the State to raise, by any available procedure, the question presented." *Id.* § 2254(c). The exhaustion requirement generally permits federal courts to consider only those claims that the petitioner has marshalled through "one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). This includes filing a petition for discretionary review in the highest court in the state if such review is part of the state's appellate procedure. *See id.* at 845–47. "Alabama convictions and prisoners clearly come within the scope of th[is] rule." *Smith v. Jones*, 256 F.3d 1135, 1141 (11th Cir. 2001). Thus, to exhaust state remedies, "a petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010). "[A]n issue is exhausted if 'the reasonable reader would understand [the] [federal] claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (second alteration in original) (quoting *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004)).

A habeas petitioner who fails to properly present a claim to the state court and who therefore loses the right to raise the claim within state procedures is said to have "procedurally defaulted" the claim and is no longer able to raise it in either state or federal court. *See Martinez v. Ryan*, 566 U.S. 1, 9–10 (2012); *see also Coleman v. Thompson*, 501 U.S. 722, 732 (1991) (explaining that "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of

an opportunity to address those claims in the first instance"). A state court's rejection of a federal constitutional claim on state procedural grounds may only preclude federal review if the procedural ruling rests upon an "adequate and independent" state ground. *Marek v. Singletary*, 62 F.3d 1295, 1301 (11th Cir. 1995) (citing *Harris v. Reed*, 489 U.S. 255, 262 (1989)). A state procedural ruling is "adequate and independent" if three elements are met:

> First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim. Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. Third, the state procedural rule must be adequate, i.e., firmly established and regularly followed and not applied "in an arbitrary or unprecedented fashion."

*Ward*, 592 F.3d at 1156 (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)).

However, procedural default is not an absolute bar to federal habeas relief. There are two exceptions to the general rule that a federal court may not consider a procedurally defaulted claim on the merits: "cause and prejudice" and "actual innocence." *Dretke v. Haley*, 541 U.S. 386, 388 (2004) ("[A] federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default. We have recognized a narrow exception to the general rule when the habeas applicant can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense . . . .").

A habeas petitioner can establish "cause" if "some objective factor external to the defense impeded the effort to raise the claim properly in the state court," and "prejudice" if "there is at least a reasonable probability that the result of the proceeding would have been different." *Harris v. Comm'r, Ala. Dep't of Corr.*, 874 F.3d 682, 688 (11th Cir. 2017)

(first quoting *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999); then quoting *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003)). Attorney negligence does not generally constitute cause to excuse procedural default unless it rises to the level of ineffective assistance of counsel. *Coleman*, 501 U.S. at 752–54. Attorney error may also supply cause for procedural default "when a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding," but the prisoner did not have effective counsel in his first collateral proceeding. *Martinez*, 566 U.S. at 14; *see Trevino v. Thaler*, 569 U.S. 413, 429 (2013). As for prejudice, a habeas petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphases in original).

"Actual innocence," on the other hand, "applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" *McQuiggin v. Perkins*, 569 U.S. 383, 395 (2013) (alteration in original) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). The petitioner bears the burden of establishing that one of these exceptions to the procedural default rule applies. *See Gordon v. Nagle*, 2 F.3d 385, 388 n.4 (11th Cir. 1993) ("A defendant has the burden of establishing cause and prejudice . . . ."); *Arthur v. Allen*, 452 F.3d 1234, 1245 (11th Cir. 2006) ("The petitioner must support the actual innocence claim 'with new reliable evidence . . . that was not presented at trial.'" (quoting *Schlup*, 513 U.S. at 324)).

States "'can waive procedural bar defenses in federal habeas proceedings,' including exhaustion." *Vazquez v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 964, 966 (11th Cir.

2016) (quoting *Hills v. Washington*, 441 F.3d 1374, 1376 (11th Cir. 2006) (per curiam)). "However, the State's failure to raise exhaustion does not constitute a waiver under AEDPA, which mandates that '[a] State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, *expressly* waives the requirement.'" *Id.* (first alteration in original) (emphasis added) (quoting 28 U.S.C. § 2254(b)(3)); *see also Dill v. Holt*, 371 F.3d 1301, 1302 n.1 (11th Cir. 2004) (stating that the AEDPA requires a federal district court to address exhaustion when it is not expressly waived by the respondent in a habeas proceeding).

**B. AEDPA Review of State Court Decisions**

When a state prisoner petitions a federal court for a writ of habeas corpus on grounds that were considered and rejected by the state courts, review is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Penry v. Johnson*, 532 U.S. 782, 792 (2001). AEDPA establishes a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Under AEDPA, a petitioner is not entitled to habeas corpus relief in connection with "any claim that was adjudicated on the merits in State court proceedings[,] unless the adjudication of th[at] claim" either: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." 28 U.S.C. § 2254(d); *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000). When making this determination, if the relevant state court decision on the merits does not come accompanied with reasons for its decision, the federal court should "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

The "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal court may grant relief "if the state court applies a rule different from the governing law set forth" in United States Supreme Court cases, or if the state court decides a case differently than the Supreme Court "on a set of materially indistinguishable facts." *Id.*; *see Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003) (per curiam). A state court's failure to cite governing Supreme Court authority does not automatically establish that the state court's decision is "contrary to" clearly established Supreme Court precedent. *Mitchell*, 540 U.S. at 16 (citing *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam)). Rather, "a state court need not even be aware of [the relevant] precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *Id.* (citing *Packer*, 537 U.S. at 8).

Under the "unreasonable application" clause, a federal court may grant relief if "the state court identifies the correct governing legal principle" from the Supreme Court's decisions "but unreasonably applies that principle to the facts" of the petitioner's case.

*Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413). A federal court making this inquiry should ask whether the state court's application of clearly established Supreme Court precedent was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132–33 (2010) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000)); *Wiggins*, 539 U.S. at 520–21. An "unreasonable" application is different from a merely "incorrect" one. *See Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *see also Wiggins*, 539 U.S. at 520. This standard is "difficult to meet and . . . demands that state-court decisions be given the benefit of the doubt." *Raulerson v. Warden*, 928 F.3d 987, 996 (11th Cir. 2019) (quoting *Pinholster*, 563 U.S. at 181).

The Supreme Court has summarized these two clauses in simple terms: "[A] state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). A legal principle is "clearly established" for AEDPA purposes if it was found in the holdings—as opposed to the dicta—of a Supreme Court decision that existed at the time of the relevant state court decision. *Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004); *see also Lopez v. Smith*, 574 U.S. 1, 2 (2014) (per curiam) (explaining that AEDPA "prohibits the federal courts of

appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established'").

AEDPA also significantly restricts the scope of federal habeas review of state court findings of fact. A federal court cannot contradict state court factual findings merely because it "would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Rather, the state court must have reached an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding" for a federal court to grant habeas relief on that basis. 28 U.S.C. § 2254(d)(2). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), that is not sufficient grounds for a federal habeas court to supersede the trial court's findings. *Wood*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341–42 (2006). The state court's factual findings are "presumed to be correct," and the petitioner has the burden of rebutting these findings "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Of course, deference does not mean that habeas relief is always precluded. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review."); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) ("The standard is demanding but not insatiable."). However, by setting forth necessary predicates before state court judgments may be set aside, AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). "'If

this standard is difficult to meet'—and it is—'that is because it was meant to be.'" *Id.* at 20 (quoting *Harrington*, 562 U.S. at 102).

For any claims properly presented to the state courts but left unaddressed, this Court conducts *de novo* review. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005). If reviewed *de novo*, a fact pleading standard is applied. *See* 28 U.S.C. § 2242 (requiring a petition for writ of habeas corpus to "allege the facts concerning the applicant's commitment or detention"). Similarly, Rule 2(c)(2) of the *Rules Governing Section 2254 Cases in the United States District Courts* also requires a petitioner to "state the facts supporting each ground" in the petition. *See* Rule 2(c)(2), Rules Governing Section 2254 Cases in the United States District Courts [hereinafter, Rules Governing Section 2254 Cases]; *see also Mayle v. Felix*, 545 U.S. 644, 656 (2005) (acknowledging this particularity requirement).

## V. DISCUSSION

The Court will address each of Beckworth's claims, including subclaims, in the order in which they are presented in the petition. Most of Beckworth's claims are subject to AEDPA review because they were previously adjudicated on the merits by the Alabama state courts, either on direct appeal or on postconviction review. However, there are instances where Beckworth has failed to exhaust portions of claims or subclaims by either raising new legal theories here that were never presented to the state courts or failing to pursue an existing claim through an entire round of Alabama's established direct appeal or collateral review process. In those instances, the Court will address the procedural default

of certain allegations first before addressing whether the state court's consideration of the remaining portions of the claim was reasonable under 28 U.S.C. § 2254(d).

### A. Beckworth's *Atkins* Claim: That Because He is Intellectually Disabled, He is Ineligible for Execution (Doc. 1 at 8–24, paras. 27–69)

On June 20, 2002, shortly before Beckworth's trial, the United States Supreme Court held for the first time that the Eighth Amendment's guarantee against cruel and unusual punishment categorically forbids the execution of intellectually disabled persons. *Atkins*, 536 U.S. at 321. Beckworth's first claim is that under *Atkins*, his death sentence is unconstitutional because he is intellectually disabled, and the state courts' rejection of this claim at trial and on direct appeal was unreasonable and contrary to clearly established federal law, pursuant to 28 U.S.C. § 2254(d).

Although the Supreme Court forbade the execution of intellectually disabled persons in *Atkins*, it did not dictate a national standard for determining whether a criminal defendant is intellectually disabled. 536 U.S. at 317. Instead, it left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Id.* (alterations in original) (citation omitted). However, the Supreme Court suggested that an evaluation of intellectual disability should conform to current medical standards, and it embraced two clinical definitions of "mental retardation" (now referred to as "intellectual disability")[8] with approval. *Id.* at 308 n.3 & 318. Those

[8] Although *Atkins* used the term "mentally retarded," the Supreme Court has since adopted the term "intellectually disabled" to describe the same condition. *See Hall v. Florida*, 572 U.S. 701, 704 (2014) ("Previous opinions of this Court have employed the term 'mental retardation.' This opinion uses the term 'intellectual disability' to describe the identical phenomenon."). The Supreme Court in *Hall* noted that the change in terminology has been approved and used in the Diagnostic and Statistical Manual of Mental Disorders, the text used by psychiatrists and other experts. *See id.* at 704–05. The Eleventh Circuit also

clinical definitions require: (1) manifestation of intellectual disability before the age of eighteen years, (2) significantly subaverage intellectual functioning, and (3) "significant limitations in adaptive skills such as communication, self-care, and self-direction." *Id.* at 318.[9] The Supreme Court also recognized that "an IQ between 70 and 75 or lower" is "typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Id.* at 309 n.5.

---

now uses the term "intellectually disabled" rather than "mentally retarded." *See Kilgore v. Sec'y, Fla. Dep't of Corr.*, 805 F.3d 1301, 1303 n.1 (11th Cir. 2015) ("We use the terms 'intellectually disabled' and 'intellectual disability' in this opinion because, as the Supreme Court stated in *Hall v. Florida*, both law and medicine have moved away from the terms 'mentally retarded' and 'mental retardation.' [572] U.S. [at 704–05]."). Following the lead of the Supreme Court and the Eleventh Circuit, this Court uses the term "intellectually disabled" in this Memorandum Opinion and Order, unless the Court is directly quoting text regarding the terms.

[9] The Supreme Court observed that all of the existing federal and state statutes providing a definition of intellectual disability generally conformed to diagnostic criteria promulgated by the American Association on Mental Retardation and the American Psychiatric Association. *Id.* at 317 n.22. The Court quoted those definitions, as follows:

> The American Association on Mental Retardation (AAMR) defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work. Mental retardation manifests before age 18." Mental Retardation, definition, Classification, and Systems of Supports 5 (9th ed. 1992).
>
> The American Psychiatric Association's definition is similar. "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000). "Mild mental retardation is typically used to describe people with an IQ of 50–55 to approximately 70. *Id.*, at 42–43.

*Id.* at 308 n.3 (emphasis in original).

Beckworth alleges numerous facts in his federal habeas petition that he claims establish that he meets all three elements of the test for intellectual disability discussed in *Atkins*. For instance, he alleges that he has an IQ score below seventy and that he suffers from deficits in adaptive skills that manifested before he turned eighteen. However, the Respondent argues that Beckworth never presented some additional allegations—namely, those contained in paragraphs 62–68 of the petition—to the state courts when they were considering Beckworth's *Atkins* claim at trial and on direct appeal. (Doc. 40 at 17). In paragraphs 62–68, Beckworth claims that the lack of positive family and social support can adversely affect a person's intellectual ability, especially during childhood. (Doc. 1 at 22–24, para. 62). Beckworth then alleges that he lacked such support early in his life, as evidenced by the following: his father was an abusive alcoholic who beat his mother in front of Beckworth and his siblings; his mother abandoned Beckworth and his siblings when he was nine years old; his entire extended family showed signs of intellectual impairment and poor social functioning; he lived with his siblings, grandparents, and several aunts and uncles in a filthy shack; discarded food, trash, and clothing were strewn all over the house; he and his family wore tattered clothing and their hygiene was inadequate; his grandfather's wife routinely urinated in public; rape and incest were rampant in the home, claiming Beckworth and his siblings as victims; physical fighting among relatives was constant; his family was exceptionally poor; from a young age, the children were sent to work catching chickens at a nearby poultry farm to support the family; there was never enough food to feed Beckworth and his siblings; most of the men in Beckworth's family were illiterate, including his father, grandfather, and several uncles;

Beckworth dropped out of school in the sixth grade at age thirteen; and Beckworth's former elementary school principal recalled that all of the Beckworth children were in special education classes, considered intellectually disabled, and never continued school beyond the sixth grade. (*Id.* at 22–23, paras. 63–66). Beckworth attaches as an exhibit to his habeas petition a handwritten report card noting that he was "below grade level—grades accordingly." (*Id.* at 23, para. 66; doc. 1-8). Beckworth also attaches as an exhibit documentation that he was absent for forty of the 101 days of school that he was on the roll in his final year of school. (Doc. 1 at 23, para. 66; doc. 1-9). Beckworth contends that this information shows that he did not receive the support and intervention that would have been necessary to manage his deficits and improve his intellectual functioning when he was a child. (Doc. 1 at 23–24, paras. 67–68).

The Respondent contends that, because Beckworth never presented this information to the state courts, this Court is precluded from considering the allegations in paragraphs 62–68 in support of Beckworth's *Atkins* claim because (1) the allegations are unexhausted and procedurally defaulted and, separately, (2) the Court's reasonableness review under § 2254(d) is limited to the record that was before the state court. As explained more fully below, the Court disagrees that the allegations are procedurally defaulted, although the Court agrees it may not consider the allegations when undertaking § 2254(d) review. Because the Respondent makes similar exhaustion argument with respect to multiple additional claims, the Court addresses in detail the relevant caselaw and why the Court concludes that the allegations in paragraphs 62–68 are not unexhausted—though they are nevertheless beyond the Court's review pursuant to § 2254(d).

To satisfy the exhaustion requirement, petitioners must have "fairly presented" their federal claims to the state courts, *Picard v. Connor*, 404 U.S. 270, 275 (1971), meaning "petitioners [must] present their claims to the state courts such that the reasonable reader would understand each claim's particular legal basis and specific factual foundation," *Kelley*, 377 F.3d at 1344–45. "The Supreme Court has instructed . . . that if 'the substance of a federal habeas corpus claim [was] first . . . presented to the state courts,' 'despite variations in the . . . factual allegations urged in its support," the claim is exhausted." *Pope*, 680 F.3d at 1286 (second, third, and fourth alterations in original) (quoting *Picard*, 404 U.S. at 277–78). Indeed, "habeas petitioners are permitted to clarify the arguments presented to the state courts on federal collateral review provided that those arguments remain unchanged in substance." *Kelley*, 377 F.3d at 1344. And "courts should exercise flexibility in determining whether defendants have met [the exhaustion] requirement." *Cummings v. Dugger*, 862 F.2d 1504, 1507 (11th Cir. 1989).

Exhaustion does not require that the petitioner first presented every factual allegation to the state court. Instead, if the federal habeas claim contains new facts that merely elaborate upon or clarify the same substantive claim that was presented in state court, the claim is generally exhausted. *See, e.g.*, *Freeman v. Comm'r, Ala. Dep't of Corr.*, 46 F.4th 1193, 1216–19 (11th Cir. 2022); *Pope*, 680 F.3d at 1286–87. By contrast, if the federal habeas claim contains new facts to support a distinct claim or legal theory, the claim is generally unexhausted. *See, e.g.*, *Kelley*, 377 F.3d at 1347–50; *Henderson v. Campbell*, 353 F.3d 880, 897–98 & n.25 (11th Cir. 2003). A review of these four cases is instructive.

In *Pope*, the Eleventh Circuit rejected the state's argument that a petitioner's ineffective assistance claim—specifically, his claim that counsel were ineffective for failing to investigate and present mitigation evidence at the penalty phase (the "failure-to-mitigate claim")—was unexhausted because "he impermissibly expanded this claim when he raised it on federal habeas review." *Id.* at 1286. The court explained that the petitioner's failure-to-mitigate claim "as pled in [the] federal habeas petition *raised the exact same legal issue that was presented to the state court*—that but for the complete absence of *any* investigation and presentation of mitigation evidence, there is a reasonable probability that the result of [the petitioner's] sentencing proceeding would have been different." *Id.* at 1287 (first emphasis added; second emphasis in original). Specifically, the court observed that the petitioner argued in his state postconviction proceedings that his trial counsel failed to present any mitigation evidence during the penalty phase other than his mother's plea for mercy, and that counsel failed to adequately "develop evidence of such mitigating factors such as defendant's psychological history, performance in the military, or his capacity for rehabilitation." *Id.* The court further observed that the petitioner's federal habeas petition "center[ed] around his abused and impoverished childhood, his positive personality traits, his mental health issues, and his honorable military service in a combat zone." *Id.* The court acknowledged that while the federal habeas petition "certainly expanded on the topics raised earlier in state court, . . . they involve[d] the same issues raised there—his psychological history, his performance in the military, and his capacity for rehabilitation—in the context of an ineffective assistance of counsel claim." *Id.* The court thus concluded that the failure-to-mitigate claim was exhausted because "the state

courts and the State were made fully aware of [the petitioner's] ineffectiveness claim, 'despite variations in the . . . factual allegations urged in its support.'" *Id.* (second alteration in original) (quoting *Picard*, 404 U.S. at 277).

*Freeman* involved an even starker contrast in detail between the claim presented in state court and that presented in federal court, but the claim was found to be exhausted. In *Freeman*, the court addressed whether the Alabama petitioner exhausted his claim that trial counsel were ineffective for failing to investigate and present mitigation evidence at the penalty phase. 46 F.4th at 1216–17. The operative Rule 32 petition alleged that trial counsel "failed to investigate, develop and present available evidence in mitigation of petitioner's punishment" and "failed to present available evidence regarding petitioner's background and his mental health history to the jury in a manner which would have allowed the jury to give this evidence mitigating effect during the sentencing phase," and that "[b]ut for counsel's deficient performance, there exists a reasonable probability that the result of petitioner's trial would have been different." *Id.* at 1217. The claim in state court "did not contain *any* factual allegations in support of his claim that his trial counsel were ineffective in failing to investigate and present 'substantial evidence' of mitigation." *Id.* at 1218 (emphasis in original). In federal court, by contrast, the petitioner "set forth almost twenty pages of extensive factual allegations in support of his claim," including "information concerning abuse and neglect he suffered while in state care from the time he was a baby until he was eighteen years old," including sexual abuse. *Id.* He also introduced in federal court allegations that he suffered from PTSD. *Id.* at 1219. Similar to *Pope*, the *Freeman* court concluded that the ineffective assistance claim was exhausted because "'the

substance of' [the petitioner's] claim was first presented to the state court, despite the 'variations in the . . . factual allegations urged in its support.'" *Id.* (second alteration in original) (quoting *Pope*, 680 F.3d at 1295). The court explained that the petitioner claimed in his Rule 32 petition that "his counsel 'failed to present available evidence regarding petitioner's background and his mental health history to the jury in a manner which would have allowed the jury to give this evidence mitigating effect during the sentencing phase,'" and that "[a]t its core, this is the *same legal issue* that [the petitioner] presented . . . in his federal habeas petition." *Id.* (emphasis added). The court concluded that "[u]ltimately, the new factual allegations [did] not change the substance of [the petitioner's] claim." *Id.*

True, in *Kelley* the Eleventh Circuit stated that "the prohibition against raising nonexhausted claims in federal court extends not only to broad legal theories of relief, but also to the specific assertions of fact that might support relief." 377 F.3d at 1344. But *Kelley* does not stand for the proposition that all new factual allegations in federal court are *per se* unexhausted. Rather, *Kelley* held that a petitioner cannot rely upon a generalized ineffective assistance of counsel ("IAC") claim raised in state court to then raise in federal court a new IAC claim based on an entirely different act or omission by counsel. *See id.* ("[H]abeas petitioners may not present particular factual instances of ineffective assistance of counsel in their federal petitions that were not first presented to the state courts.").

In *Kelley*, the petitioner raised several IAC claims in federal court, including a claim that trial counsel failed to conduct an adequate pretrial investigation and unreasonably relied on a disbarred attorney to handle the pretrial investigation (the "failure to investigate claim"). *Id.* at 1347. The federal district court granted habeas relief on the failure to

investigate claim. *Id.* The Eleventh Circuit reversed, concluding that the district court should have dismissed the failure to investigate claim as unexhausted because the petitioner had not presented a claim to the state court that "fairly notified" the state court and the state that "he intended to challenge his conviction on the ground that his attorneys were constitutionally deficient in their duty to investigate or because they relied on [the disbarred attorney] for this chore." *Id.* at 1348. The court reasoned that the failure to investigate claim "was not merely a clarified rendition of an exhausted claim, but a new claim altogether." *Id.* The court acknowledged that in state court, the petitioner raised several IAC claims, including a claim concerning trial counsel's "failure to develop defense theories" which most closely resembled the failure to investigate claim. *Id.* However, the court concluded that the "two claims are clearly distinct, in form and in substance." *Id.* The court highlighted how the state supreme court distilled the broad "failure to develop defense theories" into seven subclaims, none of which resembled a claim that trial counsel violated a general duty to investigate or improperly relied on the disbarred attorney to perform such investigation. *Id.* at 1349. The court further observed that the petitioner mentioned the disbarred attorney only twice in his brief to the state supreme court, both times in the context of a separate claim that the state trial court erred in excluding certain evidence. *Id.* The court concluded that recharacterizing the claim the petitioner presented to the state court "as a challenge to the counsel's reliance on [the disbarred attorney] for pretrial investigation would 'fundamentally alter the legal claim[s] already considered by the state courts' such that [the court] could not consider the restated claim as exhausted."

*Id.* at 1350 (second alteration in original) (quoting *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986)).

The court's decision in *Henderson* is in a similar vein as *Kelley*. In *Henderson*, the petitioner dismissed all the claims raised in his Rule 32 petition before there was an adjudication on the merits, rendering the claims unexhausted and also procedurally defaulted. 353 F.3d at 891. The petitioner did not dispute the procedural default but argued that he had shown cause to excuse the default—specifically, that he did not knowingly, voluntarily, and intelligently waive his legal rights. *Id.* at 892. In state court, the petitioner's only "cause" argument was that he lacked sufficient understanding of the consequences of dismissing his Rule 32 petition, and therefore the dismissal was not a knowing, voluntary, and intelligent waiver (the "lack of understanding claim"). *Id.* at 884 & 898 n.25. In federal court, the petitioner introduced an additional cause argument: that he was unduly influenced to dismiss his Rule 32 petition by his Rule 32 counsel, who had a conflict of interest (the "undue influence claim"). *Id.* at 891. After clarifying that arguments for cause to excuse a procedural default are themselves subject to AEDPA's exhaustion requirement, *id.* at 895–97, the court concluded that the petitioner had not exhausted his undue influence claim because he "never argued, at any level of his Rule 32 proceedings in the Alabama state courts, that his Rule 32 dismissal was involuntary as the product of the undue influence of Rule 32 counsel," *id.* at 897, 899. In a footnote, the court explained why the petitioner's presentation of his lack of understanding claim in state court did not render his undue influence claim properly exhausted. *Id.* at 898 n.25. The court explained that the undue influence claim relied on "facts and legal arguments never

presented to the state court," and that "[b]oth the legal theory and the facts on which the federal claim rests must be substantially the same for it to be the substantial equivalent of the properly exhausted claim." *Id.* "That the lack of understanding claim was presented to the state court under the same general legal umbrella but with entirely different factual underpinnings does not constitute fair presentation of the undue influence claim." *Id.*

To be sure, a petitioner's introduction of new facts or evidence in federal court that were not presented in state court has consequences: in determining whether the state court's decision was unreasonable under § 2254(d), the federal court may consider only the record "that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 180–81; *Borden v. Allen*, 646 F.3d 785, 816–17 (11th Cir. 2011). Thus, new allegations raised in federal court in support of a claim are not considered "when reviewing the reasonableness of the state court's resolution of this claim, which was based on the allegations before it." *Freeman*, 46 F.4th at 1223 (quoting *Powell*, 602 F.3d at 1273 n.8). Consequently, whether through the lens of exhaustion or § 2254(d)'s reasonableness inquiry, the federal habeas court generally does not consider new allegations or evidence that were never presented to the state courts.

Having set forth relevant precedent concerning exhaustion, the Court now turns to the Respondent's argument that the allegations in paragraphs 62–68 of Beckworth's federal habeas petition are unexhausted. After careful review, and mindful that the Court should exercise flexibility in resolving the exhaustion question, *see Cummings*, 862 F.2d at 1507, the Court concludes that these allegations are exhausted—or, more precisely, that Beckworth's *Atkins* claim is properly exhausted notwithstanding the variations in the facts

presented. Beckworth presented the substance of his *Atkins* claim to the state courts, and while he has certainly expanded on the topics he presented to the state courts, the substance of his legal claim remains unchanged: he is intellectually disabled because his disability manifested before age eighteen, he has significantly subaverage intellectual functioning, and he has significant limitations in adaptive skills, and therefore he is ineligible for execution under the Eighth Amendment pursuant to *Atkins*. This scenario is distinguishable from *Kelley* because characterizing the *Atkins* claim Beckworth presents in federal court as the same claim he presented to the state courts would not fundamentally alter the legal claim that was considered by the state courts. *See Kelley*, 377 F.3d at 1350.

Nonetheless, as indicated above, in determining whether the state courts' adjudication of Beckworth's *Atkins* claim was unreasonable, this Court may consider only the record "that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 180–81; *Borden*, 646 F.3d at 816–17. Thus, the Court does not consider Beckworth's new allegations in support of his *Atkins* claim "when reviewing the reasonableness of the state court's resolution of this claim, which was based on the allegations before it." *Freeman*, 46 F.4th at 1223 (quoting *Powell*, 602 F.3d at 1273 n.8).

The Court now turns to whether the ACCA's decision rejecting Beckworth's *Atkins* claim was unreasonable based on the state court record. The Court begins by laying out the litigation history of this claim, including the testimony presented to the trial court by Beckworth and the prosecution concerning his alleged intellectual disability.

Prior to *Atkins* being decided in June 2002, Beckworth's trial counsel had already sought and received funds to have him evaluated by a psychologist, Dr. D'Errico, for

competency to stand trial and intellectual disability. (Doc. 7-2 at 158–59; doc. 7-3 at 51). Shortly after *Atkins* was decided, which was three months before Beckworth's trial was set to begin, Beckworth's counsel filed a notice informing the trial court that they anticipated filing an *Atkins* motion after they received Dr. D'Errico's report. (Doc. 7-3 at 160). On August 7, 2002, Beckworth's counsel filed several *Atkins*-related motions. They submitted the report from Dr. D'Errico, in which he opined that Beckworth was competent to stand trial but that he met the criteria for "mild mental retardation." (Doc. 7-4 at 63–65). They filed a motion to dismiss Beckworth's indictment, arguing that under *Atkins* and *Ring*, 536 U.S. at 589, which had been decided by the Supreme Court the same month as *Atkins*, Alabama's capital punishment statute was unconstitutional because it allowed intellectually disabled persons to be executed. (Doc. 7-4 at 41–45). They also filed a motion requesting that the trial court empanel a jury prior to Beckworth's trial to determine whether he was intellectually disabled, arguing that the Supreme Court's decisions in *Atkins* and *Ring* required a jury determination of intellectual disability. (*Id.* at 33–34). In that motion, counsel also requested that a special verdict form be used to ensure that the jury voted unanimously and beyond a reasonable doubt as to Beckworth's intellectual disability. (*Id.*).

On August 15, 2002, the trial court held a hearing on the *Atkins* motions. (Doc. 7-8 at 168–95). The trial court denied the motion to dismiss the indictment, (*id.* at 195), and it ruled that whether Beckworth was intellectually disabled would not be decided before Beckworth's trial but would instead be presented during the penalty phase of the trial for the jury to determine, (*id.* at 188).

During the penalty phase, the jury heard from dueling experts—Dr. D'Errico for the defense and Dr. McKeown for the State—regarding whether Beckworth was intellectually disabled. (Doc. 7-12 at 198–203; doc. 7-13 at 3–62) (Dr. D'Errico's testimony); doc. 7-13 at 71–98 (Dr. McKeown's testimony)). The State also called two of Beckworth's former employers, Kurt Valley and Mike Tabor, to testify about work that Beckworth had performed in the past, and each testified that they did not think that Beckworth was intellectually disabled. (Doc. 7-13 at 62–66 (Kurt Valley); 66–71 (Mike Tabor)). Beckworth called his ex-wife Carol Gobbel in surrebuttal. (*Id.* at 109–45). Beckworth's counsel argued to the jury that an intellectually disabled person could not be executed, and at the conclusion of the penalty phase, the trial court charged the jury that they would be required to reach a unanimous vote on whether Beckworth was intellectually disabled and fill out a special verdict form. (Doc. 7-14 at 16–18). The trial court charged the jury on the definition of intellectual disability from the American Association of Mental Retardation, which the Supreme Court referenced in *Atkins*. (*Id.* at 17–18). After deliberating, the jury unanimously found that Beckworth was not intellectually disabled. (*Id.* at 20).

The trial court agreed with the jury on this issue, making the following written findings in its Sentencing Order:

> The defense raised as a sentencing issue the question of whether or not Mr. Beckworth was mentally retarded in light of the U.S. Supreme Court ruling in the [*Atkins* case] prohibiting execution of a mentally retarded person. The Jury and Court heard experts on the issue as well as testimony and evidence of the defendant's abilities. Although his exact tested mental ability was an issue, he appeared to function normally in his personal life and out in society, held a job as a mechanic on refrigeration or other systems for Houston Paper Company and its customers. Mr. Beckworth represented to others that he had a GED. He earned A's and B's at Sparks Technical College in the area

> of mechanical repair. He was married[,] had a child and had a commercial drivers license. The Jury found that he was not mentally retarded and the Court agrees.

(*Id.* at 59).

Beckworth appealed the trial court's ruling that he was not intellectually disabled to the ACCA. (Doc. 7-15 at 55–80). In its opinion, the ACCA first described the testimony that the jury heard during the penalty phase regarding the issue of whether Beckworth was intellectually disabled, as follows:

> Beckworth presented the testimony of Dr. Michael D'Errico, a forensic psychological consultant, who performed various evaluations of Beckworth. Dr. D'Errico testified that his initial evaluation revealed that Beckworth was competent to stand trial. He testified that Beckworth obtained a full scale score of 71 on the Wechsler Adult Intelligence Scale, Third Edition, and that his true intelligence quotient (IQ) would be in a range from 66 to 76 because the test had a "confidence limit" of plus or minus 5 points. An IQ score of less than 70 indicates mental retardation, Dr. D'Errico stated. He further testified that, because Beckworth's actual IQ might have been below 70, he requested a colleague to administer the Stanford–Binet Intelligence Scale, Fourth Edition, to Beckworth. Beckworth achieved a composite score of 67 on the Stanford–Binet; applying the 3–point confidence limit associated with this test, Dr. D'Errico determined that Beckworth's IQ score would be in the range between 64 and 70. Dr. D'Errico administered the Wide Range Achievement Test and determined that Beckworth's reading skills were at an eighth-grade level and that his spelling skills and his arithmetic skills were at a fifth-grade level. Dr. D'Errico testified that, along with Beckworth's ex-wife, he completed the Adaptive Behavior Scale, a questionnaire requiring information from someone who knows the individual well and who has observed him or her for an extended period. The results of that test indicated that Beckworth scored comparably to individuals who were mentally retarded.
>
> Dr. D'Errico testified that the determination of mental retardation involves three main criteria. First, the individual must have an IQ score of 70 or below, he said. Second, the individual must have deficits in adaptive functioning in several areas, such as independent living skills and academic skills. Third, the subaverage IQ score and the deficits in adaptive functioning must have been observable before the individual was 18 years old. He stated

that, based on all of the tests he administered, he concluded that Beckworth met the criteria for mild mental retardation.

On cross-examination, the prosecutor questioned Dr. D'Errico's credibility by eliciting testimony regarding a previous capital case involving a different defendant in which Dr. D'Errico had found the defendant incompetent to stand trial, while two other experts had determined that he was competent to stand trial and that he had been malingering. Dr. D'Errico acknowledged that the Minnesota Multiphasic Personality Inventory ("MMPI"), which he administered to Beckworth, requires at least a sixth-grade reading level. Dr. D'Errico stated that one of the scores on the test indicated either that Beckworth attempted to appear more psychologically ill than he actually was or that he had trouble understanding some of the questions.

Also on cross-examination Dr. D'Errico acknowledged that a scoring error had been made on the Wechsler test, that the raw score on one of the subtests should have been higher, and the correct score might have yielded an IQ score one point higher than he had reported.

Dr. D'Errico stated that it was not inconsistent that an individual with a diagnosis of mild mental retardation would acquire a job and a driver's license, as Beckworth did. He stated that it was also possible for a person diagnosed with mild mental retardation to engage in falsifying documents on the job so that he could obtain more money. Dr. D'Errico testified also that Beckworth told him that he had obtained a general educational development (GED) certificate, but that Beckworth's former wife stated that he had not received a GED certificate. Dr. D'Errico testified that he was aware that Beckworth had attended a technical college, where he earned A's and B's in refrigeration and electrical courses.

During the State's case at sentencing, Kurt Valley, a former employer of Beckworth's, testified that Beckworth had diagnosed the problems in and repaired janitorial equipment. Beckworth obtained a commercial driver's license (CDL) while he was employed by Valley. Thereafter, Beckworth was promoted, and he began working with customers on the road. During that time, Beckworth had to complete documents and submit them to the company's office. Valley testified that Beckworth did not appear to be retarded.

Mike Tabor testified that Beckworth had worked for him at his pest-control company as a termite technician in 1992 and 1993. Beckworth's responsibilities involved gaining knowledge of insects and toxic chemicals

and mixing chemicals safely to treat customers' homes. Tabor stated that Beckworth operated one of the company's trucks and that he did not appear to be retarded.

Dr. Doug McKeown, a clinical and forensic psychologist, testified that he had performed a court-ordered psychological evaluation of Beckworth. He had reviewed the documents from the criminal investigation, the tests that Dr. D'Errico had administered to Beckworth, and the psychological reports that had been completed, and he spoke with Beckworth. Dr. McKeown testified that Beckworth was not mentally retarded. He testified that, in light of Beckworth's employment history, his education at the technical college, and his ability to secure a bank account, a GED, and a commercial driver's license, he determined that Beckworth was not retarded. Beckworth functioned at least within the borderline range of intelligence.

Dr. McKeown stated that the Stanford–Binet test, the second intelligence test one of Dr. D'Errico's assistants had administered to Beckworth, was not as good as the Wechsler test in measuring a person's overall ability because the Stanford–Binet test had a tendency to suppress the scores of people with less educational experience and weaker verbal skills. Dr. McKeown testified that a scoring error had been made on one of the subtests of the Wechsler test, and that the error elevated Beckworth's IQ score by "a couple of points." The corrected score on the Wechsler IQ test was 73.

On rebuttal, the defense presented the testimony of Carol Gobbel, Beckworth's former wife. She testified that she had been married to Beckworth for four years, and she described him as "very caring, very attentive." Gobbel testified that she and Beckworth had a daughter and that Beckworth was a loving father who helped take care of his child. Gobbel said that she and Beckworth attempted to adopt two of his young nephews so they would not have to live in foster care. Even after Gobbel and Beckworth divorced and Gobbel remarried, she saw Beckworth nearly every day because he continued to visit their daughter. Gobbel testified as to Beckworth's work history, his education at the technical college, and his life skills, including his ability to read and write and to distinguish between right and wrong.

After the attorneys presented their closing arguments to the jury, the court charged the jury and presented jurors with two verdict forms. The first form required the jury to provide a recommendation as to the sentence Beckworth should receive. The second form required the jurors to state

> whether Beckworth was mentally retarded. The court specifically charged the jury on the definition of mental retardation from the American Association of Mental Retardation.

*Beckworth*, 946 So. 2d at 498–500 (record citations omitted). After summarizing the evidence that was presented, the ACCA affirmed the trial court's rejection of Beckworth's *Atkins* claim, stating as follows:

> Beckworth first argues that the trial court erred when it found that he was not mentally retarded. He appears to argue that the court should have accepted the opinion of the defense expert, who determined that Beckworth was mentally retarded.
>
> In *Atkins v. Virginia*, the United States Supreme Court held:
>
> > "We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our 'evolving standards of decency,' we therefore conclude that such punishment is excessive and that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender."
>
> *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).
>
> As Alabama's appellate courts have reviewed cases in which capital defendants have argued that they are mentally retarded, certain standards have been consistently applied:
>
> > "The Court [in *Atkins* ] did not define a legal standard for mental retardation, but left the definition of the term and the enforcement of the newly announced rule to the states. The Alabama Legislature has yet to enact a statute to address the holding in *Atkins*. The only Alabama statute that provides assistance in making this determination is § 15–24–2(3), Ala.Code 1975, which defines a 'mentally retarded person' as '[a] person with significant subaverage general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested during the

developmental period, as measured by appropriate standardized testing instruments.'

"The Alabama Supreme Court in *Ex parte Perkins*, 851 So.2d 453 (Ala.2002), in determining whether the appellant was mentally retarded and therefore not subject to execution, applied the broadest definition of mental retardation recognized in those states that prohibit the execution of the mentally retarded. The Court stated:

> " 'Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).' "

*Yeomans v. State*, 898 So.2d 878, 901 (Ala.Crim.App.2004). *See also Ex parte Smith*, [Ms. 1010267, March 14, 2003] —— So.2d ——, —— (Ala.2003)("Because the Legislature has not had an occasion to address this State's policy regarding mentally retarded capital defendants and establish a procedure for determining whether a capital defendant is mentally retarded and therefore not subject to the death penalty, we have conducted our review in light of the most liberal definitions considered by the United States Supreme Court in reaching its holding in *Atkins* and as defined by statutes in those states that prohibit the imposition of the death sentence on a mentally retarded defendant." (Footnote omitted.))

The trial court in this case applied the factors set forth in *Ex parte Perkins* and determined that Beckworth was not mentally retarded.[FN]6 The evidence fully supports the trial court's determination.

[FN]6 Before trial, defense counsel argued that *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), required the jury to determine whether Beckworth was mentally retarded. (8/15/02 hearing, R. 15–19.) During the trial, the learned trial judge noted that he was bound by *Atkins*, even though he had no procedure to guide him in

> determining whether Beckworth was mentally retarded. The judge informed the parties that he was considering giving the jury a special interrogatory during the penalty-phase deliberations so the jurors could indicate whether they believed Beckworth was mentally retarded. The judge further stated that he intended to define mental retardation for the jury by reading the definition from the American Association for Mental Retardation (AAMR). (R. 660–62.) The AAMR definition of mental retardation was quoted by the United States Supreme Court in *Atkins*. The judge stated that he thought it was the safest course of action to take, and the parties agreed. We note that nothing in Alabama or federal law requires that this procedure be followed, but we note that the able trial court acted out of an abundance of caution while attempting to comply with the dictates of a newly announced rule of law. The jury determined that Beckworth was not mentally retarded. (C. 967.)
>
> . . . .
>
> Applying the standards discussed in *Ex parte Perkins*, 851 So.2d 453 (Ala.2002), and its progeny, we do not hesitate to uphold the trial court's determination that Beckworth was not mentally retarded. First, we note that no testimony was presented to establish that any of Beckworth's alleged deficits manifested themselves before Beckworth was 18 years old. Second, as set forth in the trial court's order and in this Court's detailed recitation of the testimony presented at the sentencing hearing, Beckworth did not suffer from significant deficits in adaptive behavior. The testimony established that Beckworth had a consistent employment history at jobs requiring a variety of skills and technical training; that he had acquired a commercial driver's license; that he had attended a technical college where he earned A's and B's; and that he had supported his immediate family and, occasionally, some of his relatives and had even considered adopting his niece's two young twins because the boys had been placed in foster care. The trial court's determination that Beckworth did not suffer substantial deficits in adaptive functioning is fully supported by the record.
>
> Finally, although Beckworth's score on one of the intelligence tests given by the defense expert indicated that Beckworth's IQ was below 70, the other test administered by the defense expert, the one which the State's expert testified was a more reliable indicator of Beckworth's intelligence, indicated that Beckworth's IQ was 73. Because Beckworth did not suffer from a significant deficit in adaptive behavior; because there was no evidence that

> any of the alleged deficits manifested themselves before Beckworth was 18 years old; and because there was evidence that supported a determination that Beckworth did not demonstrate significantly subaverage general intellectual functioning, we can determine that Beckworth, even under the broadest definition of mental retardation, is not mentally retarded. *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); *Ex parte Perkins*, 851 So.2d 453 (Ala.2002).
>
> Based on the foregoing, we are convinced that the trial court did not err when it determined that Beckworth is not mentally retarded.

*Beckworth*, 946 So. 2d at 508–10.

Beckworth challenged the ACCA's denial of this claim again in his petition for certiorari in the Alabama Supreme Court, (doc. 7-17 at 27–54), but the Alabama Supreme Court denied the petition, *Beckworth*, 946 So. 2d at 490, which concluded Beckworth's pursuit of this claim in the state courts.

Under 28 U.S.C. § 2254(d), in order to obtain relief on this claim, Beckworth must demonstrate that the decision of the ACCA, which was the last reasoned state court decision, *see Wilson*, 584 U.S. at 125,[10] was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d). Beckworth argues that, for numerous reasons, the ACCA's decision was both contrary to and an unreasonable application of *Atkins* and that it was based upon an unreasonable determination of the facts in the record. Since Beckworth quarrels with the ACCA's conclusions as to each of the three elements of the established

[10] Because the Alabama Supreme Court denied Beckworth's petition for certiorari without explanation, the last related state court decision that does provide reasoning is the ACCA's decision, and that is the decision this Court reviews under 28 U.S.C. § 2254(d). *Wilson*, 584 U.S. at 125.

test for intellectual disability—significantly subaverage intellectual functioning, significant limitations in adaptive skills, and manifestation before the age of eighteen—the Court will address each of Beckworth's arguments by categorizing them under the appropriate element of the test.

***significantly subaverage intellectual functioning***

Beckworth first argues that the ACCA's decision was contrary to and an unreasonable application of *Atkins* because the ACCA found that he did not demonstrate "significantly subaverage intellectual functioning," which the ACCA framed as "an IQ of 70 or below." *See Beckworth*, 946 So. 2d at 509 (quoting *Yeomans v. State*, 898 So. 2d 878, 901 (Ala. Crim. App. 2004)). Beckworth fails to show that the ACCA's decision was unreasonable. In determining that Beckworth did not score a 70 or below on a reliable IQ test, the ACCA reasoned: "[A]lthough Beckworth's score on one of the intelligence tests given by the defense expert indicated that Beckworth's IQ was below 70, the other test administered by the defense expert, the one which the State's expert testified was a more reliable indicator of Beckworth's intelligence, indicated that Beckworth's IQ was 73." *Id.* at 510. Although Beckworth emphasizes that he scored a 67 on one of the tests that Dr. D'Errico administered to him during their evaluation—the Stanford-Binet Intelligence Scale, Fourth Edition ("Stanford-Binet")—the State's expert, Dr. McKeown, testified at the penalty phase that the Stanford-Binet test was not as good as the Wechsler Adult Intelligence Scale, Third Edition ("WAIS") in measuring overall intellectual ability. (Doc. 7-13 at 73). Dr. McKeown explained that the Stanford-Binet was a good tool to measure talented and gifted students in the school setting, but because it was a more verbal test than

the WAIS, individuals who had more limited educational experiences or who were not as verbal had a tendency to score lower on the Stanford-Binet than they would on other tests. (*Id.*). Dr. McKeown further explained that the Stanford-Binet would not be as good as the WAIS at measuring an individual's overall intellectual ability because the Stanford-Binet focused on "how well a person is able to articulate and put into words what they know, whereas the [WAIS] ha[s] a performance part, which measures not only what you can say, but what you can do, what you can interpret about your environment and how you use those skills." (*Id.*). Considering this testimony, as well as the fact that Dr. D'Errico's credibility was undermined in various ways on cross-examination, it was not unreasonable for the ACCA to discount the lower Stanford-Binet score and credit the higher WAIS score, in light of the testimony that the Stanford-Binet was less reliable and that the WAIS was a more reliable tool to test overall intellectual functioning.

Beckworth focuses his argument regarding this element of the test for intellectual disability on criticizing the ACCA for employing a strict IQ score "cutoff" and contends that his higher IQ score of 73 was still below 70 if one takes in account the standard error of measurement of plus or minus 5 points. In support, Beckworth relies on a Supreme Court case that was decided years after the denial of his *Atkins* claim: *Hall v. Florida*, 572 U.S. 701 (2014). In *Hall*, the Supreme Court considered a Florida law which defined intellectual disability to "require an IQ score of 70 or less" and provided that if test scores showed that an individual had an IQ above 70, "all further exploration of intellectual disability is foreclosed." *Id.* at 704. The Supreme Court held that Florida's rule disregarded established medical practice, which recognized that each IQ test has a "standard error of

measurement," generally of plus or minus 5 points. *Id.* at 713. The Court struck down Florida's law as unconstitutional and held that "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." *Id.* at 723.

However, the Eleventh Circuit has rejected the same argument based on *Hall* that Beckworth raises here. In *Clemons v. Commissioner, Alabama Department of Corrections*, the Eleventh Circuit explained why, where the state court's decision predates *Hall*, a federal habeas petitioner cannot rely on *Hall* to invalidate the state court's conclusion that he failed to satisfy the intellectual functioning prong of *Atkins* when his IQ scores were above 70, reasoning as follows:

> At the time the state court denied Clemons's petition, no clearly established federal law prohibited state courts from using a bright-line cutoff for IQ scores above 70. IQ scores at 70 and below indicate intellectual disability, while typically those above 70 do not. The state court tellingly cited Alabama precedent which, at the time, explained that a full-scale score of 72 "seriously undermines any conclusion that [a petitioner] suffers from significantly subaverage intellectual functioning as contemplated under even the broadest definitions." Ex parte Smith, 213 So. 3d 214, 225 (Ala. 2003).
>
> Years after Alabama's denial of Clemons's Atkins claim, however, the Supreme Court decided Hall v. Florida, 572 U.S. 701, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014). There, the Court held for the first time that "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error [+/- 5], the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." Id. at 723, 134 S. Ct. 1986; see also Kilgore, 805 F.3d at 1308. "Hall explained that a state's assessment of a defendant's intellectual disability should focus on whether he has evidenced, beginning 'during the developmental period,' both (1) 'significantly subaverage intellectual functioning,' and (2) 'deficits in adaptive functioning (the ability to learn basic skills and adjust behavior to changing circumstances).'" Kilgore, 805

> F.3d at 1308 (quoting Hall, 572 U.S. at 710, 134 S. Ct. 1986). Because these criteria are "interrelated" and no "single factor [is] dispositive," "an individual with an IQ test score between 70 and 75 or lower may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning." Hall, 572 U.S. at 722–23, 134 S.Ct. 1986 (quotation omitted). However, we subsequently held that Hall's procedural constitutional rule was not retroactive. See Kilgore, 805 F.3d at 1314, cert. denied, —— U.S. ——, 138 S.Ct. 446, 199 L.Ed.2d 329 (2017) (mem.); *In re Henry*, 757 F.3d 1151, 1161 (11th Cir. 2014).
>
> Clemons relies heavily on Hall because the scores he argues are valid and should be considered—73 in 2000, 75 in 2001 (adjusted down to credit Clemons's claim that Dr. King made a scoring error that produced the score of 77), 66 in 2003, and 67 in 2004—average to 70. After Hall, this would place Clemons in the standard error range of 70 to 75, and the intelligence prong would not be dispositive on its own, but rather must be considered in conjunction with adaptive functioning. But we have already held that before Hall was decided "[n]othing in Atkins suggested that a bright-line IQ cutoff of 70 ran afoul of the prohibition on executing the intellectually disabled." Kilgore, 805 F.3d at 1312. And thus, before Hall, a state court could conclude that a petitioner failed to satisfy the intellectual functioning prong of Atkins when his scores were above 70 but below 75.

967 F.3d 1231, 1248–49 (11th Cir. 2020).

Identical reasoning applies here. The ACCA denied Beckworth's *Atkins* claim in 2005, which was before *Hall* was decided, so Beckworth cannot establish that the decision was contrary to or an unreasonable application of *Hall*'s directive to take the standard error of measurement into account—because *Hall* was not yet clearly established federal law. *See Yarborough*, 541 U.S. at 660–61 (holding that a legal principle is clearly established if it was found in the holdings of a Supreme Court decision that existed at the time of the state court decision). As in *Clemons*, when the ACCA considered Beckworth's *Atkins* claim in 2005, the ACCA applied *Atkins*' holding, as interpreted by the Alabama Supreme Court in *Perkins*, 851 So. 2d at 456. As explained above, although *Atkins* forbade the

execution of intellectually disabled persons, it did not dictate a national standard for determining whether a criminal defendant is intellectually disabled, instead leaving "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." 536 U.S. at 317 (alterations in original) (citation omitted). Critically, *Atkins* did not hold that "a bright-line IQ cutoff of 70 ran afoul of the prohibition on executing the intellectually disabled." *Clemons*, 967 F.3d at 1249 (quoting *Kilgore*, 805 F.3d at 1312). Moreover, the Alabama Supreme Court held in *Perkins* that a defendant must have "an IQ of 70 or below" to meet the "significantly subaverage intellectual functioning" prong. *Perkins*, 851 So. 2d at 456. Thus, the ACCA's determination that Beckworth failed to satisfy *Atkins*' "significantly subaverage intellectual functioning" prong was neither contrary to, nor an unreasonable application of, any holding of the United States Supreme Court that existed in 2005.

In any event, the record supports the conclusion that the ACCA *did* consider the standard error of measurement in Beckworth's case. The ACCA observed that Dr. D'Errico testified that Beckworth's true intelligence quotient on the WAIS test was in the range from 66 to 76 because the test had a "confidence limit" of plus or minus 5 points. *Beckworth*, 946 So. 2d at 499. Indeed, Dr. D'Errico testified about the standard error of measurement at length during the penalty phase of Beckworth's trial. (Doc. 7-13 at 12–14). The ACCA also noted that Beckworth's score on the Stanford-Binet test would be in the range from 64 to 70. *Beckworth*, 946 So. 2d at 499. Moreover, notwithstanding Beckworth's IQ scores, the ACCA *did* consider whether Beckworth met the other elements of the test for intellectual disability—significant limitations in adaptive skills and

manifestation before the age of eighteen. *Id.* at 510. So, even if *Hall* were clearly established law when the ACCA decided this claim—which it was not—the ACCA did not contravene *Hall*'s holding because the ACCA did not end its inquiry after finding that Beckworth scored above 70 on an IQ test.

In sum, Beckworth has not established that the ACCA's conclusion that he did not suffer from significantly subaverage intellectual functioning was contrary to or an unreasonable application of clearly established federal law or based upon an unreasonable application of the facts in the state court record. 28 U.S.C. § 2254(d).

***significant limitations in adaptive skills***

Second, Beckworth argues that the ACCA's conclusion that he did not suffer from significant limitations in adaptive skills was based on an unreasonable determination of the facts that were before the state courts, pursuant to 28 U.S.C. § 2254(d)(2). In support of that conclusion, the ACCA cited the following evidence:

> The testimony established that Beckworth had a consistent employment history at jobs requiring a variety of skills and technical training; that he had acquired a commercial driver's license; that he had attended a technical college where he earned A's and B's; and that he had supported his immediate family and, occasionally, some of his relatives and had even considered adopting his niece's two young twins because the boys had been placed in foster care.

*Beckworth*, 946 So. 2d at 510. Beckworth argues that the ACCA erroneously focused only on his strengths while ignoring the evidence of his adaptive functioning deficits that was presented at the penalty phase of his trial.

As an initial matter, *Atkins* did not bar courts from considering an individual's strengths as part of the consideration as to whether that individual suffered from significant

deficits in adaptive functioning. On the contrary, *Atkins* directed the States to define the elements of intellectual disability and merely recognized the clinical definitions commonly utilized at the time. 536 U.S. at 317–18. And in *Perkins*, the first intellectual disability case decided by the Alabama Supreme Court after *Atkins*, the Alabama Supreme Court expressly considered evidence of the defendant's strengths when it determined that the defendant did not suffer from significant adaptive functioning deficits. *See* 851 So. 2d at 456. In *Perkins*, the Alabama Supreme Court noted that the defendant had interpersonal relationships, was married for ten years, and maintained a job as an electrician for a short period. *Id.* Therefore, the ACCA did not contravene or unreasonably apply clearly established federal law in Beckworth's case when it considered evidence of Beckworth's strengths in concluding that he did not suffer from significant limitations in adaptive skills.

In support of his contention that the ACCA was required to focus on his adaptive limitations rather than his strengths, Beckworth again relies on a Supreme Court case that was decided years after the denial of his *Atkins* claim: *Moore v. Texas*, 581 U.S. 1 (2017). In *Moore*, the Supreme Court reversed the denial of an *Atkins* claim, concluding that the state appellate court "overemphasized [the petitioner's] perceived adaptive strengths," despite the medical community's focus on "adaptive *deficits*." *Id.* at 15 (emphasis in original). However, in *Clemons*, the Eleventh Circuit rejected the same argument made by federal habeas petitioner for similar reasons it rejected an argument based on *Hall*, explaining as follows:

> Clemons relies on Moore[], a Supreme Court case that long post-dates the state court's rejection of his *Atkins* claim and thus could not have been "clearly established" at the time the state courts decided this matter.

> Moreover, the Supreme Court heard Moore on direct review, rather than on collateral review, where the AEDPA requires substantial deference to the state courts' decisions. And, in a more recent decision—Shoop v. Hill, [586] U.S. [45], 139 S.Ct. 504, 202 L.Ed.2d 461 (2019) (per curiam)—the Supreme Court, this time on collateral review, rejected the argument that a pre-Moore state court decision unreasonably applied Atkins by focusing on adaptive strengths over adaptive deficits. The Court reasoned that because "Atkins did not definitively resolve how [the adaptive functioning prong] was to be evaluated but instead left its application in the first instance to the States," it was not an unreasonable application of Atkins to focus on adaptive strengths. Id. at 508. While that approach today would be contrary to clearly established federal law—that is, contrary to Moore v. Texas—it was neither contrary to nor an unreasonable application of clearly established Supreme Court law when the state court denied Clemons's petition.

967 F.3d at 1250. As recognized in *Clemons*, the United States Supreme Court's subsequent holding in *Shoop* forecloses Beckworth's ability to use *Moore* to invalidate the ACCA's decision. The ACCA denied Beckworth's *Atkins* claim in 2005, which was before *Moore* was decided, so Beckworth cannot establish that the ACCA's decision was contrary to or an unreasonable application of *Moore*'s directive to focus on an individual's adaptive deficits rather than strengths. *See Yarborough*, 541 U.S. at 660–61. As was the case in *Clemons*, in 2005 when the ACCA considered Beckworth's *Atkins* claim, the ACCA applied *Atkins*' holding, as interpreted by the Alabama Supreme Court in *Perkins*, 851 So. 2d at 456. As the *Shoop* Court explained, *Atkins* did not hold that it was impermissible to focus on adaptive strengths when evaluating intellectual disability. *Shoop*, 586 U.S. at 50. Further, in *Perkins*, the Alabama Supreme Court had considered a defendant's strengths in concluding that he did not meet the "significant limitations in adaptive functioning" prong. 851 So. 2d at 456. Therefore, the ACCA's decision that Beckworth failed to satisfy the "significant limitations in adaptive skills" element of the test because he exhibited adaptive

strengths was neither contrary to, nor an unreasonable application of, any holding of the United States Supreme Court that existed in 2005.[11]

Beckworth also argues that some of his perceived strengths upon which the state courts relied were not supported by the record. First, Beckworth claims that the ACCA's reliance on his "consistent" work history as proof of normal intellectual ability was unreasonable because his ex-wife, Carol Gobbel, testified at the penalty phase that he had difficulty maintaining employment. Beckworth points to the following exchange between his counsel and Gobbel:

> Q. Did he work while you were married?
>
> A. He did work. He had a lot of bouts of unemployment, but he did—when we were first together, he started out good, because he would work—you know, he worked at one job for over a year. And then, he left there and went to another job for over a year. But, then, after that, it was kind of—it started slimming down.
>
> Q. All right. Where did he work—those particular places that he worked?
>
> A. He's worked for Tabor Pest Control. He's worked at Houston Paper Company. He's done farming. . . .

(Doc. 7-13 at 110–11). Beckworth also emphasizes that he only worked for Tabor Pest Control and the Houston Paper Company for approximately one year each. (*Id.* at 62, 67).

[11] Beckworth's attempt to demonstrate that the ACCA should have known in 2005 that it was required to focus on his deficits and not his strengths fails. In support, Beckworth cites a footnote from an article published in 2003 in the American Bar Association's *Mental and Physical Disability Law Reporter*. (Doc. 1 at para. 47; doc. 44 at 10 & n.23). The footnote states that "the presence of confirming deficits must be the diagnostician's focus." (*Id.* (quoting James W. Ellis, *Mental Retardation and the Death Penalty: A Guide to State Legislative Issues*, 27 Mental & Physical Disability L. Rep. 11, 13 n.29 (2003)). However, this guidance was not clearly established federal law as determined by the Supreme Court at the time of the ACCA's decision.

However, even if the word "consistent" was not the best adjective to describe Beckworth's employment record, it was not objectively unreasonable that the ACCA relied upon the *type* of work that Beckworth performed as evidence that he did not suffer from deficits in adaptive behavior. Mr. Valley, one of Beckworth's former employers, recalled that when Beckworth worked for him at the Houston Paper Company, he was a repairman on janitorial equipment; he had to troubleshoot electrical and mechanical problems with floor scrubbers or buffers; he obtained a Commercial Driver's License ("CDL") so that he could apply to drive the company's trucks; he received a promotion while he was there so that he could deal directly with customers; and he routinely had to complete paperwork and submit it to the office. (*Id.* at 62–66). Mr. Tabor stated that when Beckworth worked for him at Tabor Pest Control, he treated homes for termites, a job that included having to mix chemicals and deal directly with customers and their homes. (*Id.* at 67–70). Consequently, Beckworth fails to show that the ACCA's decision was unreasonable on this basis.

Second, Beckworth argues that the trial court's reliance in its sentencing order on the fact that he "represented to others that he had a GED," (doc. 7-14 at 59), as evidence that he did not suffer from significant limitations in adaptive skills was based on an unreasonable determination of the facts in the record. Beckworth asserts that he did not obtain a GED, and the fact that he told others that he had a GED when in fact he did not actually bolsters his claim of intellectual disability because, as Dr. D'Errico explained, persons with intellectual disabilities often attempt to convince others that they are "normal." (*Id.* at 61). Regardless of whether such evidence weighed in favor or against a finding of intellectual disability, the ACCA did not rely upon the GED to discredit

Beckworth's claim of intellectual disability. The ACCA merely quoted the trial court's sentencing order and also mentioned the conflicting evidence about whether Beckworth obtained a GED. *Beckworth*, 946 So. 2d at 499–500, 530. Therefore, the ACCA's decision was not based on an unreasonable determination of the facts on this basis.

Additionally, Beckworth points to three pieces of evidence on which he claims the ACCA should have focused to find that he suffered from significant limitations in adaptive skills: (1) Dr. D'Errico's testimony that on the Wide Range Achievement Test, Beckworth performed at a fifth-grade level in arithmetic and spelling, even though he was then thirty-four years old, (doc. 7-13 at 17); (2) Dr. D'Errico's testimony that records from a juvenile correctional facility indicated that Beckworth performed at a fourth-grade academic level when he was seventeen years old, (*id.* at 24–25); and (3) Dr. McKeown's testimony that Beckworth could not interpret what certain sayings meant, such as "strike while the iron is hot" and "the squeaky wheel gets the grease," (*id.* at 86). In *Atkins*, the Supreme Court recognized that significant limitations in adaptive skills usually meant deficits in two or more areas such as communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. 536 U.S. at 308 n.3. Although Beckworth identifies these three pieces of evidence to argue that he has deficits in the areas of language and functional academics, he has not directed this Court to evidence of deficits in any other areas. For a state court's decision to be unreasonable under § 2254(d), the decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Upon review of all of the testimony at the

sentencing hearing, this Court is not persuaded that the ACCA's conclusion that Beckworth did not suffer from significant limitations in adaptive skills was based on an unreasonable determination of the facts before the state courts. *See* 28 U.S.C. § 2254(d)(2).

***manifestation before the age of eighteen***

Third, Beckworth argues that the ACCA's determination that "no testimony was presented to establish that any of [his] alleged deficits manifested themselves before [he] was 18 years old," *Beckworth*, 946 So. 2d at 510, was based on an unreasonable determination of the facts. Beckworth directs the Court to Dr. D'Errico's testimony that he reached the opinion that Beckworth had deficits manifesting before age eighteen based upon "a document [he] was able to review, which appeared to be from some correctional setting, possibly from the Department of Youth Services of Alabama, when Mr. Beckworth was 18, his functional academic skills at that age, which was 17, revealed that he was functioning at the fourth-grade level." (Doc. 7-13 at 24–25). As stated previously, the trial court was entitled to weigh the credibility of each expert at sentencing, and "[t]he credibility of a witness is a question of fact entitled to a presumption of correctness under AEDPA." *Jenkins v. Comm'r, Ala. Dep't of Corr.*, 963 F.3d 1248, 1272 (11th Cir. 2020). And absent "clear and convincing evidence," this Court has "no power on federal habeas review to revisit the state court's credibility determinations." *Id.* (quoting *Bishop v. Warden*, 726 F.3d 1243, 1259 (11th Cir. 2013)). Although the record contains this reference to documentation of Beckworth's academic limitations at either age seventeen or age eighteen, the fact remains that there were no IQ scores in the record from before Beckworth turned eighteen, and there was no testimony that Beckworth had any other

significant deficits in his adaptive functioning before he turned eighteen. The state courts' determination of the facts is unreasonable "only if no 'fairminded jurist' could agree with [it]." *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1192 (11th Cir. 2013) (quoting *Holsey v. Warden, Ga. Diagnostic Prison,* 694 F.3d 1230, 1257 (11th Cir. 2012)). Applying this standard, Beckworth has not shown that the ACCA's decision that he had not established this element of the claim was based on an unreasonable determination of the facts before it. Even if it was, this was just one element of the *Atkins* test, all three of which must be established to succeed on an *Atkins* claim—and on AEDPA review, Beckworth fails to satisfy the first two elements, for the reasons discussed above.

Nor does Beckworth's reliance upon another Supreme Court case that was decided years after the denial of his *Atkins* claim change this result. For the first time in his reply brief, Beckworth cites *Brumfield v. Cain*, 576 U.S. 305 (2015), in which the Supreme Court held that the petitioner presented sufficient evidence, even without an IQ score predating age eighteen, to support a finding of intellectual disability before the age of eighteen. *Id.* at 323. However, like *Hall* and *Moore*, discussed *supra*, *Brumfield* postdates the ACCA's denial of Beckworth's *Atkins* claim and thus cannot serve as clearly established federal law for purposes of § 2254(d) review. And *Brumfield* is distinguishable in any event. The procedural posture of *Brumfield* is sufficiently different from Beckworth's case to reject its application. Because Brumfield had been sentenced to death in a Louisiana state court before *Atkins* was decided, he raised a postconviction *Atkins* claim, seeking to invalidate his death sentence based on intellectual disability, but the state postconviction court denied his request for an evidentiary hearing. *Id.* at 308–10. The Supreme Court noted that in

seeking an evidentiary hearing, Brumfield "was not obligated to show that he was intellectually disabled, or even that he would likely be able to prove as much. Rather, Brumfield needed only raise a 'reasonable doubt' as to his intellectual disability to be entitled to an evidentiary hearing" in the state postconviction court. *Id.* at 320. The Supreme Court held that Brumfield raised the requisite reasonable doubt as to the manifestation of intellectual disability before the age of eighteen based in part on two doctors testifying "at length about Brumfield's intellectual shortcomings as a child and their possible connection to his low birth weight." *Id.* at 323. *Brumfield* is distinguishable not only because the petitioner had a lesser burden in establishing his claim than Beckworth did at his trial but also because the evidence in support of the manifestation before age eighteen element was more vigorous than that presented here.

***

Although not pled in his petition, Beckworth argues in his merits brief that he was denied due process of law by the trial court's decision to set aside the issue of his intellectual disability until sentencing rather than rule on it before trial. (Doc. 42 at 9). However, Beckworth may not amend his petition by presenting a new or different claim in his briefing. Regardless, nothing in *Atkins* forbade the trial court from utilizing the procedure that it did in 2002. Additionally, the Alabama Supreme Court's decision in *Smith v. State*, 213 So. 3d 239 (Ala. 2007), in which it encouraged intellectual disability claims to be considered and ruled on by the trial judge before trial, post-dated Beckworth's trial. And the ACCA noted that the trial court, in having the jury determine whether Beckworth was intellectually disabled, "acted out of an abundance of caution while

attempting to comply with the dictates of a newly announced rule of law." *Beckworth*, 946 So. 2d at 509 n.6. For these reasons, the Court finds Beckworth's argument unavailing.

***

At trial and on direct appeal, Beckworth attempted to convince the state courts that he was intellectually disabled, but he was unsuccessful. He faces a substantially higher burden here: convincing this Court that the ACCA's denial of his *Atkins* claim was "so lacking in justification that there was an error well understood and comprehended *in existing law* beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103 (emphasis added). Beckworth has not met that burden. Although the Supreme Court's *Atkins* jurisprudence has evolved over the past twenty years, *Atkins* itself was still in its infancy at the time of Beckworth's trial and still relatively new at the time of the ACCA's affirming decision. On this record, the Court is hard pressed to conclude that the ACCA's decision was objectively unreasonable. Consequently, Beckworth is due no relief on this claim under AEDPA.

### B. Beckworth's Claim that the Trial Court Should Have Suppressed the Statements He Made to Police Because They Were Obtained Unlawfully (Doc. 1 at 24–31, paras. 70–87)

To protect the privilege against self-incrimination guaranteed by the Fifth Amendment, the Supreme Court has held that police must terminate interrogation of an accused in custody if the accused requests the assistance of counsel or requests to remain silent. *Miranda*, 384 U.S. at 473–74. The Supreme Court reinforced the protections of *Miranda* in *Edwards v. Arizona*, 451 U.S. 477 (1981), which held that once the accused requests counsel, officials may not reinitiate questioning "until counsel has been made

available" to him. *Id.* at 484–85. *Miranda* also holds that "[t]he defendant may waive effectuation" of the rights to remain silent and to counsel "provided the waiver is made voluntarily, knowingly and intelligently." 384 U.S. at 444. In *Moran v. Burbine*, the Supreme Court explained that the waiver has "two distinct dimensions," as follows:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

475 U.S. 412, 421 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

Beckworth's second claim is that the trial court erred in denying his motion to suppress the tape-recorded statements that he gave to law enforcement officers in the airport in Phoenix, Arizona, while he was awaiting extradition to Alabama. In those statements, Beckworth admitted that he and Walker stole a .22 caliber rifle and broke into Ms. Thweatt's home, and that Walker shot and killed her while Beckworth was present. Beckworth argues that the trial court should have suppressed the statements because, although he waived his right to remain silent and his right to counsel, that waiver was not made voluntarily, knowingly, and intelligently. In support, Beckworth contends that he did not validly waive his rights for three separate reasons (although he does not create separate subclaims for them): (1) he requested an attorney three times, (doc. 1 at 25–27, paras. 72, 75–76); (2) he is intellectually disabled, so he was incapable of voluntarily, knowingly, and intelligently waiving his rights, (*id.* at 27–31, paras. 78–86); and (3) "the

two-stage interrogation employed in this case—(pre-*Miranda* unrecorded discussions, followed by post-*Miranda* recorded questioning)—has been explicitly rejected by the Supreme Court," (*id.* at 27, para. 77 (citing *Missouri v. Seibert*, 542 U.S. 600 (2004))).

The standard under which this Court must review each of these three allegations differs. Regarding Beckworth's alleged requests for an attorney, the Respondent contends that the ACCA addressed this claim on the merits, and so its decision is subject to a reasonableness review by this Court under 28 U.S.C. § 2254(d). However, as explained further below, a careful review of the record reveals that this allegation is procedurally defaulted from review by this Court because Beckworth did not raise it in his petition for a writ of certiorari in the Alabama Supreme Court on direct appeal. Beckworth exhausted the second allegation pertaining to his alleged intellectual disability at trial and on direct appeal, and the state courts denied it on the merits, so this Court's review of that allegation is subject to the confines of 28 U.S.C. § 2254(d). Regarding the "two-stage interrogation" that has been rejected by the Supreme Court in *Seibert*, *supra*, the Respondent argues that this particular allegation is procedurally defaulted from review by this Court because Beckworth never raised it before the state courts, and the Court agrees.

Before addressing each of Beckworth's arguments and the Respondent's responses thereto, the Court begins with a review of Beckworth's pursuit of (some portions of) this claim in state court. On November 13, 2001, Beckworth's trial counsel filed a motion to suppress his statements, arguing that the statements were involuntary and not the product of a knowing and intelligent decision to forego the right to remain silent or the right to

counsel. (Doc. 7-2 at 164–66). The trial court held a hearing on the motion on January 8, 2002. (Doc. 7-8 at 58–108).

At the hearing, Lieutenant Donald Valenza ("Lt. Valenza"), the Houston County Sheriff's officer to whom Beckworth gave his statements, testified. (*Id.* at 62–87, 105–08). Lt. Valenza testified as follows: Together with Investigator Eric Sewell, he traveled to Phoenix, Arizona, to extradite Beckworth to Alabama. (*Id.* at 63–64). He picked up Beckworth at the Maricopa County Jail and then transported him to the airport. (*Id.* at 64). As they were waiting in a lounge area of the airport, he conducted two tape-recorded interviews with Beckworth. (*Id.* at 66–68). At the start of each recording, he explained the *Miranda* rights to Beckworth, and Beckworth "understood his rights and continued to talk." (*Id.* at 67–69). By the time of the evidentiary hearing, Investigator Sewell was deceased. (*Id.* at 108).

In a voir dire examination before the taped statements were admitted, Beckworth's counsel asked Lt. Valenza if Beckworth gave him any statements other than what was reflected in the tape-recordings, to which Lt. Valenza answered "no." (*Id.* at 77). The following exchange then occurred between Beckworth's counsel and Lt. Valenza:

> Q. [D]id you tell Mr. Beckworth anything about the facts of the case before the statement or statements that he gave in the lounge at the Pheonix International Airport?
>
> A. I told him—when I arrested him at the jail, we left—I told him why I was there; why I was bringing him back. I advised him, if he wanted to talk, we would talk later on. When I read him—when I got to the airport, when we went into the lounge, we started to talk. I told him there are two sides to every story. I have already spoken with James. James is in custody.

Q. That's the co-defendant, right?

A. That's the co-defendant. And when he decided he was going to talk to me, I advised him of his *Miranda* right, and we went into the statement one.

Q. Okay. Did you tell him, when you advised him—or at any time—before he gave the statement—and when I say "he," I'm talking about Beckworth—did you tell Mr. Beckworth what you already knew about the case, either from your investigation or from the statement that was given from the co-defendant? The co-defendant's statement was around June, wasn't it?

A. Somewhere around there.

Q. Somewhere around there. Before Mr. Beckworth gave his statements that are reflected on the tape and in the transcript, did you tell Mr. Beckworth anything about the facts of the case?

A. The best I can remember right now, I told him there was two sides to every story, and we had James in custody, and James was talking.

Q. And did you go further and articulate to him the specific facts that James was talking about?

A. I may have. I don't recall at this time.

(*Id.* at 78–79). Lt. Valenza also stated that Beckworth was always in the presence of a Houston County deputy. (*Id.* at 80).

Beckworth also testified. (*Id.* at 87–101). He stated that he asked to speak with an attorney three times: once to Lt. Valenza and Investigator Sewell at the Arizona jail, once to just Sewell at the airport, and once to both officers inside the airport lounge. (*Id.* at 88–89).

Over Beckworth's counsel's objection, both of Beckworth's recorded statements were played for the trial court during the hearing. (*Id.* at 104; *see also* doc. 7-1 at 38–41

(transcript of first statement); 42–51 (transcript of second statement)). Beckworth's counsel stated that he was objecting to the admission of the statements at both the suppression hearing and at trial for two reasons: (1) the State had not established that Beckworth had received a probable cause hearing in Arizona by the time he was extradited so he may have given his statements while he was not legally in custody, and (2) Beckworth asked for an attorney three times. (Doc. 7-8 at 102–04).

After the tapes were played, the trial court then asked Lt. Valenza additional questions, as follows:

> THE COURT: One other question. You heard Mr. Beckworth's testimony about asking you for an attorney and so forth. Did he ask you for an attorney on any of those occasions?
>
> MR. VALENZA: He never one time asked me for an attorney.
>
> THE COURT: Were you ever out of his presence for any length of time?
>
> MR. VALENZA: I was never out of his visual presence.
>
> THE COURT: Did you see any conversation going on between him and Sewell that might have indicated that he was asking for an attorney, or did he refer to anything about an attorney when you would come back or anything at all to indicate that?
>
> MR. VALENZA: No, sir, he did not.

(*Id.* at 106). Shortly after that exchange, Beckworth's counsel continued to press the same issue, as the following exchange between Hedeen and Lt. Valenza demonstrates:

> Q. Was there any time when you guys were at the airport that you went to make a phone call, and even though Beckworth would have been in your visual range—was there any time that you went to talk on the

phone or, you know, talk about the travel reservations or anything, that you may have been in Beckworth's visual range, but you could not hear if he had a conversation with Sewell?

A. Not in my opinion, no, not about this case.

Q. Okay. Let me rephrase the question, then. Was there any time that you were away from Beckworth, even though he could still see you or you could still see him, that he would have had an opportunity to talk to Sewell about anything—the Auburn offensive coordinator, this case—anything? Would he have had an opportunity to talk with him outside of your hearing?

A. He could have spoke[n] with him about other topics, but I don't see how he could have spoke[n] with him about this.

(*Id.* at 107–08). At the conclusion of the suppression hearing, the trial court orally denied Beckworth's motion to suppress. (*Id.* at 108).

After *Atkins* was decided but still prior to Beckworth's trial, Beckworth filed a motion to reconsider the denial of the motion to suppress based on "new evidence." (Doc. 7-4 at 195–97). While Beckworth did not expressly claim to be intellectually disabled in the motion, he pointed out that *Atkins* had just been decided, and the Supreme Court had noted that intellectually disabled persons are particularly susceptible to false confessions. (*Id.* at 195–96). The motion stated: "The introduction of a wrongfully obtained statement from a defendant, whether suffering from mental retardation o[r] not, compels the defendant to testify at his trial to explain away that evidence." (*Id.* at 196).

The trial court took up Beckworth's motion to reconsider at an August 15, 2002 motion hearing several weeks before trial. (Doc. 7-9 at 20–21). At that hearing, Beckworth's counsel briefly argued that Beckworth was intellectually disabled and thus susceptible to a false confession. (*Id.*). The court orally denied the motion to reconsider

without explanation. (*Id.* at 21). At Beckworth's trial, Lt. Valenza testified, and both tape-recorded statements were played for the jury, in which Beckworth admitted that he and Walker stole a .22 caliber rifle, broke into Ms. Thweatt's home, and that Walker shot and killed her while Beckworth was present. (Doc. 7-12 at 21–73; *id.* at 69).

Beckworth appealed the trial court's denial of his motion to suppress to the ACCA. (Doc. 7-15 at 97–103). He raised three arguments in his appellate brief as to why his statements should have been suppressed: (1) the State did not present evidence that he received a probable-cause hearing in Arizona and therefore his statements might have been made while he was not legally in custody; (2) Beckworth is intellectually disabled so his waiver was involuntary; and (3) Beckworth asked for an attorney three times. (*Id.* at 101, 103). The ACCA affirmed the trial court's ruling, stating as follows:

> Beckworth next argues that the trial court erred in denying his motion to suppress. Specifically, he alleges that the State failed to establish that he was legally taken into custody in Arizona before he gave his statement to the Alabama authorities, that he was mentally retarded, and that he was denied his right to counsel even though he had asked for an attorney during questioning.
>
> Confessions and inculpatory statements are inadmissible unless the State proves that the defendant was informed of his *Miranda* rights and that he or she waived them, and that the confession was voluntarily given. *E.g., Maxwell v. State,* 828 So.2d 347, 354 (Ala.Crim.App.2000). "Further, when determining whether a confession is voluntary, a court must consider the totality of the circumstances surrounding the confession. *Maples* [*v. State*, 758 So.2d 1, 41 (Ala.Crim.App.1999).]" *Id.*
>
>> "In reviewing a trial court's ruling on a motion to suppress, this Court reviews the trial court's findings of fact under an abuse-of-discretion standard of review. 'When evidence is presented *ore tenus* to the trial court, the court's findings of fact based on that evidence are presumed to be correct,' *Ex parte Perkins,* 646 So.2d 46, 47 (Ala.1994); '[w]e

> indulge a presumption that the trial court properly ruled on the weight and probative force of the evidence,' *Bradley v. State,* 494 So.2d 750, 761 (Ala.Crim.App.1985), *aff'd*, 494 So.2d 772 (Ala.1986); and we make '"all the reasonable inferences and credibility choices supportive of the decision of the trial court."' *Kennedy v. State,* 640 So.2d 22, 26 (Ala.Crim.App.1993), quoting *Bradley,* 494 So. 2d at 761. '[A]ny conflicts in the testimony or credibility of witnesses during a suppression hearing is a matter for resolution by the trial court. . . . Absent a gross abuse of discretion, a trial court's resolution of [such] conflict[s] should not be reversed on appeal.' *Sheely v. State,* 629 So.2d 23, 29 (Ala.Crim.App.1993) (citations omitted). A trial court's ultimate legal conclusion on a motion to suppress based on a given set of facts is a question of law that is reviewed de novo on appeal. *See State v. Smith,* 785 So.2d 1169 (Ala.Crim.App. 2000)."

*State v. Hargett,* 935 So.2d 1200, 1203–04 (Ala.Crim.App.2005).

Beckworth filed a motion to suppress the inculpatory statements he gave to Alabama investigators on December 20, 2000, while he was in the Phoenix, Arizona, airport. (C. 366–67.) He alleged in the motion that he did not knowingly and intelligently waive his right to counsel before he gave the statements. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The trial court held a hearing on the motion and heard the testimony of the investigator who took the statements and the testimony of Beckworth himself. The trial court denied the motion. (1/8/02 hearing, R. 52.) Beckworth later filed a motion to reconsider the trial court's ruling. In that motion, Beckworth argued: "The introduction of a wrongly obtained statement from a defendant, whether suffering from mental retardation [or] not, compels the defendant to testify at his trial to explain away that evidence." (C. 797.) He argued that the risk of being compelled to testify is "exponentially greater" for defendants who are mentally retarded. (C. 798.) Although Beckworth did not allege in his motion that he is mentally retarded, he cited *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), in support of his motion to reconsider. At the hearing on the motion, Beckworth alleged that the statements should be suppressed because he is mentally retarded. The trial court denied the motion. (8/15/02 hearing, R. 58–59.) Beckworth's tape-recorded statements were admitted into evidence and played for the jury at trial. (R. 654–55.)

At the hearing on the motion to suppress, Lt. Donald Valenza of the Houston County Sheriff's Department testified. (8/15/02 hearing, R. 6–24.) Lt. Valenza stated that he and Investigator Eric Sewell[FN]11 traveled to Arizona on December 19, 2000, to extradite Beckworth to Alabama. He stated that Beckworth had been arrested on December 17, 2000. Lt. Valenza testified that, on December 20, 2000, when he and Sewell took custody of Beckworth, Beckworth did not appear to be under the influence of drugs or alcohol. While Beckworth and the investigators were in a lounge-restaurant area at the Phoenix airport, Lt. Valenza advised Beckworth of his *Miranda* rights. Lt. Valenza said that Beckworth was not threatened, nor was he offered any inducement to make a statement. Beckworth said he understood his rights and he waived them; he gave two statements to the investigators and both statements were tape-recorded. The tape-recorded statements were played for the trial court.

[FN]11 Valenza testified that Sewell died before the case came to trial. (8/15/02 hearing, R.8.)

Beckworth testified on his behalf. (8/15/02 hearing, R. 31–44.) He stated that he informed the investigators three times that he wanted to speak to an attorney. He stated that, while he was still in the jail in Phoenix, he informed Lt. Valenza and Sewell that he wanted to speak to an attorney. Beckworth testified that, at the Phoenix airport, he told Sewell that he wanted to talk to an attorney; Lt. Valenza was not with them when he made this request, he said. Finally, Beckworth said that, while they were in the airport restaurant-lounge, he asked both investigators to be allowed to speak to an attorney.

On cross-examination, Beckworth acknowledged that he had seen the transcripts of the statements he gave to the investigators, and he further acknowledged that nowhere in the transcripts was there an indication that he had requested counsel. Beckworth stated that he was not under the influence of drugs or alcohol when he made the statements. He said he understood what Lt. Valenza said to him, and he was not threatened or induced to make the statements.

On redirect examination, Lt. Valenza testified that Beckworth never asked for an attorney. In response to questions from the court, Lt. Valenza testified that he was never out of sight of Beckworth and that he did not observe any conversation between Beckworth and Sewell that might have indicated that Beckworth was asking Sewell for an attorney.

After considering the testimony, the tape-recorded statements, and the arguments of counsel, the trial court denied the motion to suppress. (8/15/02 hearing, R. 52.) After reviewing the record as to this issue and listening to Beckworth's tape-recorded statements, we affirm the trial court's ruling on the motion.

The testimony at the suppression hearing and the tape recording of Beckworth's statements establish that Beckworth was informed repeatedly of his *Miranda* rights and that he waived those rights each time. Although the evidence as to whether Beckworth requested an attorney is conflicting, the trial court was in a better position to judge the credibility of the witnesses and to determine whether Beckworth had requested an attorney before or during questioning. We find no abuse of discretion in the trial court's resolution of that conflict in the evidence. By his own admission, Beckworth was not under the influence of drugs or alcohol and he was not coerced or threatened into making the statements. The trial judge's finding of voluntariness is fully supported by the evidence.

As to Beckworth's assertion that the trial court should have reconsidered the denial of the motion to suppress because Beckworth is mentally retarded, we disagree. First, as we held in Part II of this opinion, Beckworth is not mentally retarded. Second, even though Beckworth's IQ is below average, that factor alone would not render his confessions involuntary. We held in *Dobyne v. State,* 672 So.2d 1319, 1337 (Ala.Crim.App.1994), *aff'd,* 672 So.2d 1354 (Ala.1995), that a defendant's low IQ does not preclude a finding that a *Miranda* waiver was voluntary unless the defendant is so mentally impaired that he did not understand his *Miranda* rights. We have listened to Beckworth's tape-recorded statements and have read his testimony at the suppression hearing; it is abundantly clear that his subaverage IQ does not justify a finding that his statements were involuntary. The trial court correctly denied the motion to reconsider the denial of the motion to suppress.

Finally, Beckworth claims that the State failed to present evidence to establish why he was taken into custody in Arizona. He appears to argue, as he did at the suppression hearing, that the record does not establish that he received a probable-cause hearing in Arizona and, therefore, that his confessions might have been made while he was illegally in custody. *Powell v. Nevada*, 511 U.S. 79, 114 S.Ct. 1280, 128 L.Ed.2d 1 (1994). Beckworth himself testified at the hearing that he was arrested in Arizona on the capital-murder charge. (8/15/02 hearing, R. 35.) The trial court, the prosecutor, and defense counsel later stated that they understood that Beckworth was arrested in Arizona on the Alabama capital-murder charge and that no one maintained

> otherwise. (8/15/02 hearing, R. 38.) Furthermore, Beckworth was arrested pursuant to an arrest warrant issued after a Houston County grand jury indicted him on the capital-murder charge. (C. 22.) Therefore, Beckworth's reliance on cases requiring a probable-cause hearing following a warrantless arrest is misplaced.
>
> Considering the totality of the circumstances, we find that the trial court's determination of voluntariness was correct. The trial court did not err in denying Beckworth's motion to suppress and his motion to reconsider that ruling. Beckworth's statements were properly admitted at trial, and Beckworth is not entitled to any relief on the claims presented here.

*Beckworth*, 946 So. 2d at 515–18.

Beckworth challenged the ACCA's decision in his petition for certiorari in the Alabama Supreme Court. (Doc. 7-17 at 104–10, 125–27). However, Beckworth did not allege anywhere in his petition that he asked for an attorney three times. Beckworth's only arguments in support of why the statements should have been suppressed were that the State did not establish that he was legally in custody in Arizona and that his statements were involuntary because he was intellectually disabled. Beckworth argued that the ACCA's decision was contrary to *Gerstein v. Pugh*, 420 U.S. 103 (1975), in which the Supreme Court held that a defendant had to be brought before a magistrate within forty-eight hours. (Doc. 7-17 at 104–10).[12] In a separate part of his certiorari petition, he argued that the ACCA's decision was contrary to *Atkins* insofar as the Supreme Court stated that intellectually disabled persons can be susceptible to false confessions. (*Id.* at 125–27). The Alabama Supreme Court denied the petition without an opinion, *Beckworth*, 946 So. 2d at 490. That concluded Beckworth's pursuit of this claim in the state courts.

[12] Beckworth does not raise this argument in his federal habeas petition.

The Court now turns to the three arguments Beckworth raises within this claim.

***requests for counsel***

After careful consideration, the Court concludes that Beckworth's argument that his statements should have been suppressed because he requested an attorney three times is unexhausted and procedurally defaulted from review. His alleged requests for an attorney are not mere factual elaboration or clarification in support of the same substantive, exhausted claim that his *Miranda* waiver was involuntary: instead, it is based on a separate legal theory that all police questioning should have ceased once he asked for a lawyer. Because he did not present this argument to the Alabama Supreme Court, Beckworth cannot now invoke it in this Court.

For these reasons, Beckworth has not satisfied the exhaustion requirement of 28 U.S.C. § 2254(b)(1), and he is procedurally barred from raising this theory in a federal habeas petition. *See O'Sullivan*, 526 U.S. at 845–47 (concluding that the petitioner must marshal the claim through one entire round of the state's appeal process, including in a petition for discretionary review in the highest court of the state if such review is part of the state's appellate procedure); *Hunt v. Comm'r, Ala. Dep't of Corr.*, 666 F.3d 708, 730 (11th Cir. 2012) (explaining that an Alabama prisoner must petition the Alabama Supreme Court for certiorari review to exhaust all available remedies). Additionally, dismissal of Beckworth's habeas petition to allow him to present this allegation to the Alabama Supreme Court now would be futile because the time for filing a certiorari petition has long passed, and the certiorari petition he did file has long since been denied. *See* ALA. R. APP. P. 39(c)(2) (providing that a petition for further review by the Alabama Supreme Court

must be filed within fourteen days after the ACCA's decision on the application for rehearing). Thus, because any state remedy with respect to this allegation is procedurally barred by this state procedural rule, the allegation is procedurally defaulted from habeas review. *See Coleman*, 501 U.S. at 732.

Although a state may waive a procedural default defense, including exhaustion, AEDPA provides that "[a] State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, expressly waives the requirement." 28 U.S.C. § 2254(b)(3); *see also Dill*, 371 F.3d at 1302 n.1 (stating that the AEDPA requires a federal district court to address exhaustion when it is not expressly waived by the State). Although the Respondent has not identified this allegation as procedurally defaulted in his briefs to this Court, he also has not expressly waived the exhaustion requirement. Thus, because Beckworth has failed to properly exhaust this allegation, the Respondent has not expressly waived that failure to exhaust, and this allegation could no longer be brought in state court if this Court dismissed Beckworth's petition to return to state court, it is procedurally barred. *See McNair v. Campbell*, 416 F.3d 1291, 1304–05 (11th Cir. 2005) (holding the same in a case where the respondent did not expressly waive exhaustion).

Even assuming that Beckworth had properly apprised the Alabama Supreme Court of this allegation, such that the ACCA's rejection of it is properly before this Court for consideration pursuant to 28 U.S.C. § 2254(d), Beckworth would still not be due relief. Beckworth argues that the ACCA's statement that the evidence was "conflicting" as to whether he requested an attorney, *Beckworth*, 946 So. 2d at 517, was not supported by the record. Beckworth acknowledges that Lt. Valenza flatly denied that Beckworth ever asked

him for an attorney either at the jail or at the airport. (*See* doc. 7-8 at 106). However, Beckworth maintains that he asked Investigator Sewell for an attorney, and he claims that no evidence was ever presented to contradict that assertion. Of course, the fact that Investigator Sewell was deceased by the time of the suppression hearing prevented Investigator Sewell from either confirming or denying Beckworth's assertion that he asked him for counsel. (*Id.* at 108). Regardless, Lt. Valenza also testified that Beckworth was never alone with Investigator Sewell where Lt. Valenza could not see them. (*Id.* at 106–08). And even when he was pressed by Beckworth's counsel, Lt. Valenza still said that, even if Beckworth had had a brief opportunity to talk with Sewell while still in Lt. Valenza's eyesight but outside of Lt. Valenza's hearing, Lt. Valenza did not "see how he could have spoke[n] with him about [an attorney]." (*Id.* at 108). Ultimately, while Beckworth maintains that he asked for an attorney three times, it was not unreasonable for the ACCA to find that the evidence was conflicting, in light of Lt. Valenza's testimony. As indicated above, this Court has "no power on federal habeas review to revisit the state court's credibility determinations" absent "clear and convincing evidence," *Jenkins*, 963 F.3d at 1272 (quoting *Bishop*, 726 F.3d at 1259), which Beckworth fails to marshal here. For these reasons, Beckworth's alleged requests for an attorney do not entitle him to federal habeas relief.

***intellectual disability***

The state courts rejected on the merits Beckworth's claim that his intellectual disability prevented his knowing waiver of his rights. Thus, to obtain relief from this Court, Beckworth must demonstrate that the decision of the ACCA, which was the last reasoned

state court decision, *see Wilson*, 584 U.S. at 125, was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d).

Beckworth makes several arguments regarding the state courts' handling of this allegation. First, he complains that the trial court did not explain why it was denying his motion for reconsideration of the denial of the motion to suppress on the ground that he was intellectually disabled. For the first time in his merits brief, Beckworth cites *Jackson v. Denno*, in which the Supreme Court stated: "A defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession [were] actually and reliably determined." 378 U.S. 368, 380 (1964). Beckworth appears to be arguing that he was entitled to a hearing prior to his trial on his specific allegation that his intellectual disability rendered his rights waiver involuntary. If Beckworth is indeed making this claim, he cannot amend his petition by presenting it for the first time in his briefing. Even if the claim were properly before the Court, it fails on the merits because Beckworth has not identified a clearly established Supreme Court holding from the time of his trial that demonstrates that the state courts' decision was unreasonable. *Jackson* held that the Fourteenth Amendment requires that the procedures used to determine the voluntariness of a confession be "fully adequate to insure a reliable and clear-cut determination of the voluntariness of the confession, including the resolution of disputed facts upon which the voluntariness issue may depend." 378 U.S. at 391. *Jackson* did not consider a claim of intellectual disability. And while *Atkins* was

decided just prior to Beckworth's trial and recognized that intellectually disabled persons may be susceptible to false confessions, 536 U.S. at 320 & n.25, *Atkins* did not address whether an intellectually disabled person is constitutionally entitled to a hearing on a motion to suppress on the ground that he is intellectually disabled, let alone hold as much.

Additionally, setting aside the fact that the trial court did not explain its reasons, the ACCA independently addressed Beckworth's claim that his intellectual disability rendered his waiver involuntary. The ACCA expressly stated that it was denying the claim because Beckworth was not intellectually disabled. *Beckworth*, 946 So. 2d at 517. The ACCA further stated that, although Beckworth's IQ was below average, "a defendant's low IQ does not preclude a finding that a *Miranda* waiver was voluntary unless the defendant is so mentally impaired that he did not understand his *Miranda* rights." *Id.* (citing *Dobyne v. State*, 672 So. 2d 1319, 1337 (Ala. Crim. App. 1994), *aff'd*, 672 So. 2d 1354 (Ala. 1995)). The ACCA then concluded that, based on its independent review of Beckworth's two tape-recorded statements and his testimony at the suppression hearing, Beckworth's below-average IQ did not render his statements involuntary. *Id.*

Beckworth quarrels with this aspect of the ACCA's reasoning as well. He argues that the ACCA failed to consider the totality of the circumstances surrounding his interrogation when it stated: "[E]ven though Beckworth's IQ is below average, that factor alone would not render his confessions involuntary." (Doc. 44 at 11–12 (citing *Beckworth*, 946 So. 2d at 517); *see* doc. 42 at 15–16). In support, Beckworth cites *Moran*, 475 U.S. at 421 (courts must consider the "totality of the circumstances surrounding the interrogation" in determining whether there was "an uncoerced choice and the requisite level of

comprehension" to waive *Miranda* rights); *United States v. Arvizu*, 534 U.S. 266, 274 (2002) ("The court's evaluation and rejection of . . . factors in isolation from each other does not take into account the 'totality of the circumstances,' as our cases have understood that phrase."); and *Withrow v. Wilson*, 507 U.S. 680, 693 (1993) ("[These] circumstances include not only the crucial element of police coercion, . . . the length of the interrogation, . . . its location, . . . its continuity, . . . the defendant's maturity,. . . education,. . . physical condition, . . . and mental health . . . . They also include the failure of police to advise the defendant of his rights to remain silent and to have counsel present . . . ." (citations omitted)). Beckworth argues that the ACCA should have considered not just his intellectual limitations, which, according to Beckworth, made it impossible for him to understand the consequences of his waiver or make an informed choice as to whether to relinquish his rights, but also the fact that he requested an attorney three times and the way in which Lt. Valenza engaged in pre-*Miranda* unrecorded discussions followed by post-*Miranda* recorded questioning. However, Beckworth's attempt to demonstrate error by pointing to one phrase used by the ACCA—"that factor alone"—fails. The ACCA concluded that Beckworth was not intellectually disabled, so it was not required to consider that issue along with others in its waiver inquiry. Additionally, as will be explained in the next section, the ACCA did not have occasion to address the allegedly illegal "two-stage interrogation" because Beckworth never raised this issue to the ACCA. Applying the deference due to the ACCA's decision, this Court concludes that the ACCA's decision was neither contrary to, nor an unreasonable application of, clearly established federal law.

### *"two-stage interrogation"*

As stated, Beckworth argues that the way that Lt. Valenza interrogated him has been rejected by the Supreme Court in *Seibert*, 542 U.S. at 611, 617 (holding that "when interrogators question first and warn later" the warnings do not function effectively as *Miranda* requires). The Court agrees with the Respondent that this allegation is unexhausted and procedurally barred. The motion to suppress that Beckworth's counsel filed before trial did not mention an illegal two-stage interrogation that was violative of his constitutional rights. (Doc. 7-2 at 165–66). Rather, the motion simply argued that Beckworth's statements were involuntary and not the product of a knowing and intelligent waiver. (*See id.*). Beckworth's briefing indicates that he first became aware that Lt. Valenza engaged in a two-stage interrogation during Lt. Valenza's testimony at the suppression hearing. (Doc. 44 at 10). According to Beckworth, Lt. Valenza admitted at the suppression hearing that he began questioning him about the murders *before* he read him his rights and began recording his official statement.[13] In any event, Beckworth's

[13] However, the portion of Lt. Valenza's testimony that Beckworth cites does not unequivocally indicate that Lt. Valenza engaged in pre-*Miranda* unrecorded questioning. In support of this claim, Beckworth points to the following exchange between his counsel and Lt. Valenza:

> Q. [D]id you tell Mr. Beckworth anything about the facts of the case before the statement or statements that he gave in the lounge at the Phoenix International Airport?
>
> A. I told him—when I arrested him at the jail, we left—I told him why I was there; why I was bringing him back. I advised him, if he wanted to talk, we would talk later on. When I read him—when I got to the airport, when we went into the lounge, we started to talk. I told him there are two sides to every story. I have already spoken with James. James is in custody.
>
> Q. That's the co-defendant, right?

counsel made no mention of an illegal two-stage interrogation when he was arguing to the trial court at the conclusion of the suppression hearing. (*See* doc. 7-8 at 58–108). Rather, Beckworth's counsel's only arguments were that Beckworth's statements should be suppressed because he requested an attorney three times in a three-hour period and because he may not have been legally incarcerated under Arizona law at the time that he made the statements. (*Id.* at 102–04). After the trial court denied the motion to suppress, Beckworth did not mention an illegal two-stage interrogation in any further appellate briefs or opportunities for argument. (*See* doc. 7-4 at 195–97 (motion to reconsider denial of motion to suppress); doc. 7-9 at 20–21 (counsel's argument at a motion hearing on the motion to reconsider); doc. 7-15 at 97–103 (appellate brief to the ACCA on direct appeal); doc. 7-17 at 104–10, 125–27 (certiorari petition to the Alabama Supreme Court on direct appeal)).

---

A. That's the co-defendant. And when he decided he was going to talk to me, I advised him of his *Miranda* rights, and we went into the statement one.

Q. Okay. Did you tell him, when you advised him—or at any time—before he gave the statement—and when I say "he," I'm talking about Beckworth—did you tell Mr. Beckworth what you already knew about the case, either from your investigation or from the statement that was given from the co-defendant? The co-defendant's statement was around June, wasn't it?

A. Somewhere around there.

Q. Somewhere around there. Before Mr. Beckworth gave his statements that are reflected on the tape and in the transcript, did you tell Mr. Beckworth anything about the facts of the case?

A. The best I can remember right now, I told him there was two sides to every story, and we had James in custody, and James was talking.

Q. And did you go further and articulate to him the specific facts that James was talking about?

A. I may have. I don't recall at this time.

(Doc. 7-8 at 78–79).

Beckworth offers two reasons why this allegation is not procedurally defaulted. The first is a practical one. He points out that he could not have argued that the two-stage interrogation violated *Seibert* in his motion to suppress because the Supreme Court had not yet decided *Seibert* at that time. However, although *Seibert*, which was decided on June 28, 2004, postdated the filing of Beckworth's motion to suppress, motion to reconsider, and appellate brief, it had been decided when Beckworth filed a petition for a writ of certiorari in the Alabama Supreme Court on January 17, 2006, so Beckworth could have raised the issue then.[14] Second, Beckworth contends that this allegation is not a separate subclaim that he was required to exhaust but is instead merely additional support for the broader claim that he *did* raise in his motion to suppress, which was that his "will was overborne[] by the circumstances under which his interrogation was orchestrated." (*See* doc. 7-2 at 165). The Court disagrees. Beckworth's two-stage interrogation claim goes beyond the mere presentation of additional facts in support of the same claim. *Cf. Freeman*, 46 F.4th at 1216–19; *Pope*, 680 F.3d at 1286–87. Instead, it plainly relies on "facts *and legal arguments* never presented to the state court." *See Henderson*, 353 F.3d at 898 n.25 (emphasis added). That he presented a claim to the state court "under the same general legal umbrella"—that his rights waiver was involuntary—"but with entirely different factual underpinnings does not constitute fair presentation of the [two-stage interrogation] claim." *See id.* "*Both the legal theory and the facts* on which the federal claim rests must

[14] Beckworth does not argue that *Seibert* applies retroactively to cases on collateral review.

be substantially the same for it to be the substantial equivalent of the properly exhausted claim," *see id.* (emphasis added), and that is not the case here.

In sum, Beckworth's two-stage interrogation claim is procedurally defaulted from review, and he has not demonstrated cause and prejudice to excuse the default. *See Coleman*, 501 U.S. at 732.

* * *

Finally, Beckworth argues that his statements should have been suppressed for three independent reasons, but that this Court should also consider them collectively to determine that his statements were illegally obtained and should be suppressed. However, the Court cannot do so because Beckworth did not present one of those reasons to the Alabama Supreme Court (his requests for an attorney) and because he did not present another of those reasons to the state courts at all (the illegal two-stage interrogation). Thus, under AEDPA, the sole issue before this Court is whether the ACCA's rejection of Beckworth's claim that his statements should have been suppressed due to his intellectual disability was objectively unreasonable. The Court finds that it was not. Because "fairminded jurists could disagree" on the correctness of the ACCA's conclusion that Beckworth did not possess an intellectual disability that rendered his rights waiver involuntary, *Harrington*, 562 U.S. at 786, Beckworth is due no relief on this claim.

### C. Beckworth's Claim that the Trial Court Denied Him a Fair Trial by Preventing Him from Presenting Mitigating Evidence at the Penalty Phase (Doc. 1 at 32–43, paras. 88–117)

Beckworth's third claim is that the trial court violated his right to a fair trial in two ways: (1) excluding evidence that Beckworth's father sexually molested Beckworth's

daughter, and (2) denying Beckworth funds to hire a mitigation specialist. Each subclaim is addressed in turn.

**1. Beckworth's subclaim that the trial court improperly excluded evidence of his father's sexual molestation of his daughter (doc. 1 at 32–36, paras. 92–100)**

In *Lockett v. Ohio*, the Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. 586, 604 (1978) (emphasis and footnotes omitted). Relying upon *Lockett*, Beckworth claims that he had a constitutional right to present, as mitigating evidence, the fact that his father sexually molested his daughter, and that the trial court erred in precluding him from doing so.

The Respondent argues that Beckworth pleads additional details within this subclaim that he never presented to the state courts, and that therefore this Court should not consider them. The facts that the Respondent contends are pled for the first time in Beckworth's habeas petition are contained in the following paragraphs:

> 92. Mr. Beckworth's father, L.D. Beckworth, sexually abused Mr. Beckworth's daughter, Anna, while a guest in Mr. Beckworth's own home. While Mr. Beckworth was away at work, his ex-wife, Carol Gobbel, stopped by to drop off their daughter for a visit. L.D. assured Mrs. Gobbel that Mr. Beckworth would return soon, so she left Anna in the care of her grandfather. L.D. played a pornographic video before sexually molesting Anna. When Mr. Beckworth returned home, he discovered Anna was not wearing any underwear. Anna Beckworth was just five years old.
>
> 93. On August 19, 1998, L.D. Beckworth was charged with the sexual abuse of his granddaughter. He was initially found incompetent to stand trial,

> and was ordered committed to the Alabama Department of Mental Health and Mental Retardation. On February 22, 2005, L.D. pleaded guilty to first degree sexual abuse. He died in prison in March 2007.

(Doc. 1 at 33, paras. 92–93).

The Court agrees with the Respondent. Although Beckworth argued on direct appeal that the trial court denied him a fair trial by precluding him from presenting evidence that his father sexually molested his daughter, he did not include these additional details about when, where, and how the incident took place and about his father's subsequent charges and conviction. Beckworth argues that his daughter's molestation and his father's arrest on sexual abuse charges were "discussed in detail" in his Rule 32 Petition. (Doc. 41 at 29 (referencing paragraphs 100–03 & n.2 of Beckworth's Rule 32 Petition (doc. 7-19 at 31–32)). According to Beckworth, because he included these details in his Rule 32 Petition, they are properly before this Court. However, these facts were alleged as part of Beckworth's claim that his trial counsel performed ineffectively by failing to investigate and present mitigation evidence at the penalty phase. That he presented these allegations in his Rule 32 Petition in support of a separate ineffective assistance of counsel claim—several years after the trial court and the ACCA considered his separate claim that the trial court denied him a fair trial by excluding the presentation of mitigating evidence—does not help Beckworth establish that these allegations were part of the record when the state court adjudicated his denial-of-a-fair-trial claim. Thus, because the Court may only consider the record "that was before the state court that adjudicated the claim on the merits" when determining whether the state court's decision was reasonable under § 2254(d), the

Court will not consider these new allegations in resolving his denial-of-a-fair-trial claim. *See Pinholster*, 563 U.S. at 180–81; *Borden*, 646 F.3d at 816–17.

Having determined which allegations are properly before this Court and which are not, the Court turns to an analysis of this subclaim. Because Beckworth exhausted this claim at trial and on direct appeal, and the state courts denied it on the merits, this Court's review of this claim is limited to whether the state courts' decisions were reasonable under 28 U.S.C. § 2254(d), based on the record that was before the state court. In conducting the reasonableness analysis, the Court begins with a review of Beckworth's pursuit of this claim in the state courts.

At the penalty phase, Beckworth's counsel called Beckworth's ex-wife, Carol Gobbel, as a surrebuttal witness. (Doc. 7-13 at 109–45). On direct examination, she stated that she and Beckworth were married, divorced, and then remarried; that they had a daughter together, Anna, who was nine years old; that Beckworth was a caring husband and loving father; and that he worked sporadically. (*Id.* at 109–12, 122). Beckworth's counsel then asked her about Beckworth's family and specifically, his father, L.D. Beckworth. (*Id.* at 113). Gobbel stated that when she first met Beckworth, L.D. was in jail; that she viewed L.D. as "a man with a lot of problems[;]" she described L.D. as "creepy[,]" and she said that he reminded her of someone who sexually abused her when she was a child. (*Id.* at 113–14). Beckworth's counsel then attempted to ask Gobbel how *Beckworth* would describe L.D., but the State objected on hearsay grounds, and the trial court sustained the objection. (*Id.* at 114). Beckworth's counsel then attempted to ask Gobbel whether L.D. had been charged with sexual abuse of their daughter, but the State objected

on relevance grounds. (*See id.*). Beckworth's counsel protested that the evidence was relevant for mitigation purposes and reminded the trial court that they had asked for funds for a mitigation specialist but that the funds were denied because the court ruled that Beckworth's counsel could conduct their own mitigation investigation by speaking with Beckworth's family and friends without the need for a specialist. (*Id.*). The court sustained the State's objection, ruling that Beckworth's counsel could ask Gobbel about Beckworth's relationship with L.D. but not L.D.'s relationship with others. (*Id.* (the court stating: "[T]his is mitigation about the son, and not about the father . . . "Let's deal with the relationship between L.D. Beckworth and his son, not L.D. Beckworth and somebody else.")).

Beckworth appealed the trial court's evidentiary rulings to the ACCA. (Doc. 7-15 at 43–54). He argued, among other things, that the trial court should have permitted him to question Gobbel about whether L.D. had been charged with sexually abusing their daughter because it was relevant to mitigation. Beckworth contended that "having a parent alleged to have sexually abused your child, would have a dramatic effect on any individual. . . . Even the most stoic person would be affected by the accusation that his parent sexually abused his child." (*Id.* at 52–53).

The ACCA affirmed the trial court's evidentiary rulings, stating as follows:

> Beckworth contends that the trial court erred to reversal when it improperly precluded him from presenting evidence during the sentencing phase of his trial. Specifically, he argues that the trial court prevented him from establishing, through the testimony of his ex-wife, facts about his feelings for his father and about his father's recent arrest for alleged sexual abuse of Beckworth's daughter. He contends that the trial court's rulings violated his right to fully develop and present all relevant mitigating evidence

in violation of *Ex parte Smith,* [Ms. 1010267, March 14, 2003] —— So.2d at —— (Ala. 2003), and cases cited therein. The State contends that the trial court did not err when it excluded some of Beckworth's proffered evidence because, it argues, that evidence was not relevant and much of the evidence was admitted through the testimony of witnesses at the sentencing hearing. We agree with the State.

The United States Supreme Court had declared that a defendant convicted of capital murder must be allowed to present at the sentencing hearing a broad range of proposed mitigating evidence. The Court held:

> "[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."

*Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)(footnotes omitted).

By statute, Alabama law allows a broad spectrum of evidence to be offered as mitigation:

> "In addition to the mitigating circumstances specified in Section 13A–5–51, mitigating circumstances shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death."

§ 13A–5–52, Ala.Code 1975.

Our Supreme Court has previously stated:

> "To determine the appropriate sentence, the sentencer must engage in a 'broad inquiry into all relevant mitigating evidence to allow an individualized determination.' *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998). Alabama's sentencing scheme broadly allows the accused to present evidence in mitigation. *Jacobs v. State*, 361 So.2d 640, 652–53 (Ala.1978).

> See § 13A–5–45(g), Ala.Code 1975 ('The defendant shall be allowed to offer any mitigating circumstance defined in Sections 13A–5–51 and 13A–5–52.'). '[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.' *California v. Brown*, 479 U.S. 538 (1987) (O'Connor, J., concurring specially)."

*Ex parte Smith*, [Ms. 1010267, March 14, 2003] —— So. 2d at ——.

Evidence proffered in mitigation by the defendant must be relevant, however, and the determination of relevance is a decision for the trial court to make in the sound exercise of its discretion. *Knotts v. State,* 686 So.2d 431, 444 (Ala.Crim.App.1995), *aff'd*, 686 So.2d 486 (Ala.1996). We stated in *Knotts:*

> "The determination of the relevancy of evidence lies within the sound discretion of the trial court. *Borden v. State*, 522 So.2d 333 (Ala.Cr.App.1988); C. Gamble, *McElroy's Alabama Evidence*, § 21.01(6) (4th ed.1991). Here, the trial court was required to admit all relevant mitigating evidence of the appellant's character or record and any circumstances pertaining to the offenses. The question before us is whether the trial court abused its discretion in refusing to admit evidence pertaining to members of the appellant's family. We find that although the offered evidence may have had some slight probative value, the trial court did not abuse its discretion in refusing to allow its admission under the facts and circumstances existing here. The trial court admitted all records offered for purposes of mitigation pertaining specifically to the appellant.
>
> "Furthermore, even if the trial court's ruling was erroneous, we do not believe the error injuriously affected the substantial rights of this appellant. Matters in the excluded records pertaining to the appellant's home and family were admitted in evidence through other records and through the testimony of numerous witnesses, thus making the evidence in the excluded records cumulative. The appellant's sister testified at the sentencing hearing about the home and family

> life of the appellant. Thus, if error occurred, at all, it was harmless. See Ala.R.App.P. 45; *McMahon v. State*, 560 So.2d 1094 (Ala.Cr.App.1989)."

*Id. See also Ex parte Hodges*, 856 So.2d 936, 945–48 (Ala.2003) (testimony about defendant's unstable home environment was relevant, but no reversible error occurred when prosecutor's objections to testimony were sustained because the defendant was able to present most of the evidence through later testimony); *Windsor v. State*, 683 So.2d 1027, 1038–39 (Ala.Crim.App. 1994), *aff'd*, 683 So.2d 1042 (Ala.1996)(trial court erred in excluding hearsay evidence, but no reversal due because similar evidence was presented in later testimony).

With the foregoing principles in mind, we review Beckworth's allegations of error. Beckworth contends that the trial court should have permitted him to question his ex-wife, Carol Gobbel, about how he described his father and his family to her, whether his father had been charged with sexually abusing their daughter, and whether he had threatened her current husband. The prosecutor objected on hearsay grounds to that line of questioning, and the trial court sustained the objections. We note that hearsay is admissible at a capital-sentencing hearing, so long as the hearsay evidence is probative and relevant. § 13A–5–45(d), Ala.Code 1975. Nonetheless, for the reasons discussed below, the trial court did not err to reversal when it sustained the objections. *See W.T.J. v. State*, 665 So.2d 1019, 1022 (Ala.Crim.App.1995)(a trial court's ruling sustaining an objection to evidence will be affirmed on appeal if the excluded evidence was subject to any legal objection).

We note, first of all, that Beckworth did not attempt to present any evidence during his case-in-chief as to his claim that the family in which he was raised was dysfunctional. In his opening statement at the sentencing hearing, defense counsel argued only that Beckworth was mentally retarded, and in his case-in-chief, he presented only the testimony of Dr. D'Errico, who stated that Beckworth was mentally retarded. In its rebuttal case, the State presented the testimony of Dr. Doug McKeown, who had evaluated Beckworth and determined that he was not mentally retarded. Only in his surrebuttal case did Beckworth present testimony about his dysfunctional family and his chaotic upbringing. Furthermore, defense counsel did not mention Beckworth's dysfunctional family as a mitigating circumstance in his closing argument at the sentencing hearing.

> " 'The trial court properly confines rebuttal, and of course surrebuttal evidence to material within the scope of the

> preceding adverse evidence.' *Ellison v. State*, 33 Ala.App. 405, 34 So.2d 185, 187 (Ala.App.1948). 'It is within the discretion of the trial court to receive, in rebuttal, testimony which more properly should have been offered as part of the case in chief.' *Harris v. State*, 409 So.2d 1006, 1010 (Ala.Cr.App.1982). 'A trial court is clothed with wide discretion in the matter of permitting surrebuttal evidence, although the court's action in this regard is reviewable on appeal.' *Harris*, 409 So.2d, at 1010."

*Foster v. State*, 705 So.2d 534, 540 (Ala.Crim.App.1997).

Thus, the presentation of evidence regarding Beckworth's chaotic upbringing was not a significant element in his case in mitigation, and the trial court had the discretion to limit its presentation as surrebuttal evidence.

Moreover, Carol Gobbel was permitted to testify in detail about Beckworth's chaotic family circumstances, that his father had been in jail when they began dating and when they married, and she even testified that the stress caused by Beckworth's involvement with his dysfunctional family caused their marriage to end. (R.902–07.) Gobbel testified that their daughter had been sexually abused, that Beckworth had threatened her husband, and that Beckworth had a rocky relationship with his father, a man Gobbel described as "creepy" and as reminding her of the man who had sexually abused her as a child. Thus, Beckworth was able to present, through his questions to Gobbel, most of the evidence he now claims was improperly excluded. *Ex parte Hodges*, 856 So.2d 936, 945–48 (Ala.2003).

The single piece of evidence that was not otherwise testified to—that Beckworth's father was currently charged with sexually abusing Beckworth's daughter—was properly excluded because it was irrelevant. *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), held that a defendant must be permitted to present evidence regarding any aspect of his character or his record and any of the circumstances of the offense. Evidence of the charges pending against Beckworth's father at the time of Beckworth's trial had nothing to do with Beckworth's own upbringing or with his character or record. While pending charges against his father would have been very disturbing to Beckworth, he has never alleged that his distress over the charges was somehow related to his involvement in the murder of Bessie Lee Thweatt.[FN]4 Moreover, as the Alabama Supreme Court noted in *Ex parte Hodges*, *supra*, the weight to be afforded to the "difficult family history" mitigating circumstance depends upon the defendant's age. Beckworth was 33 years old at the time this murder was committed and he

> had a family of his own. Additional evidence about his chaotic upbringing decades earlier would have been entitled to little weight as mitigation for this crime.
>
> > [FN]4 In fact, the record does not indicate that the charge preceded the capital murder; instead, Beckworth alleges in his motion for new trial only that Beckworth's father's arrest on sexual abuse charges preceded Beckworth's *arrest* in this case.
>
> In summary, we find no error in the trial court's rulings. A majority of the evidence to which the prosecutor objected was admitted during subsequent testimony; the evidence regarding Beckworth's family circumstances was not offered in his case-in-chief and was never argued to the jury as a mitigating circumstance; that Beckworth's father had been charged in the sexual abuse of Beckworth's daughter was properly excluded because it was irrelevant; there was no logical nexus between those charges and Beckworth's murder of Thweatt. Beckworth is not entitled to any relief on this claim.

*Beckworth*, 946 So. 2d at 504–07 (emphases in original). Beckworth raised this issue again in his petition for certiorari in the Alabama Supreme Court, (doc. 7-17 at 3–27), but the Alabama Supreme Court denied the petition without an opinion, *see Beckworth*, 946 So. 2d at 490. That concluded Beckworth's pursuit of this claim in the state courts.

Because the state courts rejected Beckworth's claim on the merits, in order to obtain relief from this Court on this claim, Beckworth must demonstrate that the decision of the ACCA, which was the last reasoned state court decision, *see Wilson*, 584 U.S. at 125, was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d). The ACCA held that the trial court properly excluded the evidence that L.D. was at that time charged with sexually molesting Beckworth's daughter for two reasons: (1) it was not relevant to

Beckworth's own upbringing or to his character or record; and (2) Beckworth never argued that his distress over the incident and charges was related to his involvement in the murder of Ms. Thweatt. *Beckworth*, 946 So. 2d at 507. Beckworth challenges both reasons as contrary to law and unreasonable.

Beckworth urges that sexual abuse and incest within one's family is a relevant mitigating circumstance that a defendant has a constitutional right to present at his capital sentencing. In support, he cites *Lockett*, 438 U.S. at 604; *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989); *Wiggins*, 539 U.S. at 535; and *Rompilla*, 545 U.S. at 392–93. But in *Lockett*, the Supreme Court held that a defendant must be permitted to present evidence regarding any aspect of *his* character or *his* record and any of the circumstances of *his* offense. 438 U.S. at 604.[15] In *Penry*, the Supreme Court similarly explained: "If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, 'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'" 492 U.S. at 319 (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)).

In this case, the ACCA, citing *Lockett*, found that evidence of L.D.'s sexual molestation of Beckworth's daughter and the charges pending against L.D. "at the time of

[15] Indeed, in *Lockett*, the evidence the petitioner was prohibited from introducing was about "her character, prior record, age, lack of specific intent to cause death, and her relatively minor part in the crime." 438 U.S. at 597.

Beckworth's trial had nothing to do with Beckworth's own upbringing or with his character or his record." *Beckworth*, 946 So. 2d at 507. The Court is not persuaded that the ACCA's decision was contrary to, or an unreasonable application of, *Lockett*'s holding. *Wiggins* is also distinguishable because the omitted evidence of sexual abuse was against the defendant or was witnessed by the defendant: the defendant "experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother [and] suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care." 539 U.S. at 534–35.

Beckworth argues that *Rompilla* stands for the proposition that evidence of domestic abuse is relevant and mitigating even when the victim of the abuse is a relative of the defendant, rather than the defendant himself. Beckworth points to the following passage where the Supreme Court described the evidence that the habeas petitioner's trial counsel should have uncovered if they had conducted an adequate investigation, as follows:

> Rompilla's parents were both severe alcoholics who drank constantly. His mother drank during her pregnancy with Rompilla, and he and his brothers eventually developed serious drinking problems. His father, who had a vicious temper, frequently beat Rompilla's mother, leaving her bruised and black-eyed, and bragged about his cheating on her. His parents fought violently, and on at least one occasion his mother stabbed his father. He was abused by his father who beat him when he was young with his hands, fists, leather straps, belts and sticks. All of the children lived in terror. There were no expressions of parental love, affection or approval. Instead, he was subjected to yelling and verbal abuse. His father locked Rompilla and his brother Richard in a small wire mesh dog pen that was filthy and excrement filled. He had an isolated background, and was not allowed to visit other children or to speak to anyone on the phone. They had no indoor plumbing in the house, he slept in the attic with no heat, and the children were not given clothes and attended school in rags . . . .

*Rompilla*, 545 U.S. at 391–92 (citation omitted). Beckworth focuses on the fact that the Court mentioned physical violence between the petitioner's parents. While Beckworth is correct, the Court cannot say that the *Rompilla* Court *held* that evidence of a family member being abused is always relevant at a capital sentencing.

In sum, Beckworth has not offered a Supreme Court case from the time of his trial and direct appeal holding that courts are categorically prohibited from excluding, at the sentencing phase, evidence of sexual abuse of a defendant's family member, and not the defendant himself. The Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by th[e] Court." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (collecting cases). Thus, this Court cannot say that the state courts' decision to exclude this evidence was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *See Dixon*, 565 U.S. at 24 (quoting *Harrington*, 562 U.S. at 103); *see also Payne v. Tennessee*, 501 U.S. 808, 822 (1991) ("[V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce *concerning his own circumstances* . . . ." (emphasis added)).

As stated above, the ACCA also concluded that the evidence about L.D.'s abuse of Anna and subsequent charges was not relevant because it had nothing to do with the murder of Ms. Thweatt. Beckworth argues that the ACCA contravened both *Tennard v. Dretke*, 542 U.S. 274 (2004), and *Smith v. Texas*, 543 U.S. 37 (2004) (per curiam), in so holding. (Doc. 1 at 35). *Tennard* and *Smith*, both decided just a year before the ACCA's decision,

dealt with whether mitigation evidence must be related in some way to the crime for which the defendant was charged or convicted. *Tennard* held that mental-capacity evidence (low IQ) in particular can be mitigating regardless of whether the defendant has established a nexus between his mental capacity and the crime. 542 U.S. at 287. *Smith* applied *Tennard* to hold that evidence of a petitioner's troubled childhood and his limited mental abilities were relevant for mitigation purposes despite the lack of a nexus between them and the capital murder. 543 U.S. at 45. While the state court's failure to consider this evidence for lack of nexus to the crime might be contrary to clearly established federal law, *see Barwick v. Sec'y, Fla. Dep't of Corr.*, 794 F.3d 1239, 1256 (11th Cir. 2015) (per curiam) (citing *Smith* and explaining that a state court's failure to consider mitigation evidence for lack of nexus to the crime would be contrary to clearly established federal law); *but cf. Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1036 (11th Cir. 2022) (en banc) (rejecting the proposition that Supreme Court precedent establishes "a per se rule that the degree of connection between background and crime can *never* play any role in a court's *prejudice* analysis" (second emphasis added)), such failure does not compel habeas relief under these circumstances. As explained above, the ACCA also reasonably concluded that the evidence was properly excluded because it was not relevant to Beckworth's own character or record, and this decision was not unreasonable. Because other reasons for the state courts' decision were reasonable, that one of the state courts' proffered reasons contradicted clearly established federal law is insufficient, on this record, to support a finding that the ACCA's decision was unreasonable.

Because Beckworth failed to identify a clearly established Supreme Court holding which mandated that a capital defendant always be allowed to offer evidence of family member's abuse, Beckworth has not shown that the ACCA's decision was unreasonable under § 2254(d). *See Williams*, 529 U.S. at 412–13.

**2. Beckworth's subclaim that the trial court improperly denied funds for a mitigation specialist (doc. 1 at 36–43, paras. 101–17)**

Beckworth claims that the trial court violated his right to a fair trial by refusing his request for funds to retain a mitigation specialist. Beckworth exhausted this claim on direct appeal, and the state courts denied it on the merits, which means that review of this claim is limited to whether the state courts' decisions were reasonable under 28 U.S.C. § 2254(d).

The Court first reviews Beckworth's pursuit of this claim in the state courts. Prior to Beckworth's trial, on January 23, 2002, Beckworth's attorneys filed an *ex parte* motion seeking $6,500.00 to secure the services of a mitigation specialist to investigate and present information on Beckworth's background and family history to use in mitigation at the penalty phase. (Doc. 7-2 at 183–95; doc. 7-3 at 3–10). Counsel attached the affidavit of Aaron D. McCall, a mitigation specialist with the Alabama Prison Project, who explained the nature of his services and the expense involved. (Doc. 7-3 at 5–7). The trial court took up the motion at a pretrial hearing on March 18, 2002. (Doc. 7-8 at 134–39). The court asked Beckworth's counsel to provide any specific legal authority that supported his request for funds for a mitigation specialist. (*Id.* at 135). In response, on March 25, 2002, Beckworth's counsel filed a memorandum in support of his motion. (Doc. 7-3 at 89–92). Beckworth's counsel explained that the only mitigation efforts that they had engaged in at

that point were to conduct an in-person interview with Beckworth's ex-wife, Carol Gobbel, and a telephone conversation with Beckworth's mother, Linda Ball. Counsel further explained that they were aware of their duty in capital murder cases to investigate and pursue all avenues of mitigation which would include learning as much as possible about Beckworth's background and family history, and they complained that they did not have enough time to do the investigative legwork on their own. The memorandum identified the following areas of possible mitigation that they wished to explore, after having spoken with Beckworth, his mother, and his ex-wife:

> 1. The Defendant's father was an abusive alcoholic;
>
> 2. The Defendant's family was poor and lived in a urine and feces infested house;
>
> 3. The living conditions/abuse was so bad that the Defendant's mom left for work, when the Defendant was young, and just never came back;
>
> 4. The Defendant saw evidence of his dad's sexual abuse of Defendant's younger sister;
>
> 5. With the mother gone and the father constantly drunk, the Defendant was forced to raise himself and his siblings;
>
> 6. The Defendant received no supervision or guidance to establish a proper foundation for adulthood;
>
> 7. While still a young newlywed, the Defendant's entire family, including the father, would just show up, out of the blue, demanding that the Defendant provide them shelter, money, transportation, etc. This continued throughout the marriage and was the primary reason for the divorce;
>
> 8. The Defendant only completed the 8th grade;
>
> 9. The Defendant did not have stable employment or relationships;

> 10. The Defendant's father is currently charged with the sexual abuse of the Defendant's daughter. This event occurred before the death of Ms. Thweatt.

(*Id.* at 91–92). The trial court denied the motion for funds the following day, advising Beckworth's counsel that they could conduct a mitigation investigation on their own by talking with Beckworth's friends and family without the need for a mitigation specialist. (*See id.* at 93, 104).

On April 19, 2002, Beckworth's counsel filed a motion to reconsider the denial of the motion for funds. (*Id.* at 106–11). In said motion, counsel set forth the following list of mitigation factors that they said would be critical to the penalty phase:

> a. Defendant's mother, Linda D. Ball, abandoned the family when the Defendant was twelve years of age.
>
> b. Defendant was left with his two younger siblings in the custody of Defendant's father, L.D. Beckworth, a[] habitually unemployed abusive drunk.
>
> c. The children had to fend for themselves, without any guidance, care or supervision to [e]nsure that even their most basic needs would be met.
>
> d. The father was not only physically and verbally abusive to his wife, but also to the children.
>
> e. During this time after the mother had left, the Defendant discovered his father was sexually molesting his younger sister.
>
> f. The defendant dropped out of school in the eighth grade.
>
> g. The father has been indicted for molesting the Defendant's minor daughter and his currently incarcerated in the Houston County Jail, and the Defendant is a key State's witness against him.
>
> h. The defendant's father may have been determined incompetent.
>
> i. The Defendant's mother has recently advised undersigned counsel in a letter that she will be unable to come to Court and testify for the penalty

> phase of the trial due to poor health and insufficient financial resources with which to pay for transportation from Pawnee Rock, Kansas.

(*Id.* at 109–10). The record does not indicate that the trial court ever ruled on the motion to reconsider.

Beckworth appealed the trial court's denial of his motion to the ACCA. (Doc. 7-15 at 43–54). The ACCA affirmed the trial court in a thorough discussion, stating:

> Beckworth first argues that the principles of *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), were violated when the trial court denied his requests for funds to hire a mitigation expert to assist him in the sentencing phase of trial, and he lists various characteristics of his family and his upbringing that he argues constituted relevant mitigation evidence that was not presented. The State contends that the trial court did not err when it denied the request for funds and that the trial court had correctly determined that Beckworth could introduce the evidence through family witnesses.
>
> Beckworth filed an ex parte motion seeking funds to hire a mitigation specialist, stating he was entitled to present, and to have the sentencing jury consider, aspects of his background and character that might be mitigating. He argued that "a comprehensive investigation must be undertaken of Mr. Beckworth's entire life," including his educational, medical, and social history, and he requested $6,500 to secure the services of the Alabama Prison Project to complete this investigation. (C.385–89.) At a hearing on pending motions, the trial court asked defense counsel to provide any specific legal authority that supported his request for funds for the mitigation expert. (3/18/02 hearing, R.22.)
>
> Defense counsel filed a memorandum of law supporting presentation of mitigation evidence. (C. 488–91.) In that motion, counsel cited *Hodges v. State*, 856 So.2d 875 (Ala.Crim.App.2001), *aff'd*, 856 So.2d 936 (Ala.2003), and other cases for the proposition that a difficult family history has been considered a mitigating circumstance in capital-murder cases. Counsel also included a list of possible mitigation evidence received in interviews of Beckworth and of Beckworth's mother and ex-wife. Thereafter, the trial court denied the motion for funds, stating that the proposed mitigation could be adequately presented through the testimony of family members. (C. 492.) Defense counsel filed a motion seeking reconsideration of the trial court's denial of the request for funds to hire a mitigation expert. (C. 505–33.) The

record does not reflect that the trial court ruled on the motion for reconsideration.

Defendants may be eligible to receive funds to hire certain experts to facilitate the formulation and presentation of a defense. *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). The funds, however, are not to be granted automatically upon request. Rather, the grant or denial of such funds is a matter for the trial court's discretion and is based on the allegations in the request for funds to hire the expert.

> "Based on the foregoing, we conclude that for an indigent defendant to be entitled to expert assistance at public expense, he must show a reasonable probability that the expert would be of assistance in the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet this standard, the indigent defendant must show, with reasonable specificity, that the expert is absolutely necessary to answer a substantial issue or question raised by the state or to support a critical element of the defense. If the indigent defendant meets this standard, then the trial court can authorize the hiring of an expert at public expense."

*Ex parte Moody*, 684 So.2d 114, 119 (Ala. 1996).

In *Hodges v. State*, 856 So.2d 875, 915 (Ala.Crim.App.2001), we examined several cases in which funds had been requested to hire experts.

> "As the Alabama Supreme Court stated in *Dobyne v. State*, 672 So.2d 1354 (Ala.1995):
>
> > " '[A] defendant, in order to be entitled to funds to pay for an expert, must show more than a mere possibility that he or she will receive useful assistance from the expert. Rather, the defendant must show a reasonable probability that the expert would aid in the defense and that the denial of an expert to assist at trial would result in a fundamentally unfair trial. In the past, Alabama decisions have been based upon whether the defendant made an adequate showing of a need for the requested expert. [citations omitted].

> " ' . . . .
>
> " 'As we stated in *Dubose*, a defendant seeking expert assistance must show a reasonable probability that the expert would aid in the defense and that the denial of an expert to assist at trial would result in a fundamentally unfair trial. Dobyne failed to make such a showing. *Dubose* involved "critical" DNA evidence that directly linked Dubose to the crime. This Court held that Dubose had made an adequate showing of the need for the requested services of a DNA expert. Here, Dobyne requested funds to hire a neurologist to present evidence of mitigating circumstances at the penalty phase of the trial. While we agree that there can be a need for expert assistance at the penalty phase of a capital trial, Dobyne has not shown that the denial of funds to hire a neurologist resulted in unfairness to him.'
>
> "672 So.2d at 1357–59. Hodges failed to show that his trial was fundamentally unfair because of the failure of the trial court to approve funds for experts. Therefore, the trial court correctly held that Hodges failed to meet his burden of showing that he was entitled to state funds."

As was found in *Hodges* and in the cases cited therein, we find that Beckworth did not establish that the mitigation specialist would have assisted his defense or that the denial of the funds would render his trial fundamentally unfair. *See also Lee v. State*, 898 So.2d 790, 853 (Ala.Crim. App.2001)("Similarly, in this case, the appellant did not make a threshold showing that either of the requested experts would probably assist his defense and that the denial of funds to hire the experts would result in a fundamentally unfair trial. Rather, he simply speculated that the experts would assist his defense. Therefore, because the appellant did not make the required showing of need, the trial court did not abuse its discretion in denying his requests for expert assistance."). Beckworth had argued to the trial court that a mitigation expert would have investigated his life history, including his father's abuse of his mother and his siblings, his mother's abandonment of the family, and the level of dysfunction in the family. The trial court correctly determined

> that all of this evidence was available from Beckworth and his family. Unlike *Ake*, which involved a request for a psychiatrist to prove an insanity defense, or *Dubose v. State*, 662 So.2d 1189 (Ala.1995), which involved a request for a DNA expert to challenge the foundation of the State's case and to establish a critical element of the defense, Beckworth sought expert assistance with evidence already known and available to him through his own knowledge and experience and through the testimony of his family members. He failed to establish that the requested expert was "absolutely necessary to answer a substantial issue or question raised by the state or to support a critical element of the defense." *Ex parte Moody,* 684 So.2d at 119. The denial of the requested funds did not render Beckworth's trial fundamentally unfair. Therefore, we find no merit to this portion of Beckworth's claim; he is entitled to no relief.

*Beckworth*, 946 So. 2d at 502–04 (first alteration in original) (footnote omitted). Beckworth raised this issue again in his petition for certiorari in the Alabama Supreme Court, (doc. 7-17 at 77–89), but the Alabama Supreme Court denied the petition without an opinion, *see Beckworth*, 946 So. 2d at 490. That concluded Beckworth's pursuit of this claim in the state courts.

Because the state courts rejected Beckworth's claim on the merits, in order to obtain relief from this Court on this claim, Beckworth must demonstrate that the decision of the ACCA, which was the last reasoned state court decision, *see Wilson*, 584 U.S. at 125, was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d). Beckworth raises several arguments in this regard.

Relying upon Alabama state law precedent, the ACCA stated that the standard by which an indigent defendant's request for expert assistance at the public's expense is to be evaluated is whether there is a "reasonable probability that the expert would be of

assistance in the defense and that the denial of expert assistance would result in a fundamentally unfair trial." *Beckworth*, 946 So. 2d at 503 (quoting *Ex parte Moody*, 684 So. 2d 114, 119 (Ala. 1996) (per curiam)). The ACCA also held that the indigent defendant must show "with reasonable specificity, that the expert is absolutely necessary." *Id.* (quoting *Moody*, 684 So. 2d at 119). Beckworth argues that the ACCA's decision that a mitigation specialist was not absolutely necessary because Beckworth's counsel could have conducted their own investigation was contrary to and an unreasonable application of the principles in *Ake*. *See* 470 U.S. at 77, 83.

As indicated above, the ACCA considered *Ake*, observing that it stood for the proposition that indigent defendants may be eligible to receive funds to hire certain experts to facilitate the presentation of a defense. *Beckworth*, 946 So. 2d at 503. However, *Ake* concerned an examination by a psychiatrist, not a mitigation specialist. *Ake*'s holding is narrow: "We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. at 83. The holding does not embrace the provision of non-psychiatric assistance, like mitigation specialists, or even the provision of expert psychiatric or psychological assistance for purposes other than evaluating, preparing, and presenting a defense based on the defendant's "sanity at the time of the offense." *Id.* Beckworth has not alerted this Court to any Supreme Court case extending *Ake*'s explicit holding into these areas. Again, "it is not 'an unreasonable application of' 'clearly established Federal

law' for a state court to decline to apply a specific legal rule that has not been squarely established by th[e Supreme] Court." *Knowles*, 556 U.S. at 122. Accordingly, the ACCA did not unreasonably apply federal law in concluding that Beckworth was not entitled to the assistance of a mitigation specialist.

Beckworth also argues that that the state courts acted unreasonably in concluding that Beckworth's counsel could investigate all mitigating information by merely talking with Beckworth and his family without the services of a specialist. However, the state courts' conclusion that a specialist was not absolutely necessary was not based on an unreasonable determination of the facts. Beckworth alleged in his motion for funds that he needed a specialist to investigate evidence that his father was an abusive alcoholic; his family was poor and lived in a urine and feces infested house; his mother abandoned her children; his father sexually abused his sister; Beckworth had to raise his siblings; while Beckworth was a newlywed his family would show up demanding food, money, a place to live, and transportation; and Beckworth did not get past the eighth grade in school. As explained above, counsel requested a mitigation specialist to explore these areas after speaking with Beckworth, his mother, and his ex-wife. The fact that Beckworth's counsel already knew this information before trial after speaking with Beckworth and his family members could have reasonably suggested to the trial court that Beckworth's counsel would be capable of continuing to investigate by speaking further with Beckworth and his family and friends.[16]

[16] Indeed, some of this evidence was presented at the penalty phase, despite the fact that counsel never retained the services of a specialist. Dr. McKeown, the State's psychological expert, testified that from

Beckworth argues that clearly established federal law at the time of the ACCA's decision— *Wiggins*, 539 U.S. at 535, and *Rompilla*, 545 U.S. at 381–82—instructed that capital defense attorneys should consult a broad range of sources when performing a mitigation investigation. While Beckworth is not wrong, he nonetheless has not identified a Supreme Court case in existence at the time of the ACCA's decision holding that a court violates a defendant's constitutional rights by refusing to give that defendant funds to retain a mitigation specialist. Beckworth also cites other cases in which Alabama courts have appointed mitigation specialists, argues that the importance of mitigation specialists has been recognized by the American Bar Association, and points out that the ABA's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases has been endorsed by the Supreme Court in *Wiggins* as "well-defined norms." 539 U.S. at 524. The Court does not doubt that mitigation specialists may possess several advantages when conducting investigations that counsel may lack, and the Court acknowledges that many state and federal courts have recognized as such and have appointed mitigation specialists in other capital cases. Nonetheless, these sources are not a substitute for a Supreme Court holding that was clearly established when the ACCA decided this claim, as § 2254(d) requires.

---

talking with Beckworth, he learned that Beckworth's mother left at an early age, deserting the family when he was twelve years old. (Doc. 7-13 at 84). He stated that Beckworth told him that his father was a worthless parent because he was an alcoholic and provided no support. (*Id.*). Dr. McKeown stated that Beckworth had a disjointed childhood, troubled youth, and he quit school in the fifth or sixth grade. (*Id.*). He said that Beckworth started drinking alcohol at a very early age, between ten and twelve. (*Id.* at 84–85). Carol Gobbel testified that Beckworth and his father had a "rocky relationship" based on troubles from the past. (*Id.* at 116). She stated that she ultimately divorced Beckworth due to the stress that his family put on their marriage by doing things like showing up unannounced and demanding food, a place to stay, money, and transportation. (*Id.* at 119–20).

In sum, Beckworth has not identified a Supreme Court decision in existence at the time of the ACCA's decision holding that capital defendants are constitutionally entitled to funds to retain a mitigation specialist. Consequently, Beckworth has not established that the ACCA's decision was contrary to, or an unreasonable application of, clearly established federal law. *See Williams*, 529 U.S. at 412–13.

### D. Beckworth's *Brady* Claim: That the State Suppressed Evidence in Violation of His Due Process Rights (Doc. 1 at 43–50, paras. 118–37)

Beckworth's fourth claim, based upon *Brady*, 373 U.S. at 87, is that the State suppressed evidence favorable to his defense in violation of his due process rights. Beckworth divides this claim into two subclaims. First, he alleges that the State suppressed the fact that Walker, his co-defendant, confessed to being the one who shot and killed Ms. Thweatt. (Doc. 1 at 43–48, paras. 119–32). Second, Beckworth alleges that the State suppressed other favorable evidence. He alleges that the State suppressed physical evidence that was collected from the crime scene and tested by the State's labs, such as footprints, fingerprints, blood, and cigarette butts, that he claims showed no link between Beckworth and the crime. (*Id.* at 49–50, paras. 133–37). He also alleges that the State suppressed the fact that breaking and entering charges against Angela Lynn Russell[17] and her mother, Patricia Walker, were dropped in exchange for Russell's testimony for the State at his trial. (Doc. 1 at 50, para. 136).

[17] In its opinion on direct appeal, the ACCA referred to Russell as "Angela Lynn Foster." *Beckworth*, 946 So. 2d at 497. The names refer to the same person.

The Supreme Court summarized the evolution of *Brady* jurisprudence in *Strickler v. Greene*, explaining:

> In *Brady*, this Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S., at 87, 83 S.Ct. 1194. We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*., at 682, 105 S.Ct. 3375; see also *Kyles v. Whitley*, 514 U.S. 419, 433–434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor." *Id*., at 438, 115 S.Ct. 1555. In order to comply with *Brady*, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Kyles*, 514 U.S., at 437, 115 S.Ct. 1555.
>
> These cases, together with earlier cases condemning the knowing use of perjured testimony, illustrate the special role played by the American prosecutor in the search for truth in criminal trials. . . .
>
> This special status explains both the basis for the prosecution's broad duty of disclosure and our conclusion that not every violation of that duty necessarily establishes that the outcome was unjust. Thus the term "*Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called "*Brady* material"—although, strictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

527 U.S. 263, 280–82 (1999) (footnotes omitted). The defendant has the burden to establish a *Brady* violation. *See United States v. Stein*, 846 F.3d 1135, 1145 (11th Cir. 2017). Each subclaim is addressed in turn.

**1. Beckworth's subclaim that the State suppressed Walker's confession (doc. 1 at 43–48, paras. 119–32)**

The Respondent contends that Beckworth pleads several facts within this subclaim that he did not present to the state courts and that, therefore, this Court cannot consider them on AEDPA review. The Court will first describe Beckworth's allegations and then address the Respondent's contention that some cannot be considered by the Court.

Beckworth alleges that during the guilt phase of his trial, the prosecutor told the jury in closing: "[T]he State can't tell you—I admit this right now—beyond all doubt, a hundred percent in any way from the evidence that the State has, who actually pulled the trigger that killed her." (Doc. 1 at 43, para. 119 (alteration in original) (quoting doc. 7-10 at 70)). Beckworth alleges that when he made that statement, the prosecutor had known for over a year that Walker had confessed to being the shooter, but the prosecutor never shared that information with Beckworth's defense counsel.

To support this allegation, Beckworth points out that following his conviction, the same prosecutor called Timothy Byrd to testify at Walker's trial in August 2003, and Byrd testified as follows: He and Walker were cellmates at the Houston County Jail sometime around June 2000, after Walker had been arrested and charged with Ms. Thweatt's

murder.[18] Walker told him that he (Walker) shot and killed Ms. Thweatt, that the murder was "getting to him," and that he was "having bad dreams" and "crying a lot."[19] Byrd

---

[18] Walker was arrested in Etowah County, Alabama and charged with capital murder in June 2000, but, as discussed previously, Beckworth was not located by authorities in Arizona until December 2000. *See Walker v. State*, 932 So. 2d 140, 145–46 (2004).

[19] Beckworth attached as an exhibit to his habeas petition the transcript of Byrd's testimony at Walker's trial. (Doc. 1-1). The portion of the transcript at issue here shows that the following exchange occurred between the prosecutor and Byrd at Walker's trial:

Q. . . . Do you recall when you were interviewed by Houston County Deputies about this statement?

A. Yes.

Q. Was that Eric Sewell?

A. Yes, sir.

. . . .

Q. Well, did you talk to him in June of 2000, the Defendant?

A. We talked for five or six months.

Q. And, the times you talked to him, tell the Jury where you were?

A. Houston County Jail.

Q. Tell the Ladies and Gentlemen of the Jury what Walker said to you about Bessie Lee Thweatt?

A. About the whole conversation?

Q. Yes, sir. Just what he said about Bessie Lee Thweatt's case, the victim, who killed her?

A. He said he did.

Q. Did he say who pulled the trigger?

A. He said he did.

Q. Would you tell the Ladies and Gentlemen of the Jury did he indicate how it affected him in relationship[s] after he got arrested?

A. He was going through some, having bad dreams, crying a lot, really getting to him.

stated that he conveyed this information to Investigator Sewell in April 2001.[20] Beckworth emphasizes that in subsequently sentencing Walker to death, the trial court "explicitly relied on" Walker's confession to being the triggerman, even though the same prosecutor had suggested that *Beckworth* was the shooter in *Beckworth's* trial. (Doc. 1 at 44, para. 121). Beckworth quotes selections from Walker's judicial sentencing hearing, in which the trial judge stated: "During the trial it was this Court's understanding that Mr. Beckworth was the shooter . . . . [H]owever, the Court learned that was not necessarily the case. That through the testimony of witnesses or a witness, that your client[, Walker] is the one that actually did the killing." (*Id.* (alteration in original) (citing (doc. 1-10 at 6))).[21]

---

> Q. Would you tell the Ladies and Gentlemen of the Jury did he tell you who went with him or did the burglary of Ms. Thweatt's house, which person?
>
> A. His brother.
>
> Q. Did he give you a name?
>
> A. Rex Beckworth.

(*Id.* at 7–9).

[20] (*See* doc. 1-1 at 10–11).

[21] The quoted passage cannot be fairly evaluated without considering the broader context in which it was made. Beckworth attached the transcript of Walker's sentencing to his habeas petition. (Doc. 1-10). Beckworth's trial judge did not preside over Walker's trial. The complete passage in which the judge made the quoted statements is as follows:

> I have thought about this case often since [Walker's] trial. During [Walker's] trial it was this Court's understanding that Mr. Beckworth was the shooter and that was from reading the statement of your client; that he did not go into the residence, that he did not have anything to do with it other than to be there and that when it happened, he fled in fear. Those were the statements of your client. During the trial[,] however, the Court learned that was not necessarily the case. That through the testimony of witnesses or a witness, that your client[, Walker] is the one that actually did the killing. I know inevitably in these type case where Co-Defendants are involved, many times there is finger pointing at each other. And I believe that it probably happened in this case as well, that there was finger

Beckworth argues that Walker's confession to being the shooter was favorable to his defense, and that the State's suppression of that evidence prejudiced him for several reasons. He argues that, had Walker's confession been presented to the jury, he would not have been found guilty of capital murder, especially considering that no physical evidence linked him to the crime and his status as an intellectually disabled person meant that his confession to police was involuntary. He also argues that Walker's confession would have undercut Angela Russell's testimony at the guilt phase that Beckworth was the leader among the two co-defendants. He quotes a portion of Russell's trial testimony, as follows:

> Q. During the conversations with Beckworth and Walker present with you, who gave the instructions, if anyone, as to what was going to happen and what they were going to do; where they were going to go?
>
> A. You mean, as in leader and follower, kind of—
>
> Q. Yes, ma'am, what you observed—
>
> A. Rex has always been the stronger one, leader, kind of. He decides what—who's driving, stuff like that.
>
> Q. Now, do you have an opinion as to who is stronger physically? Beckworth or your brother?
>
> A. I believe they can probably both hold their own. But against each other?
>
> Q. Yeah. Against each other, if you have an opinion?
>
> A. I would have to say Rex.

---

> pointing. But, in this case, there was evidence that your client was the trigger man. Had he not been, perhaps the Jury Recommendation might have been different. Had his story been, as he presented it, at least in the statements he gave investigators, the Jury may have recommended Life Without Parole. But, it didn't turn out that way.

(*Id.* at 6–7).

(Doc. 1 at 45, para. 124 (quoting doc. 7-12 at 14–15)).

The Respondent contends that Beckworth did not present the following facts to the state courts: despite knowing about Walker's confession for over a year (*id.* at 43, para. 119); the trial court relied heavily on Walker's confession to sentence Walker to death in his own case (*id.* at 44, para. 121); if presented at Beckworth's trial, Walker's confession would have discredited Angela Russell's testimony that Beckworth was the leader and more culpable among the two half-brothers; (*id.* at 45, para. 124); and if presented at Beckworth's trial, Walker's confession would have changed the outcome especially considering that Beckworth is intellectually disabled, so his own confession was susceptible to challenge as being involuntary (*id.* at 44–45, para. 123). The Respondent argues that, because these facts were not presented to the state court, this Court should not consider them when evaluating the reasonableness of the state courts' decisions.

Beckworth does not dispute that he did not plead these facts to the state courts, but he counters that since he is merely quoting portions of the record from his trial and Walker's trial, he should not be barred from having this Court consider those portions of the record in considering his subclaim. But Beckworth does more than just quote portions of the trial record: he uses those portions of the record to fashion new arguments about how the State suppressed evidence in violation of his constitutional rights. There is no question that the transcript of portions of Beckworth's trial, on which Beckworth bases some of his arguments, was before the state courts, but he did not include any references to these transcripts in pleading his *Brady* claim to the state courts. For example, in his Rule

32 Petition, Beckworth did not quote or even paraphrase the prosecutor's statement in closing argument that the State did not know who pulled the trigger on the gun that killed Ms. Thweatt. So, the postconviction courts could not consider whether that detail was evidence in support of Beckworth's claim that the State suppressed Walker's confession. Nor did Beckworth quote or even mention Angela Russell's trial testimony that Beckworth was the leader and Walker was the follower. Thus, the postconviction courts could not consider whether that evidence supported Beckworth's claim that Walker's confession was material to his guilt or innocence in that it could have undermined her testimony. Nor did Beckworth ever plead in his Rule 32 Petition as part of his *Brady* claim that his alleged intellectual disability rendered his own confession involuntary. Instead, he pled that his confession in Arizona was "susceptible to challenge as involuntary and unreliable" for a different reason: because "it was obtained by a police officer who was primed by Walker to obtain an admission of guilt from Mr. Beckworth." (Doc. 7-19 at 75). And, Beckworth never asserted that the trial court in Walker's subsequent trial stated that he had come to discover that Walker "actually did the killing." Thus, although they knew that Byrd testified against Walker in Walker's subsequent trial, (*see id.* at 74), the state courts did not have that additional information before them in assessing whether the suppression of the evidence was prejudicial. For the reasons the Court has previously explained, it would not be appropriate for this Court to consider whether these new allegations contribute to the merit of Beckworth's *Brady* subclaim because the state courts never had the opportunity to do so.

The Court turns to the portions of this subclaim that Beckworth did present to the state courts. Beckworth raised a *Brady* claim premised on Walker's confession for the first time in his Rule 32 Petition. (Doc. 7-19 at 73–76). The Rule 32 Court summarily dismissed Beckworth's entire Rule 32 Petition for failure to state a claim and did not explicitly discuss Beckworth's *Brady* claims. (*Id.* at 160–61). Beckworth appealed that ruling to the ACCA. (Doc. 7-20 at 45–55). The ACCA held that the Rule 32 Court's failure to address the *Brady* claims was harmless because Beckworth had not pled the claims sufficiently under ALA. R. CRIM. P. 32.6(b), and because the claims were procedurally barred under ALA. R. CRIM. P. 32.2(a)(3) and (5) because they could have been raised at trial or on direct appeal but were not. *Beckworth*, 190 So. 3d at 540–41. Beckworth raised this claim again in his petition for certiorari to the Alabama Supreme Court. (Doc. 7-23 at 35–38, 42–47). The Alabama Supreme Court granted certiorari only as to this subclaim. The court reversed the ACCA's holding, concluding that the procedural bar relied on by the ACCA was inapplicable, and remanded the claim to the ACCA for consideration of the merits of the claim. *Beckworth*, 190 So. 3d at 575.[22]

---

[22] The Alabama Supreme Court explained that although Beckworth brought this *Brady* subclaim pursuant to ALA. R. CRIM. P. 32.1(a), by alleging a constitutional violation, the ACCA's analysis of the subclaim on appeal relied upon case law discussing the pleading requirements applicable to claims made under ALA. R. CRIM. P. 32.1(e) instead, which pertains to newly discovered evidence. *Beckworth*, 190 So. 3d at 573–74. The court explained that a petitioner must plead and ultimately prove more if he is pleading newly discovered facts under Rule 32.1(e) than if he is pleading a constitutional violation under Rule 32.1(a). *Id.* at 574. Since Beckworth pled a constitutional violation and not newly discovered evidence, he was not required to plead that he could not have raised the claim at trial or on appeal. *Id.* at 574–75 ("Rule 32.3 does not impose any burden of pleading on the petitioner regarding preclusion, only a burden of disproving preclusion if preclusion is pleaded by the State."). The court held that Beckworth's subclaim should not have been dismissed on the ground that it lacked allegations negating the preclusive bars of Rule 32.2(a)(3) and (5). *Id.* at 575.

On remand, the ACCA held once again that the Rule 32 Court properly dismissed Beckworth's *Brady* claim, this time because he failed to plead that the evidence was suppressed. (Doc. 7-25 at 48–52). Explaining its rationale, the ACCA stated:

> "To establish a Brady violation, [the defendant] must demonstrate (1) that the prosecution suppressed evidence; (2) that that evidence was favorable to him or exculpatory; and (3) that the evidence was material." Ex parte Kennedy, 472 So. 2d 1106, 1110 (Ala. 1985). " 'Furthermore, the rule of Brady applies only in situations which involve "discovery after trial of information which had been known to the prosecution but unknown to the defense." United States v. Agurs, 427 U.S., at 103, 96 S. Ct., at 2397.' Gardner v. State, 530 So. 2d 250, 256 (Ala. Cr. App. 1987), affirmed, Ex parte Weaver, 530 So. 2d 258 (Ala. 1988). (Emphasis in original.)" Bates v. State, 549 So. 2d 601, 609 (Ala. Crim. App. 1989). See also Bryant v. State, [CR-08-0405, Sept. 5, 2014] ___ So. 3d ___ (Ala. Crim. App. 2014).
>
> Thus, Beckworth was required to allege in the petition sufficient facts to establish that evidence of Walker's statement to his cell mate was not known to the defense, and he failed to do so. Thus, having failed to allege the first element of a Brady claim, Beckworth failed to meet the specificity requirement of Rule 32.6(b), Ala. R. Crim. P., and the circuit court was correct to summarily dismiss that claim. See Rule 32.7(d) , Ala. R. Crim. P.
>
> Therefore, we again conclude that summary dismissal of this Brady claim—that the State withheld evidence of Walker's statement to his cell mate—was proper. The circuit court's summary dismissal of this claim is affirmed.

(*Id.* at 51–52). On September 18, 2015, the Alabama Supreme Court denied Beckworth's petition for certiorari. (Doc. 7-25 at 130). That concluded Beckworth's pursuit of this claim in the state courts.

Under AEDPA, dismissal of a claim under ALA. R. CRIM. P. 32.6(b) based on insufficient pleading is considered an adjudication on the merits. *Borden*, 646 F.3d at 815–16 ("[A]n Alabama court's consideration of the sufficiency of the pleadings concerning a federal constitutional claim contained in a Rule 32 petition necessarily entails a

determination on the merits of the underlying claim; we cannot construe such a rule to be a state procedural bar that would preclude our review.”). Thus, this Court can award relief only if it finds that the ACCA’s decision that Beckworth failed to sufficiently plead this claim was “contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States,” 28 U.S.C. § 2254(d)(1), or “based on an unreasonable determination of the facts in light of the evidence presented, *id.* § 2254(d)(2).

Beckworth argues that the ACCA’s decision is contrary to and an unreasonable application of the Supreme Court’s decision in *Brady* because, by requiring Beckworth to plead that his counsel was not aware of the evidence, the ACCA impermissibly added a fourth element to *Brady*’s three-part test. However, the Court is not persuaded that the ACCA contravened or unreasonably applied *Brady* on this basis. The ACCA set out the three elements that are necessary to state a *Brady* claim: (1) that the prosecution suppressed evidence; (2) that that evidence was exculpatory or favorable to the defendant; and (3) that the evidence was material. (Doc. 7-25 at 51). The ACCA also stated, based on the Supreme Court’s holding in *United States v. Agurs*, 427 U.S. 97, 103 (1976), that *Brady* only applies in situations involving “discovery after trial of information which had been known to the prosecution but unknown to the defense.” (Doc. 7-25 at 51(emphasis omitted)). In other words, the ACCA was stating that, for a *Brady* claim to be successful, the defendant could not have already known about the information that he claims was suppressed. Applying *Brady* and *Agurs*, the ACCA then determined that Beckworth failed to plead the first

element of a *Brady* claim—suppression—because he did not plead that the evidence was unknown to him before his trial.

The ACCA did not unreasonably conclude that Beckworth failed to adequately plead the *Brady* claim based on Walker's confession. It bears repeating that this Court is only considering what Beckworth pled in his Rule 32 Petition and not what he alleges in his federal habeas petition. *See Borden*, 646 F.3d at 816 ("AEDPA limits [the federal court's] review to whether the state court's determination that [the petitioner] failed to plead sufficient facts in his Rule 32 petition to support a claim of ineffective assistance of counsel was contrary to or an unreasonable application of Supreme Court precedent. Thus, [the federal court] look[s] only to the allegations in [the petitioner's] Rule 32 petition and whether those allegations sufficiently state a claim for ineffective assistance of counsel." (second alteration in original) (emphasis omitted) (quoting *Powell v. Allen*, 602 F.3d 1263, 1273 (11th Cir. 2010 (per curiam))). In Beckworth's Rule 32 Petition, he stated the legal conclusion that the prosecution suppressed Walker's confession, but the factual allegations in support of that conclusion are sparse at best. Beckworth alleged that around June 2000, Walker told Byrd that he (Walker) had pulled the trigger, and that after this conversation, Byrd "made a statement to Investigator Eric Sewell." (*See* doc. 7-19 at 74). Beckworth then alleged that the prosecution found Byrd's statement "highly probative," and that "[t]he same District Attorney who withheld the evidence during Mr. Beckworth's trial called Mr. Byrd to testify at the later trial of James Walker." (*Id.*). Construing these allegations liberally and in Beckworth's favor, one could infer that Byrd told Investigator Sewell in

June 2000, before Beckworth's trial began, that Walker had confessed to him.[23] But it was not unreasonable for the ACCA to conclude that these allegations, without more, were insufficient to establish the suppression element of a *Brady* claim.

The Court acknowledges that the allegation that the State withheld evidence *could* be construed as a factual allegation, not just a legal conclusion. But on AEDPA review, Beckworth must do more than show that another jurist could reach a different conclusion—indeed, he must do more than show that the state courts' decision was incorrect. *See Harrington*, 562 U.S. at 101; *Schriro*, 550 U.S. at 473. To succeed, he must show that *no* fairminded jurist "could reach the state court's conclusion under [the Supreme Court's] precedents." *Brown v. Davenport*, 596 U.S. 118, 135 (2022) (citing *Davis v. Ayala*, 576 U.S. 257, 269 (2015)). Beckworth has failed to clear the high bar necessary to establish that the ACCA *unreasonably* concluded that he pled the legal conclusion of suppression but insufficient facts to support it.

Beckworth insists that the ACCA erroneously derived from the Supreme Court's dicta in *Agurs* a "fourth pleading requirement"—that a petitioner must plead that he was unaware of the evidence that he claims was suppressed—where that was never intended by the Supreme Court. The Supreme Court in *Agurs* stated in relevant part: "The rule of *Brady* [], arguably applies in three quite different situations. Each involves the discovery,

[23] The Court acknowledges that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). However, Beckworth did not allege in his Rule 32 petition (nor in his submissions to this Court) that his prosecutor should be held responsible for evidence known to Investigator Sewell. This deficiency supplies yet another justification for the ACCA's conclusion that Beckworth failed to sufficiently plead this *Brady* claim. *See Pye*, 50 F.4th at 1036.

after trial of information which had been known to the prosecution but unknown to the defense." 427 U.S. at 103. Beckworth is correct that the ACCA, in quoting this language, emphasized the phrase "after trial" where it was not originally emphasized by the Supreme Court. (*See* doc. 7-25 at 51–52). But even if the Supreme Court in *Agurs* was merely describing the general scenario in which a *Brady* claim can emerge, as Beckworth claims, and the ACCA misconstrued *Agurs*' language to mean that a defendant must demonstrate that he did not discover the suppressed evidence until a later time, that interpretation did not graft on an additional element to the *Brady* test. Under *Brady*, evidence is not "suppressed" if the defendant is aware of it before trial. *See Agurs*, 427 U.S. at 103 (describing a *Brady* violation as involving information that was unknown to the defense). Therefore, it was not unreasonable for the ACCA to conclude that if Beckworth knew about the evidence, it could not have been suppressed.

Beckworth also argues that by requiring him to plead that he was not aware that Walker confessed to being the shooter, the ACCA was essentially requiring him to take it upon himself to seek out favorable evidence that the State suppressed. He contends that the Supreme Court has repeatedly refused to place the burden on a defendant to discover evidence that the State withholds, citing *Banks v. Dretke*, 540 U.S. 668 (2004). In *Banks*, the lower court rejected the defendant's *Brady* claim by imposing a due diligence requirement on the defendant: ruling that the defendant "should have asked to interview" a witness who could have furnished the exculpatory evidence that the prosecutor did not disclose. *Id.* at 688. The Supreme Court held that there was no such requirement on the defendant in a criminal case, stating that its precedent "lend[s] no support to the notion that

defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Id.* at 695 (citing *Strickler*, 527 U.S. at 285). However, Beckworth's attempt to equate these two issues fails. Requiring a defendant to plead facts supporting the legal conclusion that the prosecution suppressed evidence, which is what the ACCA did here, is not the same as imposing on a defendant a diligence requirement to seek out evidence hidden by a prosecutor.[24]

Beckworth also argues the ACCA's decision was "contrary to" *Brady* because the facts of his case are "materially indistinguishable" from *Brady* but the ACCA decided his case differently from *Brady*. *See Bell*, 535 U.S. at 694 (stating that under the "contrary to" clause, a federal court may grant relief if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts). The defendant in *Brady* received a new penalty phase trial because the prosecution suppressed a statement by his co-defendant in which the co-defendant admitted that he was the triggerman. 373 U.S. at 84–85. The Supreme Court agreed with the state appellate court that the co-defendant's confession was material to the issue of punishment (but not guilt). *Id.* at 86–91. However, in *Brady*, the fact that the prosecution suppressed favorable evidence from the defendant was not in dispute. *Id.* at 84. The prosecution showed several of the co-defendant's statements to the defendant before his trial, but the "one dated July 9, 1958, in which [his

[24] The Respondent contends that Beckworth did not raise this particular argument, which relies upon *Banks*, below, so it is procedurally defaulted. The Court disagrees. As Beckworth points out, he did not mention this argument in his Rule 32 Petition because, when he filed it in 2007, he could not have predicted how the ACCA would rule on his claims seven years later on appeal. Beckworth is not raising a new argument by invoking *Banks*; instead, he is attempting to demonstrate why the ACCA's decision was contrary to law under 28 U.S.C. § 2254(d).

co-defendant] admitted the actual homicide, was withheld by the prosecution and did not come to petitioner's notice until after he had been tried, convicted, and sentenced, and after his conviction had been affirmed." *Id.* Thus, there was no dispute in *Brady* that the prosecution suppressed evidence. In contrast here, the ACCA held that Beckworth did not plead any facts supporting that the evidence was actually suppressed. Whether or not any evidence was actually suppressed is certainly a distinguishing factor between this case and *Brady*.[25]

In sum, the ACCA's conclusion that Beckworth did not plead the suppression element of his *Brady* claim was not unreasonable under 28 U.S.C. § 2254(d). However, if this Court is incorrect, and the ACCA's specific justification for holding that Beckworth failed to sufficiently plead the claim was objectively unreasonable (because the ACCA added an additional pleading requirement, as Beckworth claims), this Court must also consider other, unstated rationales which might support the ACCA's conclusion. *See Pye*, 50 F.4th at 1036. In *Pye*, the en banc Eleventh Circuit held that a federal court is not required "to strictly limit [its] review to the particular justifications that the state court provided." *Id.* Instead, "having determined the reasons for the state court's decision, [the court] may consider any potential justification for those reasons." *Id.*; *see also King v. Warden, Ga. Diagnostic Prison*, 69 F.4th 856, 867 (11th Cir. 2023) ("We evaluate the

[25] Beckworth points out that in an order denying Beckworth's request for discovery of *Brady* evidence, the Magistrate Judge previously assigned to this case stated that the facts of this case "are nearly identical to the facts in *Brady*." (Doc. 35 at 18). However, at that juncture, the Magistrate Judge was not considering whether the ACCA's decision on the merits of Beckworth's *Brady* claim was unreasonable under AEDPA.

reasons offered by the court, but if we can justify those reasons on a basis the state court did not explicate, the state-court decision must still stand.”).

Applying *Pye*’s directive here, the “particular justification[]” the ACCA gave for determining that Beckworth did not sufficiently plead his *Brady* claim was that he failed to plead that the evidence was suppressed (because he failed to plead that he was unaware of it at trial). (Doc. 7-25 at 52). But the overall “reason” for the ACCA’s denial of relief was that Beckworth failed to sufficiently plead the claim. As explained below, this Court can justify that reason in another way: Beckworth did not sufficiently plead, to the state courts, that Walker’s statement was material either to his guilt or to the death sentence imposed under the circumstances of this case.

Evidence is material “only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability’ is a probability sufficient to undermine confidence in the outcome.” *Bagley*, 473 U.S. at 682. Thus, Beckworth had to plead that there was a reasonable probability that, had Walker’s confession been disclosed and presented to the jury, he either would not have been found guilty of capital murder or would not have been sentenced to death.

Taking materiality to guilt first, Beckworth did not sufficiently plead in his Rule 32 Petition that there was a reasonable probability that he would have been acquitted had Walker’s confession been disclosed. In support of materiality to guilt, Beckworth pled that the prosecution offered no physical evidence connecting him to the murder; that the statements he made to law enforcement were the only evidence the prosecution offered of

Beckworth's guilt; and that those statements were unreliable because he was essentially coerced by police into making them. (*See* doc. 7-19 at 73–76). However, Beckworth ignored the abundant circumstantial evidence of his guilt in the record. As stated in the background section of this Opinion, Mark Peacock testified that before the murder, he had told Beckworth that his grandmother, Ms. Thweatt, kept a lot of money in her house. *Beckworth*, 946 So. 2d at 496–97. Chris Hood testified that before the murder, Beckworth had asked him for help obtaining a weapon that could not be traced, indicating a preliminary intent to use the weapon in some illegal fashion. *Id.* at 497. Chris Hood also testified that Beckworth had previously told him that the best way to kill a person was execution style. *Id.* Further, Angela Russell testified that before the murder, she looked in the trunk of the car Beckworth had been driving and saw the barrel of a gun that she believed to be a .22 caliber rifle or shotgun. *Id.* She said Beckworth told her that someone had given him the gun. *Id.* She also testified that based on her personal observations of Beckworth and Walker, Beckworth was the leader of the two, being over ten years older than Walker. *Id.* A .22 caliber rifle was later recovered from water in an area approximately one and one-half miles from Ms. Thweatt's home. *Id.* Shell casings recovered from Ms. Thweatt's home were determined to be from the same .22 caliber rifle that was recovered near her home. *Id.* at 498.

The evidence recounted above, combined with Beckworth's confession in which he provided numerous details that were unknown to others—such as how he and Walker entered the home and where he and Walker later disposed of the rifle—constituted strong evidence of Beckworth's guilt. In his Rule 32 Petition, Beckworth alleged that if Timothy

Byrd had testified about Walker's confession, Byrd's testimony would have corroborated Beckworth's statement to police that he was not the triggerman. (Doc. 7-19 at 76). But the jury had already heard that Beckworth was not the triggerman from Beckworth himself; and as Beckworth points out, the prosecutor also told the jury in his closing argument that the State did not know who pulled the trigger. Moreover, the jury was instructed on the legal theory of complicity and accomplice liability under Alabama law, so even if Beckworth did not wield the murder weapon, he was guilty as an accomplice. *See Beckworth*, 946 So. 2d at 530; (*see also* doc. 7-12 at 166–67, 184 (transcript of portion of jury instruction on accomplice liability)). Consequently, the ACCA's determination that Beckworth failed to sufficiently plead this *Brady* claim was not unreasonable based on the additional justification that Beckworth failed to plead that there was a reasonable probability that Walker's confession, had it been disclosed, would have resulted in the jury finding him not guilty, thus preventing him from meeting *Brady*'s materiality element as to the guilt phase.

Turning to materiality to punishment, the question is whether, if Walker's confession had been presented to the jury, there is a reasonable probability that at least one of the ten jurors who voted for the death penalty would have voted for a sentence of life imprisonment instead, and even if one had not, whether Walker's confession would have created a reasonable probability that the trial court would have overridden the jury's recommendation of death and sentenced Beckworth to life imprisonment instead. *Cf. Borden*, 646 F.3d at 820 (articulating this standard in the context of *Strickland* prejudice, whose legal inquiry is substantially similar). Under the circumstances of this case, the

Court is not persuaded that a different sentencing result would be reasonably probable had the jury and trial court heard Walker's confession. First, the jury heard the pathologist's testimony that, after attempting to flee her attackers and before she was shot, Ms. Thweatt was severely beaten in her face and head, including his testimony that Ms. Thweatt was alive when these injuries were inflicted and that a great amount of force was used to inflict them. Comparable aggravating evidence was not present in *Brady* (or at least was not discussed by the Supreme Court in its opinion), and this difference reasonably supports the conclusion that Beckworth's co-defendant's confession to being the triggerman would not be material to the jury's death recommendation, even though Brady's co-defendant's similar confession was material. Further, in its written sentencing order, the trial court never stated that Beckworth was the triggerman. (Doc. 7-14 at 55–60). The trial court did find that Beckworth's participation in the murder was not minor, bases on Beckworth's own statement that he was present at the murder, Angela Russell's testimony that Beckworth had obtained the murder weapon prior to the killing, and Chris Hood's testimony that Beckworth wanted to find a weapon that could not be traced. (*See id.* at 58). The trial court further found that the State proved three aggravating circumstances beyond a reasonable doubt: (1) the murder was committed during the commission of a burglary; (2) Beckworth was on parole when the crime was committed; and (3) the murder was especially heinous, atrocious, and cruel, given the evidence that Ms. Thweatt attempted to flee her home before being beaten with a gun and eventually shot. (*Id.* at 56–57). On this record, Walker's confession that he was the triggerman does not meaningfully undermine the evidence upon which the trial court relied in finding that the aggravating circumstances

outweighed the mitigating circumstances such that a death sentence was appropriate. In sum, the ACCA's determination that Beckworth failed to adequately plead this *Brady* claim was not unreasonable for the additional justification that Beckworth failed to sufficiently plead that there was a substantial probability that Walker's confession, had it been disclosed, would have changed the outcome of the penalty phase of his trial, thus preventing him from meeting the materiality element of a *Brady* claim as to the punishment phase.

In sum, the Court finds that the ACCA's rejection of this *Brady* subclaim was not objectively unreasonable or contrary to law pursuant to 28 U.S.C. § 2254(d). However, even if it was, other objectively reasonable grounds justify the ACCA's conclusion, so Beckworth is not entitled to habeas relief on this subclaim.

**2. Beckworth's subclaim that the State suppressed other favorable evidence (doc. 1 at 49–50, paras. 133–37)**

Beckworth also claims that the State suppressed other favorable evidence: (1) physical evidence from the crime scene that he says could have pointed to a different perpetrator, and (2) the fact that the State dropped criminal charges against Angela Russell and her mother in exchange for Russell's testimony against him at trial. Beckworth argues that had this evidence been presented to the jury, there is a reasonable likelihood that he would not have been found guilty of Ms. Thweatt's murder.

The Respondent argues that this subclaim is procedurally defaulted from this Court's review because Beckworth did not exhaust them during his Rule 32 proceedings by failing to include them in his petition for a writ of certiorari to the Alabama Supreme

Court. For the following reasons, the Court does not agree that Beckworth failed to exhaust this claim.

Beckworth pled a *Brady* claim based upon these allegations for the first time in his Rule 32 petition, (doc. 7-19 at 76–77), and after the Rule 32 Court dismissed the entire petition without discussing his *Brady* claims, (*id.* at 160–61), Beckworth argued that this was error on appeal to the ACCA (doc. 7-20 at 48–52). However, the ACCA held that the Rule 32 Court's failure to explicitly discuss these claims was harmless because Beckworth did not plead them sufficiently under ALA. R. CRIM. P. 32.6(b), and because they should have been but were not presented either at trial or on appeal under ALA. R. CRIM. P. 32.2(a)(3) and (5), stating as follows:

> *2. Exculpatory evidence*
>
> Beckworth alleged in his petition that "[i]dentifiable physical evidence linked to someone other than Mr. Beckworth would have been material and exculpatory, given his consistent claim that he was not present when the crime was committed." (C. 74.) This claim was not sufficiently pleaded, and it was procedurally barred from review. Beckworth did not plead any facts in the petition to support this claim. He did not allege the existence of any physical evidence linking the murder to someone else, only that if such evidence had existed, it would have been material. Because he failed to plead any facts regarding the existence of any exculpatory physical evidence, he necessarily failed to plead any facts indicating that the evidence was known to the prosecution and not revealed to him in time for this claim to have been raised at trial or on appeal. Because Beckworth failed to plead any facts supporting this claim, it was not sufficiently pleaded and was due to be dismissed because it was procedurally barred. Rule 32.6(b), Ala. R.Crim. P.; Rule 32.2(a)(3) and (5), Ala. R.Crim. P.
>
> *3. Plea bargains*
>
> Beckworth alleged in his petition: "The prosecution failed to reveal that breaking and entering charges against Angie Russell and her mother Patricia Walker were dropped in return for Angie Walker's testimony." (C.

75.) This claim was due to be dismissed because it failed to include the full factual basis for the claim. The claim was also due to be dismissed because it was procedurally barred; the claim could have been, but was not, raised at trial and on appeal. In the petition, Beckworth failed to include any facts indicating the substance of Angie Walker's testimony at his trial; he did not plead any facts indicating who Angie Russell and Patricia Walker were and why charges against them might have been dropped in exchange for Angie Walker's testimony; he did not plead any facts indicating that evidence of the alleged plea bargains was relevant or material to any issue at Beckworth's trial; and Beckworth failed to plead any facts indicating when he discovered that the State had made plea bargains with the witnesses or that he did not discover them in time to file a motion for a new trial or to raise the issue on appeal. Thus, the claim was not sufficiently pleaded and it was procedurally barred from review. Rule 32.3, Rule 32.6(b), Ala. R.Crim. P.

Finally, the alleged plea bargains would have constituted only impeachment evidence, and relief on a *Brady* claim is not allowed when the facts amount to only impeachment evidence. *Johnson v. State*, [Ms. CR–05–1805, Sept. 28, 2007] ––– So. 3d ––– (Ala.Crim.App.2007). Therefore, even if Beckworth had provided a sufficient factual basis for the claim and even if he had alleged that he did not discover the evidence until after the time for filing a motion for a new trial and an appeal had lapsed, the claim would nonetheless have failed to state a material issue of fact or law that would have entitled Beckworth to relief. Dismissal would have been proper for this additional reason. Rule 32.7(d), Ala. R.Crim. P. Therefore, the trial court's failure to address this claim specifically did not result in reversible error.

*Conclusion*

None of Beckworth's *Brady* claims were pleaded with sufficient specificity, and each lacked a full disclosure of the factual basis supporting the claim. Summary dismissal of each of the claims would have been proper, additionally, because each claim could have been raised at trial or on appeal, but was not, and thus was procedurally barred. Finally, dismissal of the claim that alleged that the State had failed to disclose plea agreements would have been proper because the alleged plea agreements would have constituted only impeachment evidence, and the claim presented no material issue of fact or law that would have entitled Beckworth to relief.

*Beckworth*, 190 So. 3d at 542–43.

In his petition for certiorari to the Alabama Supreme Court, Beckworth argued that he did plead facially meritorious *Brady* claims, specifically arguing as follows:

> It is well-established that a defendant is entitled to have the government produce exculpatory evidence in a criminal proceeding. *Brady v. Maryland*, 373 U.S. 83 (1963). Indeed, there is no distinction between the State's obligation to provide exculpatory evidence and evidence that can be used to impeach or otherwise challenge the veracity of a witness. *United States v. Bagley*, 473 U.S. 667, 678 (1985); *see also Giglio v. United States*, 405 U.S. 150 (1972); *Ex parte Womak*, 541 So. 2d 47 (Ala. 1988); Ala. R. Crim. P. 16. Further, in the context of a capital proceeding, the State is under a heightened obligation to provide discovery to the defendant, as the hovering possibility of a death sentence is a special circumstance that places an increased obligation on the State. *Ex parte Monk*, 557 So. 2d 832 (Ala. 1989). A Fifth Amendment claim of state suppression of material evidence consists of three elements: (i) the State did not reveal evidence, (ii) that evidence was favorable to the defense, and (iii) it was material to the defendant's guilt or sentence. *Brady*, 373 U.S. at 87.
>
> . . . .
>
> Mr. Beckworth [] alleged that the State made plea deals with Angela Walker and her mother in return for Ms. Walker's testimony and did not reveal those deals to the defense. (Rule 32, C. 75 at [para.] 238). He alleged that Ms. Walker's testimony was crucial to the State's case because she testified that she saw a gun, which resembled the murder weapon, in the trunk of the co-defendant's car. (Rule 32, C. 59 at [para.] 199). He therefore alleged facts which, if true, would have warranted his relief. *Giglio v. United States*, 405 U.S. 150, 154 (1972) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)) (holding that the State's suppression of a witness' plea deals can be a violation of due process).
>
> Mr. Beckworth also alleged that the State withheld physical evidence from the defense. (Rule 32, C. 73-74 at [paras.] 234-237). He alleged that the evidence would have shown a person other than he was at Ms. Thweatt's home the night of her murder. (Rule 32, C. 74 at [para.] 236). As the State's case relied on Mr. Walker's version of events, which involved only he and Mr. Beckworth, Mr. Beckworth alleged the suppressed evidence was material to his case. *Id*. He therefore alleged facts which, if true, would have warranted his relief. *See Youngblood v. West Virginia*, 547 U.S. 867 (2006) (holding that the State's suppression of exculpatory physical evidence can be a violation of due process).

> Mr. Beckworth pleaded facts which, if true, would warrant relief under clearly established United States Supreme Court precedent. The Court of Criminal Appeals['] decision to the contrary is therefore in conflict with the prior decisions of [t]he Alabama Court of Criminal Appeals, this Court, and the United States Supreme Court. Therefore, this Court should grant certiorari, reverse the Court of Criminal Appeals, and remand for a hearing on Mr. Beckworth's claims.

(Doc. 7-23 at 35–38). The Alabama Supreme Court denied certiorari on this claim. (Doc. 7-24 at 26).

As stated, the Respondent argues that the foregoing argument that Beckworth made to the Alabama Supreme Court was not sufficient to "fairly present," *Ward*, 592 F.3d at 1156, these *Brady* claims to that court because Beckworth merely argued that he had pled the claims sufficiently, but he was also required to "argue the merits of th[e] claim[s]." (Doc. 43 at 69). But "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). Beckworth did so in his petition to the Alabama Supreme Court, in which he argued that he had pled facts which, if true, would warrant relief under *Brady*, *Napue*, and *Giglio*.[26] This presentation was sufficient to indicate the federal law basis for the claim as instructed by the Supreme Court in *Baldwin*. *See Dieter v. Florida*, 759 F. App'x 885, 890 (11th Cir. 2019) (the petitioner is not required to "fully address the

[26] Moreover, as the Court previously stated, dismissal of a claim under ALA. R. CRIM. P. 32.6(b) based on insufficient pleading is considered an adjudication on the merits. *Borden*, 646 F.3d at 815–16. Thus, under these circumstances, arguing insufficient pleading versus the merits is a distinction without a difference.

merits of a federal claim in order to fairly present the claim to a state court. Rather, a petitioner may satisfy *Baldwin* by making the state court *aware* that the petitioner raises a federal issue." (emphasis added)).[27]

Having determined that this subclaim is fully exhausted and properly before this Court, the Court turns to AEDPA review of the state courts' decision. Under 28 U.S.C. § 2254(d), in order to obtain relief on this claim, Beckworth must demonstrate that the decision of the ACCA, which was the last reasoned state court decision, *see Wilson*, 584 U.S. at 125, was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d). However, Beckworth makes no attempt to do so in his habeas petition. He does not offer any argument as to why the ACCA's decision was contrary to law or unreasonable. Additionally, in his merits brief and reply brief, he makes no mention of this subclaim at all.[28] Accordingly, Beckworth has not met his burden of demonstrating that the ACCA's decision is unreasonable under 28 U.S.C. § 2254(d), and he is therefore entitled to no relief on this subclaim.

---

[27] Here, and elsewhere in this Opinion, the Court cites nonbinding authority. While the Court acknowledges these cases are nonprecedential, the Court finds them persuasive.

[28] The Court further observes that, based on his own allegations, it appears that Beckworth's trial counsel were aware that this physical evidence existed before trial but was merely informed that the evidence was so degraded that it was useless. (*See* doc. 1 at 49, para. 134). Thus, Beckworth likely also failed to adequately plead that the evidence was suppressed.

**E. Beckworth's Claim that His Trial Counsel Rendered Ineffective Assistance at the Guilt and Penalty Phases of His Trial in Violation of His Sixth Amendment Rights by Failing to Investigate and Present Evidence of Beckworth's Background and Family History and His Intellectual Disability (Doc. 1 at 50–91, paras. 138–269)**

In this claim, Beckworth alleges that his constitutional right to effective assistance of counsel was violated because his trial counsel failed to investigate and present evidence of his background, family history, and intellectual disability for mitigation purposes.[29] This claim spans forty pages of his petition and contains numerous distinct allegations as well as a litany of details about what his trial counsel allegedly would have learned about him if they had investigated. Beckworth raised a similar ineffective assistance of counsel claim in his Rule 32 Petition, but the state courts concluded that he failed to plead the claim with specificity under ALA. R. CRIM. P. 32.6(b) because he failed to state how he was prejudiced by the failure to investigate. Thus, this Court must review this claim—to the extent that it is the same claim that Beckworth raised below—by examining the state courts' decision under 28 U.S.C. § 2554(d). The first step in that endeavor is to discuss the framework used by courts for evaluating ineffective assistance of counsel claims under AEDPA when the state courts have adjudicated them on the merits.

The Supreme Court has recognized that the Sixth Amendment guarantees a criminal defendant the right to the effective assistance of counsel. *See Powell v. Alabama*, 287 U.S. 45 (1932); *Johnson v. Zerbst*, 304 U.S. 458 (1938); *Gideon v. Wainwright*, 372 U.S. 335

[29] Beckworth alleges elsewhere in his petition that his trial counsel were ineffective at the guilt phase of his trial for other reasons, and the Court addresses that claim, *infra*, at Section V.I. This claim focuses solely on his trial counsel's presentation, or lack thereof, of mitigation evidence.

(1963). The "right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial." *Strickland*, 466 U.S. at 684. In *Strickland*, the Supreme Court established the constitutional standard for determining whether a criminal defendant has been denied the effective assistance of trial counsel:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687. A habeas petitioner has the burden to prove both prongs of the *Strickland* standard by a preponderance of the evidence. *Ward*, 592 F.3d at 1163; *Mills v. Singletary*, 63 F.3d 999, 1020 (11th Cir. 1995).

To satisfy the deficient performance prong of *Strickland*, a defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688); *Williams*, 529 U.S. at 390–91. The defendant has the burden of proof and must overcome a strong presumption that his trial counsel's conduct falls within a wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 687–88, 690–91. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins*, 539 U.S. at 523 (holding that the proper analysis under *Strickland*'s performance prong is an objective review of the "'reasonableness [of counsel's performance] under prevailing professional norms,' . . . which includes a context-

dependent consideration of the challenged conduct as seen 'from the counsel's perspective at the time'" (quoting *Strickland*, 466 U.S. at 688–89)). "Based on this strong presumption of competent assistance, the petitioner's burden of persuasion is a heavy one; 'petitioner must establish that no competent counsel would have taken the action that his counsel did take.'" *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc)). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (quoting *Strickland*, 466 U.S. at 688–89).

To satisfy the "prejudice" prong, a petitioner "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693. Rather, a petitioner must establish a reasonable probability that, but for the objectively unreasonable conduct of his counsel, the result of the proceeding would have been different. *Wiggins*, 539 U.S. at 534; *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.

To establish *Strickland* prejudice in the capital sentencing context, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant

death." *Strickland*, 466 U.S. at 695. "In determining whether there is a reasonable probability of a different result, a court must consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" *Gavin v. Comm'r, Ala. Dep't of Corr.*, 40 F.4th 1247, 1263 (11th Cir. 2022) (alteration in original) (quoting *Porter*, 558 U.S. at 41).

Importantly, "whether defense counsel's performance fell below *Strickland*'s standard" is not the question before a federal habeas court reviewing a state court's decision under 28 U.S.C. § 2254(d). *Harrington*, 562 U.S. at 101. Where § 2254(d) applies, "the question is not whether counsel's actions were reasonable" but is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. at 105. This "extra layer of deference that § 2254 provides" means that "it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Johnson v. Sec'y, DOC*, 643 F.3d 907, 911 (11th Cir. 2011).

Having discussed the standards for reviewing this claim, the second step for this Court is to ensure that it is aware of which allegations Beckworth actually placed before the state courts that ruled on the merits of his claim. As explained earlier, this Court cannot appropriately consider the reasonableness of the state courts' decision that Beckworth did not sufficiently plead this claim by considering allegations that Beckworth never placed before those courts. *See Pinholster*, 563 U.S. at 180–81 (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the

claim on the merits"). With respect to that issue, the Respondent argues that there are three series of allegations that this Court cannot consider because Beckworth did not plead them in his Rule 32 Petition.

The first series of allegations that the Respondent says is new appears in Beckworth's petition under the heading: "Mr. Beckworth's life took a turn for the worse after he became acquainted with James Walker." (Doc. 1 at 74). Within this series of allegations, Beckworth describes first meeting Walker and Walker's use of him as a scapegoat for various crimes. (*See* doc. 1 at 74–76, paras. 227–34). The Respondent contends that Beckworth did not plead this in his Rule 32 Petition. Beckworth disagrees and points the Court to specific areas of his Rule 32 Petition in which he discussed his and Walker's relationship. (*See* doc. 7-19 at 31, para. 99; *id.* at 33, paras. 105–06; *id.* at 35, para. 113; *id.* at 56, para. 183; *id.* at 69, para. 217). After a thorough examination of Beckworth's entire Rule 32 Petition, the Court finds that Beckworth pled the substance of this allegation to the state courts.

In the second series of allegations, Beckworth claims that he was prejudiced at the guilt phase of his trial because his counsel could have used the information they discovered about his upbringing to challenge Russell's testimony that Beckworth was the leader and the more culpable party between him and Walker. (Doc. 1 at 76–79, paras. 235–42). Beckworth offers several anecdotes from his life to demonstrate that, rather than a leader, he was a follower who was often swayed and influenced by others into making mistakes and committing crimes. The Respondent contends that Beckworth did not argue that he was prejudiced in this specific way in his Rule 32 Petition. The Court agrees. Although

Beckworth claimed in his Rule 32 Petition that he was used as a scapegoat for others' crimes, he never stated that he was prejudiced because his counsel could have used that information to undercut Russell's testimony at trial. As this specific argument is unexhausted and procedurally defaulted, the Court will not consider it. *See Kelley*, 377 F.3d at 1344.

In the third series of allegations, Beckworth claims that he was prejudiced at both his suppression hearing and at the guilt phase of his trial because his counsel could have used information about his intellectual limitations to challenge the admissibility of his statements to law enforcement on the ground that they were involuntary and unreliable. (Doc. 1 at 79–83, paras. 243–51). The Respondent argues that Beckworth did not raise this argument in his Rule 32 Petition. The Court agrees. Beckworth points to a single phrase in his Rule 32 Petition—"and his mental limitations" (doc. 7-19 at 56–57, para. 184)—that he claims apprised the state courts that he was raising this specific allegation that his counsel should have used evidence of his intellectual disability to challenge his confession. However, an examination of the entire Rule 32 Petition shows that Beckworth plainly did not raise this claim in his Rule 32 Petition, and thus the Court will not consider it. *See Kelley*, 377 F.3d at 1344.[30]

The Respondent also argues that Beckworth adds numerous details throughout this claim that he never pled to the state courts. After comparing the mitigation information that Beckworth now alleges with the information that he pled in his Rule 32 Petition, the

[30] Even if this argument and the argument discussed in the preceding paragraph were properly before the Court, it would not change the Court's conclusion.

Court finds that Beckworth has indeed added numerous details that he never mentioned before, but he has also eliminated some allegations that he did raise before the Rule 32 Court. As a general matter, where the Rule 32 Petition simply alleged facts about Beckworth's childhood and upbringing without specifying the sources of those facts, a failing which caused the state courts to ultimately find that Beckworth failed to plead this claim with specificity, Beckworth now attempts to remedy that failing by specifically naming individuals who he says could have provided information to his trial counsel: Linda Ball (Beckworth's mother), Inez Robinson (the mother of Beckworth's teenage girlfriend), Diane Beckworth (Beckworth's sister), Carol Gobbel (Beckworth's ex-wife), Shannon Beckworth (Beckworth's brother), Dorothy Ann Robinson (Beckworth's aunt), and Nelson Whitehurst and Nellie English (the principal and a teacher at Beckworth's elementary school). (*See, e.g.,* doc. 1 at 55, para. 151 ("Mrs. Ball vividly recalls the first time L.D. physically abused her."); *id.* at 57, para. 158 ("Diane remembers that when L.D. was drunk, he would scream and curse at the children, and call Diane a bitch and whore."); *id.* at 58, para. 164 ("Inez Robinson . . . recalls that approximately 15 people lived together in the small, two-bedroom shack."); *id.* at 61, para. 176 ("Shannon reports that his childhood was 'a living hell,' permeated by poverty and physical and sexual abuse."); *id.* at 64, para. 188 ("Mr. Whitehurst and Ms. English recall that the special education class consisted mostly of Beckworth children.")).

The Court concludes that this claim is exhausted because Beckworth presents the same claim here that he presented to the state courts—trial counsel was ineffective for failing to investigate and present mitigation evidence at the penalty phase concerning his

impoverished and abusive childhood—despite variations in the factual allegations. *See Freeman*, 46 F.4th at 1219. However, the Court is nonetheless precluded from considering the new allegations in his federal habeas petition. Because the state courts held that Beckworth failed to plead this claim with specificity under Alabama's pleading requirements, this claim was adjudicated on the merits and is thus governed by AEDPA. Consequently, the Court considers only the allegations Beckworth raised in his Rule 32 Petition and disregards the allegations he raises in his federal petition. *See Borden*, 646 F.3d at 816 ("AEDPA limits [the federal court's] review to whether the state court's determination that [the petitioner] failed to plead sufficient facts in his Rule 32 petition to support a claim of ineffective assistance of counsel was contrary to or an unreasonable application of Supreme Court precedent. Thus, [the federal court] look[s] only to the allegations in [the petitioner's] Rule 32 petition and whether those allegations sufficiently state a claim for ineffective assistance of counsel." (emphasis omitted) (second alteration in original) (quoting *Powell*, 602 F.3d at 1273)).

In his Rule 32 Petition, Beckworth alleged that his trial counsel performed deficiently by failing to investigate and present evidence at both stages of his trial of his background and family history, which was marked by poverty, neglect, and abuse. (Doc. 7-19 at 12–37, paras. 23–119). The information that Beckworth alleged his counsel should have uncovered is as follows:

Beckworth grew up in extreme poverty in rural Coffee and Geneva counties. His mother, Linda Ball, was one of eleven children born to a sharecropping family. She and her siblings began working in the fields picking cotton when she was six years old. They

worked all day and had few friends outside of their family. Linda met L.D. Beckworth ("L.D."), Beckworth's father, when she was just a child. They married when she was sixteen and had three children: Beckworth, his sister Diane, and his brother Shannon.

L.D. Beckworth was an alcoholic and physically abused Linda and his children. Beckworth would try to stop his father from beating his mother and he would get beaten himself. Beckworth remembers seeing his mother beaten and bloody, lying on the floor. Beckworth would pour out his father's beer to stop him from drinking. Linda abandoned her three children when Beckworth was nine years old, leaving them to the care of L.D., whose alcohol abuse became worse. For example, L.D. forced Beckworth to go to bars and drink alcohol with him when Beckworth was as young as ten years old. Beckworth and his siblings believe that L.D. killed his brother David to prevent David from testifying against L.D. in a criminal case.

Beckworth was forced to begin caring for his siblings at a young age. While Beckworth was still a child, the family sometimes lived with L.D.'s father, Dovie, and his wife Mavis in their house next door. Beckworth often observed L.D. and Dovie get into vicious fights. Mavis and Dovie had fifteen children who all lived in the house with them. Dovie and Mavis were old and in poor health. Mavis was extremely obese. Their home was a small shack with only one bed and no windows. It was dirty, clothes and dishes were rarely washed, and there were maggots in the kitchen. The children slept four or five to a bed or on piles of dirty clothes on the floor. The children also ate on the floor because there was no kitchen table. Beckworth and other young family members often did not have enough to eat, as the adults ate first and then the children. Sometimes all the children

would get was a biscuit. Beckworth and his siblings were teased at school based upon his family's poverty and reputation for incest and drunkenness. They were also lacking in clothes and shoes and always had lice. One example of the neglect the children experienced was that Beckworth's brother Shannon had to have a large portion of his stomach and intestines removed as a child due to physical abuse by his uncle that led to an infection that the family ignored for years.

Sexual abuse and incest were also rampant in Beckworth's extended family. Beckworth's sister Diane was repeatedly raped by her uncles from the time she was four years old until she was twelve years old. The principal at Diane's school discovered that she was being abused, leading the Department of Human Resources to place Diane in a girl's home, but after one of her uncles moved out of Dovie's house, she was placed back in Dovie's custody. Beckworth's mother Linda once caught Beckworth's uncle David simulating anal sex on Beckworth and made him stop. Beckworth's brother Shannon was also repeatedly raped by his uncles and attempted suicide several times due to the trauma of repeated sexual abuse. Dovie's wife Mavis had a sexual relationship with her son John L. Dovie's brother Van Calvin had a sexual relationship with his daughter Sabrina. Years later, after Beckworth married and started a family of his own, L.D. was charged with molesting Beckworth's daughter Anna when she was five years old.

As Beckworth got older, he often broke the law at his father's behest and was manipulated into taking the blame for crimes committed by others, including his father. For example, L.D. stole a car and required Beckworth to take the blame, which landed Beckworth in prison. L.D. and Diane used Beckworth's truck to steal an air conditioner.

Beckworth was arrested and spent eighteen months in jail, although L.D. and Diane were eventually convicted. L.D. continued to abuse Beckworth into adulthood. For example, when Beckworth and Diane were teenagers, L.D. allowed them to borrow his car. Beckworth ran off the road and into a bale of hay, and although the car was not damaged, L.D. beat him severely. Once he met Walker, his half-brother, Walker and his sister Angela Russell began using Beckworth as a scapegoat for crimes that they had committed.

When Beckworth first met Carol Gobbel, she was in an abusive relationship. Beckworth helped her leave that relationship, and they married and had a daughter in 1993. Although he felt supported and loved by Gobbel's family, the loyalty he felt to his own family often resulted in him being at odds with Gobbel's family. For example, he allowed L.D. to borrow money and stay at their home. Beckworth's family caused Gobbel so much stress that she asked for a divorce in 1997. Even though they were divorced, Beckworth continued to be a loving father to Anna.

Intellectual disabilities and mental illness affected others in Beckworth's family as well. Beckworth's father, brothers, and sister exhibited indications of intellectual disability and mental illness. Anna, Beckworth's daughter, was diagnosed with schizophrenia and bipolar disorder following the sexual abuse by L.D. She also suffers from visual and auditory hallucinations, depression, mood swings, and has tested in the mildly intellectually disabled category.

Beckworth was devastated when he found out that his father had sexually abused his daughter. He felt tremendous pain and guilt because he believed he had betrayed his daughter.

Beckworth often went out of his way to help people and was particularly attentive to the elderly.

In his Rule 32 petition, Beckworth alleged that he was prejudiced at the penalty phase of his trial by his trial counsel's failure to investigate and present this information for two reasons. First, he alleged that it would have convinced the jury to sentence him to life imprisonment rather than death.[31] Second, he alleged that it would have convinced the jury to find that he was intellectually disabled and thus not eligible for execution. He alleged that if his counsel had interviewed family and friends who knew him before he turned eighteen, they could have referred those people to their intellectual disability expert, Dr. D'Errico, upon whom they relied to attempt to prove Beckworth's *Atkins* claim. Beckworth claimed that such witnesses would have provided Dr. D'Errico with additional information that would have enabled him to testify about deficits in adaptive behavior that Beckworth demonstrated before he turned eighteen.

In a two-page order, the Rule 32 Court dismissed Beckworth's entire petition for failure to state a claim. (Doc. 7-19 at 160–61). In his order, the court noted that he remembered Beckworth's trial well. (*Id.* at 160). He ruled that Beckworth's allegations of ineffective assistance of counsel failed to state a claim for relief, finding that they were "of a conclus[ory] and speculative nature." (*Id.*). He stated that "[a]lthough, in retrospect, various different or additional investigation and trial measures might have been employed,

[31] Although Beckworth now argues that he was prejudiced at the guilt phase because his counsel could have presented some of this information to undercut Angela Russell's testimony that he was the leader and more culpable one between Walker, as previously stated, this argument is procedurally defaulted from this Court's review because Beckworth never raised it in his postconviction proceedings.

the Court finds that none of the allegations raised in the Petition give rise to the lack of trial conduct that would have made any difference in Mr. Beckworth['s] trial or its results." (*Id.*).

Beckworth appealed that ruling to the ACCA, arguing that he sufficiently pled this ineffective assistance of counsel claim. (Doc. 7-20 at 55–87). However, the ACCA affirmed the Rule 32 Court's ruling that this ineffective assistance of counsel claim was not pled with sufficient specificity under ALA. R. CRIM. P. 32.6(b). *Beckworth*, 190 So. 3d at 563–70. The ACCA examined each allegation within the claim and explained why Beckworth failed to plead it with specificity, as follows:

> Beckworth next argues that the trial court erred when it dismissed claims he raised regarding trial counsel's performance at the penalty phase of his trial, specifically that trial counsel failed to investigate and present "critical mitigation evidence." (Beckworth's brief, at p. 49.) Beckworth raised these claims in part III of his petition. (C. 61–70.) We examine separately the allegations regarding counsel's claimed failure to investigate.
>
> *1. Evidence of childhood abuse, abandonment, and poverty*
>
> Beckworth argues that the trial court erred when it dismissed several claims in the petition alleging that counsel had failed to investigate and present mitigating evidence about Beckworth's childhood. Specifically, Beckworth alleged in paragraph 213 of his petition that trial counsel failed to investigate or to present any evidence that "Beckworth's childhood was defined by pervasive physical and sexual abuse in the home (as described in paragraphs 31–43, 59–70)." (C. 63.) In paragraph 214 of the petition, Beckworth alleged that "counsel failed to investigate or present evidence that Mr. Beckworth was emotionally and psychologically impacted by his mother's abandonment of the family when he was 10 years old (as described in paragraphs 35–40)." (C. 64.) In paragraph 215 of the petition, Beckworth alleged: "Trial counsel did not present evidence that Mr. Beckworth grew up in severe and crippling poverty (as described in paragraphs 45–58)." (C. 64.) Although it appears that paragraph 211 of the petition was intended merely as a portion of the introductory paragraphs to the claims quoted above, we note, out of an abundance of caution, that Beckworth alleged in

that paragraph that trial counsel failed to "interview any of Mr. Beckworth's family members who were available and easy to contact at the time of trial." All of the claims presented in this portion of the petition failed to satisfy the specificity and full-factual-pleading requirements of Rule 32.6(b), and they were properly summarily dismissed.

In *Smith v. State*, 71 So.3d at 23, this Court considered a similar claim regarding trial counsel's alleged failure to investigate. This Court adopted the findings of the trial court, which stated:

> " 'In *Thomas v. State*, 766 So.2d 860, 892 (Ala.Crim.App.1998), the Alabama Court of Criminal Appeals held that "claims of failure to investigate must show with specificity what information would have been obtained with investigation, and whether, assuming the evidence is admissible, its admission would have produced a different result." In *Woods v. State*, [957 So.2d 492 (Ala.Crim.App.2004)], the Alabama Court of Criminal Appeals reviewed the circuit court's summary dismissal of Woods's postconviction claim that his defense counsel were ineffective for failing to interview member[s] of his family. The Alabama Court of Criminal Appeals held that the circuit court's holding that Woods's allegation did not meet the specificity and full factual pleading requirements of Rule 32.6(b) was correct and adopted the circuit court's findings that "Woods fail[ed] to identify any family member by name, proffer what their testimony would have been at trial, or argue why such testimony would have caused a different result at the penalty phase or at sentencing." *Id*.
>
> " 'If the specificity and factual pleading requirements of Rule 32.6(b) mean anything, certainly they would require a postconviction petitioner, or his counsel, to identify for a court reviewing a Rule 32 petition to name [sic] the witnesses a defense attorney should have interviewed and proffer what beneficial information the specific witnesses could have

> > provided at trial. Smith fails to identify in Part I.C(1) of his second amended petition a single member of his family by name or proffer to the Court with any specificity what they would have testified about at trial. The Court finds that the allegation in Part I.C(1) fails to meet the specificity and full factual pleading requirements of Rule 32.6(b), Ala.R.Crim.P. See *Coral v. State*, [900 So. 2d 1274 (Ala.Crim.App.2004)] (holding that "[e]ach subcategory [of ineffective assistance of counsel] is an independent claim that must be sufficiently pleaded"). Therefore, this allegation is summarily dismissed.'
>
> "(Supp. C.R. 391–93.) We agree with the circuit court. Smith failed to meet his burden of pleading in regard to this claim. Smith does not plead the name of any specific family member who failed to testify or plead what their specific omitted testimony would have consisted of. Rule 32.6(b), Ala.R.Crim.P."

*Smith v. State*, 71 So.3d at 24.

Beckworth's petition suffers from the same pleading deficiencies noted in *Smith*. Although Beckworth made numerous factual allegations about his upbringing, he never specified the name of any family member who would have testified at his trial to any of the allegations. For example, in paragraph 37 of the petition, Beckworth alleged, "[Beckworth's father's] alcoholism became worse after his wife left. He mixed beer and whiskey with Valium. He was completely unrecognizable in this state. He would become so intoxicated he could not move. He would fall to the floor and lay there." (C. 13.) Beckworth failed to allege what investigation trial counsel should reasonably have performed that would have revealed this information, and he failed to allege the name of the witness who would have testified to the information at Beckworth's trial. We note that Beckworth alleged in the petition that, after his mother left the family, he "suppressed his memories and feelings" (C. 13), so presumably this information was not available through testimony from Beckworth. We note, further, that during an August 15, 2002, pretrial hearing, the prosecutor stated that Beckworth's father had been declared incompetent to stand trial on a pending criminal matter, and that the father was to be sent to a mental institution. (August 15, 2002, hearing, R. 33.)

All of the allegations raised in this portion of the petition suffer from this pleading deficiency and, therefore, all were due to be dismissed. To plead the claims sufficiently, Beckworth was required to identify the names of the witnesses he alleged should have been interviewed, to plead with specificity what admissible information those witnesses would have provided, and to allege how the result of the proceedings would have been affected by the additional testimony. *Smith v. State*, 71 So.3d at 19. Because Beckworth failed to meet the specificity and full factual pleading requirements of Rule 32.6(b), the claims were properly dismissed, and Beckworth is not entitled to any relief.

. . . .

*3. "Scapegoat" evidence*

Beckworth next argues that the trial court erred when it summarily dismissed the claim that he was frequently used as a scapegoat for crimes committed by others. Beckworth raised this claim in paragraph 217 of the petition. The trial court did not err when it summarily dismissed this claim because it did not satisfy the specificity and full factual pleading requirements of Rule 32.6(b), Ala. R.Crim. P., which states that "[t]he petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds." Each allegation in this claim was merely conclusory and was unsupported by any specific factual details to support the assertions. For example, Beckworth alleged that "[t]rial counsel did not present evidence that Mr. Beckworth's father made Mr. Beckworth take blame for his [father's] conduct in order to escape punishment for himself." (C. 66.) Beckworth failed to allege the name of the person who could have provided this information to trial counsel; failed to provide factual details such as what conduct Beckworth allegedly took the blame for, when this incident occurred, or how Beckworth was made to take the blame for his father's conduct; failed to allege that this person—or any other person—could have and would have provided relevant and admissible testimony about this incident at trial; failed to allege how counsel could have discovered this information and, through what act of deficient performance they failed to do so; and failed to allege any specific facts indicating how this testimony would have changed the outcome of the trial. All of the allegations in this claim failed to include the full specific factual basis, and the claim was insufficiently pleaded.

We note that Beckworth incorporated by reference paragraphs 74-78, 93-96, and 113 of the petition into this claim. However, the paragraphs

Beckworth referred to contained only nonspecific and conclusory factual allegations, such as:

> "On many occasions, Mr. Beckworth was manipulated by others or took the blame for crimes committed by others. For example, Mr. Beckworth was charged with auto theft. He had simply gone for a ride with a friend. The friend driving the stolen car was a relative of the owner. No charges were brought against the friend who actually stole the car."

(C. 21.) As in all other allegations in this petition, the conclusory factual allegations failed to identify the specific acts or omissions of counsel; failed to identify specific facts supporting the conclusory allegations, such as the date of any of the alleged incidents, identification of the parties involved, and any crimes for which Beckworth had been wrongly convicted; failed to plead specific facts indicating how counsel could have, but failed to, discover this information; failed to identify the names of any witness who would have provided relevant, admissible testimony at trial about these incidents; and failed to identify specifically how he was prejudiced by counsel's alleged deficient performance.

Beckworth failed to satisfy the pleading requirements of Rule 32.6(b) because he failed to present the full factual basis supporting any of the allegations of ineffective assistance of counsel raised in this claim. See, e.g., *Boyd v. State*, 913 So.2d 1113 (Ala.Crim.App.2003):

> "Boyd's claim does not provide a 'clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds.' Rule 32.6(b), Ala. R.Crim. P. (Emphasis added.) With regard to this claim, no tangible fact tending to establish counsel's allegedly inadequate performance was presented to the circuit court. As the circuit court correctly found, Boyd's petition does not disclose the 'critical exculpatory evidence' that should have been uncovered by his counsel; does not disclose 'one specific piece of evidence that went undiscovered' based on the allegedly deficient performance of counsel; does not disclose any reasons why Boyd's arrest and pretrial detention were unlawful; does not disclose how counsel allegedly failed to adequately cross-examine witnesses or the information that was omitted as a result of the allegedly inadequate cross-examination; and does not disclose what type of defense that counsel should have investigated or should have mounted.

> Thus, the circuit court correctly ruled that the claim had not been sufficiently pleaded."

*Boyd v. State*, 913 So.2d at 1131–32 (footnote omitted).

Summary dismissal of this claim was proper, and Beckworth is not entitled to any relief.

*4. Family history of mental retardation and mental illness*

Beckworth argues that the trial court erred when it summarily dismissed the claim that counsel had rendered deficient performance when they failed to investigate and present evidence of Beckworth's family history of mental illness and mental retardation. This claim was raised in paragraph 218 of the petition, which incorporated by reference paragraphs 101–02 and 142 of the petition. The trial court did not err when it summarily dismissed this claim because it did not meet the specificity and full factual pleading requirements of Rule 32.3 and Rule 32.6(b).

First, Beckworth failed to allege any facts indicating why evidence about family members' mental retardation and mental illness was relevant or that it would have been admissible at his trial. Although the United States Supreme Court held in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), that a defendant convicted of capital murder must not be precluded from presenting a broad range of proposed mitigating evidence at his sentencing hearing, the Court limited the range to "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604. Although Beckworth alleged in paragraph 142 of his petition that "[s]ome forms of mental retardation are genetic" (C. 40), he failed to allege that the form of mental retardation from which he or his family members allegedly suffered was one of those genetic forms. Beckworth failed to make any factual allegations indicating the relevance of evidence of mental illness in his family. Therefore, Beckworth failed to allege any specific facts indicating that the evidence he says counsel should have discovered and presented was relevant or that it would have been admissible at trial.

Furthermore, Beckworth failed to allege specific facts regarding how trial counsel could have reasonably discovered this evidence and how, through their allegedly unreasonable actions, they failed to discover it. Beckworth also failed to identify the names of any witnesses who would have testified to this information at Beckworth's trial. Finally, Beckworth failed

to allege any specific facts indicating how presentation of the evidence would have changed the result at trial.

Some of the allegations in the petition were vague: "Trial counsel did not present evidence that many of Mr. Beckworth's father's brothers and sisters exhibit many indications of mental retardation and mental illness." (C. 66–67.); and "[Trial counsel] would have also discovered that several of Mr. Beckworth's aunts and uncles exhibit characteristics of mental retardation though they have never been diagnosed." (C. 40.) Beckworth's failure to identify even the names of any of the relatives, the characteristics those relatives exhibited, and the names of any witnesses who would have provided relevant, admissible testimony in support of the allegations mandated dismissal of these allegations for failure to meet the pleading requirements of Rule 32.2 and Rule 32.6(b). There was no factual basis for those allegations. See *Boyd v. State*, 913 So.2d 1113 (Ala.Crim.App.2003).

The pleading deficiencies set out above fully support the trial court's summary dismissal of this claim.

*5. Family members depended on Beckworth*

Beckworth argues that the trial court erred when it summarily dismissed the claim that trial counsel's performance was ineffective because they failed to investigate or present evidence that Beckworth's family members depended on him for support and that Beckworth provided that support to them. Beckworth presented this claim in paragraph 219 of his petition, and he incorporates paragraphs 38, 70, and 93–95 of the petition.

Beckworth has failed to state a claim for relief as to this allegation of the petition. The evidence that, he says, counsel failed to discover and present was, in fact, presented at trial through the testimony of his ex-wife, Carol Gobbel. (Trial R. 901–07, 923.) An allegation that is refuted by the record fails to state a claim and does not establish that a material issue of fact or law exists as required by Rule 32.7(d). *McNabb v. State*, 991 So.2d 313 (Ala.Crim.App.2007); *Duncan v. State*, 925 So.2d 245 (Ala.Crim.App.2005). Because the underlying assertions on which Beckworth's allegations are based is refuted by the record, Beckworth failed to state a claim upon which relief could be granted. Summary dismissal as to this claim was, therefore, proper.

*6. Helping those in need*

Beckworth next alleges that the trial court erred when it summarily dismissed the claim that Beckworth helped those in need and that he was protective of those who were vulnerable. This claim was presented in paragraph 220 of the petition, and it incorporated paragraphs 84–86 and 89–91 of the petition. Summary dismissal of this claim was proper because Beckworth failed to plead the claim with sufficient specificity.

This claim contains general, conclusory allegations such as, "Trial counsel failed to present evidence that Mr. Beckworth would frequently go out of his way in order to assist the elderly and was once fired from a job for helping an elderly couple." (C. 68.) In this allegation, and all the others in this claim, Beckworth failed to provide a full factual basis. Not only did Beckworth fail to provide details such as names and dates when Beckworth allegedly acted in defense of vulnerable people, he also failed to allege what reasonable investigation counsel could have performed, but failed to perform, that would have led to the discovery of such facts. Moreover, Beckworth failed to allege the names of any witnesses who would have been able to give relevant, admissible testimony on this matter at the sentencing hearing. Finally, Beckworth failed to provide specific facts indicating how presentation of this evidence would have led to a different result in the case.

For all of the foregoing reasons, the trial court's dismissal of this claim was proper. See, e.g., *Hyde v. State*, 950 So.2d 344 (Ala.Crim.App.2006).

*7. Allegations that Beckworth's father sexually abused Beckworth's daughter*

Beckworth argues that the trial court erred when it summarily dismissed his claim that trial counsel were ineffective for failing to present evidence that he was suffering from severe emotional and psychological stress because Beckworth's father had sexually abused Beckworth's daughter not long before Beckworth's trial. This claim was presented in paragraph 222 of the petition, and incorporated paragraphs 100–03, 107–08, and 116–17 of the petition. The trial court did not err when it dismissed this claim because Beckworth failed to plead sufficient facts to support it.

Defense counsel were aware of allegations that Beckworth's father had sexually abused Beckworth's daughter, and counsel attempted to present that evidence at the penalty phase through the testimony of Beckworth's ex-wife. The trial court sustained the prosecutor's objection to questions about that alleged abuse on the ground that it was irrelevant. (Trial R. 902.)

Beckworth argued on appeal that the trial court's ruling was in error, but this Court affirmed the trial court's ruling, holding that the testimony had been properly excluded because it was irrelevant. *Beckworth v. State*, 946 So.2d at 507. Because defense counsel attempted to present the evidence that Beckworth argues defense counsel should have presented, the claim underlying this allegation of ineffective assistance of counsel is baseless. An allegation that is refuted by the record fails to state a claim and does not establish that a material issue of fact or law exists as required by Rule 32.7(d). *McNabb v. State*, 991 So.2d 313 (Ala.Crim.App.2007); *Duncan v. State*, 925 So.2d 245 (Ala.Crim.App.2005). Beckworth alleged in the petition that trial counsel should have presented evidence that Beckworth's daughter had been sexually abused, without presenting evidence that the alleged perpetrator was his father. This portion of the claim was properly dismissed because Beckworth's ex-wife was permitted to testify, over the prosecutor's objection, that their daughter had been sexually molested. (Trial R. 909.) Therefore, this portion of the petition failed to state a claim for relief and was due to be summarily dismissed. An allegation that is refuted by the record fails to state a claim and does not establish that a material issue of fact or law exists as required by Rule 32.7(d). *McNabb v. State*, 991 So.2d 313 (Ala.Crim.App.2007); *Duncan v. State*, 925 So.2d 245 (Ala.Crim.App.2005).

Beckworth alleged in the petition that trial counsel should have presented evidence that Beckworth had been "severely impacted" by his daughter's sexual abuse. Beckworth failed to allege specific facts indicating how he was "impacted" by his daughter's alleged sexual abuse; he failed to allege any specific acts or omissions of counsel related to the alleged failure to present this evidence; and he failed to allege how any alleged impact was relevant as a mitigating circumstance in the crime he committed against the 87–year–old victim. Alabama law provides:

> "In addition to the mitigating circumstances specified in Section 13A–5–51, mitigating circumstances shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death."

§ 13A–5–52, Ala. Code 1975.

> Because Beckworth failed to provide a full factual basis for this claim and pleaded only a general allegation that he was "impacted" by his daughter's sexual abuse, he failed to plead facts indicating that the evidence would have been relevant or admissible as proposed mitigation for this crime, and the claim was insufficiently pleaded. Furthermore, because Beckworth failed to plead any facts indicating the specific actions or omissions of counsel related to this claim, this claim was insufficiently pleaded. For the foregoing reasons, this claim was due to be dismissed. See, e.g., *Boyd v. State*, 913 So.2d 1113 (Ala.Crim.App.2003).
>
> . . . .
>
> **Conclusion**
>
> Having thoroughly reviewed each of the allegations that, Beckworth says, the trial court erroneously dismissed, we have concluded that the trial court did not err. A majority of the claims failed to satisfy the specificity and full factual pleading requirements of Rule 32.3 and Rule 32.6(b), Ala. R.Crim. P., and the remaining claims were subject to dismissal because they failed to state a claim or were rebutted by the trial record or by this Court's opinion on direct appeal. Each of the claims of ineffective assistance of counsel was properly dismissed, and Beckworth is not entitled to any relief on appeal.

*Beckworth*, 190 So. 3d at 562–70 (footnotes omitted). In his petition for certiorari to the Alabama Supreme Court, Beckworth argued that the ACCA's decision was erroneous and that he sufficiently pled the allegations, (doc. 7-23 at 19–35, 38–42, 47–51), but the Alabama Supreme Court denied the petition, (doc. 7-24 at 26). That concluded Beckworth's pursuit of this claim in the state courts.

As previously stated, the decision of the ACCA, which was the last reasoned state court decision, *see Wilson*, 584 U.S. at 125, was that Beckworth failed to sufficiently plead with specificity the allegations of this claim under ALA. R. CRIM. P. 32.6(b). A ruling by an Alabama court under ALA. R. CRIM. P. 32.6(b) is a ruling on the merits for purposes of AEDPA. *Borden*, 646 F.3d at 815–16. To resolve this claim, the Court must decide

(1) whether Beckworth's Rule 32 petition "pleaded enough specific facts that, if proven, amount to a valid penalty phase ineffective assistance of counsel claim"; and (2) if the answer to the first question is "yes," the Court must then determine whether the ACCA's "decision to the contrary was unreasonable under § 2254(d)." *Freeman*, 46 F.4th at 1223 (quoting *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1261 (11th Cir. 2016)).

Beckworth argues at length that his trial counsel's performance was constitutionally deficient because they failed to conduct an adequate mitigation investigation. In support, Beckworth discusses several of the Supreme Court's opinions applying the *Strickland* standard to counsel's duty to investigate their client's background for mitigation purposes: *Porter*, 558 U.S. at 39; *Rompilla*, 545 U.S. at 377; *Wiggins*, 539 U.S. at 526; and *Williams*, 529 U.S. at 410. Beckworth contends that these cases establish that defense counsel must conduct a thorough investigation of the defendant's background prior to a capital murder trial.

Beckworth is not wrong, but the ACCA's conclusion that Beckworth failed to sufficiently plead this claim was premised on his failure to offer facts showing how he was *prejudiced*, rather than facts showing how his counsel performed deficiently. Indeed, although the ACCA acknowledged that Beckworth pled numerous factual allegations about his background and family history, the ACCA repeatedly concluded that Beckworth did not specify the names of witnesses—whether they be family members, friends, former educators, or others—that his trial counsel should have contacted and called to testify on his behalf at trial. The ACCA also concluded that Beckworth did not proffer what the substance of their testimony would have been or what specific beneficial information any

specific witness would have provided at trial. Throughout its discussion, the ACCA provided examples of this failure to offer factual information, quoting allegations from the petition and explaining how they were conclusory and lacking in details, such as who could have testified to this information at trial, whether that testimony would have been admissible and relevant, how counsel could have discovered this information, and perhaps most importantly how the information could have changed the outcome of the trial. The ACCA also held that Beckworth did not plead that any form of intellectual disability that members of his family suffer from is genetic or why the fact that his family has a history of mental illness or intellectual disability would be relevant to his sentencing. He failed to provide names of witnesses who would have told his attorneys that mental issues ran in his family or how his counsel would have discovered that. The ACCA also concluded that some of this evidence was actually presented at trial by Carol Gobbel, such as evidence that Beckworth's family members depended on him for support and the fact that their daughter Anna had been sexually abused. The ACCA thus found that some of his allegations were refuted by the record and thus did not state a claim for relief under ALA. R. CRIM. P. 32.7(d).

This Court may decline to address whether trial counsel's mitigation efforts were deficient if Beckworth fails to establish that he was prejudiced by this purportedly deficient performance. *See Borden*, 646 F.3d at 818; *see also Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance of counsel claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."). Ultimately, this Court need not, and does not, decide whether Beckworth's trial counsel's

mitigation investigation was constitutionally inadequate because, for the reasons explained below, the ACCA did not unreasonably determine that Beckworth failed to plead facts sufficient to establish that he was prejudiced by counsel's performance.

Regarding how his counsel's purportedly deficient performance prejudiced him, Beckworth merely alleged: "This inadequate investigation prejudiced Mr. Beckworth at the sentencing phase of his trial. Had the jury considered the extensive and compelling mitigation evidence that was readily available to trial counsel, there is a reasonable probability that the jury would have returned a sentence other than death." (Doc. 7-19 at 66, para. 212). In *Borden*, the Eleventh Circuit explained that Rule 32 petitioners are subject to a heightened pleading requirement—fact pleading—because "[t]he evidence supporting an ineffective assistance of counsel claim is available following the conviction, if not before," so "the petitioner is, or should be, aware of the evidence to support the claim before bringing the petition." 646 F.3d at 810. True, in *Borden*, the petitioner's Rule 32 petition contained "no substantive factual allegations that [the court] [could] properly assess," *id.* at 822, whereas Beckworth's Rule 32 petition did contain substantive factual allegations. However, Beckworth's petition did not offer facts as to who would have provided which pieces of information to his counsel, and what the substance of their testimony would be. Because of these deficiencies, the ACCA concluded that Beckworth failed to sufficiently plead prejudice. Although Beckworth now identifies to this Court the names of witnesses who could have provided this information, that information was not part of the state court record and, therefore, this Court may not consider it in evaluating the reasonableness of the state courts' decisions.

In his submissions to this Court, Beckworth does not meaningfully argue that the ACCA's determination that he failed to plead prejudice was contrary to, or an unreasonable application of, clearly established federal law. In discussing prejudice, he cites, in passing, the Supreme Court's decisions in *Wiggins*, 539 U.S. 510, and *Porter*, 558 U.S. 30, (*see* doc. 42 at 55), but he does not explain how the ACCA's decision here was contrary to, or an unreasonable application of, *Wiggins* or *Porter*.

In any event, neither *Wiggins* nor *Porter* compels the conclusion that the ACCA's decision here was unreasonable. At the outset, the Court acknowledges that the allegations in Beckworth's Rule 32 petition, if true, would constitute powerful mitigation evidence similar, even if not identical, to that which the Supreme Court found in *Wiggins*. In *Wiggins*, the mitigation evidence included evidence that the petitioner "experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother," 539 U.S. at 535, including evidence that his mother frequently left him and his siblings "alone for days, forcing them to beg for food and to eat paint chips and garbage"; that she had sex with men while her children slept in the same bed; and that on one occasion, she forced the petitioner's hand against a hot stove burner, leading to his hospitalization, *id.* at 516–17. Additionally, the petitioner was placed in foster care at age six, and he "suffered physical torment, sexual molestation, and repeated rape during his . . . years in foster care." *Id.* at 535. When he was sixteen, the petitioner ran away from his foster home and lived on the streets. *Id.* at 517. Considering the allegations in Beckworth's Rule 32 petition, the Court has little trouble concluding that Beckworth, like the petitioner in *Wiggins*, had a horrific childhood. To be sure, the jury and trial court

heard some of this evidence, including Dr. McKeown's penalty phase testimony that Beckworth reported that his mother abandoned the family when he was around twelve years old, that his father was an alcoholic who provided no support for the family, that Beckworth had a "very disjointed and troubled youth" and quit school in the fifth or sixth grade, and that Beckworth began drinking at ten or twelve years old, (doc. 7-13 at 84–85); as well as Carol Gobbel's penalty phase testimony that Beckworth and his father had a "rocky relationship," (*id.* at 116), and that Beckworth's family strained Beckworth and Gobbel's marriage because the family constantly asked them for financial support, (*id.* at 119). However, they did not hear a significant number of details concerning the abuse Beckworth says he suffered or the extent of his impoverished upbringing.

Nonetheless, assessing prejudice under *Strickland* "involves a case-by-case inquiry," and "simply because prejudice was found after considering similar omitted mitigating evidence in one case is not dispositive of whether prejudice necessarily exists in another." *Gavin*, 40 F.4th at 1269. Here, none of Beckworth's allegations "alter in any way the aggravating circumstance of a heinous and atrocious crime"—or the other two aggravating circumstances the State proved beyond a reasonable doubt—"that supported the imposition of the death penalty in this case." *See Grayson v. Thompson*, 257 F.3d 1194, 1226 (11th Cir. 2001); *see also Boyd*, 592 F.3d at 1300–01. As stated earlier, Beckworth's jury and trial judge heard forensic testimony that Ms. Thweatt was severely beaten in her face and head after she tried to flee and before she was fatally shot, including testimony that Ms. Thweatt was alive when these injuries were inflicted and that a great amount of force was used to inflict them. Further, the trial judge found that the State proved three

aggravating circumstances beyond a reasonable doubt: (1) the murder was committed during the commission of a burglary; (2) Beckworth was on parole when the crime was committed; and (3) the murder was especially heinous, atrocious, and cruel, given the evidence that Ms. Thweatt attempted to flee her home before being beaten with a gun and eventually shot. (Doc. 7-14 at 56–57). Comparable aggravating evidence was not present in *Wiggins* (or at least was not discussed by the Supreme Court in its opinion). Similarly, the *Porter* Court opined that the weight of aggravation evidence in that case was "not as substantial as the sentencing judge thought." 558 U.S. at 41. This difference reasonably supports the conclusion that Beckworth's new mitigation evidence, considered with the mitigation evidence already presented and weighed against the substantial evidence of aggravation, would not create a reasonable probability that the jury and trial judge would have concluded that a death sentence was not warranted—even though the new mitigation evidence in *Wiggins* and *Porter* did. *See Boyd*, 592 F.3d at 1295–97; *see also Pye*, 50 F.4th at 1049 (explaining that the Eleventh Circuit has "repeatedly held that even extensive mitigating evidence wouldn't have been reasonably likely to change the outcome of sentencing in light of a particularly heinous crime and significant aggravating factors").[32] Although the ACCA did not rely on a comparative analysis of Beckworth's case with

[32] There is an additional problem with Beckworth's (passing) invocation of *Wiggins* in support of his prejudice argument: in *Wiggins*, AEDPA deference did not apply to the prejudice prong. *See Wiggins*, 539 U.S. at 534 (explaining that, because the state court did not reach the prejudice prong, the Court's review was "not circumscribed by a state court conclusion with respect to prejudice"). Thus, because the Supreme Court "did not apply AEDPA deference to the question of prejudice in" *Wiggins*, it "offer[s] no guidance with respect to whether a state court has *unreasonably* determined that prejudice is lacking"—which is the relevant question in Beckworth's case. *See Pinholster*, 563 U.S. at 202 (emphasis in original); *accord Gavin*, 40 F.4th at 1269.

*Wiggins* or *Porter* in concluding that Beckworth failed to adequate plead prejudice, this justification lends additional support to this Court's conclusion that the ACCA's prejudice determination was not unreasonable. *See Pye*, 50 F.4th at 1036.

In sum, under AEDPA, Beckworth is not entitled to relief on this claim.

### F. Beckworth's Claim that Alabama's Capital Sentencing Statute Violated His Right to a Trial by Jury (Doc. 1 at 92–95, paras. 270–80)

This claim is premised upon the Supreme Court's holdings in *Apprendi*, 530 U.S. at 589; *Ring*, 536 U.S. at 589, and *Hurst*, 577 U.S. at 94. Beckworth asserts that Alabama's capital sentencing statute under which he was sentenced to death is unconstitutional because it relegates the jury to an advisory role and empowers the trial judge to make the fact findings necessary to impose a death sentence. Before addressing this claim, the Court explains Alabama's system of bifurcated trials for capital offenses and the holdings of *Apprendi*, *Ring*, and *Hurst*.

A defendant convicted of a capital offense in Alabama cannot be sentenced to death unless at least one statutory aggravating circumstance, as defined in ALA. CODE § 13A-5-49, exists. *See* ALA. CODE § 13A-5-45(f) ("Unless at least one aggravating circumstance as defined in Section 13A-5-49 exists, the sentence shall be life imprisonment without parole."). Many capital offenses have a built-in aggravating circumstance that corresponds to one or more aggravating circumstances listed in § 13A-5-49. For example, one way that the State can convict a person of capital murder is to show that the murder was committed during a burglary. *See id.* § 13A-5-40(a)(4). This same showing—that a burglary was committed—is also an aggravating factor for the purposes of sentencing. *Id.* § 13A-5-49(4).

Further, Alabama law provides that when a defendant is found guilty of a capital offense, "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentenc[ing] hearing." *Id.* § 13A-5-45(e).

Unless impracticable, the sentencing hearing is conducted before the same jury that convicted the defendant. *See id.* § 13A-5-46(a), (b). At the time of Beckworth's conviction and sentencing in 2002, juries heard the evidence and arguments of both parties, deliberated, and returned an advisory verdict recommending either life imprisonment without parole (if it determined that no aggravating circumstances existed, or that the aggravating circumstances did not outweigh the mitigating circumstances) or death (if it determined that one or more aggravating circumstances existed, and that they outweighed the mitigating circumstances). *See id.* § 13A-5-46(e) (repealed 2017).[33] Following the advisory verdict, the trial court then independently determined the appropriate sentence. *See id.* § 13A-5-47(a) (repealed 2017). In doing so, it would "enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstance offered pursuant to Section 13A-5-52." *Id.* § 13A-5-47(d) (repealed 2017). Then, the trial court would weigh the aggravating circumstances against the mitigating circumstances, taking into consideration the jury's recommendation.

[33] In 2017, the Alabama legislature amended ALA. CODE §§ 13A-5-45, 13A-5-46, and 13A-5-47. *See* Ala. Laws Act 2017-131 (S.B. 16). Now, the jury's sentencing determination is binding on the judge and is no longer advisory. However, the 2017 amendment "shall not apply retroactively to any defendant who has previously been convicted of capital murder and sentenced to death prior to April 11, 2017." ALA. CODE § 13A-5-47.1.

*See id.* § 13A-5-47(e) (repealed 2017). If the court found that at least one aggravating circumstance existed, and that it outweighed any mitigating circumstances, it could impose a death sentence, notwithstanding a contrary jury recommendation. *See id.*

In 2000, the United States Supreme Court decided *Apprendi*. In that case, the defendant had fired several shots into the home of a Black family that had recently moved into a previously all-white neighborhood. *Apprendi*, 530 U.S. at 469. The defendant admitted to police that he did not want them in the neighborhood because they were Black. *Id.* The defendant pled guilty to and was convicted under New Jersey law for second-degree possession of a firearm for an unlawful purpose, which carried a prison term of five to ten years. *Id.* at 470. However, a New Jersey hate crime statute allowed for an extended term of imprisonment if the trial judge found, by a preponderance of the evidence, that the defendant committed the firearms crime with a purpose to intimidate a person or group because of race. *Id.* After the defendant was convicted, the trial court held a separate evidentiary hearing to determine the defendant's "purpose" for the shooting, during which the defendant testified that the incident was an unintended consequence of overindulgence in alcohol and denied that he was biased against Black people. *Id.* at 471. Nonetheless, the trial court found that the shooting was racially motivated and sentenced the defendant to a twelve-year term of imprisonment. *Id.* The Supreme Court reversed and remanded the sentence, holding that a sentencing scheme violates a criminal defendant's Sixth Amendment right to a trial by jury if it "removes the jury from the determination of a fact that, if found, exposes the criminal defendant to a penalty *exceeding* the maximum he

would receive if punished according to the facts reflected in the jury verdict alone." *Id.* at 482–83.

Two years later in *Ring*, the Supreme Court extended its holding in *Apprendi* to capital murder defendants specifically, in considering the constitutionality of Arizona's capital sentencing statute. *Ring*, 536 U.S. at 588–89. Under Arizona law at the time, the crime of first-degree murder was punishable by life imprisonment or death. *Id.* at 588. However, a defendant convicted of first-degree murder could not be sentenced to death unless the trial judge—alone—determined that at least one aggravating circumstance existed. *Id.* The Supreme Court held that this capital sentencing scheme was incompatible with the Sixth Amendment's right to a jury trial because it empowered the judge, and not the jury, to make the critical finding of fact—i.e., the presence or absence of an aggravating circumstance—that raised a defendant's maximum penalty from life imprisonment to death. *Id.* at 589.

In 2016, the Supreme Court applied its holding in *Ring* to Florida's capital sentencing statute, holding that it was also unconstitutional. *Hurst*, 577 U.S. at 94. There, the defendant had been convicted of first-degree murder. *Id.* That conviction made a defendant eligible for a maximum sentence of life imprisonment without the possibility of parole. *Id.* at 95. However, a person convicted of first-degree murder was eligible for the death penalty only if, at the conclusion of a separate sentencing hearing, death was found to be the appropriate sentence. *Id.* at 95–96. The imposition of the death penalty involved a two-step process. *Id.* First, the jury would recommend an advisory sentence of life or death but it would not specify the facts upon which the recommendation was based. *Id.*

Second, the trial court would give the jury's recommendation "great weight" but nevertheless independently determine whether aggravating and mitigating circumstances existed and whether the aggravating circumstances outweighed any mitigating circumstances such that a sentence of death was warranted. *Id.* at 96. In *Hurst*, the jury found at least one aggravating circumstance proven beyond a reasonable doubt—but it was unclear which one(s)—and recommended by a vote of seven to five that the defendant be sentenced to death. *Id.* The trial court then independently found two statutory aggravators proven beyond a reasonable doubt, balanced the aggravators and mitigators, and sentenced the defendant to death. *Id.* The Supreme Court reversed and remanded the sentence, explaining that, under Florida law, the maximum punishment a defendant could have received without court-made findings of fact was life imprisonment. *Id.* at 98–99. The Supreme Court further explained that, despite the role of the advisory jury in the process, a court was impermissibly authorized to increase a defendant's authorized punishment "based on [its] own factfinding." *Id.* at 99. *Hurst* held that the Sixth Amendment requires a state to base a death sentence "on a jury's verdict, not a judge's factfinding." *Id*. at 102.

Against this backdrop, the Court returns to Beckworth's claim. Beckworth argued that Alabama's capital sentencing statute was unconstitutional after *Apprendi* and *Ring* at his trial and on direct appeal, and the state courts denied the claim on the merits. More specifically, on August 9, 2002, shortly after the Supreme Court decided *Ring*, Beckworth's trial counsel filed a pretrial motion to declare Alabama's capital sentencing statute unconstitutional and to bar imposition of the death penalty in his case. (Doc. 7-4 at 122–34). During a pretrial hearing on August 15, 2002, the trial court denied the motion.

(Doc. 7-9 at 13–19). On direct appeal, Beckworth challenged the trial court's denial of his motion. (Doc. 7-15 at 91–97). However, the ACCA affirmed the trial court's ruling, stating as follows:

> Beckworth [] argues that Alabama's capital-murder statutory scheme is unconstitutional. Specifically, he appears to argue that the Alabama statute violates *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L.Ed.2d 556 (2002). Beckworth raised this claim in the court below. (C. 678–89, 722–35.) Beckworth acknowledges in his brief that the Alabama Supreme Court rejected this claim in *Ex parte Waldrop*, 859 So.2d 1181 (Ala.2002); he argues that that decision is "constitutionally flawed both on its face and in its use." (Beckworth's brief at p. 83.)
>
> The State correctly argues that this Court is bound by the decisions of the Alabama Supreme Court. § 12–3–16, Ala.Code 1975. Even if we were persuaded by Beckworth's arguments on this issue, and we are not, we could not somehow issue a ruling in opposition to *Ex parte Waldrop*. *See Barber v. State*, [Ms. CR–03–0737, May 27, 2005] ––– So.2d –––, ––– (Ala.Crim.App.2005).

*Beckworth*, 946 So. 2d at 515. Beckworth raised the issue again in his petition for certiorari to the Alabama Supreme Court, (doc. 7-17 at 97–104), but that court denied the petition, *see Beckworth*, 946 So. 2d at 490. That concluded Beckworth's pursuit of this claim in the state courts.

Because the state courts rejected this claim on the merits, in order to obtain relief from this Court, Beckworth must demonstrate that the decision of the ACCA, which was the last reasoned state court decision, *see Wilson*, 584 U.S. at 125, was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d). To do this, Beckworth argues

that the ACCA's decision was both contrary to and an unreasonable application of *Ring*. However, the Court is not persuaded.

The ACCA held that it was bound by the Alabama Supreme Court's decision in *Ex parte Waldrop*, 859 So. 2d 1181 (Ala. 2002). *Beckworth*, 946 So. 2d at 515. In *Waldrop*, the Alabama Supreme Court held that Alabama's capital sentencing statute was still constitutional after *Ring*. 859 So. 2d at 1188. In *Waldrop*, the defendant had been convicted of murder during a first-degree robbery in violation of ALA. CODE § 13A-5-4(a)(2). *Id.* The Alabama Supreme Court explained that "[b]ecause the jury convicted Waldrop of two counts of murder during a robbery in the first degree . . . the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, ALA. CODE 1975, § 13A-5-49(4), was 'proven beyond a reasonable doubt.'" *Id.* (citing ALA. CODE §§ 13A-5-45(e), 13A-5-45(f)). The court noted that "[o]nly one aggravating circumstance must exist in order to impose a sentence of death." *Id.* (citing ALA. CODE § 13A-5-45(f)). The court thus held that "the findings reflected in the jury's verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty [and this was] all *Ring* and *Apprendi* require." *Id.*

The same is true here as was true in *Waldrop*. Beckworth was found guilty of murder during the commission of a burglary. Beckworth's jury thus necessarily found beyond a reasonable doubt the existence of the corresponding aggravating circumstance specified in ALA. CODE § 13A-5-49(4). This finding of fact *by the jury* exposed Beckworth to a range of punishment that had the death penalty as its maximum. In his concurrence in

*Ring*, Justice Scalia explained that the Court's decision in *Ring* did not affect capital sentencing statutes like Alabama's, reasoning as follows:

> What today's decision says is that the jury must find the existence of the *fact* that an aggravating factor existed. Those States that leave the ultimate life-or-death decision to the judge may continue to do so—by requiring a prior jury finding of aggravating factor in the sentencing phase or, more simply, by placing the aggravating-factor determination (where it logically belongs anyway) in the guilt phase.

536 U.S. at 612–13 (Scalia, J., concurring) (emphasis in original).[34] This second option that Justice Scalia referenced—whereby the jury makes a factual determination during the guilt phase that an aggravating factor exists beyond a reasonable doubt—is what happened in Beckworth's case. Thus, Beckworth's assertion that "[h]ad [Mr. Beckworth's] judge not engaged in any factfinding, [Mr. Beckworth] would have received a life sentence," (doc. 42 at 60), is inaccurate. The jury had already engaged in the factfinding that resulted in Beckworth being eligible for the death penalty. In contrast, the defendant in *Ring* was not eligible for the death penalty based on his conviction alone because, in Arizona at that time, the trial judge had to make the independent factfinding that a statutory aggravating circumstance existed before a defendant could become eligible for the death penalty. *See Ring*, 536 U.S. at 588–89.

Furthermore, in 2013, the Eleventh Circuit rejected the same argument that Beckworth raises here: that under 28 U.S.C. § 2254(d), the ACCA's decision that *Ring* did not invalidate Alabama's capital sentencing statute was contrary to and an unreasonable

[34] While the Court acknowledges that this concurrence is not binding authority, the Court finds it persuasive.

application of *Ring*. *See Lee*, 726 F.3d at 1197–98. The Eleventh Circuit reasoned as follows:

> We can easily dispose of Lee's claim in light of the narrowness of the Supreme Court's holding in *Ring*. As the state appellate court in *Lee I* concluded, the jury's guilty verdict on the capital offense of robbery-murder established the existence of an aggravating circumstance sufficient to support a death sentence. In Alabama, a statutory aggravating circumstance is that "[t]he capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit . . . robbery." Ala.Code § 13A–5–49(4). In the guilt phase, the jury convicted Lee of the capital offense of "[m]urder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant." Ala.Code § 13A–5–40(a)(2). A jury's guilt-phase finding of conviction under § 13A–5–40(a)(2) necessarily includes a finding that the aggravating circumstance in § 13A–5–49(4) is present. Alabama statute requires interpreting the jury verdict in this manner. *See* Ala.Code § 13A–5–45(e) ("[A] ny aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing."). Nothing in *Ring*—or any other Supreme Court decision—forbids the use of an aggravating circumstance implicit in a jury's verdict. Indeed, *Ring* itself specifically left open and did not decide the question of whether the aggravator used to impose a death sentence could be implicit in the jury's verdict. *See Ring*, 536 U.S. at 609 n. 7, 122 S.Ct. at 2443 n. 7 ("We do not reach the State's assertion that any error was harmless because a pecuniary gain finding was implicit in the jury's guilty verdict.").
>
> Furthermore, *Ring* does not foreclose the ability of the trial judge to find the aggravating circumstances outweigh the mitigating circumstances. As the *Ring* Court also made clear, it was not deciding whether the Sixth Amendment: (1) required the jury to make findings as to mitigating circumstances; (2) required the jury to make the ultimate determination as to whether to impose the death penalty; or (3) forbade the state court from reweighing aggravating and mitigating circumstances. *Id*. at 597 n.4, 122 S.Ct. at 2437 n.4.
>
> The holding of *Ring* is narrow: the Sixth Amendment's guarantee of jury trials requires that the finding of an aggravating circumstance that is necessary to imposition of the death penalty must be found by a jury. That occurred in Lee's case by virtue of the jury's capital robbery-murder verdict. *Ring* goes no further, and Lee points to no Supreme Court precedent that has

> extended *Ring*'s holding to forbid the aggravating circumstance being implicit in the jury's verdict or to require that the jury weigh the aggravating and mitigating circumstances.
>
> Accordingly, we must conclude that the state appellate court's decision is not contrary to or an unreasonable application of *Ring*, and Lee is not entitled to habeas relief on this claim.

*Id.* Thus, *Lee* forecloses Beckworth's ability to successfully overcome the deference this Court owes the ACCA's decision under § 2254(d).

Beckworth also argues that *Hurst*, in which the Supreme Court held that Florida's capital sentencing scheme was unconstitutional, further discredits Alabama's capital sentencing procedure. However, *Hurst* was not clearly established federal law when the ACCA rejected Beckworth's Sixth Amendment claim. *See Yarborough*, 541 U.S. at 660–61 (explaining that the clearly established law must exist at the time of the state court decision). So, the ACCA's decision could not have contradicted *Hurst* or been an unreasonable application thereof. In any event, Beckworth's death sentence complies with the Sixth Amendment because the jury, and not the trial judge, unanimously determined at the guilt phase of Beckworth's trial that an aggravating circumstance necessary for imposition of the death penalty—that the murder was committed during the course of a burglary—had been proven beyond a reasonable doubt.[35]

[35] Moreover, in 2016, the Alabama Supreme Court upheld Alabama's capital sentencing scheme against a constitutional challenge based upon *Hurst*. *See Ex parte Bohannan*, 222 So. 3d 525, 528–34 (Ala. 2016), *cert. denied*, 580 U.S. 1101 (Jan. 23, 2017).

In sum, Beckworth has failed to show that the ACCA contradicted or unreasonably applied clearly established federal law in rejecting this claim. *See* 28 U.S.C. § 2254(d). On AEDPA review, Beckworth is not entitled to relief.

### G. Beckworth's Claim that the Trial Court's Denial of His Motion for a Change of Venue Deprived Him of His Rights to a Fair Trial and Impartial Jury (Doc. 1 at 96–103, paras. 281–98)

Beckworth claims that the trial court erred in denying his motion for a change of venue due to pretrial publicity. The Respondent contends that the ACCA adjudicated this claim on the merits, with some exceptions,[36] and thus the ACCA's decision is subject to a reasonableness review by this Court under 28 U.S.C. § 2254(d). However, as explained below, a careful review of the record reveals that this claim is procedurally defaulted from review because Beckworth did not raise the claim in his petition for a writ of certiorari in the Alabama Supreme Court.

On November 13, 2001, Beckworth's counsel filed a pretrial motion for a change of venue. (Doc. 7-2 at 153–57). The motion asserted that "no presumption of innocence surrounds Mr. Beckworth" because there was "widespread community bias against Mr. Beckworth and there is a general feeling that he should be sentenced to death." (*Id.* at 153).

[36] The Respondent contends that Beckworth adds facts in this claim that he never presented to the state courts. (Doc. 40 at 19). The Respondent specifies that the following facts are new: the facts in all but the first sentence of paragraph 285; the facts in paragraphs 286–87; the facts in the third sentence of paragraph 289; the facts in paragraphs 290–92; and the facts in paragraph 295. These facts are actually summaries of news reports that were admitted into evidence at a hearing on the motion for a change of venue and references to responses made by potential jurors during voir dire when they were asked whether they had seen news reports about the murder. As he has done with other claims, Beckworth responds that because these facts form part of the state court record, they are properly considered by this Court. (Doc. 41 at 34). The Court need not decide whether it may properly consider these additional facts because the claim in its entirety is unexhausted and procedurally defaulted from review, as explained herein.

The motion argued that Beckworth's constitutional rights to a fair trial and an impartial jury would be violated without a change of venue. (*Id.* at 154). On March 18, 2002, the trial court held a hearing on Beckworth's motion. (Doc. 7-8 at 117–64). Beckworth's counsel called as a witness a local television news reporter, who testified about the coverage the murder investigation had received by his station. (*Id.* at 149–55). He stated that from April 2000, when Beckworth was identified as a suspect, until March 14, 2002, the station ran approximately 150 news stories implicating Beckworth. (*Id.* at 151). Printed copies of the stories were admitted as exhibits at the hearing. However, at Beckworth's counsel's request, the trial court stated that he was going to reserve ruling on the motion until completion of voir dire at Beckworth's trial, so that the court could determine whether potential jurors had been exposed to pretrial publicity that might affect their consideration of the evidence. (*Id.* at 140). During voir dire at Beckworth's trial, numerous potential jurors indicated that they had seen or heard news stories about Ms. Thweatt's murder, and the trial court questioned those potential jurors individually. (Doc. 7-9 at 163–200). Beckworth's counsel challenged some jurors for cause, and the trial court struck them. (Doc. 7-10 at 5–7). At the conclusion of voir dire, Beckworth's counsel reiterated his argument that a change of venue was warranted, but the trial court denied the motion for a change of venue. (*Id.* at 12–13).

Beckworth appealed the denial of the motion to the ACCA. (Doc. 7-15 at 104–05). The ACCA affirmed the trial court's ruling, reasoning as follows:

> Beckworth next argues that the trial court erred when it denied his motion for a change of venue. He appears to argue only that the motion

should have been granted because 33% of the prospective jurors had heard something about the case.

The legal principles governing review of a trial court's denial of a motion for a change of venue are well established. First, we note that a trial court's ruling on a motion for a change of venue is not to be overturned on appeal absent an abuse of discretion. The ruling on a change-of-venue motion is generally left to the sound discretion of the trial court, because the court is in a better position to evaluate the effect on the venire of any allegedly prejudicial publicity against the defendant. *See Wimberly v. State*, 934 So.2d 411, 421–22 (Ala.Crim.App.2005), and cases quoted therein.

Section 15–2–20, Ala.Code 1975, provides that a defendant may obtain a change of venue if he demonstrates to the trial court that he cannot receive a fair and impartial trial in the county where he was indicted. "Absent inherently prejudicial publicity which has so saturated the community as to have a probable impact upon the prospective jurors, there must be some showing of a connection between the publicity generated by the news articles, radio and television broadcasts and the existence of actual jury prejudice." *McWilliams v. United States*, 394 F.2d 41, 44 (8th Cir. 1968), quoted in part in *Gavin v. State*, 891 So.2d 907, 939 (Ala.Crim.App.2003); *Whitehead v. State*, 777 So.2d 781, 800 (Ala.Crim.App.1999), *aff'd*, 777 So.2d 854 (Ala.2000); and *Oryang v. State*, 642 So.2d 979, 982 (Ala.Crim.App.1993).

> "In *Murphy v. Florida*, 421 U.S. 794 (1975), we reviewed a trial in which many jurors had heard of the defendant through extensive news coverage. Characterizing our previous cases in which we had overturned a state-court conviction on these grounds as involving 'a trial atmosphere that had been utterly corrupted by press coverage,' *id.*, at 798, we recognized:
>
> > " 'Qualified jurors need not, however, be totally ignorant of the facts and issues involved.
> >
> > " ' "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." '

> "*Id*., at 799–800, quoting from *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)."

*Dobbert v. Florida*, 432 U.S. 282, 302, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).

" 'The burden of showing this saturation of the community or actual prejudice lies with the appellant. *Sheppard v. Maxwell*, 384 U.S. 333 (1966).' " *Gavin v. State*, 891 So.2d 907, 939 (Ala.Crim.App.2003)(quoting *Oryang v. State*, 642 So.2d 979, 983 (Ala.Crim.App.1993)). Moreover, "the passage of time is a factor that can bring objectivity to a case in which the pretrial publicity has been extensive." *Ex parte Travis*, 776 So.2d 874, 878 (Ala.2000).

> "The relevant question is not whether the community remembered the case, but whether the jurors at [a defendant's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant. *Irvin* [*v. Dowd*, 366 U.S. 717, 723 (1961)]. It is not unusual that one's recollection of the fact that a notorious crime was committed lingers long after the feelings of revulsion that create prejudice have passed."

*Patton v. Yount*, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).

With the foregoing relevant legal principles in mind, we review the facts and arguments presented here. In Beckworth's November 13, 2001, motion for a change of venue, he alleged that the case had received extensive publicity in the newspapers and on radio and television, and that there existed a widespread community bias against him, as well as "a general feeling" in the community "that he should be sentenced to death." (C. 355.) On March 18, 2002, the trial court held a hearing on the motion, although the parties understood that the court would defer its ruling until after voir dire examination of the potential jurors had been completed. At the hearing, Wayne May, a reporter with a local television station, testified about the coverage the murder investigation had received by his station. He stated that from April 2000, when Beckworth was identified as a suspect, until March 14, 2002, the station had broadcast 150 stories mentioning Beckworth's name. May clarified that his station actually broadcast "probably forty-six different stories," some of which were broadcast three or four times during a single day. (3/18/02 hearing, R. 40–41.) Beckworth was mentioned on "America's Most Wanted," a national television show featuring suspects who had eluded arrest. On cross-examination, printed copies of the stories

were admitted as an exhibit at the hearing. Most of the stories are short, one-half page or less, and they are factual. The stories included information such as that Beckworth was a suspect in the shooting, that he was believed to have left the area, and that he had been apprehended in Phoenix, Arizona. (C. 1274, 1294.)

During voir dire examination, prospective jurors who had heard of the case were questioned individually. (R. 135–172.) Only a few of those prospective jurors remembered details of the crimes, and all but a few veniremembers stated that they would be able to put out of their minds the information they had heard and decide the case based on the evidence presented in the courtroom. Beckworth and the prosecutor moved to strike several prospective jurors who stated that they had already formed an opinion or that they could not set aside the media information they had heard; the trial court struck those jurors. (R. 189–91.)

Defense counsel then argued for a change of venue. He stated that, in addition to the testimony taken at the pretrial hearing, the motion was due to be granted because "at least thirty-three percent of the people that were here today to be potential jurors had had some knowledge of the case, and there were a number of people . . . that were struck specifically for that reason. . . ." (R. 196.) The trial court denied the motion.

Beckworth has utterly failed to establish that the trial court abused its discretion when it denied the motion to suppress. He failed to sustain his burden of proof at trial. Several of the jurors remembered the news reports of the crime, but the relevant question is not whether the community remembered the case, because jurors are not required to be ignorant of the facts. *Patton v. Yount*, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). All the prospective jurors who remembered facts about the case but who were not struck for cause stated that they could impartially judge the case based on the evidence presented at trial. Beckworth failed to establish any juror prejudice against him as a result of the media.

> "Petitioner in this case has simply shown that the community was made well aware of the charges against him and asks us on that basis to presume unfairness of constitutional magnitude at his trial. This we will not do in the absence of a 'trial atmosphere . . . utterly corrupted by press coverage,' *Murphy v. Florida*, [421 U.S. 794, 798 (1975) ]. One who is reasonably suspected of murdering his children cannot expect to remain anonymous."

*Dobbert v. Florida*, 432 U.S. at 303, 97 S.Ct. 2290.

> We find, as did the United States Supreme Court in *Dobbert*, that Beckworth urges us to presume prejudice here based on the existence of media coverage and the fact that some of the prospective jurors had heard about the crime. There is no legal or logical basis for such a presumption here. Therefore, we hold that the trial court did not err in denying the motion for a change of venue.

*Beckworth*, 946 So. 2d at 518–20. As indicated above, Beckworth did not include this claim in his petition for certiorari in the Alabama Supreme Court.

Beckworth has not satisfied 28 U.S.C. § 2254(b)(1)'s exhaustion requirement, and he is procedurally barred from raising this claim in a federal habeas petition. *See O'Sullivan*, 526 U.S. at 845–47; *Hunt*, 666 F.3d at 730. Because he failed to seek review in the Alabama Supreme Court, Beckworth cannot now seek relief in this Court. Further, as explained *supra* Section V.B., dismissal of his habeas petition to allow him to present this claim in the Alabama Supreme Court now would be futile because the time for filing such a certiorari petition has long passed, and the certiorari petition that he did file has long since been denied. *See* ALA. R. APP. P. 39(c)(2). Thus, because any state remedy with respect to this claim is procedurally barred by a state procedural rule, the claim is procedurally defaulted from habeas review. *See McNair*, 416 F.3d at 1304–05.

Although the State may waive a procedural default defense, including exhaustion, AEDPA provides that "[a] State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, expressly waives the requirement." 28 U.S.C. § 2254(b)(3); *see also Dill*, 371 F.3d at 1302 n.1. Although the Respondent did not

argue that this entire claim was unexhausted, he also has not expressly waived the exhaustion requirement.[37]

Thus, because Beckworth failed to properly exhaust this claim, the Respondent has not expressly waived that failure to exhaust, and this claim could no longer be pursued in state court if this Court dismissed Beckworth's petition, this claim is procedurally defaulted. *See McNair*, 416 F.3d at 1304–05. Consequently, Beckworth is not entitled to relief on this claim.

### H. Beckworth's Claim that the Trial Court's Misstatements of Law During Voir Dire Deprived Him of His Rights to a Fair Trial and Impartial Jury (Doc. 1 at 103–05, paras. 299–309)

Beckworth claims that the trial court used an incorrect legal standard when it asked prospective jurors during voir dire the following question:

> [A]re there any of you who, for any reason, could not recommend life without parole, even though, under the evidence and the law given to you in this case, you were convinced beyond a reasonable doubt that life without parole was the sentence warranted in this case? Any of you who could not recommend life without parole, even though you were convinced beyond a reasonable doubt that that was the sentence that was warranted in this case?

(Doc. 7-9 at 51). Beckworth acknowledges that trial courts are authorized to ask what are known as "death qualifying questions" and "life qualifying questions," i.e., questions designed to gauge potential jurors' preconceived notions about the death penalty or about life imprisonment. However, Beckworth argues that in repeatedly using the "beyond a reasonable doubt" language, the trial court erroneously suggested to the jury that they

[37] As noted, the Respondent argues that Beckworth adds additional facts to this claim that he did not present to the state courts. However, the Respondent does not argue that Beckworth failed to exhaust the entire claim by failing to raise it in his petition for review by the Alabama Supreme Court.

should not vote for a life sentence unless they were convinced beyond a reasonable doubt that life rather than death was warranted.[38] Beckworth contends that this suggestion violated the principle that no burden of proof should be imposed to restrict the jury's consideration of mitigating evidence during sentencing in a capital case.

In support, Beckworth relies upon *Weeks v. Angelone*, 528 U.S. 225, 233 (2000), in which the Supreme Court instructed that jurors are required to consider mitigation information at the sentencing phase of a capital trial if there is evidence to support it. Beckworth also relies upon *Kansas v. Carr*, 577 U.S. 108, 119 (2016), in which the Supreme Court "doubt[ed] whether it is it is even possible to apply a standard of proof to the mitigating-factor determination [because w]hether mitigation exists . . . is largely a judgment call (or perhaps a value call)[.]" According to Beckworth, by announcing to jurors as part of its life qualifying questions that a life sentence was only permitted if they were convinced beyond a reasonable doubt, the trial court produced a "tribunal organized to return a verdict of death." *Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968). Beckworth also quotes *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) ("Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored."), and *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991) (explaining that voir dire "enable[s] the court to select an impartial jury and assist[s] counsel in exercising peremptory challenges").

---

[38] The trial court also asked the venire whether any of them would be unable to recommend the death penalty even if they were convinced "beyond a reasonable doubt" that the death penalty was warranted. (*Id.* at 49–50). Beckworth does not challenge the trial court's use of this death qualifying question.

Although his Answer is somewhat unclear, the Respondent appears to contend both that (1) this claim is unexhausted and procedurally defaulted because Beckworth raised only a state law claim before the ACCA and did not raise a constitutional violation until his petition for certiorari in the Alabama Supreme Court, and (2) this claim is unexhausted and procedurally defaulted because this is the first time that Beckworth has ever raised this particular constitutional claim. (Doc. 16 at 57–60). As explained below, either way, the Court cannot consider the merits of this claim.

On direct appeal, Beckworth raised a purely state law claim. The claim was that the trial court erred both when it asked the prospective jurors during voir dire if they would be unable to recommend a death sentence even if they were convinced "beyond a reasonable doubt" that the death penalty was warranted, *and* when it asked them "the reverse of that question" which was whether any of them would be unable to recommend a life sentence even if they were convinced "beyond a reasonable doubt" that a life sentence was warranted. (Doc. 7-15 at 89–91). In other words, he challenged both the death qualifying and life qualifying questions on the ground that the trial court used the "beyond a reasonable doubt" language. Beckworth did not argue that this error amounted to a constitutional violation. In fact, Beckworth did not cite any law at all, merely arguing that the "trial court's instruction to the jury was contrary to the law under which Beckworth was indicted." (*Id.* at 91). The ACCA denied relief on this claim, stating:

> Beckworth next argues that the trial court erred to reversal because it asked the prospective jurors if any of them would be unable to recommend a death sentence, even if they were convinced "beyond a reasonable doubt" that the death penalty was warranted. He argues that the question incorrectly incorporated the "beyond a reasonable doubt" standard, which applies only

to aggravating circumstance findings. He concludes his brief argument on this issue by stating, "The trial court's instruction to the jury was contrary to the law under which Beckworth was indicted." (Beckworth's brief at p. 82.) The State correctly points out that the jury was not "instructed" improperly as to the law relevant to sentencing because the issue before us involves only the court's questions to the venire. The State also correctly notes that Beckworth did not object to the questions at trial, so the claim is reviewed now only for plain error. [FN]10 We find no plain error.

> [FN]10 We question whether Beckworth has presented this claim adequately for this Court to review. He has quoted portions of the record, but has not included any substantive argument or citations to the authorities, which Rule 28(a)(10), Ala. R.App. P., requires.

Beckworth does not argue that the trial court could not "death qualify" the veniremembers. The United State Supreme Court in *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), upheld this practice and Alabama's appellate courts have upheld the "death-qualification" of veniremembers. *See Gamble v. State*, 791 So.2d 409, 426 (Ala.Crim.App.2000), and cases cited therein. To the extent Beckworth is attempting to argue that the trial court's voir dire questions to the venire should be reviewed as if they were instructions given to the jury at the sentencing hearing, Beckworth has presented this Court with no legal authority to support that proposition, and we decline to consider it.

"The purpose of voir dire is to provide sufficient information on the jurors to enable the trial court to make a meaningful determination as to whether the veniremembers could be impartial." *Pressley v. State*, 770 So.2d 115, 124 (Ala.Crim.App.1999), *aff'd*, 770 So.2d 143 (Ala.2000). The trial court in this case was "death-qualifying" the venire to determine whether any member would be unable to recommend a death sentence or if any member had a fixed opinion against the death penalty. The court also asked the venire whether any member would be unable to recommend a sentence of life without parole, "even though you were convinced beyond a reasonable doubt that that was the sentence that was warranted in this case?" (R. 23.) While the trial court incorrectly placed language "beyond a reasonable doubt" in its "life-qualifying" questions and in its "death-qualifying" questions, we find no plain error here. Beckworth has cited no authority, and our research has revealed none, to support a determination that a reference to an incorrect standard of review during voir dire questioning requires a reversal for a new trial.

> The trial court, in its introductory questioning, was attempting to identify veniremembers who would be unable to render an impartial sentencing recommendation so that these veniremembers could be questioned individually by the attorneys in their follow-up examinations. That the trial court stated an incorrect burden of proof during its introductory questioning resulted in no harm to Beckworth, especially in light of the fact that the trial court correctly instructed the sentencing jury that it could return a death-penalty recommendation only if the aggravating circumstances outweighed the mitigating circumstances. (R. 992–93, 1003.)
>
> No plain error occurred here, and Beckworth is not entitled to any relief on this claim.

*Beckworth*, 946 So. 2d at 514–15. As can be seen from the above-quoted section, the ACCA did not treat the claim as if a federal constitutional question had been raised. Beckworth argues that the ACCA's reference to the Supreme Court case *Lockhart v. McCree*, 476 U.S. 162 (1986), meant that the ACCA acknowledged the federal constitutional issue, even if he did not raise one. According to Beckworth, the exhaustion element has been satisfied because the ACCA considered and rejected a constitutional claim on the merits. In support, Beckworth cites *Sandstrom v. Butterworth*, 738 F.2d 1200, 1206 (11th Cir. 1984), in which the Eleventh Circuit held that exhaustion is determined not by "how petitioner's state court pleadings are to be interpreted" but instead by looking at "what the state courts actually considered." The Court finds Beckworth's argument unavailing. Although the ACCA cited *Lockhart*, the purpose was merely to show that the Supreme Court has authorized the practice of death qualifying potential jurors. *Beckworth*, 946 So. 2d at 514. But the ACCA also explicitly stated that Beckworth was not arguing that the trial court should not have death qualified potential jurors in his case; instead, his argument was that the trial court erred in using the "beyond a reasonable doubt" language

in its death and life qualifying questions. Therefore, the holding of *Lockhart* was irrelevant to the issue Beckworth was arguing to the ACCA. The ACCA simply did not mention an alleged violation of Beckworth's federal constitutional rights in its decision.

As alluded to previously, Beckworth challenged the ACCA's decision in his petition for certiorari in the Alabama Supreme Court, (doc. 7-17 at 92–97), arguing for the first time that the ACCA's decision was contrary to the Supreme Court's decision in *Morgan v. Illinois*, 504 U.S. 719 (1992). Aside from quoting *Morgan* at length, Beckworth did not offer any explanation as to how the trial court's death qualifying and life qualifying questions were contrary to *Morgan*. The Alabama Supreme Court denied the petition without an opinion. *See Beckworth*, 946 So. 2d at 490.

Thus, Beckworth did not raise a constitutional claim at all before the ACCA, and the Court questions whether he even raised the same constitutional claim before the Alabama Supreme Court that he does here. In *Morgan*, the only United States Supreme Court precedent cited by Beckworth in his certiorari petition, the Court held that a trial court may not refuse a party's request that the trial court ask potential jurors during voir dire whether anyone would automatically impose the death penalty upon conviction. 504 U.S. at 725. Beckworth does not mention *Morgan* in his federal habeas petition, merits brief, or reply brief. Perhaps this is because *Morgan* is irrelevant to the issue that Beckworth now presents. Now, Beckworth's argument is that the "reasonable doubt" language used by the trial court in its life qualifying questions was contrary to the Supreme Court's decisions in *Weeks*, 528 U.S. at 233, and *Carr*, 577 U.S. at 118–22, which instruct

that a jury must not be precluded from considering all kinds of mitigation information that is presented at sentencing, life imprisonment being one kind of that mitigation.

In sum, Beckworth never raised in state court the federal claim he now presses in this Court. Therefore, the claim is unexhausted, procedurally defaulted, and Beckworth has not offered cause and prejudice to excuse the default. *See Coleman*, 501 U.S. at 732 (explaining that "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance").

Even assuming Beckworth's argument to the Alabama Supreme Court could be considered the same constitutional claim that he now raises, his claim is still procedurally defaulted. A petitioner does not fairly present a federal constitutional claim to the state courts when he litigates only a state law issue before the ACCA and then asserts a federal constitutional theory for the first time in a petition for certiorari. Because the ACCA—the court that actually adjudicated the claim on the merits—was never alerted to the federal nature of the issue, the state courts were not afforded the opportunity to consider the claim. In *Castille v. Peoples*, 489 U.S. 346, 349 (1989), the Supreme Court considered "whether the presentation of claims to a State's highest court on discretionary review, without more, satisfies the exhaustion requirements of 28 U.S.C. § 2254." In that case, the state prisoner had presented his claims for the first time to the Pennsylvania Supreme Court in a petition for "allocatur review," which is granted "'not [as] a matter of right, but of sound judicial discretion.'" *Id.* at 347 (quoting PA. R. APP. P. 1114). The Supreme Court unanimously held that presenting the claims for the first time in that kind of discretionary proceeding

did not exhaust them under 28 U.S.C. § 2254(d). Several years later, the Eleventh Circuit held that the rule in *Castille* bars a petitioner from seeking federal habeas review of claims that were raised for the first time in a petition for a writ of certiorari before the Georgia Supreme Court. *See Mauk v. Lanier*, 484 F.3d 1352, 1358 (11th Cir. 2007). The court explained:

> Because the Georgia Supreme Court's decision to grant certiorari is discretionary, *see, e.g.*, *Adair v. Traco Div.*, 192 Ga. 59, 14 S.E.2d 466, 469 (Ga.1941), and because certiorari can only be granted in cases "which are of gravity or great public importance," Ga. Const. art. VI, § 6, ¶ 5, we cannot say, in light of *Castille*, that Mauk has fairly presented his claims. Mauk's claims were presented in a procedural context in which the merits were not considered, as the Georgia Supreme Court's denial of certiorari does not constitute a ruling on the merits. *See Adair*, 14 S.E.2d at 469 (explaining that the Georgia Supreme Court's denial of a petition for certiorari " 'shall not be taken as an adjudication that the decision or judgment of the Court of Appeals is correct' ") (citation omitted); *Ezor v. Thompson*, 241 Ga.App. 275, 526 S.E.2d 609, 610–11 (Ga.Ct.App.1999) (same). We thus must conclude that Mauk has not fairly presented his federal constitutional claims to the Georgia courts and thus has failed to exhaust his state remedies.

*Id.* In an unpublished opinion, the Eleventh Circuit subsequently held that the same analysis applied to Alabama's appellate rules in a case where a federal habeas petitioner failed to raise a constitutional claim until he petitioned the Alabama Supreme Court for discretionary review. *See Waldrop v. Comm'r, Ala. Dep't of Corrs.*, 711 F. App'x 900, 918 (11th Cir. 2017) (per curiam). The court stated:

> This case is materially indistinguishable from *Castille* and *Mauk*. Like the standards for granting allocator review in *Castille* and certiorari review in *Mauk*, certiorari review by the Alabama Supreme Court "is not a matter of right, but of judicial discretion," and will only be granted "when there are special and important reasons." Ala. R. App. P. 39(a). And, as with the Georgia Supreme Court, a denial of a writ of certiorari by the Alabama Supreme Court is not a decision on the merits. *See Ex parte McDaniel*, 418 So. 2d 934, 935 (Ala. 1982).

*Id.* The court thus held that the petitioner procedurally defaulted the claim.

Here, assuming Beckworth presented the same claim to the Alabama Supreme Court that he presents here, he still did not fairly present his claim to the Alabama state courts because he presented it "for the first and only time in a procedural context in which its merits will not be considered unless 'there are special and important reasons,'" *Castille*, 489 U.S. at 351 (quoting PA. R. APP. P. 1114). The claim is thus unexhausted, procedurally defaulted, and because Beckworth has offered no reason why the doctrines of cause and prejudice would excuse the default, the Court cannot consider the claim. *See Coleman*, 501 U.S. at 732.

## I. Beckworth's Claim that His Trial Counsel Rendered Ineffective Assistance at the Guilt Phase of His Trial in Violation of His Sixth Amendment Rights (Doc. 1 at 105–19, paras. 310–50)

In this claim, Beckworth alleges that his trial counsel were ineffective during the guilt phase of his trial in seven distinct ways, amounting to a violation of his Sixth Amendment right to counsel. Beckworth alleges that his trial counsel (1) failed to object to the prosecutor's inflammatory statements; (2) failed to investigate his alibi and background; (3) failed to hire independent experts to review the prosecution's forensic evidence; (4) did not conduct an adequate voir dire; (5) failed to investigate, impeach, and cross-examine the State's witnesses; (6) failed to investigate and challenge his statements to police; and (7) failed to hire a private investigator. Three of these subclaims—subclaims (1), (4), and (7)—are unexhausted and procedurally defaulted because Beckworth did not pursue them in his certiorari petition to the Alabama Supreme Court on collateral review.

The other subclaims were dismissed by the ACCA on the basis that Beckworth failed to plead them with specificity under ALA. R. CRIM. P. 32.6(b). Each subclaim is addressed in turn.

**1. Beckworth's subclaim that his trial counsel failed to object to the prosecutor's inflammatory statements (doc. 1 at 106–07, paras. 311–13)**

Beckworth's first allegation is that his trial counsel failed to object to the following statements made by the prosecutor: In his opening statement, the prosecutor told the jury that Beckworth and Walker were "bringing death and destruction to Ms. Bessie." (Doc. 7-10 at 44). He told the jury later in his opening statement that Beckworth and Walker were "looking at her [the victim], just like Beckworth is looking at you." (*Id.* at 50). During his closing argument, the prosecutor stated:

> And she was home alone. And the one place she felt safe and secure, among other places in her lifetime, was in the house with pictures of her husband and all the family. And she is there, and here comes death and destruction. There is one of them sitting right over there.

(Doc. 7-12 at 113). The prosecutor twice stated that Beckworth and Walker committed the murder for "sheer enjoyment" in his closing argument: first stating that they "brought death and destruction, inflicted pain for sheer enjoyment on an 87-year-old woman as they took that rifle, and they fired it," (*id.* at 120–21), and then repeating that they were "inflicting pain for sheer enjoyment," (*id.* at 125).

The Respondent contends that the ACCA addressed this claim on the merits, and so its decision is subject to a reasonableness review by this Court under 28 U.S.C. § 2254(d). However, a careful review of the record reveals that Beckworth procedurally defaulted this

claim because he did not raise it in his petition for a writ of certiorari in the Alabama Supreme Court during his Rule 32 proceedings.

Beckworth did raise this claim in his Rule 32 petition. (Doc. 7-19 at 63). After the Rule 32 Court dismissed Beckworth's petition in its entirety, (*id.* at 160–61), Beckworth appealed, arguing that he sufficiently pled this subclaim, (doc. 7-20 at 69, 71–72). However, the ACCA affirmed the trial court's ruling that this claim was insufficiently pleaded under ALA. R. CRIM. P. 32.6(b), reasoning as follows:

> Beckworth argues that the trial court erred when it dismissed the claim that defense counsel were ineffective for failing to object to the "prejudicial and inflammatory comments" the prosecutor made during the guilt phase of the trial. (C. 58.) Beckworth alleged in the petition that the prosecutor made statements for which there was no evidentiary support, and he cites to comments the prosecutor made that characterized Beckworth as one of the men who brought death and destruction to the victim and who inflicted pain on the victim for their sheer enjoyment. The allegations Beckworth raised were due to be dismissed because they failed to state a claim.
>
> > "This court has stated that '[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.' *Bankhead v. State*, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). See also *Henderson v. State*, 583 So.2d 276, 304 (Ala.Crim.App.1990), aff'd, 583 So.2d 305 (Ala.1991) (1992). 'In judging a prosecutor's closing argument, the standard is whether the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Bankhead*, 585 So.2d at 107, quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). 'A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.' *Roberts v. State*, 735 So.2d 1244, 1253

> (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.1999). Moreover, 'statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.' *Bankhead*, 585 So.2d at 106."

> *Ferguson v. State*, 814 So.2d 925, 945–46 (Ala.Crim.App.2000), *aff'd*, 814 So.2d 970 (Ala.2001).
>
> We have reviewed the prosecutor's statement in the context of all the evidence presented and in the context of the prosecutor's complete argument to the jury, and we have determined that they constituted characterizations of the crime and the defendant, based on the prosecutor's reasonable inferences from the evidence. None of the prosecutor's comments challenged in Beckworth's petition so infected the trial with unfairness that he would be entitled to a new trial. See *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). This is particularly true because the trial court instructed the jurors that they were the judges of the evidence, that their verdict was not to be based on the attorneys' arguments, and that, if the attorneys' perception of the evidence differed from the jurors' perception of the evidence, the jurors were to "go by what [they] heard." (Trial R. 755–56.)
>
> Because the substantive argument underlying this claim—that the prosecutor's statements constituted reversible error—is meritless, summary dismissal of the claim was proper. Rule 32.7(d), Ala. R.Crim. P.

*Beckworth*, 190 So. 3d at 561–62. As stated, Beckworth did not mention this subclaim in his petition for certiorari in the Alabama Supreme Court. Although he argued that he sufficiently pled an ineffective assistance of trial counsel claim, and he specifically pointed out that he pled that his trial counsel failed to investigate an alibi defense, failed to challenge his confession, failed to hire experts to review the forensic evidence in the case, and failed to investigate the backgrounds of several State witnesses in order to effectively cross-examine them, (doc. 7-23 at 29–31), he did not argue that he sufficiently pled that his trial counsel failed to object to the prosecutor's statements. This is a separate subclaim

based upon its own factual basis, and the Alabama Supreme Court did not have the opportunity to consider it.

As a result, Beckworth has not satisfied § 2254(b)(1)'s exhaustion requirement, and he is procedurally barred from raising this subclaim in a federal habeas petition. *See O'Sullivan*, 526 U.S. at 845–47; *Hunt*, 666 F.3d at 730. Having bypassed review by the Alabama Supreme Court, Beckworth cannot now seek relief in this Court. Additionally, for the same reasons explained *supra* Section V.B., dismissal of Beckworth's federal habeas petition to allow him to present this claim to the Alabama Supreme Court now would be futile because he would be barred from raising it under state procedural rules. *See* ALA. R. APP. P. 39(c)(2). Thus, because any state remedy with respect to this subclaim is procedurally barred by these state procedural rules, the subclaim is procedurally defaulted from habeas review.

Although a state may waive a procedural default defense, including exhaustion, the waiver must be expressed. 28 U.S.C. § 2254(b)(3); *see also Dill*, 371 F.3d at 1302 n.1. Although the Respondent has not identified this subclaim as procedurally defaulted in his briefs to this Court, he also has not expressly waived the exhaustion requirement. Thus, because Beckworth has failed to properly exhaust this subclaim, the Respondent has not expressly waived that failure to exhaust, and this subclaim could no longer be brought in state court if this Court dismissed Beckworth's petition to return to state court, this subclaim is procedurally barred. *See McNair*, 416 F.3d at 1304–05.

### 2. Beckworth's subclaim that his trial counsel failed to investigate his alibi and background (doc. 1 at 107–08, paras. 314–17)

Beckworth's second allegation comprises two parts. First, he alleges that his trial counsel made no effort to investigate and verify his alibi on the night of the murder. He contends that his counsel should have examined records from the motel where Angela Russell worked and spoken with that motel's employees to verify that he actually spent the entire night the murder occurred at that motel. He also contends that his counsel should have spoken with employees and examined security camera footage from a gas station where Walker and Angela Russell stopped to buy cigarettes that night.[39] Additionally, Beckworth contends that his counsel should have interviewed Bill Weber and Bob Roberts, the two parole officers that Beckworth contacted or attempted to contact about changing the location of his parole supervision from Gadsden to Dothan so that he could be closer to his daughter Anna. Beckworth claims that these men would have explained to his trial

[39] Beckworth did not allege in his federal habeas petition why this information about the gas station would have contributed to his alibi. However, in examining Beckworth's Rule 32 Petition, the Court now understands that Beckworth pled more details before the state courts than he does now with specific regard to his version of what happened on the night of the murder. In his Rule 32 Petition, Beckworth alleged the following: On the night of the murder, Beckworth drove from Gadsden down to Dothan with Walker, arrived at 11:00 p.m., and met up Walker's half-sister Angela Russell. (Doc. 7-19 at 33). Ms. Russell did not want Beckworth to stay with her and Walker because they intended to use drugs that evening, and Beckworth did not use drugs. (*Id.* at 34–35). Instead of staying at Russell's, the three rented a room at Walker's Deluxe Inn. (*Id.* at 35). Walker and Russell then left the hotel room, telling Beckworth that they were going to Russell's house. (*Id.*). Beckworth saw them leave from outside of his hotel room and saw them stop at a nearby gas station to buy cigarettes. (*Id.*). Beckworth then went to sleep, and he was awoken the next morning by Walker, who said he had to leave because the police were looking for him. (*Id.*). Because he had no car of his own, he left with Walker and Russell when they insisted on returning to Gadsden. (*Id.*). Beckworth had no idea what had happened during the night. (*Id.*). Beckworth fled when police attempted to arrest him at Walker's trailer in Gadsden because "he thought the police would eventually arrest the true perpetrators and realize Mr. Beckworth did not have anything to do with the crime." (*Id.*).

counsel that the purpose of Beckworth's trip to Dothan on the night of the murder was merely to visit his daughter.

Second, Beckworth alleges that his counsel failed to investigate his relationship with Walker, which would have explained Walker's choice of Beckworth as a scapegoat for the crime. Beckworth claims that, had his trial counsel investigated their relationship by talking with Beckworth and other family members and friends in Dothan, they would have learned that Walker was dominant and manipulative in their relationship, while Beckworth was widely considered slow, and that Walker and his relatives had previously blamed Beckworth for their crimes. Beckworth claims that his counsel could have presented this information to the jury to explain Beckworth's unique susceptibility to being falsely accused of crimes.

The Respondent argues that Beckworth did not present these facts about his relationship with Walker and his susceptibility to being blamed for others' crimes to the state courts when Beckworth raised this ineffective assistance of trial counsel claim in his Rule 32 proceedings. (Doc. 40 at 19 (referring to doc. 1 para. 316)).[40] The Respondent thus contends that these facts are unexhausted and procedurally defaulted. However, the Court agrees with Beckworth that he did include these facts in his Rule 32 Petition. (Doc. 41 at 35 (referring to doc. 7-19 at 31, 34–35, and 49–50)). His Rule 32 Petition clearly states that his trial counsel should have talked to him about his relationship with Walker which would have explained Walker's choice of Beckworth as a scapegoat for his crimes.

[40] Even though the Respondent's procedural default brief refers to these facts as contained in paragraph 216 of the petition, it is clear that the Respondent meant paragraph 316.

Beckworth exhausted this entire subclaim during his Rule 32 proceedings, and the state courts denied it on the merits, which means that review of this claim is limited to whether the state courts' decisions were reasonable under 28 U.S.C. § 2254(d). Beckworth raised this subclaim in his Rule 32 petition. (Doc. 7-19 at 49–50, 59). After the Rule 32 Court dismissed Beckworth's petition in its entirety, (*id.* at 160–61), Beckworth appealed, arguing that he sufficiently pled this subclaim, (doc. 7-20 at 63–67). However, the ACCA affirmed the trial court's ruling that this subclaim was insufficiently pleaded under ALA. R. CRIM. P. 32.6(b), reasoning as follows:

> Beckworth argues that the trial court erred when it dismissed the claim that trial counsel had failed to investigate and verify his account of his whereabouts at the time of the crime, which, he says, was exculpatory. Beckworth raised this allegation in paragraphs 159–161 and paragraph 192 of the petition. The trial court correctly dismissed this claim because Beckworth failed to include in the petition a sufficient factual basis for the claim. To plead the claim sufficiently, Beckworth was required to identify the names of the witnesses he alleged should have been interviewed, to plead with specificity what admissible information those witnesses would have provided, and to allege how the result of the proceedings would have been affected by the additional testimony. *Smith v. State*, 71 So. 3d 12 (Ala. Crim. App. 2008). Beckworth testified at the suppression hearing that no threats or promises were made to him when he gave his inculpatory statements, and that no inducements were offered to him. (Jan. 8, 2002, R. 41.) Furthermore, the transcripts of the statements demonstrate that Beckworth admitted his involvement in the crime with his codefendant and that he told the investigators, "I wish I could take it back man, but I can't." (C. 35.) Beckworth failed to allege any specific facts that, he says, would have changed the outcome of the proceeding in light of his own admissions and the additional inculpatory evidence presented at trial. Therefore, Beckworth did not satisfy the requirements of Rule 32.3 and Rule 32.6(b), Ala. R. Crim. P., and the claim was properly dismissed.

*Beckworth*, 190 So. 3d at 555 (footnote omitted). Beckworth specifically argued in his petition for certiorari to the Alabama Supreme Court that he pled this subclaim sufficiently,

(doc. 7-23 at 29), but the Alabama Supreme Court denied the petition on this ground, (doc. 7-24 at 26).[41]

An Alabama court's ruling under ALA. R. CRIM. P. 32.6(b) is a ruling on the merits for purposes of AEDPA. *Borden*, 646 F.3d at 815–16. Thus, this Court can award relief only if it finds that the ACCA's decision that Beckworth failed to sufficiently plead this subclaim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "based on an unreasonable determination of the facts in light of the evidence presented," *id.* § 2254(d)(2).

In his federal habeas petition, Beckworth merely quotes the language from 28 U.S.C. § 2254(d) but does not explain how the ACCA erred in deciding this subclaim. (*See, e.g.*, doc. 1 at 105, para. 310). In his merits brief, Beckworth does not divide this overarching ineffective assistance of trial counsel claim into the seven subclaims that he listed in his petition. Instead, he presents one argument with regard to all seven subclaims.

[41] Beckworth's argument that he sufficiently pleaded this subclaim was contained within ground 2 of his petition. (*See* doc. 7-23 at 19, 29). The Alabama Supreme Court's order granting certiorari stated that Beckworth's petition was granted as to ground 2. (Doc. 7-24 at 26). In its opinion, however, the Alabama Supreme Court stated that it had "granted certiorari review to consider whether a Rule 32 petitioner has a duty to plead facts negating the affirmative defenses of preclusion under Rule 32.2(a)(3) and (5), Ala. R.Crim. P. (claims that could have been, but were not, raised at trial or on appeal, respectively)." *Beckworth*, 190 S. 3d at 571 (parenthetical in original). As indicated earlier, the Alabama Supreme Court concluded that "Beckworth's Rule 32 petition should not have been dismissed on the ground that his claim for relief under Rule 32.1(a) lacked allegations negating the preclusive bars of Rule 32.2(a)(3) and (5)," and the court "reverse[d] the judgment of the [ACCA] to the extent it holds to the contrary" and remanded the case for further proceedings. *Id.* at 575. In its opinion on remand, the ACCA stated that the Alabama Supreme Court granted certiorari on one issue: "whether [the ACCA] had properly affirmed the circuit court's summary dismissal of Beckworth's Brady v. Maryland, 373 U.S. 83 (1963), claim regarding his co-defendant's statement on the ground that Beckworth had failed to state a claim because he did not plead any facts that would negate the grounds of preclusion set out in Rule 32(a)(3) and (5), Ala. R. Crim. P." (Doc. 7-25 at 49).

(Doc. 42 at 71–77). He discusses numerous United States Supreme Court cases to make general points about trial counsel's duty to investigate. For example, he quotes *Strickland*, *Wiggins*, and *Rompilla* for the rule that trial counsel must conduct a reasonable investigation before devising a trial strategy. (*See id.* at 72 & n.184). He argues generally that his counsel did not conduct a sufficient investigation into the State's case so that they could adequately defend him. He also makes the general argument that his counsel left the jury to hear the State's evidence largely unchallenged, quoting *United States v. Cronic*, 466 U.S. 648, 656 (1984), in which the Supreme Court stated that "[t]he right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." However, the ACCA rested its conclusion that Beckworth failed to plead this particular subclaim with specificity on the grounds that he failed to offer facts showing that he was prejudiced by his counsel's alleged failures, not on his counsel's performance. Ultimately, this Court need not, and does not, decide whether Beckworth's trial counsel's performance regarding his alibi and background at the guilt phase was constitutionally inadequate because, as explained further below, Beckworth fails to demonstrate that the ACCA unreasonably determined that he failed to sufficiently plead prejudice. *See Borden*, 646 F.3d at 818; *see also Strickland*, 466 U.S. at 697.

Beckworth argues in his merits brief that the ACCA applied an unreasonably high pleading requirement to his Rule 32 petition, criticizing him for not providing detailed information and, in essence, requiring him to prove his claims rather than merely plead them. Beckworth argues that the ACCA's decision was thus based on an unreasonable

determination of the facts because it ignored the details that Beckworth *did* set forth in his Rule 32 petition to prove his claims.

However, the ACCA's decision that Beckworth did not plead this subclaim with sufficient specificity is reasonable. Concerning his claims that trial counsel rendered ineffective assistance because they failed to interview or call certain witnesses, Beckworth's "burden is particularly 'heavy . . . because often allegations of what a witness would have testified to are largely speculative.'" *McKiver v. Sec'y, Fla. Dep't of Corr.*, 991 F.3d 1357, 1365 (11th Cir. 2021) (quoting *Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir. 2006)). To establish prejudice in this habeas proceeding, Beckworth must show that the ACCA unreasonably determined that he had not sufficiently pled prejudice—i.e., a reasonable probability that the result of the trial would have been different if counsel had interviewed and called these witnesses. *See Harringon*, 562 U.S. at 104–05, 111–12; *Borden*, 646 F.3d at 823.

The ACCA discussed that Beckworth did not provide the names of the witnesses he alleged should have been interviewed; he did not state with specificity what admissible information those witnesses would have provided; and he did not allege how the result of the proceedings would have been affected by the additional testimony. For example, although Beckworth alleged that his counsel should have examined records from the Walker's Deluxe Inn and spoken with employees to verify that he had stayed at the motel all night, he did not explain what a motel "record" would have shown, or how a motel record could have proven that he stayed inside his motel room all night. Nor did he provide the name of a motel employee or offer what any motel employee would have said. He did

not explain how a motel employee could have sworn under oath that Beckworth did not leave his motel room at any point during the night of the murder. In short, the ACCA reasonably concluded that these allegations were insufficient to show prejudice.

Similarly, Beckworth did not explain how video evidence that Walker and Russell stopped to buy cigarettes at a gas station on the night of the murder was relevant to Beckworth's role in the murder. Nor did he explain how testimony from parole officers that Beckworth wanted to travel to Dothan to visit his daughter could have cast reasonable doubt on the fact that Beckworth committed the murder that evening.

The same is true for Beckworth's allegations about his relationship with Walker. He did not offer any specific family members or friends who he claims could have testified to facts that made it likely that Walker framed Beckworth. He did not offer what their specific testimony would be. Nor did he explain how such testimony could have convinced a jury that Beckworth did not murder Ms. Thweatt.

In sum, Beckworth's Rule 32 petition offered little more than vague allegations about the witnesses whom trial counsel purportedly unreasonably failed to interview. Thus, on AEDPA review, the ACCA's decision on this subclaim was not unreasonable, and Beckworth is not entitled to relief.

**3. Beckworth's subclaim that his trial counsel failed to hire independent experts to review the prosecution's forensic evidence (doc. 1 at 108–09, paras. 318–20)**

Beckworth's third subclaim comprises two parts. First, Beckworth faults his trial counsel for not retaining experts to conduct an independent examination of the forensic evidence in the case. He notes that blood, hair, footprints, and cigarette butts were found

at the crime scene but that the State never argued that any of this evidence matched Beckworth's biological profile. He claims that, had his counsel engaged experts to analyze this evidence, his counsel could have argued that another person committed the murder. Second, Beckworth faults his trial counsel for stipulating to the expertise of the State's ballistics expert, Joe Saloom, and for failing to hire an expert to independently review the State's ballistics evidence.

The Respondent contends that Beckworth did not present these allegations about the ballistics expert to the state courts. (Doc. 40 at 19 (referring to doc. 1 at 109, para. 319)). The Respondent argues that these facts are unexhausted and thus procedurally defaulted. The Court disagrees. Beckworth raised these allegations in his Rule 32 Petition. (Doc. 7-19 at 60, para. 194 ("Counsel stipulated to the qualifications of the prosecution's ballistics examiner as an expert and did not subject the ballistics evidence to an independent review.")).

Thus, Beckworth exhausted this entire subclaim during his Rule 32 proceedings, and the state courts denied it on the merits, which means that review of this claim is limited to whether the state courts' decisions were reasonable under 28 U.S.C. § 2254(d). Beckworth raised this subclaim in his Rule 32 petition. (Doc. 7-19 at 50, 59–60). After the Rule 32 court dismissed Beckworth's petition in its entirety, (*id.* at 160–61), Beckworth appealed, arguing that he sufficiently pled this subclaim, (doc. 7-20 at 64). The ACCA affirmed the trial court's ruling that this subclaim was insufficiently pleaded under ALA. R. CRIM. P. 32.6(b), reasoning as follows:

> Beckworth argues that the trial court erred when it dismissed his claim that trial counsel's performance was inadequate because they failed to hire independent experts to evaluate the results of forensic tests conducted by the State. Beckworth presented this claim in paragraphs 162 and 193–194 of the petition. The claim was due to be dismissed because it failed to satisfy the pleading requirements of Rule 32.3 and Rule 32.6(b), because it included no specific factual allegations of deficient performance or prejudice.
>
> Beckworth presented only general allegations that counsel should have hired unspecified "independent experts" to evaluate evidence obtained at the scene (C. 47), and that "results indicating that another person was present at the crime scene would have bolstered Mr. Beckworth's defense" (C. 56–57.) However, Beckworth failed to present any specific facts to support these general allegations, such as identifying the types of experts counsel should have called, the names of any such experts who would have testified at trial, and the substance of their testimony. Beckworth also failed to plead any specific allegations of prejudice. He alleged only that evidence that there was another perpetrator *would have* bolstered his defense; he did not allege that additional witnesses would have testified that another perpetrator was, in fact, present. Because Beckworth failed to include the full factual basis for either the allegation of deficient performance or the allegation of prejudice, the claim was insufficiently pleaded and it was due to be dismissed. E.g., *Hyde v. State*, 950 So.2d at 355–56.
>
> . . . .
>
> In the petition, Beckworth set forth only general allegations of deficient performance and prejudice. For example, he alleged that counsel failed to investigate "ways to impeach the State's forensic or ballistics experts." (C. 48.) Beckworth did not provide the names of any of the experts he says counsel should have impeached; he did not include any specific facts regarding the information counsel could have discovered that would have impeached the experts; he did not provide any specific facts in an effort to allege that any impeachment of the witnesses would have resulted in a different outcome at his trial.

*Beckworth*, 190 So. 3d at 555–56, 559. Beckworth specifically argued in his petition for certiorari to the Alabama Supreme Court that he pled this subclaim sufficiently, (doc. 7-23

at 30–31), but the Alabama Supreme Court denied the petition on this ground, (doc. 7-24 at 26).[42]

Under AEDPA, an Alabama court's ruling under ALA. R. CRIM. P. 32.6(b) is a ruling on the merits. *Borden*, 646 F.3d at 815–16. Thus, this Court can award relief only if it finds that the ACCA's decision that Beckworth failed to sufficiently plead this subclaim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "based on an unreasonable determination of the facts in light of the evidence presented," *id.* § 2254(d)(2).

As noted in the previous subsection, Beckworth argues generally that his counsel was constitutionally required to conduct an adequate investigation into the State's case and that the ACCA's decision was unreasonable insofar as it required too much of him at the Rule 32 pleading stage. Again, this argument fails. The ACCA reasonably determined that Beckworth's failure to identify any forensics or ballistics experts who would have testified on his behalf, what they would have said, or even allege that a third party was present at the scene of the murder, meant that he failed to adequately allege prejudice and thus failed to state a claim for relief.

Under AEDPA review, the ACCA's decision on this claim was reasonable, and Beckworth is not entitled to relief on this subclaim.

---

[42] The precise procedural history of the Alabama Supreme Court's treatment of this claim is virtually identical to that discussed *supra* note 41.

### 4. Beckworth's subclaim that his trial counsel conducted an inadequate voir dire (doc. 1 at 109–11, paras. 321–29)

Beckworth's fourth subclaim is that his trial counsel did not obtain information from potential jurors that would have been necessary to remove biased jurors for cause and to make effective use of peremptory challenges. Beckworth contends that his trial counsel thus deprived him of a fair and impartial jury. He mentions three jurors specifically: E.R., A.L., and T.W. Beckworth claims that his counsel did not ask any potential jurors whether any of them lived with or cared for an elderly relative or friend, and that juror E.R. lived with and cared for his elderly mother and was upset that the victim was an elderly woman. Beckworth alleges that such questioning would have identified jurors like E.R., who served on the jury. Beckworth also claims that juror A.L. decided early on that he would automatically vote for the death penalty for whoever was found guilty of this crime, and that A.L. decided this after reading about the crime in the local newspaper. He says that A.L. had decided that the rest of the trial was a waste of time and that no amount of mitigation would change his mind. Beckworth claims that his counsel's failure to expose jurors who would automatically impose the death penalty following a murder conviction resulted in A.L. serving on the jury. Similarly, Beckworth claims that juror T.W. decided that no amount of mitigation would convince him to vote for life in prison. Beckworth claims that his counsel did not question him sufficiently about this bias.[43]

[43] The Respondent contends that Beckworth adds two facts in this claim that he never presented to the state courts: that E.R. "was reminded of his own elderly mother by the victim, and who was especially upset that the crime had been committed against an elderly woman, as opposed to someone younger" (doc. 1 at 110–11, para. 326) and that T.W. served as the foreperson on his jury (doc. 1 at 111, para. 329). (Doc. 40 at 19). Beckworth responds that he did in fact allege these specific details in his Rule 32 Petition. (Doc.

The Respondent contends that the ACCA decided this claim on the merits, and so its decision is subject to a reasonableness review by this Court under 28 U.S.C. § 2254(d). However, a careful review of the record reveals that Beckworth procedurally defaulted this claim because he did not raise it in his petition for a writ of certiorari in the Alabama Supreme Court during his Rule 32 proceedings.

Beckworth did raise this subclaim in his Rule 32 petition. (Doc. 7-19 at 52–54). After the Rule 32 Court dismissed Beckworth's petition in its entirety, (*id.* at 160–61), Beckworth appealed, arguing that he sufficiently pled this subclaim, (doc. 7-20 at 64–65). However, the ACCA affirmed the trial court's ruling that this subclaim was insufficiently pleaded under ALA. R. CRIM. P. 32.6(b), reasoning as follows:

> Beckworth argues that the trial court erred when it dismissed the claim that counsel rendered ineffective assistance because they failed to conduct "adequate voir dire" examination, and did not obtain the information that was necessary to exercise peremptory strikes or to challenge the biased jurors for cause. (Beckworth's brief, at p. 41–42.) Beckworth alleged in paragraphs 167–177 of his petition that counsel conducted inadequate voir dire examination and "thereby deprived Beckworth of a fair and impartial jury." (C. 47–51.)
>
> a. In paragraphs 167 and 171, Beckworth made general allegations that trial counsel did not conduct adequate voir dire and that they did not ask questions that were detailed enough to identify the veniremembers' biases. To the extent Beckworth intended for these allegations to constitute separate claims, we hold that they failed to satisfy the pleading requirements of Rule 32.3 and Rule 32.6(b), because they contained no specific factual allegations of either deficient performance or prejudice. They were, therefore, properly dismissed by the trial court. *Hyde v. State*, 950 So.2d 344 (Ala.Crim.App.2006) (Rule 32.6(b), Ala. R.Crim. P., requires that the petition contain a full disclosure of the factual basis for each claim).

41 at 36). The Court need not decide whether it may properly consider these additional facts because the claim in its entirety is unexhausted and procedurally defaulted from review, as explained herein.

b. In paragraph 172 of the petition, Beckworth alleged that trial counsel should have asked the veniremembers whether any of them lived with or cared for an elderly person. He alleged that such questioning would have identified veniremembers such as juror E.R., who was upset that the victim in this case was an elderly woman. (C. 50.) Beckworth failed to satisfy the pleading requirements of Rule 32 with regard to this claim. Beckworth did not allege that juror E.R.'s feelings rose to the level of bias that would have supported a challenge for cause or that would have resulted in counsel's exercising a peremptory strike against E.R. Nor did Beckworth allege that E.R. or any other juror rendered a biased decision as a result of their caring for an elderly person. Therefore, this claim was due to be dismissed because it failed to satisfy the requirements of Rule 32.3 and Rule 32.6(b), Ala. R.Crim. P., and it failed to state a claim for which relief could be granted. *Hyde v. State*, 950 So.2d at 344 ("Conclusions unsupported by specific facts will not satisfy the requirements of Rule 32.3 and Rule 32.6(b).); *Duncan v. State*, 925 So.2d 245 (Ala.Crim.App.2005).

c. In paragraph 173 of the petition, Beckworth alleged:

> "Trial counsel failed to expose those jurors who would automatically impose the death penalty following a murder conviction in this case. Though the judge asked the potential jurors whether they would automatically vote for death if the defendant was convicted, trial counsel neglected to obtain information from potential jurors that would have revealed that they would vote automatically for death."

(C. 50.)

In paragraph 174, Beckworth alleged that juror A.L. would have automatically voted for death, and that once A.L. decided that Beckworth was guilty, A.L. made up his mind that Beckworth deserved the death penalty. (C. 50.) In paragraph 175 of the petition, Beckworth also alleged, "Trial counsel failed to uncover prospective jurors who are unable to give meaningful consideration to mitigating evidence." (C. 51.) He further alleged that jurors A.L. and T.W. refused to consider the testimony of Beckworth's family members and would have recommended that Beckworth be punished by the death sentence regardless of that testimony.

As to the claims raised in paragraphs 173–175, Beckworth failed to satisfy the pleading requirements set forth in Rule 32. Beckworth failed to identify what additional questions counsel should have asked the veniremembers that would have revealed these alleged biases. Beckworth

> was required to specifically identify such questions because during its voir dire questioning, the trial court inquired whether anyone would be unable to recommend a sentence of life imprisonment without parole, and no veniremember responded. (Trial R. 23.) Beckworth was also required to specifically plead what additional questions defense counsel should have asked because defense counsel, during their voir dire questioning, asked the veniremembers twice whether anyone would automatically recommend the death sentence if Beckworth was found guilty. (Trial R. 120–122.) No veniremember responded to either of those questions. Defense counsel's second question was very specific; counsel asked:
>
>> "Is there anybody who feels, as we are sitting right now, that regardless of the kind of upbringing that Rex Beckworth had, that despite how his parents were, that despite his intelligence level—despite all of those things—if he is found guilty of capital murder, that he should be put to death as you are sitting here right now? Does anybody feel that way? Because if you do, that is your opinion, and that's great. Does anybody feel that way?"
>
> (Trial R. 122.)
>
> In light of the questions that were asked of the veniremembers by the trial court and by defense counsel about automatically recommending a death sentence in disregard of evidence offered in mitigation, Beckworth's failure to identify in the petition any additional questions that, he alleged, counsel should have asked to reveal such a bias was a critical failure of pleading. Furthermore, Beckworth failed to plead any allegations of prejudice, as he was required by Rule 32.3 and Rule 32.6(b), Ala. R.Crim. P., to do. Because Beckworth failed to satisfy the pleading requirements, the trial court correctly dismissed these claims of ineffective assistance of counsel.
>
> For the foregoing reasons, we hold that the trial court did not abuse its discretion when it dismissed Beckworth's claims that trial counsel were ineffective for failing to conduct an adequate voir dire examination.

*Beckworth*, 190 So. 3d at 557–59 (footnotes omitted). As stated, Beckworth did not mention this subclaim in his petition for certiorari in the Alabama Supreme Court. Although he argued that he sufficiently pled an ineffective assistance of trial counsel claim, and he specifically pointed out that he pled that his trial counsel failed to investigate an

alibi defense, failed to challenge his confession, failed to hire experts to review the forensic evidence in the case, and failed to investigate the backgrounds of several State witnesses in order to effectively cross-examine them, (doc. 7-23 at 29–31), he did not argue that he sufficiently pled that his trial counsel failed to conduct an adequate voir dire. This is a separate subclaim based upon its own factual basis, and the Alabama Supreme Court did not have the opportunity to consider it.

Consequently, Beckworth has not satisfied § 2254(b)(1)'s exhaustion requirement, and he is procedurally barred from raising this subclaim in a federal habeas petition. *See O'Sullivan*, 526 U.S. at 845–47; *Hunt*, 666 F.3d at 730. Because he failed to seek review in the Alabama Supreme Court, Beckworth cannot now seek relief in this Court. Further, for the same reasons explained *supra* Section V.B., dismissal of Beckworth's habeas petition to allow him to present this claim to the Alabama Supreme Court now would be futile because he would be barred from raising it under state procedural rules. *See* ALA. R. APP. P. 39(c)(2). Thus, because any state remedy with respect to this subclaim is procedurally barred by this state procedural rule, the subclaim is procedurally defaulted from habeas review.

Although the State may waive a procedural default defense, including exhaustion, the waiver must be expressed. 28 U.S.C. § 2254(b)(3); *see also Dill*, 371 F.3d at 1302 n.1. Although the Respondent has not argued to this Court that this subclaim is entirely unexhausted, he also has not expressly waived the exhaustion requirement. Thus, because Beckworth has failed to properly exhaust this subclaim, the Respondent has not expressly waived that failure to exhaust, and this subclaim could no longer be brought in state court

if this Court dismissed Beckworth's petition to return to state court, this subclaim is procedurally barred. *See McNair*, 416 F.3d at 1304–05. Consequently, Beckworth is due no relief on this subclaim.

**5. Beckworth's subclaim that his trial counsel failed to adequately investigate, impeach, and cross-examine the State's witnesses (doc. 1 at 111–13, paras. 330–35)**

Beckworth's fifth allegation is that his trial counsel performed deficiently by not calling any witnesses at trial. He also alleges that trial counsel did not challenge some of the State's witnesses through effective impeachment and cross-examination. Specifically, he states that his counsel never ascertained whether Jackie Stanton, Chris Hood, Mark Peacock, or Angela Russell had been offered consideration by the prosecution for their testimony, so they could not impeach the witnesses on this point. He also alleges that his trial counsel gratuitously told the jury in closing, "I used to work with Mr. Valeska. When Mr. Valeska tells you that he made no promises, you can take that to the bank." (Doc. 1 at 112, para. 332).

Beckworth also makes additional allegations regarding Russell, Hood, and Stanton. Regarding Russell, Beckworth alleges that counsel should have confronted her on her bias against him on the ground that she was Walker's sister. He alleges that counsel should have cross-examined her on her inconsistent statements to police because she first told them that the gun she saw in the back of Walker's car was a shotgun, but she later changed that to a .22 caliber rifle. Regarding Hood, Beckworth alleges that counsel should have contested his testimony that Beckworth asked him where he could find a gun that could not be traced and that Beckworth once told him that the best way to shoot someone was

execution style. Beckworth alleges that counsel should have called Eric Metcalf, a friend of Hood's, to testify, who would have testified that Hood was high on drugs when he met Beckworth and that Beckworth never made those two statements to Hood. Regarding Stanton, Beckworth alleges that counsel should have cross-examined him or should have objected when Stanton testified that Beckworth would flee to Gadsden until things cooled down if he got in trouble.

The Respondent argues that Beckworth again adds several new facts within this subclaim that he did not allege to the state courts when he raised this ineffective assistance of trial counsel subclaim in his Rule 32 proceedings. (Doc. 40 at 19 (referring to doc. 1 at the last sentence of para. 331 ("Because trial counsel failed to independently investigate the case or regularly communicate with Mr. Beckworth, they were unprepared to challenge the State's witnesses."); the quoted material within the third sentence of para. 334 ("[Hood] testified that Mr. Beckworth was looking for a gun that could not be traced and that the best way to shoot someone was execution style: 'Put the gun to the back of somebody's head and pull the trigger.'"); and the second sentence of para. 335 ("Stanton's testimony portrayed Mr. Beckworth as a person so frequently involved in criminal activity that he has a regular hideout."))). The Respondent thus contends that these facts are unexhausted and procedurally defaulted. Beckworth responds that witness testimony is part of the state court record and that he raised essentially the same allegations below. Upon review, the Court concludes that Beckworth exhausted the substance of this claim in state court. Nonetheless, because the ACCA determined that Beckworth failed to sufficiently plead this subclaim under ALA. R. CRIM. P. 32.6(b) and thus adjudicated it on the merits, AEDPA

review governs this claim. And on AEDPA review this Court considers only the factual allegations in his Rule 32 petition and not any new allegations presented in his federal habeas petition. *See Borden*, 646 F.3d at 816.

Beckworth exhausted this claim during his Rule 32 proceedings, and the state courts denied it on the merits, which means that review of this claim is limited to whether the state courts' decisions were reasonable under 28 U.S.C. § 2254(d). Beckworth raised this subclaim in his Rule 32 petition. (Doc. 7-19 at 61–63). After the Rule 32 court dismissed Beckworth's petition in its entirety, (*id.* at 160–61), Beckworth appealed, arguing that he sufficiently pled this subclaim, (doc. 7-20 at 68–69). The ACCA affirmed the trial court's ruling that this subclaim was insufficiently pleaded under ALA. R. CRIM. P. 32.6(b), reasoning as follows:

> Beckworth argues that the trial court erred when it dismissed the claim that trial counsel did not adequately impeach and cross-examine some of the State's witnesses. None of the allegations in Beckworth's petition were pleaded with sufficient specificity, and the claim was due to be dismissed.
>
> In paragraph 198 of the petition, Beckworth alleged that trial counsel's performance was deficient because "they never ascertained whether Jackie Stanton, Chris Hood, Mark Peacock, or Angie Russell had been offered consideration by the prosecution for their testimony," so they could not impeach the witnesses on this point. (C. 58–59.) In paragraphs 199–201, Beckworth presented additional allegations regarding Stanton, Hood, and Russell. Beckworth did not present any additional allegations regarding Peacock.
>
> Beckworth failed to satisfy the pleading requirements set forth in Rule 32.3 and Rule 32.6(b). For example, in paragraph 198 of the petition, Beckworth alleged that counsel never ascertained *whether* the witnesses had been offered consideration by the prosecution, but he does not allege that the witnesses were, in fact, offered consideration by the prosecution. Because Beckworth did not allege that the witnesses received some sort of consideration for their testimony—and, in fact, the witnesses' testimony

discloses otherwise—and that counsel could have discovered this evidence and that it would have changed the result, this claim was due to be dismissed.

In paragraph 199, Beckworth again alleged that counsel failed to discover *if* Russell had reached a plea agreement with the State. In order to plead this claim sufficiently, Beckworth would have had to allege that an agreement had been reached, that counsel failed to discover that information and impeach Russell at trial, and that, if counsel had done so, the result of the trial would have been different. In this paragraph of the petition, Beckworth also alleged that counsel failed to confront Russell because Beckworth's codefendant, Walker, was her brother, and he alleged that counsel failed to cross-examine her on her inconsistent identification of the type of gun she had seen in the trunk of Beckworth's car following the murder. The prosecutor elicited this information from Russell during his direct examination, so the information was already before the jury. (Trial R. 589, 594–95.) Beckworth failed to allege any specific facts indicating that any additional information could have been elicited from Russell, and he failed to identify any questions defense counsel should have asked to elicit the additional information. Finally, Beckworth failed to allege that, but for counsel's failure to elicit additional information from Russell, the outcome of his proceeding would have been different. Therefore, this claim was due to be dismissed because it failed to state a claim for relief and because it failed to satisfy the pleading requirements of Rule 32.

In paragraph 200 of the petition, Beckworth alleged that counsel "failed to make available objections" to Jackie Stanton's testimony and did not cross-examine him "despite the susceptibility of his testimony to disparagement." (C. 59.) This allegation was properly dismissed because it contains only vague, conclusory assertions unsupported by any factual allegations, and it failed to satisfy the requirement that the petitioner state a full factual basis for each claim. See, e.g., *Hodges v. State*, 147 So.3d 916, 948 (Ala.Crim.App.2007).

In paragraph 201 of the petition, Beckworth alleged that trial counsel's performance was deficient because they failed to interview Eric Metcalf who, Beckworth alleged, would have refuted the trial testimony of Chris Hood. Hood testified at trial that sometime before the murder, Beckworth had asked him if he knew where to find an untraceable gun because his wife was going to be driving a truck and they needed the weapon while they were on the road. Hood also testified that Beckworth had told him that the easiest way to kill a person was by an execution-style gunshot wound. Beckworth alleged in the petition that Metcalf was a friend of Hood's and that he would have testified that he was present at this meeting

> with Beckworth and Hood, that Hood was "high" on drugs during that meeting, and that Beckworth did not ask about a gun or make a statement about execution-style shooting. Hood contacted law-enforcement authorities after he heard about the murder in this case.
>
> Although Beckworth provided some factual allegations in support of this claim, he failed to allege in the petition any facts indicating how Metcalf's testimony would have been admissible at trial. Hood's testimony at trial indicated that he socialized with Beckworth on more than one occasion, but there is nothing in the record indicating the dates on which Beckworth allegedly asked about a gun and made the statement about execution-style shootings. Because the petition fails to allege facts indicating that Metcalf was present every time Hood was with Beckworth, or that Metcalf was with Beckworth and Hood on the occasions when Hood alleged that the conversations occurred, then Beckworth has failed to plead allegations that, if true, would entitle him to relief. Therefore, Beckworth failed to state a claim upon which relief could be granted, and he failed to meet the specificity requirements in Rule 32. Therefore, the trial court did not err when it dismissed this claim.
>
> For the foregoing reasons, the pleading deficiencies in the petition warranted dismissal of each of the claims regarding counsel's alleged failure to impeach and cross-examine the State's witnesses. Beckworth is not entitled to relief on this claim of error.
>
> . . . .
>
> Beckworth alleged in paragraph 206 of the petition: "Counsel called no witnesses at the guilt/innocence phase of trial. This was not a reasonable defense strategy in response to the prosecution's evidence. Any competent defense attorney would have realized that such a strategy guaranteed Mr. Beckworth's conviction of capital murder." (C. 61.) This claim was "so conclusory and/or vague that [it] plainly failed to satisfy the pleading requirements of Rule 32.3 and Rule 32.6(b)." *Hodges v. State*, 147 So.3d 916, 935 (Ala.Crim.App.2007). As we stated in *Hodges*: "Asserting bare conclusions of deficient performance and prejudice do not satisfy the pleading requirements." *Hodges v. State*. Beckworth clearly failed to plead sufficient facts alleging either deficient performance or prejudice. Therefore, summary dismissal of the claim was proper.

*Beckworth*, 190 So. 3d at 559–62. Beckworth specifically argued in his petition for certiorari to the Alabama Supreme Court that he pled this subclaim sufficiently, (doc. 7-23

at 31–32), but the Alabama Supreme Court denied the petition on this ground, (doc. 7-24 at 26).[44]

Under AEDPA, an Alabama court's ruling under ALA. R. CRIM. P. 32.6(b) is a ruling on the merits. *Borden*, 646 F.3d at 815–16. Thus, this Court can award relief only if it finds that the ACCA's decision that Beckworth failed to sufficiently plead this subclaim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented," *id.* § 2254(d)(2).

Similar to previous subsections, Beckworth merely quotes 28 U.S.C. § 2254(d) in his habeas petition and argues generally in his merits brief that his counsel was constitutionally required to conduct an adequate investigation into the State's case. He also argues that the ACCA's decision was unreasonable insofar as it required too much of him at the Rule 32 pleading stage. Again, this argument fails. The ACCA reasonably concluded that Beckworth had not pled the prejudice prong of *Strickland*. The ACCA noted that he never pled that these witnesses actually had been offered consideration in exchange for their trial testimony. Regarding the allegations against individual witnesses, the ACCA thoroughly explained how Beckworth's allegations were vague and conclusory. Beckworth does not explain how the ACCA erred in either his merits brief or reply brief. Beckworth bears the burden of establishing that the ACCA's decision was unreasonable

[44] The precise procedural history of the Alabama Supreme Court's treatment of this claim is virtually identical to that discussed *supra* note 41.

under § 2254(d), and here, he does not meet that burden. Consequently, he is not entitled to relief on this subclaim.

**6. Beckworth's subclaim that his trial counsel failed to investigate and challenge his statements to police (doc. 1 at 113–17, paras. 336–48)**

Beckworth's sixth subclaim is that his trial counsel failed to challenge his statements to police on the specific ground that they were coerced by police and thus false. Beckworth claims that Lt. Valenza and Investigator Sewell refused his requests for an attorney; threatened to remove his daughter Anna from his ex-wife Carol Gobbel's house and place Anna in foster care if he did not confess; threatened to plant drugs in Gobbel's house and arrest Gobbel if he did not confess; provided Beckworth with details of what to say in his confession; and then once they were satisfied that Beckworth could recite the story as directed, tape recorded Beckworth's statements. Beckworth alleges that because his trial counsel never interviewed him about the circumstances of him confessing to police in the Arizona airport, they did not know that his confession was given under duress and was thus false.

Beckworth exhausted this subclaim during his Rule 32 proceedings, and the state courts denied it on the merits, which means that review of this subclaim is limited to whether the state courts' decisions were reasonable under 28 U.S.C. § 2254(d). Beckworth raised this subclaim claim in his Rule 32 petition. (Doc. 7-19 at 48). After the Rule 32 court dismissed Beckworth's petition in its entirety, (*id.* at 160–61), Beckworth appealed, arguing that he sufficiently pled this allegation, (doc. 7-20 at 67–68). The ACCA affirmed

the trial court's ruling that this subclaim was insufficiently pleaded under ALA. R. CRIM. P. 32.6(b), reasoning as follows:

> Beckworth argues that the trial court erred when it dismissed the claim that trial counsel had failed to effectively communicate with him and that, as a result, they had failed to learn facts that could have been used to demonstrate that his inculpatory statement was involuntary and not credible. This claim was presented in paragraphs 157–158 of Beckworth's petition. In paragraphs 188–191 of the petition, Beckworth presented a variety of allegations regarding an inculpatory statement, including that the statement was extracted and coerced and that testimony from "family members" would have demonstrated Beckworth's "vulnerability to police tactics." (C. 55.)
>
> This claim was properly dismissed because Beckworth failed to plead sufficient facts to satisfy the requirements of Rule 32.3 and Rule 32.6(b). Beckworth failed to allege any facts supporting the assertion that counsel did not have "effective communication" with him. Furthermore, Beckworth failed to allege in the petition even a single fact that he now says counsel should have learned and that would have supported suppression of his statement. He made only conclusory allegations about what counsel should have learned, such as how his codefendant's confession "affected" him, and how "he had often been the fall guy for others." (C. 55.) Beckworth actually gave two statements to law-enforcement officers, and both statements were transcribed; Beckworth, however, refers in his petition to only a single statement. Beckworth failed to allege in the petition which statement was allegedly involuntary and not credible, and would have been excluded if counsel had communicated effectively with him. This constitutes an additional deficiency in the pleading. The bare allegations that counsel did not communicate effectively and that they failed to learn "these facts" were insufficient to warrant further proceedings and provide ample support for the circuit court's summary dismissal. E.g., *Hodges v. State*, 147 So.3d 916, 950 (Ala.Crim.App.2007).
>
> Moreover, we note that Beckworth filed a pretrial motion to suppress the two inculpatory statements he had made to law-enforcement officers, and the trial court held a hearing on the motion. At the hearing, Beckworth testified that he was not under the influence of drugs or alcohol when he made the statements, that he had not been threatened or induced to make the statements, and that the transcripts of the statements did not indicate that he had asked to speak to an attorney. The trial court denied Beckworth's motion to suppress, and this Court upheld the ruling. *Beckworth v. State*, 946 So.2d at 515–17. Beckworth failed to allege any facts indicating the existence of

> any additional grounds that would have warranted suppression of the statements. The trial court's dismissal of this claim is due to be affirmed.

*Beckworth*, 190 So. 3d at 554–55 (footnote omitted). Beckworth argued that he sufficiently pled this subclaim in his petition to the Alabama Supreme Court, (doc. 7-23 at 29–30), but the Alabama Supreme Court denied the petition on this ground, (doc. 7-24 at 26).[45]

Under AEDPA, an Alabama court's ruling under ALA. R. CRIM. P. 32.6(b) is a ruling on the merits. *Borden*, 646 F.3d at 815–16. Thus, this Court can award relief only if it finds that the ACCA's decision that Beckworth failed to sufficiently plead this subclaim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "based on an unreasonable determination of the facts in light of the evidence presented," *id.* § 2254(d)(2).

For the reasons discussed in the previous section, Beckworth's citation to case law concerning deficient performance in his merits brief does not help him establish that the ACCA erred in concluding that he did not sufficiently plead prejudice—i.e., that the outcome of his case would have been different had his counsel presented evidence that his confession was made under duress. As noted, Beckworth also argues in his merits brief that the ACCA applied an unreasonably high pleading requirement to his Rule 32 petition, criticizing him for not providing detailed information and, in essence, requiring him to prove his claims rather than merely plead them. Beckworth argues that the ACCA's

---

[45] The precise procedural history of the Alabama Supreme Court's treatment of this claim is virtually identical to that discussed *supra* note 41.

decision was thus based on an unreasonable determination of the facts because it ignored the details that Beckworth *did* set forth in his Rule 32 petition to prove his claims. Beckworth specifically argues that when the ACCA concluded that he did not plead any facts that would support his allegation that his counsel did not have "effective communication" with him, the ACCA ignored that elsewhere in his Rule 32 Petition, he complained that his counsel spent an insufficient amount of time on his case, specifically that they only spent four hours communicating with him over three jail visits and one post-hearing conference the week before trial. (Doc. 42 at 77 (referencing doc. 7-19 at 37–38, paras. 121–22)). Those allegations were contained within a separate claim in Beckworth's Rule 32 petition. In any event, the ACCA did not unreasonably determine that Beckworth failed to plead sufficient facts showing a reasonable probability that, had his counsel presented his "side of the story" concerning his confession at trial, the outcome of his trial would have been different, particularly given the other evidence of guilt. Consequently, on AEDPA review Beckworth is not entitled to relief on this claim.

**7. Beckworth's subclaim that his trial counsel failed to hire a private investigator (doc. 1 at 118–19, paras. 349–50)**

Beckworth's final subclaim within this IAC claim is that his trial counsel should have hired a private investigator who would have been able to, among other things, gather evidence to corroborate his alibi, uncover details about the circumstances under which he confessed to police in Arizona that he claims would have shown that his confession was coerced, research State witnesses' backgrounds for impeachment information, and

interviewed Beckworth's family and friends to uncover other defenses that could be used at trial.

The Respondent contends that the ACCA decided this claim on the merits, and thus its decision is subject to a reasonableness review by this Court under 28 U.S.C. § 2254(d). However, a careful review of the record reveals that this subclaim is procedurally defaulted from review by this Court because Beckworth did not raise it in his petition for a writ of certiorari in the Alabama Supreme Court during his Rule 32 proceedings.

Beckworth did raise this claim in his Rule 32 petition. (Doc. 7-19 at 50–51, 60). After the Rule 32 Court dismissed Beckworth's petition in its entirety, (*id.* at 160–61), Beckworth appealed, arguing that he sufficiently pled this subclaim, (doc. 7-20 at 66). However, the ACCA affirmed the trial court's ruling that this subclaim was insufficiently pleaded under ALA. R. CRIM. P. 32.6(b), reasoning as follows:

> Beckworth argues that the trial court erred when it dismissed his claim that trial counsel had rendered deficient performance because they failed to hire a private investigator. This claim, which was raised in paragraphs 163–164 and 195 of the petition, failed to satisfy the pleading requirements of Rule 32, and the trial court correctly dismissed the claim.
>
> Beckworth alleged that "a private investigator could have reviewed the crime scene and the circumstances surrounding it, interviewed witnesses relevant to both phases of trial, and uncovered evidence of undisclosed deals made by the prosecution with State's witnesses." (C. 45–46.) He further alleged that if counsel had hired an investigator, "they would have been able to develop evidence supporting a viable theory of defense at the guilt/innocence phase of the trial." (C. 57.) These bare, conclusory allegations were insufficient.
>
> This Court has stated:
>
>> "To sufficiently plead an allegation of ineffective assistance of counsel, a Rule 32 petitioner not only must 'identify the

> [specific] acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,' *Strickland v. Washington*, 466 U.S. 668, 690 (1984), but also must plead specific facts indicating that he or she was prejudiced by the acts or omissions, i.e., facts indicating 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' 466 U.S. at 694. A bare allegation that prejudice occurred without specific facts indicating how the petitioner was prejudiced is not sufficient."
>
> *Hyde v. State*, 950 So.2d at 356.
>
> Beckworth failed to identify any specific facts to indicate what evidence a private investigator would have discovered; he did not identify the name of a private investigator trial counsel could have hired to investigate the case; nor did he allege that the evidence that an investigator might have discovered would have been admissible at his trial. Furthermore, Beckworth did not allege any specific facts to indicate that the result of the trial would have been different if counsel had hired an investigator. Thus, Beckworth failed to satisfy the pleading requirements for both the deficient-performance prong and the prejudice prong of a claim of ineffective assistance of counsel. Therefore, summary dismissal of this claim was proper.

*Beckworth*, 190 So. 3d at 556–57. As stated above, Beckworth did not mention this subclaim in his petition for certiorari in the Alabama Supreme Court. Although he argued that he sufficiently pled an ineffective assistance of trial counsel claim, and he specifically pointed out that he pled that his trial counsel failed to investigate an alibi defense, failed to challenge his confession, failed to hire experts to review the forensic evidence in the case, and failed to investigate the backgrounds of several State witnesses in order to effectively cross-examine them, (doc. 7-23 at 29–31), he did not argue that he sufficiently pled that his trial counsel failed to hire a private investigator. This is a separate subclaim based upon its own factual basis, and the Alabama Supreme Court did not have the opportunity to consider it.

Thus, Beckworth has failed to satisfy § 2254(b)(1)'s exhaustion requirement, and this subclaim is procedurally barred from federal habeas review. *See O'Sullivan*, 526 U.S. at 845–47; *Hunt*, 666 F.3d at 730. Because he bypassed review in the Alabama Supreme Court, Beckworth cannot now seek relief in this Court. Additionally, for the same reasons explained *supra* Section V.B., dismissal of Beckworth's habeas petition to allow him to present this claim to the Alabama Supreme Court now would be futile because he would be barred from raising it under state procedural rules. *See* ALA. R. APP. P. 39(c)(2). Thus, because any state remedy with respect to this subclaim is procedurally barred by this state procedural rule, the subclaim is procedurally defaulted from habeas review.

Although the state may waive a procedural default defense, including exhaustion, the waiver must be expressed. 28 U.S.C. § 2254(b)(3); *see also Dill*, 371 F.3d at 1302 n.1. Although the Respondent did not argue to this Court that this subclaim is unexhausted, he also has not expressly waived the exhaustion requirement. Therefore, because Beckworth has failed to properly exhaust this subclaim, the Respondent has not expressly waived that failure to exhaust, and this subclaim could no longer be brought in state court if this Court dismissed Beckworth's petition to return to state court, this subclaim is procedurally barred. *See McNair*, 416 F.3d at 1304–05.

* * *

Although not labeled as a separate "cumulative effects" subclaim, Beckworth appears to argue in his merits brief that his counsel's alleged errors must be considered cumulatively rather than individually in order to determine whether he was prejudiced. (Doc. 42 at 73 ("In assessing whether this reasonable probability [of prejudice] can be

shown, the aggregate harm flowing from all of counsel's individual errors must be considered cumulatively, rather than merely determining whether each individual error, standing alone, was prejudicial.")). Beckworth did allege in his Rule 32 Petition that all of the alleged failures that he set out constituted deficient performance when considered together. (Doc. 7-19 at 54, 64). The ACCA addressed that claim, concluding, "We have found no error in the specific instances of ineffective assistance of counsel alleged by Beckworth. We likewise find no cumulative error here. *See Hyde v. State*, 13 So. 3d 997 (Ala. Crim. App. 2007)." *Beckworth*, 190 So. 3d at 562. Beckworth has not argued, let alone established, that the ACCA's decision was contrary to law or unreasonable, so any cumulative effects argument fails. In sum, Beckworth is not entitled to relief on his guilt phase ineffective of trial counsel claims.

### J. Beckworth's Claim that He Was Denied a Fair Trial Because Jurors Failed to Truthfully Answer Questions During Voir Dire and Considered Extraneous Evidence (Doc. 1 at 119–27, paras. 351–72)

In this claim, Beckworth alleges that one juror, A.L., failed to answer questions truthfully during voir dire and that another juror, D.B., considered extraneous evidence during deliberations. Beckworth argues that these instances deprived him of a fair trial by a panel of "impartial, indifferent jurors," quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Each subclaim is addressed in turn.

#### 1. Juror A.L. (doc. 1 at 119–26, paras. 353–69)

Beckworth claims that A.L. failed to answer questions truthfully during voir dire. Beckworth sets forth five separate topics on which he claims A.L. was not truthful: (1) A.L. did not disclose his relationship with Buford Fortson ("Fortson"), a State witness

who was related to Ms. Thweatt by marriage and who first discovered her body after she was murdered; (2) A.L. did not disclose his relationship with Chris Hood, the State witness who testified that Beckworth had asked him where to get a "hot" gun and that Beckworth had once told him that the best way to kill someone was "execution-style"; (3) A.L. did not disclose his previous employment with the Federal Bureau of Investigation ("FBI"); (4) A.L. did not disclose the fact that he had read about the murder in the *Dothan Eagle*, a local newspaper; and (5) A.L. did not disclose that after reading about the murder in the newspaper, he decided that he would automatically vote for the death penalty for whoever committed the murder. According to Beckworth, had A.L. provided truthful information during voir dire when asked, instead of remaining silent, his answers would have provided a valid basis for his counsel to challenge his place on the jury for cause or, at the least, for his counsel to use a peremptory strike.

In support of his claim that A.L.'s misrepresentations violated his right to a fair trial, Beckworth relies upon *McDonough Power Equipment, Inc. v. Greenwood*, in which the Supreme Court held that, to obtain a new trial based upon a juror giving false information, the challenging party "must first demonstrate that a juror failed to answer honestly a material question on voir dire," and must "further show that a correct response would have provided a valid basis for a challenge for cause." 464 U.S. 548, 556 (1984). "The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *Id.*; *see also Warger v. Shauers*, 574 U.S. 40, 45 (2014) ("If a juror was dishonest during voir dire and an honest

response would have provided a valid basis to challenge that juror for cause, the verdict must be invalidated.").

Beckworth exhausted this claim during his Rule 32 proceedings, and the state courts denied it on the merits, which means that review of this claim is limited to whether the state courts' decisions were reasonable under 28 U.S.C. § 2254(d). Beckworth raised a nearly identical claim in his Rule 32 petition. (Doc. 7-19 at 79–81). He asserted the same allegations about A.L. that he does now, except that instead of alleging that A.L. failed to disclose that he knew Hood, he merely stated that A.L. failed to disclose that he knew "another state's witness . . . either Hood, Peacock, or Stanton." (*Id.* at 80).[46] The Rule 32 Court summarily dismissed Beckworth's petition in its entirety for failure to state a claim. (*Id.* at 160–61).

Beckworth appealed to the ACCA, raising this subclaim about A.L., except that he did not include the allegation that A.L. failed to disclose that he had allegedly already decided that whoever murdered Ms. Thweatt deserved the death penalty. (Doc. 7-20 at 53–55). In its opinion on postconviction appeal, the ACCA thus held that Beckworth had abandoned that allegation and refused to consider it. *Beckworth*, 190 So. 3d at 543 n.1. Regarding Beckworth's allegation that A.L. failed to disclose that he knew "another state's witness . . . either Hood, Peacock, or Stanton," the ACCA held that Beckworth failed to

[46] The Court concludes that this subclaim was properly exhausted, notwithstanding Beckworth's factual clarification in this Court regarding which witness A.L. allegedly knew, because he fairly presented the substance of this claim to the state courts. However, as explained further below, the ACCA concluded that Beckworth failed to sufficiently plead this subclaim under ALA. R. CRIM. P. 32.6(b). Therefore, as explained earlier, on AEDPA review this Court considers only the factual allegations in his Rule 32 petition and not any new allegations presented in his federal habeas petition. *See Borden*, 646 F.3d at 816.

sufficiently plead it under ALA. R. CRIM. P. 32.2 and 32.6(b) because "Beckworth failed to identify which witness A.L. allegedly knew, and he failed to disclose the substance of that witness's testimony." *Id.* at 543. The ACCA thus held that the Rule 32 Court correctly dismissed that allegation. *Id.*

However, regarding the three other allegations about A.L.—his relationship with Fortson, his employment with the FBI, and his exposure to newspaper articles about the murder—the ACCA held that they were sufficiently pleaded and remanded them to the Rule 32 Court to provide Beckworth with the opportunity to prove their merit. *Id.* at 545. The ACCA noted that in deciding those claims, the Rule 32 Court should adhere to the standard for determining whether juror misconduct warrants a new trial, as follows:

> [W]hether the misconduct might have prejudiced the defendant; that determination is within the trial court's discretion based on an evaluation of all the relevant factors, including the remoteness of the matter inquired about, the materiality of the matter inquired about, the clarity of the questions asked, and the juror's inadvertence or willfulness in failing to answer truthfully.

*Id.* (citing *Ex parte Dobyne*, 805 So. 2d 763 (Ala. 2001)).

On remand, the Rule 32 Court held an evidentiary hearing during which A.L., Fortson, and Beckworth's trial counsel Hedeen and Nemish testified (hereinafter, the "remand hearing"). (Doc. 7-21 at 206–36; doc. 7-22 at 3–25). A.L. testified as follows: He was a juror during Beckworth's trial, but he did not recall any of the specific questions asked during voir dire. (Doc. 7-21 at 211). A.L. worked for the FBI as a fingerprint analyst in the late 1950's. (*Id.* at 212). He did not recall the prosecutor listing Fortson as a witness during voir dire or Fortson testifying at the trial, but he had known Fortson for many years because Fortson was the Dothan Fire Chief and because Fortson was a customer at A.L.'s

dry cleaning business. (*Id.* at 213, 215–16). However, A.L. and Fortson were not friends, did not socialize together, and were more like acquaintances. (*Id.* at 213, 222). Additionally, he and Fortson used to work at the same toy manufacturing company, but Fortson was a machine operator and A.L. was in payroll: "But that's the limit of it. I knew everybody that was in that plant. I knew all the employees because of my involvement with their payroll." (*Id.* at 214). A.L. also described an incident where he spoke to Fortson for a few seconds in the hallway of the courthouse before the trial began but that a bailiff stopped them from speaking any further. (*Id.* at 214–15). A.L. had not seen Fortson since Beckworth's trial. (*Id.* at 222). Additionally, A.L. read the local newspaper every day and that, before Beckworth's trial began, he had seen a news article about the murder, but he did not know the specific details about the murder. (*Id.* at 216–17, 225).

Beckworth's counsel then attempted to ask A.L. about his relationship to Hood and whether A.L. had already made up his mind before the trial that whoever murdered Ms. Thweatt deserved the death penalty, but the State objected on the ground that those matters were outside of the scope of the remand order, and the Rule 32 Court sustained the objection. (*Id.* at 217–19). On cross-examination, A.L. confirmed that he did not work in law enforcement in 2002 during Beckworth's trial. (*Id.* at 219). A.L. also testified as follows: He did not intentionally fail to answer questions during voir dire about whether he had worked in law enforcement, but he simply did not remember the question being asked. (*Id.* at 219–20). Also, he did not willfully hide the fact during voir dire that he had read about the case in the newspaper—he simply did not remember any questions about that subject being asked. (*Id.* at 226). Finally, A.L. was able to set aside the fact that he

previously worked for the FBI in the 1950's, that he knew of Fortson, and that he read about the case in the newspaper, and those facts had no impact on his ability to render a fair and impartial verdict in Beckworth's trial. (*Id.* at 221, 223, 226–27).

Additionally, Fortson testified as follows: He knew who Juror A.L. was in 2002 because he worked with A.L.'s wife, who was the City Clerk while Fortson was the Fire Chief, and because he used A.L.'s dry cleaning business. (*Id.* at 230). However, Fortson was not friends with A.L. and did not socialize with him. (*Id.* at 231). Fortson did not recall working at the same toy manufacturing plant as A.L. (*Id.* at 230). And although Fortson knew A.L.'s wife worked for the City of Dothan, she worked in a different department than he did. (*Id.* at 231–32).

Hedeen, one of Beckworth's trial counsel, also testified as follows: If A.L. had disclosed during voir dire that he worked with the FBI, that would have concerned him as a criminal defense lawyer, and he would have challenged A.L. for cause or used a peremptory strike against him. (*Id.* at 235–36). Further, if a prospective juror had stated that he knew a witness, then Hedeen would have asked additional questions to determine whether that juror could have set that information aside, and if not, then Hedeen would have asked that the juror be excused for cause or used a peremptory strike against him. (Doc. 7-22 at 3). Additionally, if Hedeen had known that A.L. worked at the same toy manufacturing plant as Fortson, then he would have challenged A.L. for cause or used a peremptory strike. (*Id.* at 4). And if Hedeen had known that a juror had read about a case in the newspaper, then he would have asked further questions about whether that juror

could set that aside and render a fair verdict, and if Hedeen was not convinced of that, then he would have used a strike for cause or a peremptory strike. (*Id.* at 4–5).

Nemish testified that she did not ask questions during Beckworth's voir dire, but she stated that she would have wanted to further examine a potential juror who stated during voir dire that he had previously been employed by the FBI. (*Id.* at 13–14). She stated that she would have also wanted to explore further a potential juror's testimony that he knew one of the witnesses in a trial. (*Id.* at 14).

Following the hearing, the Rule 32 Court issued an order denying these claims, stating as follows:

> The matter before the Court is the remand of this case concerning responses made by juror [A.L.] as raised in paragraphs 243, 245 and 247 of Defendant's Rule 32 Petition.
>
> An Evidentiary Hearing was held in this case on October 26, 2009[,] without the presence of the Defendant himself as such presence was waived in open court by Defendant's attorney on said petition.
>
> Upon considering the testimony and the record, the Court finds as follows:
>
> 1. [A.L.] had read about the case in the paper testifying that he had not remembered anything material about the case and did not consider such in his deliberations.
>
> 2. The venire was asked whether any of them "work for a law enforcement agency, sheriff's department, police department, state troopers, FBI, ABI, CIA, anything like that?" [A.L.] did not work for such an agency although he had worked as a finger print record clerk with the FBI in the late 1950s.
>
> 3. The venire was asked if they knew any of the State's witnesses "enough that you would consider them acquaintances." [A.L.] testified he knew Mr. Fortson,

> the Fire Chief at the time, as [A.L.]'s wife was the City Clerk but thought that he had testified in his professional capacity regarding the 911 call. [A.L.] also testified at hearing that he said hello to Mr. Fortson in the hall at the temporary courthouse when he saw him as he would with anyone whom he might know but did not talk with him about the case and that such was prior to the trial.

> The Court finds that [A.L.]'s responses were in good faith; that his media information was insignificant having no bearing on his deliberations; that his FBI employment almost 50 years prior to the trial was of no consequence to his considerations in the case; and that his knowledge of the witness, Buford Fortson, was immaterial.

> The Court notes that Mr. Fortson's testimony was merely as to finding the victim[']s body and his credibility and testimony in no way connected the Defendant with the commission of the crime. The Court further notes that at least 3 other jurors who served (Fridell, Walker, and Emfinger) knew law enforcement witnesses including the chief investigator on the case, Donald Valenza, who took Defendant's statement and coordinated the investigation.

> Therefore, the Court finds that the allegations in paragraphs 243, 245 and 247 of the Rule 32 Petition do not warrant setting aside the conviction or ordering a new trial and said Petition is denied.

(Doc. 7-21 at 203–04).

Beckworth again appealed to the ACCA, arguing that the Rule 32 Court erred in denying relief. (Doc. 7-22 at 28–74). Beckworth also argued that the court erred when it refused to allow him to inquire of A.L. at the remand hearing whether he knew Hood and whether he had already made up his mind about the death penalty on the ground that those two issues were outside the scope of the remand order. (*Id.* at 68–73).

The ACCA affirmed the Rule 32 Court's rejection of these claims in a lengthy opinion. (Doc. 7-22 at 137–55 (unpublished memorandum opinion)). The ACCA first

recounted the testimony presented at the remand hearing in detail. (*Id.* at 137–43). The ACCA then noted that it would review the Rule 32 Court's denial of the claims for an abuse of discretion. (*Id.* at 143). The ACCA then stated that the standard by which a court must determine whether juror misconduct warrants a new trial is whether the party might have been prejudiced by the juror's failure to make a proper response. (*Id.* at 144–45) (quoting *Dobyne*, 805 So. 2d at 771–72). The ACCA noted that the following circumstances have been considered in determining probable prejudice: "temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or in failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about." (*Id.* at 145 (quoting *Dobyne*, 805 So. 2d at 772)). The ACCA then applied these standards to each of Beckworth's claims about A.L., as follows:

> A. <u>A.L.'s acquaintance with Buford Fortson</u>
>
> In paragraph 243 of his Rule 32 petition Beckworth alleged that Juror A.L. did not answer truthfully when the venire was asked whether anyone knew Buford Fortson, who was the fire chief at the time of the murder. During voir dire questioning, defense counsel read the names of some of the State's witnesses to the venire and inquired whether the veniremembers knew any of the witnesses. Defense counsel qualified the degree of knowledge of a witness about which he was inquiring, and he stated: "And as [the prosecutor] said—when we are talking about know, we are not talking about, do you know who they are—we are talking about, did you know them enough that you would consider them friends or acquaintances. Okay?" (R. 103.) Juror A.L. did not respond when defense counsel read Fortson's name.
>
> At the hearing on remand, Juror A.L. testified that he had been acquainted with Fortson because Fortson was the fire chief, because they previously had been employed at the same company, and because Fortson had been a customer at A.L.'s dry cleaning business. A.L. testified that he did not recall counsel or the judge asking whether anyone knew Fortson, and

further testified that he did not know that Fortson was going to be a witness at the trial. (Remand R. 10.) He also testified that if veniremembers had been asked to identify themselves if they were friends of Fortson's, he would not have raised his hand because he only knew who Fortson was, but he did not consider himself to be a friend or even a close acquaintance of Fortson's.

The matter inquired about was not temporally remote; A.L. knew Fortson at the time of the crime and at the time of trial, and A.L. did not fail to recollect at trial that he knew Fortson. However, A.L.'s testimony at the hearing on remand does indicate that his failure to respond during voir dire questioning that he knew Fortson was not based on his willful failure to answer. Rather, it appears either that A.L. did not hear Fortson's name listed as a witness, or that he did not consider the question to require a response from him because he merely knew who Fortson was but was not well acquainted with him and did not consider Fortson a friend. As noted above, defense counsel expressly informed veniremembers that he was not asking them to identify themselves if they simply knew who a witness was. The questions propounded by counsel were somewhat ambiguous, because the degree of knowledge or intimacy required for acknowledgement by a veniremember that a witness was "known" to him was described in vague terms. The materiality of the matter inquired about was not great. Fortson testified that he found the victim's body inside her house, but he did not participate in the investigation or connect Beckworth to the crime.

While counsel at the hearing on remand testified that they would have wanted to know if a veniremember knew a witness or had worked with a witness and that they would have explored the relationship through additional questions, Hedeen also testified that the ultimate determination would have been whether the veniremember could set aside the relationship and decide the case fairly. A.L. testified that his acquaintance with Fortson did not affect his ability to listen to the evidence and the law, or to issue a fair and impartial verdict in the case, and the trial court so found. Nothing in the trial record or in the record on remand even suggests that A.L.'s acquaintance with Fortson affected his judgment, was brought to the attention of other jury members, or affected the deliberations or verdict of the jury.

Furthermore, the trial record reflects that other veniremembers who stated that they knew or had worked with the prosecution's witnesses, including law-enforcement witnesses, were not struck from the jury by Beckworth. Notably, juror T.W. stated during voir dire questioning that he knew Commander Bill Land, whom the prosecutor described as "the number two man in the sheriff's office," because they met while T.W. "was in

security at the nuclear plant." (R. 81-82.) Juror T.W. further stated that, through his employment, he knew Lt. Don Valenza of the Houston County Sheriff's Office (R. 107-08); Valenza was the chief investigator in Beckworth's case, and he testified in detail about the investigation of the crime and about statements Beckworth had made. The trial court inquired of T.W. whether his acquaintance with the law-enforcement officers would affect him in the case, and T.W. stated that it would not. (R. 170.) Beckworth did not challenge T.W. for cause or exercise a peremptory strike against him. We find the lack of a challenge for cause or exercise of a peremptory strike to be of particular significance because Hedeen noted specifically that he knew that Lt. Valenza was the lead investigator, that he would testify at trial, and that the credibility of law-enforcement witnesses would be an issue for the jury. Additionally, juror S.F. stated during voir dire questioning that she knew State's witness, Kris Rocco, who was an investigator with the Houston County Sheriff's Office and who had been assigned to work with the FBI crime task force. Beckworth did not challenge S.F. for cause, and did not exercise a peremptory strike against her. Therefore, because Beckworth did not strike all jurors who knew law-enforcement witnesses, we find A.L.'s acquaintance with Fortson to be of limited materiality. Because other veniremembers who indicated an acquaintance and a prior employment relationship with law-enforcement witnesses were not challenged or struck by Beckworth, we find that the State adequately rebutted Beckworth's prima facie case of prejudice.

The trial court did not abuse its discretion when it denied the claim raised in paragraph 243 of Beckworth's petition.

B. <u>A.L.'s prior employment with the FBI</u>

Beckworth also argues that the trial court erred when it denied the claim for relief raised in paragraph 245 of the petition, alleging error on the ground that juror A.L. failed to disclose his prior employment with the FBI.

During voir dire questioning, defense counsel asked: "Does anybody here themselves work for a law enforcement agency, sheriff's department, police department, state troopers, FBI, ABI, CIA, anything like that? Does that apply to anybody here?" (R. 97.) A.L. did not respond to the question. On remand, A.L. testified that he had been employed as a fingerprint examiner with the FBI in the 1950's, and that he had worked left employment as a fingerprint examiner in 1958.

The trial court found, as we agree, that defense counsel's question to the venire was whether any veniremember at the time of trial was employed

by a law-enforcement agency, and that A.L. was not then employed by the FBI. Thus, A.L. did not fail to disclose any information requested by defense counsel during voir dire. This Court previously examined a virtually identical issue in DeBruce v. State, 890 So. 2d 1078 (Ala. Crim. App. 2003), overruled on other grounds, Ex parte Jenkins, 972 So. 2d 159 (Ala. 2005):

> "When addressing this issue the circuit court made the following findings:
>
>> "'DeBruce alleges that juror [M.F.'s] husband was involved in law enforcement and that she improperly failed to answer that question during voir dire. The question asked of [M.F.'s] panel was whether they or a family member "is" in law enforcement. The question did not ask whether anyone was or had been in law enforcement. During the evidentiary hearing, [M.F.] testified that her husband worked as a volunteer, or a reserve county deputy, sometime around 1975. He then worked full time as a county deputy in the Talladega County Sheriff's Department for one year from 1978–79. He also served in the reserves for one year after being a full-time deputy. [M.F.'s] husband was not in law enforcement in 1991 or 1992, which is the information sought to be elicited by the voir dire question. He was not involved in law enforcement at all after 1980.
>>
>> "'The question itself was not asked in such a way as to elicit information regarding past law enforcement activities. The activities were more than ten years previous to this trial. [M.F.] did not intentionally withhold information.'
>
> "The circuit court's findings are supported by the record. The question that was asked of M.F.'s panel was 'whether they or a family member "is" in law enforcement.' As the juror stated during the Rule 32 hearing, her husband had not been in law enforcement for more than 10 years at the time of DeBruce's trial. There was no showing that this juror failed to disclose any information during voir dire."

890 So. 2d at 1079.

As in DeBruce, the venire in Beckworth's case was asked about current employment in law enforcement and A.L.'s employment as a fingerprint examiner with the FBI had ended decades earlier. Thus, there was no failure to disclose information as to this issue, and the trial court correctly denied the claim for relief raised in paragraph 245 of the petition.

C. Media coverage

Beckworth also argues that he was entitled to post-conviction relief on the claim raised in paragraph 247 of his petition, and that the trial court erred when it denied this claim. In paragraph 247, Beckworth alleged that Juror A.L. had failed to disclose during voir dire that he had been exposed to media information about the murder because he read the local newspaper every day. In its order denying Beckworth relief on this claim, the trial court stated that the information A.L. read in the newspaper was insignificant and had no bearing on his deliberations.

During voir dire examination, the trial court asked the following questions:

> "THE COURT: Now, the next question — and when I ask it, I don't want you to tell me what you may have heard or read, but I just want to know if you have any information that would affect you in this case.
>
> "Do any of you have any knowledge about the facts in this case? I am going to give you a very brief description of what I think the State is going to — or some of the circumstances the State is going to be presenting, but just a very, very brief outline of that. The victim in this case — the alleged victim is Ms. Bessie Thweatt, an elderly lady who lived in Wicksburg, and she was found dead in her home out in Wicksburg after an alleged burglary. That's Ms. Bessie Thweatt from Wicksburg.
>
> "Do any of you know anything about the facts in the case? In other words, have you talked with anyone about the case — someone who might know something about it? Have you read anything in the newspaper or seen anything on TV which you remember, which would affect you in the case?

> "First of all, has anybody received any information — has anybody read anything in the paper or seen anything on TV about the case?
>
> "We have several there. And what I am going to do — I am going to get your names and ask you to come up and just tell me what you do remember about it. And then, I am going to ask you whether or not it will have any effect on your judgment in the case. In other words, will you go by what you saw in the paper or saw on TV, or will you go by the evidence in the is case? That's what — when I ask you to come up — so, be thinking about what you remember or what you saw, and also, whether it — you could set that aside or not, because we would ask you to set that aside and only try the case based on the evidence that is actually presented in court.
>
> "Let me get those names, if I could . . . ."

(R. 24-25.) (Emphasis added.)

We note that the trial judge during voir dire proceedings indicated on three occasions that he wanted to know whether anyone had received information that would affect the veniremembers' judgment in the case. The trial judge also stated he wanted to know whether the veniremembers had been exposed to information they remembered, or whether they had gained information from someone who knew something about the facts of the case. It is possible that Juror A.L. failed to respond because, based on the trial court's statements, he believed that the trial court was attempting to identify only those veniremembers who knew facts of the case or who would be affected by what they had seen in the media. Nonetheless, the fact remains that A.L. did not reveal during voir dire proceedings that he had read newspaper reports that there had been a murder.

Juror A.L. did not respond to the trial court's questions during voir dire. At the remand hearing A.L. testified that he had read about the murder in the local newspaper, but that the substance of the news stories he had read only announced that there had been a murder. A.L. testified that he did not recall any details from the newspaper reports, and he said that he had decided the case based on the evidence presented at trial. His reading of the reports did not affect his ability to set aside the stories and issue a fair verdict in the case, he said.

At the remand hearing, Hedeen testified that he would have made inquiries of a veniremember who stated that he had had some media exposure prior to trial. Then Hedeen testified, "[U]ltimately, it would get down to whether or not they could set that aside and render a fair and just verdict in the case. And, again, if I thought there was enough, I would challenge for cause, and if that was not successful, use one of the peremptory strikes." (Remand R. 34.)

Hedeen did not testify at the remand hearing that he would challenge for cause or exercise a peremptory strike any juror who was aware of information from a media report. Rather, Hedeen testified he would challenge a juror who could not render a fair and just verdict. Nothing in the record indicates that, based on the newspaper reports he read before trial, that Juror A.L. was unable to render a just and fair verdict based on the evidence presented at trial. Section 12-16-150 (7), Ala. Code 1975, states that a juror is subject to being struck for cause if "he has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict." Therefore, the record indicates that a challenge for cause would not have been granted, even if A.L. had acknowledged that he had read news articles.

There is no indication in the record that, at the time of trial, A.L. remembered any of the information contained in the newspaper reports or that the information affected his deliberations or his verdict. Nothing in the remand hearing indicates that defense counsel would have exercised a peremptory challenge against Juror A.L. based on his exposure to media. As the State correctly notes, three jurors — R.B., C.P., and E.R. — acknowledged during voir dire that they had seen media reports about the murder, but stated that they could set aside what they had seen and could decide the case based on the evidence, and defense counsel did not challenge those jurors for cause or exercise peremptory strikes against them.

Beckworth failed to establish a prima facie case of prejudice as to this claim of error, and the trial court correctly denied this claim.

Moreover, even if Beckworth had argued and proved that he would have successfully challenged for cause or exercised a peremptory strike against Juror A.L. based on his exposure to newspaper reports and he had, thus, established a prima facie case of prejudice, Beckworth would still not be entitled to relief. Based on a consideration of the five factors relevant to a claim of juror misconduct, any allegation of prejudice would have been sufficiently rebutted by the record. The temporal remoteness of the matter inquired about was unclear because the record does not contain the dates on which the newspaper A.L. read printed reports about the murder. As noted

> above in the discussion of the trial court's voir dire questioning, there was some ambiguity in the questions propounded. The trial court's initial statements to the venire indicated it was seeking only those veniremembers who knew something about the case, or who had been exposed to media reports and would be affected by those reports. Although the trial court did eventually limit its inquiry to identify those veniremembers who had been exposed to media reports at all, Juror A.L. might have believed that the trial court was attempting to identify only those veniremembers whose opinions had been affected by the reports. There is a reasonable inference from the record that A.L. did not respond because his opinion about Beckworth's guilt or innocence had not been influenced by those reports, and because he did not believe the trial court was asking for identification unless a veniremember's opinion had been influenced. It does not appear that A.L. inadvertently failed to answer or that he did not answer because he did not recollect having read news reports. Beckworth did not prove that the matter inquired about was of great materiality. The articles printed in the newspaper A.L. read were not introduced. We note, nonetheless, even if the articles had been introduced and even if they contained substantial detail about the murder or about Beckworth, A.L. testified that nothing he read affected his ability to render a fair verdict based on the evidence presented at trial. The trial court, which was in a better position than this Court to judge the credibility of the witnesses and their testimony, determined that A.L. testified in good faith and that he was decision was not affected by the media reports he had read. Finally, nothing in the record before us indicates that Juror A.L. mentioned or considered during deliberations any information from the articles he read. Therefore, we have no disagreement with the trial court's denial of the claim raised in paragraph 247 of the petition.
>
> D. <u>Conclusion</u>
>
> Based on the foregoing, we find no abuse in the trial court's ruling on the claims Beckworth raised in paragraphs 243, 245, and 247 of his Rule 32 petition. Therefore, we hold that the trial court correctly denied those claims for relief.

(Doc. 7-22 at 145–54 (footnote omitted)). Finally, the ACCA affirmed the Rule 32 Court's refusal to allow Beckworth to admit evidence at the remand hearing about A.L.'s relationship with Hood or propensity to vote for the death penalty, as those issues were outside of the scope of the remand order. (*Id.* at 155).

Beckworth sought rehearing by the ACCA, (*id.* at 156–218), but it was denied (*id.* at 219). Beckworth raised this claim again in his petition for certiorari in the Alabama Supreme Court, (doc. 7-23 at 51–72), but the Alabama Supreme Court denied the petition regarding these issues, (doc. 7-24 at 26). That concluded Beckworth's pursuit of this claim in the state courts.

As can be seen from the foregoing procedural history, Beckworth's allegation that he was denied a fair trial and an impartial jury because A.L. failed to disclose his alleged predisposition to voting for the death penalty is procedurally defaulted because Beckworth did not exhaust it in the state courts, and the ACCA dismissed it based upon adequate and independent state law procedural grounds. As noted previously, Beckworth did not present argument as to this allegation on appeal from the Rule 32 Court's denial of his Rule 32 petition. The ACCA thus found that Beckworth had abandoned the claim, explaining:

> Beckworth alleged in paragraph 246 of his petition that A.L. failed to disclose that he would automatically recommend a death-penalty verdict if Beckworth was found guilty. (C. 78.) However, in his brief to this Court Beckworth did not present any argument as to that portion of the juror-misconduct claim; therefore, we deem that argument abandoned. *See Simmons v. State*, 879 So. 2d 1218, 1221 n.1 (Ala. Crim. App. 2003).

*Beckworth*, 190 So. 3d at 543 n.1. The holding of the ACCA constitutes a state procedural bar that forecloses habeas relief. *Sims v. Singletary*, 155 F.3d 1297, 1311 (11th Cir. 1998) (state court finding that argument was "abandoned" on appeal is a finding of default based upon state procedural grounds). The ACCA dismissed the allegation based upon a state law ground that was "independent of the federal question" and "adequate to support the judgment," *see Marek*, 62 F.3d at 1301, and the ACCA never considered the merits of the

allegation. Beckworth is thus procedurally barred from raising this claim in a federal habeas petition. *See O'Sullivan*, 526 U.S. at 845; *Pope*, 680 F.3d at 1286; *Ward*, 592 F.3d at 1156. Furthermore, dismissal of this habeas petition to allow Beckworth to present this allegation now in Alabama state court would be futile because it would be procedurally barred by state procedural rules: a Rule 32 petition would be barred by Alabama's statute of limitations, *see* ALA. R. CRIM. P. 32.2(c), as well as Alabama's ban on successive petitions, *see* ALA. R. CRIM. P. 32.2(b). Beckworth's only response to the procedural default of this allegation is to argue that his claim as to juror A.L. is premised upon his pattern of untruthfulness throughout voir dire, not a single instance of misconduct. This argument is insufficient to undermine the ACCA's finding that he abandoned this allegation. Because he offers no cause or prejudice to excuse the default, this Court may not consider it.

Turning to Beckworth's allegation that he was denied a fair trial and an impartial jury because A.L. did not disclose that he knew Hood, this Court reviews that allegation under the confines of 28 U.S.C. § 2254(d). The Court does so because the ACCA held that Beckworth failed to sufficiently plead that allegation because he merely alleged in his Rule 32 petition that A.L. failed to disclose that he knew another State's witness, "either Hood, Peacock, or Stanton," without specifying which witness. *Beckworth*, 190 So. 3d at 543. The court reasoned:

> The claim contained in paragraph 244, that A.L. knew "another State's witness," was not sufficiently pleaded and was due to be summarily dismissed. Beckworth failed to identify which witness A.L. allegedly knew, and he failed to disclose the substance of that witness's testimony. Because the petition failed to include the full factual basis for this portion of the claim,

> Beckworth failed to satisfy his burden of pleading under Rule 32.2 and Rule 32.6(b), Ala. R.Crim. P. *Hyde v. State*, 950 So. 2d at 356.

*Id.* On AEDPA review, an Alabama court's ruling of insufficient pleading under Rule 32.6(b) is a ruling on the merits. *Borden*, 646 F.3d at 815–16. Thus, this Court can award relief only if it finds that the ACCA's decision that Beckworth failed to sufficiently plead this claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "based on an unreasonable determination of the facts in light of the evidence presented," *id.* § 2254(d)(2).

In his habeas petition and merits brief, Beckworth now offers more details about A.L.'s relationship with Hood than he offered in his Rule 32 petition. He claims that A.L. knew Hood because Hood's mother worked for A.L.'s dry cleaning business and because he had hired Hood and his brother to help dismantle one of his stores. (*See* doc. 1 at 121, para. 357; doc. 42 at 84). As the Court has explained, however, because the ACCA determined that Beckworth failed to sufficiently plead this subclaim under ALA. R. CRIM. P. 32.6(b), this Court considers only the factual allegations in his Rule 32 petition and not any new allegations presented in his federal habeas petition. *See Borden*, 646 F.3d at 816. As noted above, the ACCA found that this subclaim was insufficiently pleaded because Beckworth did not specify which State's witness A.L. allegedly knew. Beckworth offers no explanation as to how the state courts' finding that he failed to plead the claim sufficiently was unreasonable, so he fails to meet his burden.

Additionally, Beckworth asserts that the ACCA erred when it affirmed the Rule 32 Court's refusal to admit evidence about A.L.'s relationship with Hood at the remand hearing, arguing that such evidence was admissible to demonstrate A.L.'s pattern of misconduct. But this argument amounts to a challenge to a state court's state procedural ruling (i.e., whether evidence was outside the scope of the appellate court's remand order), and thus it is not a basis for federal habeas relief. *See Estelle*, 502 U.S. at 67 ("[F]ederal habeas corpus relief does not lie for errors of state law.").

Finally, Beckworth's allegations that he was denied a fair trial and an impartial jury because A.L. did not disclose that he knew Fortson, that he was previously employed by the FBI, or that he had seen media coverage of the murder, are also considered pursuant to 28 U.S.C. § 2254(d). To obtain relief on these allegations, Beckworth must demonstrate that the decision of the ACCA on return from remand, which was the last reasoned state court decision on these issues, *see Wilson*, 584 U.S. at 125, was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d).

Beckworth argues that the ACCA contravened clearly established federal law in *McDonough*, 464 U.S. at 554, which held that a new trial is warranted if a juror answers falsely or fails to disclose material information. Here, the ACCA concluded that A.L. neither answered falsely nor failed to disclose material information. Relatedly, Beckworth also contends that the ACCA's decision was based on an unreasonable determination of

the facts under 28 U.S.C. § 2254(d)(2) for several reasons, which the Court addresses in turn.

*First*, Beckworth argues that the ACCA misconstrued the record when it concluded that A.L.'s silence when asked about Fortson was justified because A.L. either did not hear Fortson's name being called as a witness or did not consider the question to require an answer because he merely knew who Fortson was but did not consider Fortson a friend. (*See* doc. 7-23 at 186). According to Beckworth, the record demonstrated that A.L. could not have failed to hear Fortson's name being called because during voir dire, Fortson's name was mentioned multiple times; trial counsel even spelled out Fortson's name at one point to clarify to the venire to whom he was referring; and another veniremember responded that he knew Fortson's son and that he knew Fortson from working at the city. (Doc. 7-9 at 132). Beckworth further points out that A.L. testified at the remand hearing that he could hear and understand the questions asked during voir dire. (Doc. 7-21 at 13–14). Thus, Beckworth asserts that it is implausible that A.L. did not hear or understand that he should have revealed his relationship with Fortson during voir dire. Additionally, Beckworth asserts that the record before the ACCA demonstrated that A.L. actually knew Fortson very well. In support, Beckworth points out that A.L. testified during the remand hearing that he had known Fortson for "many years"; that he met Fortson as a co-worker at a toy manufacturing company; that Fortson had been a customer at A.L.'s dry cleaning business until Fortson retired; that he understood that Fortson was still the fire chief at the time of Beckworth's trial; that he knew Fortson worked with his wife at the clerk's office;

and that he had had a conversation with Fortson in the hallway before trial which was interrupted by a bailiff.

Upon careful consideration of the record, the ACCA's decision was not unreasonable. Beckworth challenges the truthfulness of A.L.'s testimony at the remand hearing that he did not remember being asked about Fortson, but the Rule 32 Court was in the best position to judge the credibility of witnesses at the remand hearing. Additionally, Fortson's testimony corroborated A.L.'s regarding their relationship: Fortson testified similarly that he knew A.L. in 2002 but that he would not describe himself as a friend or close acquaintance and they did not socialize together. A habeas petitioner faces an uphill battle when attempting to establish that a state court's factual determination, or a credibility determination based upon facts presented, is unreasonable, especially after an evidentiary hearing in the court below. *Jenkins*, 963 F.3d at 1272 (explaining that, under AEDPA, witness credibility is a "question of fact entitled to a presumption of correctness" and that the federal court "must accept the trial court's credibility determinations of the Rule 32 witnesses"). As previously explained, this Court has "no power on federal habeas review to revisit the state court's credibility determinations" absent "clear and convincing evidence," which Beckworth fails to marshal here. *See id.* (quoting *Bishop*, 726 F.3d at 1259); *see also Wood*, 558 U.S. at 301 ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.").

*Second*, Beckworth argues that the Rule 32 Court unreasonably concluded that the voir dire question about Fortson was not material because, although Fortson testified about

discovering Ms. Thweatt's body after the murder, Forston was not involved in the investigation and did not connect Beckworth to the murder in any way. (Doc. 7-21 at 204). Beckworth asserts that Fortson was an important witness because he had known Ms. Thweatt for fifty years, lived five miles away from her house, was her relative, and was the first person to discover her body and notify authorities. Again, although Beckworth quarrels with the state court's assessment of the evidence presented at the remand hearing, he does not meet his burden of showing that the state court's decision was unreasonable based on the facts before the state court. *See Wood*, 558 U.S. at 301 (explaining that "even if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination'" (alterations in original) (quoting *Rice*, 546 U.S. at 341–42)). The state court reasonably concluded that the voir dire question about Fortson was not material.

*Third*, Beckworth argues that the ACCA again misconstrued the record in its discussion about A.L.'s failure to disclose his prior employment with the FBI by reasoning that A.L. was not obliged to answer because the question only pertained to current, as opposed to past, employment. (Doc. 7-22 at 148). Beckworth again asserts that the record showed otherwise because several other veniremembers answered the question about law enforcement employment, and they understood the question to pertain to both current and past employment. (*See* doc. 7-9 at 125–28). Beckworth thus argues that the record showed that A.L. should have answered the question instead of remaining silent. As explained in the previous paragraph, disagreement with the state courts' assessment of the evidence is insufficient to establish that the state courts' decision was unreasonable. *See Wood*, 558

U.S. at 301. The state courts' decision regarding A.L.'s prior employment was not unreasonable.

*Fourth*, Beckworth argues that the ACCA unreasonably minimized A.L.'s misconduct regarding A.L.'s failure to disclose that he had read about the murder in the newspaper. The ACCA found that it was possible that A.L. did not disclose that he had read about the murder in the newspaper because A.L. may have believed that the question was only directed to those who "would be affected by what they had seen in the media." (Doc. 7-22 at 151). Beckworth also asserts that the ACCA did not properly consider A.L.'s pattern of untruthfulness when it gave credit to A.L.'s remand hearing testimony that "nothing he read affected his ability to render a fair verdict." (*Id.* at 153). However, Beckworth's arguments are little more than quarrels with the state courts' credibility determination. As explained above, this Court has "no power on federal habeas review to revisit the state court's credibility determinations" absent "clear and convincing evidence," which Beckworth fails to marshal here. *See Jenkins*, 963 F.3d at 1272 (quoting *Bishop*, 726 F.3d at 1259); *see also Rice*, 546 U.S. at 341–42 (explaining that, even when "[r]easonable minds reviewing the record might disagree about [a person's] credibility," such disagreement does not suffice on habeas review to supersede the state courts' credibility determination).

In sum, Beckworth has not demonstrated that the state courts' rejection of his claim that Juror A.L.'s voir dire answers deprived him of a fair trial was unreasonable based on *McDonough*, or that the state courts' decisions were based on an unreasonable

determination of the facts. Thus, under AEDPA, Beckworth is not entitled to relief on this claim.

**2. Juror D.B. (doc. 1 at 126–27, paras. 370–72)**

Beckworth further claims that juror D.B. considered information outside of the trial evidence to reach his verdict that Beckworth was not intellectually disabled at the penalty phase. According to Beckworth, D.B. recalled that evidence was presented that Beckworth had obtained his CDL. D.B. recalled that his wife, who acquired her CDL and worked as a bus driver, had told him that the CDL test was difficult and complex. D.B. said that as a result of what his wife explained regarding a CDL, he did not believe Beckworth was intellectually disabled. Beckworth claims that D.B.'s failure to decide the case solely based on trial evidence deprived him of a fair trial, relying again upon *McDonough*, in which the Supreme Court stated: "One touchstone of a fair trial is an impartial trier of fact—'a jury capable and willing to decide the case solely on the evidence before it.'" 464 U.S. at 554 (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)).

The Respondent contends that the ACCA adjudicated this claim on the merits during Beckworth's Rule 32 proceedings, and thus the ACCA's decision is subject to a reasonableness review under 28 U.S.C. § 2254(d). However, upon a careful review of the record, the Court finds this subclaim is procedurally defaulted from review because Beckworth did not raise it in his petition for a writ of certiorari in the Alabama Supreme Court during his Rule 32 proceedings.

Beckworth did raise this subclaim in his Rule 32 petition. (Doc. 7-19 at 81–82). After the Rule 32 Court dismissed Beckworth's petition for failure to state a claim, (*id.* at

160–61), Beckworth appealed, raising the issue to the ACCA, (doc. 7-20 at 52–53). However, the ACCA affirmed the trial court's ruling that Beckworth failed to state a claim for relief under ALA. R. CRIM. P. 32.7, reasoning as follows:

> Beckworth alleged in paragraph 248 of his petition that juror D.B. considered extraneous evidence during the determination of the jury's sentencing recommendation. Specifically, Beckworth alleged:
>
> > "D.B. remembers that the defense tried to claim that Mr. Beckworth was mentally retarded. He did not think that the defendant was mentally retarded because he had gotten his Commercial Driver's License (CDL). D.B. knows that the test to receive a CDL is very difficult because his wife is a bus driver and has her CDL. She told him that the test was difficult and complicated. Because of what he knew about the CDL test from his wife, D.B. did not believe that Mr. Beckworth could be mentally retarded."
>
> (C. 78–79.)
>
> This claim was due to be summarily dismissed because it presented no material issue of fact or law that would have entitled Beckworth to relief. Rule 32.7(d), Ala. R.Crim. P. The trial court determined, based on the evidence presented at trial, that Beckworth was not mentally retarded. D.B.'s opinion about whether Beckworth was mentally retarded and his alleged consideration of extraneous information in making that determination were irrelevant. Although the trial court submitted a special interrogatory to the jury at the sentencing phase of Beckworth's trial and the jury indicated that it believed that Beckworth was not mentally retarded, this Court noted in its opinion on direct appeal "that nothing in Alabama or federal law require[d] that this procedure be followed . . . ." *Beckworth v. State*, 946 So.2d at 509 n. 6. Because Beckworth's claim as to D.B. failed to raise a material issue of fact or law that would have entitled him to relief, the claim was due to be dismissed. The trial court's failure to address the claim in its order resulted in no reversible error.

*Beckworth*, 190 So. 3d at 545–46. Beckworth did not raise this subclaim about D.B. again in his petition for certiorari in the Alabama Supreme Court. Although he specifically argued that the ACCA should have granted him a new trial regarding A.L.'s alleged

misrepresentations, Beckworth nowhere mentioned the ACCA's dismissal of his allegations concerning D.B.

As a result, Beckworth has not satisfied § 2254(b)(1)'s exhaustion requirement, and he is procedurally barred from raising this subclaim in a federal habeas petition. *See O'Sullivan*, 526 U.S. at 845–47; *Hunt*, 666 F.3d at 730. Because he failed to seek relief in the Alabama Supreme Court, Beckworth cannot now seek relief in this Court. Additionally, for the same reasons explained *supra* Section V.B., dismissal of Beckworth's habeas petition to allow him to present this subclaim to the Alabama Supreme Court now would be futile. *See* ALA. R. APP. P. 39(c)(2). Thus, because any state remedy with respect to this subclaim is procedurally barred by this state procedural rule, the subclaim is procedurally defaulted from habeas review.

AEDPA requires a federal district court to address exhaustion unless it is expressly waived by the State. *Dill*, 371 F.3d at 1302 n.1; *see also* 28 U.S.C. § 2254(b)(3). Although the Respondent has not argued to this Court that this subclaim is unexhausted, he also has not expressly waived the exhaustion requirement. Thus, because Beckworth has failed to properly exhaust this subclaim, the Respondent has not expressly waived that failure to exhaust, and this subclaim could no longer be brought in state court if this Court dismissed Beckworth's petition to return to state court, this subclaim is procedurally barred. *See McNair*, 416 F.3d at 1304–05. Consequently, Beckworth is due no relief on this subclaim.

**K. Beckworth's Claim of Cumulative Error (Doc. 1 at 127, para. 373)**

Beckworth's final claim is that the cumulative effect of all of the errors identified in his habeas petition violated his constitutional rights to due process and a fair trial under

the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. Because Beckworth did not raise this "cumulative error" claim in the state courts, it is unexhausted and procedurally defaulted from this Court's review. *See* 28 U.S.C. § 2254(b)(1); *Martinez*, 566 U.S. at 9.

Beckworth protests that he *did* raise a "cumulative error" claim on direct appeal, (*see* doc. 7-15 at 126), and the ACCA denied it on the merits, *see Beckworth*, 946 So. 2d at 532. However, that "cumulative error" claim did not, and obviously could not have, include Beckworth's *Brady*, ineffective assistance of counsel, and juror misconduct claims, as Beckworth did not allege those claims until his Rule 32 proceedings. Thus, Beckworth did not raise the *same* "cumulative error" claim on direct appeal that he raises now. *See Pope*, 680 F.3d at 1286 ("[A]n issue is exhausted if 'the reasonable reader would understand [the] [federal] claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court." (quoting *Kelley*, 377 F.3d at 1344–45)).[47]

Beckworth also points out that he raised a claim during his Rule 32 proceedings that all of his ineffective assistance of counsel allegations should be considered cumulatively. (*See* doc. 7-19 at 54, 64). Again, however, the "cumulative error" claim he raised in state court was not the same claim that he raises here, as the state court claim did not pertain to any claims other than to his ineffective assistance of counsel claims. *See Pope*, 690 F.3d at 1286.

[47] The Respondent contends that the cumulative error argument that Beckworth raised on direct appeal is not procedurally defaulted. However, the Court maintains that Beckworth's cumulative error argument as to only his trial errors, which he did raise in state court, is not the same claim that he now raises. In any event, Beckworth has not presented any argument that the ACCA's rejection of his cumulative error claim on direct appeal was unreasonable under 28 U.S.C. § 2254(d).

Beckworth also contends that he was not required to exhaust this "cumulative error" claim in the state courts before raising it here because each of the individual constitutional claims that he raised in his federal habeas petition are themselves sufficient to warrant reversal of his conviction and sentence. In support, Beckworth cites *Kyles v. Whitley*, 514 U.S. 419 (1995), and *Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992) (en banc). However, both cases are distinguishable, and neither case absolved Beckworth of his responsibility to exhaust this "cumulative error" claim in the state courts before raising it here.

Beckworth describes *Kyles* as a case in which the Supreme Court reversed the court of appeals because that court failed to consider constitutional violations cumulatively. (Doc. 1 at 127; doc. 41 at 26). But Beckworth reads *Kyles* more broadly than its holding permits. In *Kyles*, the Court addressed a habeas petitioner's claim that the prosecution suppressed evidence in violation of *Brady*, 514 U.S. at 421–22, and it held that all items of suppressed evidence must be considered collectively, rather than individually, in deciding whether such evidence is "material" for purposes of *Brady*, *id.* at 436–48. The Supreme Court reversed the court of appeals' denial of the petitioner's *Brady* claim, noting that there was "room to debate whether the two judges in the majority in the Court of Appeals made an assessment of the cumulative effect of the evidence." *Id.* at 440. The Supreme Court then considered the suppressed evidence collectively and held that the disclosure of all of the evidence would have made a different result reasonably probable. *Id.* at 441–54. Thus, *Kyles* addressed a discrete issue—the cumulative effect of suppressed evidence—and does not stand for the proposition Beckworth claims.

In *Derden*, the Fifth Circuit sitting en banc held that federal habeas relief may be granted if a petitioner can show that he was denied due process by the cumulative effect of errors at his trial. 978 F.2d at 1456. However, the court warned that it was "adopt[ing] a particularly cautious approach to granting habeas relief for cumulative errors." *Id.* at 1457. The court stated:

> After *en banc* rehearing, we now hold that federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors "so infected the entire trial that the resulting conviction violates due process."

*Id.* at 1454 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). The court then applied that test to each of the trial errors complained of by the petitioner, including alleged judicial misconduct, prosecutorial misconduct, and a *Brady* violation. *Id.* at 1459–60. The court concluded: "Because there were no trial court errors that affected [the petitioner]'s specific constitutional rights, and few that were properly preserved by objection, the 'error' predicate for a cumulative error habeas corpus theory dissolves." *Id.* at 1461; *see also id.* at 1458 ("A habeas petitioner may not just complain of unfavorable rulings or events in the effort to cumulate errors.") (citing *Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Twenty times zero equals zero."))). Thus, the court reversed the previous panel decision, which had held that, although none of the petitioner's claimed trial errors individually violated his constitutional rights, they did violate his rights when considered cumulatively. *Id.* at 1456.

In addition to being nonbinding, *Derden* is distinguishable because the Fifth Circuit did not discuss whether the petitioner exhausted the cumulative error claim in state court before raising it in federal court. Although it does not appear that the petitioner raised the cumulative error claim until his federal habeas proceedings, *see id.* at 1455 n.2 (listing the claims that the petitioner raised on direct appeal, which did not include a "cumulative error" claim), the Fifth Circuit's silence on the issue may not be construed as a holding that the petitioner was not required to exhaust the claim. *See Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."). The parties or court may have overlooked the issue, or the appellee may have waived the petitioner's failure to exhaust the claim.

In any event, even if Beckworth had exhausted this claim in the state courts, *Derden* would not help him establish that all of the alleged errors raised in this petition, when considered cumulatively, violated his constitutional rights. As was the case in *Derden*, this Court has already concluded that no individual constitutional violation existed; thus, the cumulative error claim must likewise fail. *See Derden*, 978 F.2d at 1461.

## VI. CERTIFICATE OF APPEALABILITY

Under AEDPA, before a petitioner may appeal the denial of a § 2254 habeas corpus petition, the petitioner must obtain a Certificate of Appealability ("COA"). *Miller-El v. Cockrell*, 537 U.S. 322, 335–36 (2003); 28 U.S.C. § 2253(c)(2). Thus, this Court is required to issue or deny a COA when entering a final order that is adverse to a federal habeas petitioner. *See* Rule 11(a), Rules Governing Section 2254 Cases. A COA will not

be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000). To make such a showing, the petitioner must demonstrate that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Miller-El*, 537 U.S. at 336 (citing *Slack*, 529 U.S. at 484).

After careful review, the Court finds that reasonable jurists could debate whether Beckworth's *Brady* claim based on Walker's confession should have been resolved in a different manner, and that the issue is adequate to deserve encouragement to proceed further. Thus, the Court will grant a COA on the following issue:

> Whether the prosecution suppressed Beckworth's co-defendant's confession that he was the triggerman in violation of Beckworth's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963).

Beckworth's remaining claims do not satisfy either standard.

## VII. CONCLUSION

Accordingly, for the reasons stated, it is

ORDERED as follows:

1. Beckworth's petition for a writ of habeas corpus (doc. 1), as supplemented by his briefs in support, is DENIED;

2. Beckworth is GRANTED a certificate of appealability on the following issue:

Whether the prosecution suppressed Beckworth's co-defendant's confession that he was the triggerman in violation of Beckworth's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963).

3. Beckworth is DENIED a certificate of appealability on the remaining issues.

A separate Final Judgment will be entered contemporaneously herewith.

DONE this 25th day of September, 2026.

/s/ Emily C. Marks
EMILY C. MARKS
UNITED STATES DISTRICT JUDGE